Appeal Nos. 2015-1069, -1070

# United States Court of Appeals

*for the*

# Federal Circuit

CORNING INCORPORATED,

*Appellant,*

– v. –

DSM IP ASSETS B.V.,

*Cross-Appellant.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD NO. IPR2013-00048

## BRIEF FOR APPELLANT

MICHAEL L. GOLDMAN
RICHARD A. MCGUIRK
LECLAIRRYAN,
   A PROFESSIONAL CORPORATION
70 Linden Oaks, Suite 210
Rochester, New York 14625
(585) 270-2100

*Counsel for Appellant*
   *Corning Incorporated*

January 21, 2015

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Appellant Corning Incorporated certifies the following:

1.      The full name of every party represented by the undersigned counsel in this case is:  Corning Incorporated.

2.      The name of the real party in interest represented by the undersigned counsel in this case is:  Corning Incorporated.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by the undersigned counsel are: None.

4.      The names of all law firms and the partners or associates that have appeared for the party represented by the undersigned counsel in the trial court or agency or are expected to appear in this Court are:

LECLAIRRYAN,
A PROFESSIONAL CORPORATION
Michael L. Goldman
Edwin V. Merkel
Richard A. McGuirk
70 Linden Oaks, Suite 210
Rochester, New York  14625
Tel: (585) 270-2100
Fax: (585) 270-2179

LECLAIRRYAN,
A PROFESSIONAL CORPORATION
Jeffrey N. Townes
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Tel: (703) 647-5914
Fax: (703) 647-5974

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF CONTENTS .................................................................... ii

TABLE OF AUTHORITIES ..............................................................vi

TABLE OF ABBREVIATIONS ..........................................................ix

STATEMENT OF RELATED CASES ............................................... xii

STATEMENT REQUESTING ORAL ARGUMENT ..........................xiv

STATEMENT OF JURISDICTION......................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE...............................................................3

    A.    Introduction ..........................................................................3

    B.    Procedural History................................................................6

    C.    Statement of the Facts ...........................................................8

        1.    The '189 Patent ...........................................................8

        2.    The Parties' Claim Construction Positions ...............10

            a.    Ratio of the Change in Length Limitation......10

            b.    Modulus of Elasticity Limitation and the Use of Ebecryl® 284 ..................................................13

            c.    Sufficient Adhesion Limitation .......................15

        3.    The PTAB Issues and Maintains Its Final Decision ................17

a.    The Change in Length Limitation ................................17

b.    Use of Ebecryl® 284 and the Modulus of Elasticity Limitation ................................................................18

c.    Sufficient Adhesion Limitation ....................................18

SUMMARY OF THE ARGUMENT ....................................................20

A.    Change in Length .........................................................20

B.    Use of Ebecryl® 284 .....................................................20

C.    Sufficient Adhesion Limitation....................................21

ARGUMENT ......................................................................................23

I.    STANDARD OF REVIEW ........................................................23

II.    THE PTAB ERRED IN DETERMINING THAT CORNING FAILED TO MEET ITS BURDEN REGARDING THE CHANGE IN LENGTH LIMITATION ..................................................................24

A.    The PTAB Improperly Narrowed the Construction of the Change in Length Limitation to Exclude Corning's Testing ...............................24

B.    The PTAB's Criticism of Corning's Change-in-Length Testing is Without Merit ...........................26

1.    The Evidence Supports Corning's Test Methodology and Description of that Methodology and the PTAB's Ruling Is Based on Erroneous Reasoning .................................27

a.    Corning's Testing Procedure Was Explained and Ms. Kouzmina's Knowledge as to the Procedures Employed Was Sufficient .............................27

b.    The PTAB Improperly Discounted the Testimony of Dr. Ju............................................................30

c.    The PTAB Raised Additional Issues *Sua Sponte* ...........32

2.    The PTAB's Rulings Are Inconsistent and Prejudicial ...........33

C.    Conclusion ........................................................................34

III.   THE PTAB'S RULING ON CORNING'S FORMULATION OF
       SHUSTACK EXAMPLE X COATING WAS THE PRODUCT OF AN
       ERROR OF LAW AND/OR A FLAWED ANALYSIS ...............................34

       A.    The PTAB Committed Legal Error in Construing the Oligomer
             Description of Shustack Example X as Constituting a Genus ............35

       B.    Corning Faithfully Reproduced Shustack Example X .......................37

             1.    Shustack .....................................................................38

             2.    Expert Testimony During Trial .......................................39

       C.    Conclusion ........................................................................39

IV.    THE PTAB FAILED TO PROPERLY INTERPRET THE SUFFICIENT
       ADHESION LIMITATION IN ACCORDANCE WITH THE BRI ............40

       A.    The PTAB Is Required to Apply the BRI to Claim Terms ................40

       B.    Corning's Interpretation of the Sufficient Adhesion Limitation Was
             Reasonable, Comported with the Claims and Specification, and Was
             Proper under the BRI ..........................................................41

       C.    The PTAB Did Not Properly Apply the BRI to the Sufficient
             Adhesion Limitation ............................................................43

             1.    Nothing in the '189 Patent Supports the PTAB's Interpretation
                   of "Moisture" as "Liquid Water" ...............................46

                   a.    The PTAB's Reference to Dr. Taylor's Testimony is
                         Misplaced ...................................................49

                   b.    The Wet Adhesion Test Does Not Support the PTAB's
                         Change of "Moisture" to "Liquid Water" ......................50

                   c.    The Elastic Modulus Test Description Does Not
                         Support the PTAB's Change of "Moisture" to
                         "Liquid Water" .............................................51

iv

d. Other Uses of the Term "Moisture" in the '189 Patent Undercut the PTAB's Interpretation of that Term .........52

e. One Potential Use of the Coating Does Not Dictate that "Moisture" Must Equal Water ........................................53

f. Extrinsic Evidence Does Not Support the PTAB's Narrowed Claim Interpretation......................................54

2. The PTAB's Determination that the Term "Delamination" Should be Understood Only in Connection with Exposure to Liquid Water is Incorrect ..........................................................55

3. Conclusion ................................................................................61

V. CONCLUSION............................................................................62

ADDENDUM

PROOF OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

## CASES

*C.W. Zumbiel Co. v. Kappos*,
  702 F.3d 1371 (Fed. Cir. 2012) .......................................................23

*Cisco Sys., Inc. v. Lee*,
  557 Fed. Appx. 963 (Fed. Cir. 2014) ..................................................... 45-46
  *cert. denied*, No. 14-221, 2014 WL 4206949 (Oct. 14, 2014) ....................46

*Facebook, Inc. v. Pragmatus AV, LLC*,
  582 Fed. Appx. 864 (Fed. Cir. 2014) ...............................................46, 47, 53

*In re Abbott Diabetes Care, Inc.*,
  696 F.3d 1142 (Fed. Cir. 2012) .............................................................23, 24

*In re Huai-Hung Kao*,
  639 F.3d 1057 (Fed. Cir. 2011) ............................................................ 23-24

*In re Morris*,
  127 F.3d 1048 (Fed. Cir. 1997) ....................................................................24

*In re Paulsen*,
  30 F.3d 1475 (Fed. Cir. 1994) .......................................................................40

*In re Shoner*,
  341 Fed. Appx. 642 (Fed. Cir. 2009) ..........................................................47

*In re Van Geuns*,
  988 F.2d 1181 (Fed. Cir. 1993) ....................................................................40

*Leo Pharm. Prods., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) ....................................................................45

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .......................................................41, 48, 51

*Smith & Nephew, Inc. v. Rea*,
    721 F.3d 1371 (Fed. Cir. 2013) ...............................................23, 24

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. ___ (2015)...................................................................23

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) ....................................................45

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................48

*Yorkey v. Diab*,
    601 F.3d 1279 (Fed. Cir. 2010) ..................................................41

## FEDERAL CODES, STATUTES, RULES, AND OTHER

28 U.S.C. § 1295(a)(4)(A) .........................................................1

35 U.S.C. §§ 6(b)(4).................................................................1

35 U.S.C. § 141(c) ...................................................................1

35 U.S.C. § 315(e) ...................................................................33

35 U.S.C. § 316(c) ...................................................................1

37 C.F.R. § 42.71(d) .................................................................1

37 C.F.R. § 42.72 ....................................................................34

37 C.F.R. § 42.100(b) ...............................................................24

Federal Circuit Rule 47.4 ...........................................................i

Federal Circuit Rule 47.5 ...........................................................xii

Webster's Third New International Dictionary of the English Language
Unabridged, (2002), pp. 595. ......................................................59

Webster's Third New International Dictionary of the English Language
Unabridged, (2002), pp. 1101 ................................................................48

Webster's Third New International Dictionary of the English Language
Unabridged, (2002), pp. 1453-54 ..........................................................48

## TABLE OF ABBREVIATIONS

| Parties | |
|---|---|
| Corning | Petitioner-Appellant Corning Incorporated |
| DSM | Patent Owner-Cross-Appellant DSM IP Assets B.V. |

| Terms | |
|---|---|
| '189 Patent | U.S. Patent No. 6,298,189 to Szum et al. (Ex. 1001 in IPR2013-00048) |
| '666 Patent | U.S. Patent No. 6,339,666 to Szum et al. (Ex. 1001 in IPR2013-00045) |
| '771 Application | U.S. Patent Application Serial No. 09/035,771 to Szum et al. (Ex. 2043 in IPR2013-00048) |
| A__ | Joint Appendix at page(s), with (column:lines) for patents |
| Appeal | Federal Circuit Case 2015-1069,1070 captioned *Corning Incorporated v. DSM IP Assets B.V.* |
| BRI | Broadest Reasonable Interpretation |
| Change in Length Limitation | Limitation in claims 2-4, 6-8, 10-12, and 14-16 of the '189 Patent, wherein it recites "the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25°C. to stripping temperature" or "the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25°C. to stripping temperature." |
| Court | United States Court of Appeals for the Federal Circuit |
| Decision Instituting IPR | Decision Institution of *Inter Partes* Review 37 C.F.R. § 42.108 by the PTAB on May 13, 2013 in IPR2013-00048 (Paper 15) |
| Decision on Rehearing | Decision Petitioner's Request for rehearing 37 C.F.R. § 42.71(d) issued by the PTAB on July 11, 2014 in IPR2013-00048 (Paper 96) |
| Duecker | EP 0 407 004 A2 to Duecker (Ex. 1018 in IPR2013-00048) |

| Terms | |
|---|---|
| Final Decision | Final Written Decision 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 issued by the PTAB on May 9, 2014 in IPR2013-00048 (Paper 94) |
| IPR | *Inter Partes* Review |
| Kouzmina Declaration | Declaration of Inna I. Kouzmina filed November 15, 2012 in IPR2013-00048 (Ex. 1015 in IPR2013-00048) |
| Modulus of Elasticity Limitation | Limitation in claims 1-4 of the '189 Patent, wherein it recites "a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature." The limitation in claims 6-8 recites "a modulus of elasticity of between about 10 MPa to about 40 MPa at 100°C." The limitation in claims 10-12 recites "a modulus of elasticity of greater than 25 MPa at stripping temperature." The limitation in claims 14-16 recites "a modulus of elasticity of greater than 25 MPa at 100°C." |
| Motion to Amend | Patent Owner's Motion To Amend Under 37 C.F.R. § 42.121 filed August 27, 2013 in IPR2013-00048 (Paper 47) |
| Petition | Corning's Petition for *Inter Partes* Review of the '189 Patent filed November 15, 2012 in IPR2013-00048 (Paper 6) |
| PO Response | Patent Owner's Response Under 37 C.F.R. § 42.120 to Corning's Petition for *Inter Partes* Review of Claims 1–52 of the '189 Patent filed August 27, 2013 in IPR2013-00048 (Paper 46) |
| Preliminary Response | Patent Owner's Preliminary Response under 37 C.F.R. § 42.107 to Petition for *Inter Partes* Review of the '189 Patent filed February 20, 2013 in IPR2013-00048 (Paper 14) |
| PTAB | The Patent Trial and Appeal Board of the United States Patent and Trademark Office |
| Request for Rehearing | Corning's Request for Rehearing under 37 C.F.R. § 42.71(d) filed June 7, 2014 in IPR2013-00048 (Paper 95) |
| Shustack | U.S. Patent No. 5,352,712 to Shustack (Ex. 1003 in IPR2013-00048) |

| Terms | |
|---|---|
| Sufficient Adhesion Limitation | Limitation in claims 1-4 and 9-12 of the '189 Patent, wherein it recites "sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling" |
| Sutton | Sutton, M.A. et al., "Determination of the Displacements Using an Improved Digital Correlation Method, *Image and Vision Computing*, vol. 1, no. 3 (1983) (Ex. 1067 in IPR2013-00048) |
| Szum | WO 95/15928 to Szum (Ex. 1005 in IPR2013-00048) |
| PTO | United States Patent and Trademark Office |

All emphasis in this brief is added unless otherwise indicated.

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Corning states that there is no other appeal in or from the same civil action or proceeding in the lower court or body that was or is before this or any other appellate court.

The following cases currently pending in this Court may directly affect, or be directly affected by, the Court's decision in this Appeal, which pertains to claims 1-4, 6-12, 14-16, 18-20, 30-32, 34-36, 38-40, 46-48, and 50-52 of the '189 Patent.  Claims 53-66 of the '189 Patent were challenged in IPR2013-00049, which is entitled *Corning Incorporated v. DSM IP Assets B.V.*  U.S. Patent No. 6,339,666 (the '666 Patent), also owned by DSM, is related to the '189 Patent; the application from which the '189 Patent issued is the parent of the application from which the '666 Patent issued.  The '666 Patent is the subject of IPR2013-00045, which is entitled *Corning Incorporated v. DSM IP Assets B.V.*  The Final Decision for the '666 Patent was issued on the same day as the final decisions in IPR2013-00048 and IPR2013-00049.  On September 8, 2014, Corning timely filed notices of appeal with this Court of the final decisions in IPR2013-00048 and IPR2013-00049.

On October 27, 2014, the Court determined this Appeal, along with Appeal No. 2014-1730 (the appeal arising from IPR2013-00045) and Appeal No. 2015-

1068 (the appeal arising from IPR2013-00049) will be considered companion

cases and assigned to the same merits panel for oral argument.

On August 21, 2014, Corning commenced a declaratory judgment action

against DSM and DSM Desotech, Inc. in the United States District Court for the

District of Delaware, Case No. 14-cv-01081, entitled *Corning Incorporated v.*

*DSM Desotech, Inc. and DSM I.P. Assets B.V.*, *inter alia*, seeking a declaration that

Corning does not infringe the '189 Patent and the '666 Patent, and that the

'189 Patent and the '666 Patent are invalid.  In addition, on or about October 16,

2014, DSM and DSM Desotech, Inc. commenced an action against Corning in the

United States District Court for the Northern District of Illinois, Case No. 14-cv-

08111, entitled *DSM Desotech, Inc. and DSM I.P. Assets B.V. v. Corning*

*Incorporated*, alleging, *inter alia*, that Corning will, has been, and/or is directly

infringing and/or inducing infringement of and/or contributorily infringing claims

of the '189 Patent and the '666 Patent.

Other than the aforementioned cases, there are no other cases known to

counsel to be pending in this or any other court that will directly affect or be

directly affected by this Court's decision in the Appeal.

## STATEMENT REQUESTING ORAL ARGUMENT

Oral argument is respectfully requested.

## STATEMENT OF JURISDICTION

This appeal arises from the following action in the United States Patent and Trademark Office, Patent Trial and Appeal Board: *Corning Incorporated v. DSM IP Assets B.V.*, IPR2013-00048.  This action relates to claims 1-52 of the '189 Patent.

The PTAB entered a Final Decision on May 9, 2014, granting Corning's challenge to claims 5, 13, 17, 29, 33, 37, 45, and 49 and rejecting Corning's challenge to claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52.

The PTAB had subject matter jurisdiction over the underlying case pursuant to 35 U.S.C. §§ 6(b)(4) and 316(c).  The PTAB entered a Final Written Decision on May 9, 2014 (Paper 94), and a Decision on Petitioner's Request for Rehearing 37 C.F.R. § 42.71(d) on July 11, 2014 (Paper 96).  Corning timely filed a Notice of Appeal on September 8, 2014; DSM filed a cross appeal on September 22, 2014.  This Court has jurisdiction pursuant to 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).  This appeal involves each of those final decisions and all orders, opinions, rulings, and judgments underlying the decisions.

## STATEMENT OF THE ISSUES

(1)    Did the PTAB err in construing the claimed Change in Length Limitation as not encompassing Corning's test method, because of insufficiently demonstrated rigor, where no particular change-in-length test methodology is specified or required by the '189 Patent, Corning's test method was characterized as the "traditional" method, had a reasonable 2-5% error rate, and was sufficiently rigorous in all ways material to the PTAB's analysis?

(2)    Did the PTAB err in deciding that Corning's replication of Shustack Example X with the oligomer Ebecryl$^{®}$ 284 (for modulus of elasticity testing) was improper because that example encompassed an almost infinite number of hypothetical, non-commercial oligomers, where Example X itself was far more specific in specifying a "commercially available" aliphatic urethane acrylate oligomer with a polyester backbone containing 12% hexanediol acrylate, and Ebecryl$^{®}$ 284 is the only such known commercial oligomer?

(3)    Did the PTAB err in construing the Sufficient Adhesion Limitation to equate "moisture" as liquid water and exclude from the meaning of "moisture," exposure to 95% relative humidity?

2

## STATEMENT OF THE CASE

### A.    Introduction

Certain independent claims of the '189 Patent call for an inner primary coating which, after radiation cure, has "sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling" (the "Sufficient Adhesion Limitation"). A137-A144, claims 1-4 and 9-12.  Independent claims 2-4, 6-8, 10-12, and 14-16 also recite an outer primary coating composition, where the cured inner and outer primary coatings have a specified change-in-length ratio when they are heated (the "Change in Length Limitation").  A137-A144.

The claims and specification of the '189 Patent do not describe one specific test method for determining the Sufficient Adhesion Limitation.  Additionally, the specification and claims are utterly silent on how to determine if the Change in Length Limitation is met.

DSM could have avoided the indefiniteness problems it created by drafting the claims to explicitly identify specific procedures for determining whether the Change in Length and Sufficient Adhesion Limitations have been met.  However, DSM chose not to do so and, instead, left the public to guess what test method to use.  Likewise, in the specification, DSM could have explicitly defined both the meaning of the Change in Length Limitation and the Sufficient Adhesion Limitation (*i.e.*, by setting forth objective criteria to assess what falls within the

claim scope) and which tests should be performed.  However, again, DSM provided the public with no clear direction.

Nothing in the '189 Patent describes what test method should be used in determining whether the Change in Length Limitation is met.  Experts for both DSM and Corning identified, as acceptable, using digital images and correlating the movement of points on a sample as it was heated—a technique recognized in the scientific literature.  Corning's test method, which involves a scientist observing digital images from a microscope and measuring the change in length of coating samples as they are heated, is "traditional" and has a low error rate of 2-5%.

Absent any specification of how to determine the Change in Length Limitation in the '189 Patent claims, it was entirely proper to construe that limitation as encompassing Corning's test method.  Despite the breadth of the claims regarding test methodology, the PTAB held that Corning did not cite sufficient evidence of rigor in its testing procedures.  A51; A84.  By concluding that the '189 Patent claims (and specification), which have no rigor with regard to test methodology, do not encompass Corning's accurate and reasonable testing procedure, the PTAB failed to adhere to the BRI standard.  The PTAB's holding otherwise improperly narrows the breadth of the Change in Length Limitation and undeservedly rewards DSM for ambiguous patent claim drafting.

Similarly, without any guidance or limitation on the proper test to determine the Sufficient Adhesion Limitation, Corning's choice of the wet adhesion test from the specification was both reasonable and appropriate. In rejecting Corning's testing, the PTAB held that the requirement in the Sufficient Adhesion Limitation of "in the presence of moisture" can only be satisfied by exposing test samples to liquid water. A10. Because Corning relied on test results after exposure to 95% relative humidity (the wet adhesion test from the specification), but did not immerse its test samples in liquid water, the PTAB rejected Corning's evidence as not probative of adhesion in the presence of liquid water. A10-A11.

Thus, the PTAB's Final Decision construes the Sufficient Adhesion Limitation in a way that excludes a proper test explicitly disclosed in the '189 Patent. Such an interpretation cannot be the BRI and, therefore, it was reversible error to reject Corning's testing in favor of an unduly narrow claim interpretation. That interpretation both excludes from the ordinary understanding of "moisture" many forms of moisture (*e.g.*, humidity, water vapor, *etc.*) and leaves completely undefined and indeterminate the required conditions (*e.g.*, water conditions, period of soaking time, *etc.*) for exposure to liquid water.

The other issue in this appeal is whether Corning properly replicated Shustack Example X when it used Ebecryl® 284 as the oligomer in that formulation. The PTAB held that Example X of Shustack discloses many potential

oligomers and does not identify Ebecryl® 284. A43-A44. Thus, the PTAB held that Corning had not properly replicated Shustack Example X, and as a result, Corning's testing of that prior art coating for modulus of elasticity did not support Corning's position. A43-A44. However, the description of Shustack's oligomer qualifies that oligomer as *available commercially* and an aliphatic urethane acrylate with a polyester backbone (used in a mixture containing 12% hexanediol acrylate). A1221, 30:25-50. With the qualifiers of commercial availability, the oligomer's polyester backbone, and the oligomer's presence in 12% hexanediol acrylate in mind, experts for both Corning and DSM stated that Ebecryl® 284 was a suitable choice. A1462 n.5; A2830-A2831, 427:21-428:3; A2832, 432:5-433:24; A2758-A2759 ¶¶86-88. In fact, DSM's expert was unable to identify a *single* commercially available oligomer other than Ebecryl® 284 that would meet Shustack's criteria. A2832, 433:13-16. Accordingly, Corning's replication of Shustack Example X was proper, and the modulus testing on Shustack Example X was sufficient for claims 2-4, 6-8, 10-12, 14-16, 18-20, 30-32, 34-36, 38-40, 46-48, and 50-52.

### B.    Procedural History

On November 15, 2012, Corning filed its IPR Petition, regarding claims 1-52 of the '189 Patent. A342-A408. DSM filed a Preliminary Response on February 20, 2013, without providing any claim construction positions. DSM

stated that "the Board's determination of the appropriate scope of these claim terms is not necessary" and offered a blanket objection to Corning's proposed claim constructions to the extent that they did not correspond to the BRI.  A474.

On May 13, 2013, the PTAB granted Corning's Petition based on anticipation and obviousness grounds.  A482-A483.  The PTAB also made no explicit claim construction in the Decision Instituting IPR.  A486.

On August 27, 2013, DSM filed its PO Response and a Motion to Amend. On November 27, 2013, Corning filed its Reply and its Opposition to DSM's Motion to Amend.  The PTAB issued its Final Decision on May 9, 2014, granting Corning's request to cancel claims 5, 13, 17, 29, 33, 37, 45, and 49, denying Corning's request to cancel claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52, and denying DSM's Motion to Amend without prejudice.  A77.

On June 7, 2014, Corning filed a Request for Rehearing, asking the PTAB to reconsider its Final Decision regarding claims 6-8, 14-16, 18-20, 30-32, 34-36, 38-44, 46-48, and 50-52 of the '189 Patent.  A1179-A1195.  On July 11, 2014, the PTAB issued a Decision Regarding Corning's Request for Rehearing, in which the PTAB declined to modify its Final Decision.  A89-A90.

Corning now appeals the PTAB's determination that Corning had failed to demonstrate that claims 1-4, 6-12, 14-16, 18-20, 30-32, 34-36, 38-40, 46-48, and 50-52 of the '189 Patent were unpatentable.

7

### C.    Statement of the Facts

#### 1.    The '189 Patent

The '189 Patent relates generally to radiation-curable inner and outer primary optical glass fiber coating compositions, coated optical glass fibers, and optical glass fiber assemblies with improved ribbon stripping capabilities.  A104, 1:18-23.  The '189 Patent has 28 independent claims (claims 1-16 and 53-64) and 38 dependent claims, directed to various embodiments of a coating composition, a system for coating an optical glass fiber, a coated optical fiber, and a ribbon assembly.  A137-A144.  The coated optical fiber described in the '189 Patent includes two coating compositions that may be applied on an optical fiber:  the inner primary coating that contacts the glass surface of the fiber (A93, Fig. 1; A108, 10:7-9) and the outer primary coating that overlays the inner primary coating (A93, Fig. 1; A108, 10:7-9).  To create a cable or ribbon assembly, used in the construction of multi-channel transmission cables, a plurality of coated optical fibers are bonded together in a matrix material.  A104, 1:39-45.

Certain independent claims of the '189 Patent recite a coating composition, including an inner primary coating composition having a combination of four properties:  (1) fiber pull-out friction; (2) crack propagation; (3) glass transmission temperature; and (4) sufficient adhesion to a glass fiber to prevent delamination in the presence of moisture and during handling (Sufficient Adhesion Limitation).

A137-A144.  The specification of the '189 Patent describes specific tests for

determining numerical value ranges for the first three recited properties for the

inner primary coating *but not* the Sufficient Adhesion Limitation.

Instead, the '189 Patent describes three different tests that relate to the

adhesion between a radiation-cured coating and glass:  a water soak delamination

test (A117, 27:22-37), a "dry" adhesion test at 50% relative humidity (A117-A118,

28:50-29:63), and a "wet" adhesion test at 95% relative humidity (A117-A118,

28:50-29:63).  However, the '189 Patent does not make clear which of these tests

should be performed to assess whether a particular coating composition meets the

Sufficient Adhesion Limitation.

Independent claims 2-4, 6-8, 10-12, and 14-16 also recite an outer primary

coating composition that has the Modulus of Elasticity Limitation, and where the

cured inner and outer primary coatings have the Change in Length Limitation.

A137-A144.  The '189 Patent describes a modulus of elasticity test in which a

cured coating is exposed to a temperature sweep at a predetermined rate to measure

mechanical and viscoelastic properties of the sample.  A120-A121, 34:57-35:24.

With regard to change in length when heated, the '189 Patent describes this as the

change in expansion from the ambient working temperature of the ribbon assembly

to the ribbon stripping temperature measured in one plane "dL" divided by an

initial length of the one plane measured at ambient working temperature of the

ribbon assembly "L", or dL/L.  A110, 14:10-20.  However, nothing in the '189

Patent describes what test method should be used in determining dL/L.

## 2.    The Parties' Claim Construction Positions

### a.    Ratio of the Change in Length Limitation

Dr. Winningham explained that the '189 Patent contains no disclosure of

what type of instrument should be used to measure the change in length or any

procedure that should be followed.  A1474-A1475 ¶102.  Dr. Winningham further

explained that there are a number of accepted methods for measuring the change in

length of a cured coating when heated.  A1474 ¶101.  Accordingly, Corning

conducted measurements of the change in length of the coatings using an optical

microscope while the coated films were heated on a hot stage.  A1822 ¶57.  In

particular, after applying talc on both sides of the sample, it was placed onto a

microscope slide and then on a hot stage.  A1823 ¶58.  The sample was then heated

from the 25°C set point to 100°C and digital images were captured through a

microscope.  A1823 ¶58.  Change in length of the sample was calculated by

comparing the length between two points on the sample when the sample was at

two different temperatures.  A1823 ¶59.

Corning's expert, Dr. Winningham, confirmed that using an optical

microscope is an acceptable way to measure the change in length and would be

recognized as such by skilled scientists.  A1474-A1475 ¶102.

DSM argued that Corning's test procedure for measuring change in length was unreliable and should not be given any weight. A734. Therefore, DSM asserted that Corning failed to present reliable evidence that the prior art coatings necessarily satisfy the Change in Length Limitation. A736.

In reply, Corning demonstrated that the Change in Length Limitation did not specify the test to be used to determine change in length when heated. A874; A2455, 563:13-564:17. In addition, Corning's test for measuring the change in length was a "traditional" test, yielded correct results, and had a reasonable margin of error which was far below that suggested by DSM's expert. A874-A875; A5274, 202:21-203:5; A2006-A2007 ¶¶89-90.

DSM had raised two concerns with regard to Corning's change-in-length testing: (1) the possible restraint of expansion in Corning's test due to adhesion of the sample to the glass microscope slide and (2) the method of identifying the points used to determine the change in length and the corresponding error rate. A4580-A4584 ¶¶115-123.

With regard to restraint of expansion, Corning's expert, Dr. Jiann-Wen Woody Ju, pointed to the declaration of Ms. Inna Kouzmina, which described the test conducted by Corning and clearly stated that talc was applied to both sides of the film to prevent sticking to the microscope slide. A2003 ¶82; A1823 ¶58. With regard to the possible error rate using the Corning methodology, Dr. Ju explained

that the calculations conducted by DSM's expert were improperly based on a

magnified image from a .pdf file, which has greatly reduced resolution as

compared to the files used by Corning to calculate change in length. A2004 ¶84;

A2006 ¶88. Further, Dr. Ju explained that, based on his own observation of the

technique used by Corning and the deposition testimony of Corning's expert, Ms.

Kouzmina, Corning used distinct talc particles as reference points for determining

change in length in high-resolution .tif images, resulting in a low error rate of

about 2-5%. A2006-A2007 ¶¶88-89.

Ms. Kouzmina explained that Corning chose "a point that is easy to track

and that is represented by a marked …, particle or a part of the [talc] particle that

you would record the coordinates off, and then you would follow that spot as a

sample is being heated." A3865, 123:18-124:5. In addition, Ms. Kouzmina

explained that the talc and ink were used to pinpoint the spots used for change-in-

length calculations. A3866, 126:24-127:7. Dr. Ju further explained that "distinct

[talc] particles or specific features in these particles" were used as reference points

for determining change in length when heated. A2005-A2006 ¶87. Dr. Ju

characterized Corning's experimental method as a "traditional" method for

determining change in length when heated, a method that he had used in his

scientific work, and one in which he would expect a low 2-5% error rate. A5274,

202:21-203:5; A2006-A2007 ¶¶89-90.

b.    **Modulus of Elasticity Limitation and the Use of Ebecryl® 284**

In all claims which are the subject of this Appeal, the '189 Patent requires a modulus of elasticity of the outer primary coating of either "between about 10 MPa to about 40 MPa" or "greater than 25 MPa" at either stripping temperature or 100°C.  A137-A144.

Shustack discloses ultraviolet radiation-curable coating compositions for optical fibers.  A375; A1205, Abstract; A1492 ¶122.  Shustack Example X is an example of an outer primary coating for optical fibers (A375; A1207, 1:49-60; A1492 ¶122), which recites a coating composition including an aliphatic urethane acrylate oligomer with polyester backbone used as a mixture containing 12% hexanediol acrylate.  A1221, 30:25-57.  Shustack lists suitable oligomers for secondary coatings.  A1462 n.5; A1216, 19:18-34.  Corning's expert, Dr. Winningham, explained that none of the oligomers listed, however, would meet the description in Shustack Example X.  A1462 n.5.  Shustack makes clear that the oligomer used for Example X is one that was commercially available.  A1221, 30:25-57.  Duecker, published prior to the filing date of Shustack, describes Ebecryl® 284, as an aliphatic polyester urethane diacrylate in 12% 1,6-hexanediol acrylate.  A1845, 12:30-40; A1462 n.5.  Dr. Winningham stated that Ebecryl® 284 would be considered a suitable aliphatic urethane acrylate oligomer with polyester backbone containing 12% hexanediol acrylate.  A1462 n.5.

13

Shustack Example X made with Ebecryl® 284 was found to have a modulus of elasticity at 100°C of 30 MPa, which is within the scope of the claims of the '189 Patent. A376; A1822 ¶55.

DSM argued that Shustack does not teach a specific oligomer with the requisite properties, and that "there is no evidence that the outer coating (that could be made with any number of oligomers) would unavoidably have the requisite modulus of elasticity." A741.

In reply, Corning demonstrated that Ebecryl® 284 met the description of the oligomer used by Shustack for these examples. A876; A2758-A2759 ¶¶86-88. Moreover, this may be the *only* commercially available oligomer that meets this description. A876; A2758-A2759 ¶¶86-88. Corning's expert, Dr. Dotsevi Y. Sogah, is aware of no other commercially available oligomers that would be considered an aliphatic urethane acrylate oligomer having a polyester backbone prepared in a 12% hexanediol diacrylate. A2758-A2759 ¶¶87-88; A876. Moreover, DSM's own witness, Dr. Bowman, could not identify any other commercially available oligomer that would fall within the scope of Example X. A2832, 433:13-24. During his deposition, Dr. Bowman confirmed that Corning's selection of Ebecryl® 284 as the oligomer for Example X of Shustack is an acceptable choice. A876; A2830-A2831, 427:21-428:3; A2832, 433:13-24.

### c.    Sufficient Adhesion Limitation

The Sufficient Adhesion Limitation is not defined in the '189 Patent;

however, adhesion force values of at least 5 grams/inch and at least 12 grams/inch

were provided in the original claim set in the '771 Application; and a preferred

value for "wet adhesion" of at least about 5 grams/inch is disclosed in the '189

Patent.  A365; A4948-A4971; A118, 29:17-18.  The term "wet adhesion" is

described in the '189 Patent as adhesion at 95% relative humidity (A117, 28:46-51;

A365; A1477 ¶107), and the wet adhesion test procedures are described in the '189

Patent.  A117-A118, 28:50-29:18.  Corning's position challenging the claims was

based on this language as guidance regarding the meaning of the Sufficient

Adhesion Limitation.  *See, e.g.,* A374; A385; A1479-A1480; A1585 ¶138; A1593

¶144.

Dr. Winningham explained that there are a number of accepted methods for

measuring the adhesion of a coating to glass, one of which is the wet adhesion

method described in the '189 Patent.  A1470-A1471 ¶93; A117-A118, 28:50-

29:18.  Dr. Winningham also confirmed that the coatings of Shustack and Szum

had adhesion to glass values that, when tested using the wet adhesion

methodology, would provide sufficient adhesion to the glass fiber to prevent

delamination in the presence of moisture and during handling (A1471 ¶¶94-95;

A1820 ¶51), as they far exceeded 5 grams/inch or 12 grams/inch in the wet adhesion test.  A1492 ¶121; A1593 ¶144; A1820 ¶51.

DSM argued that the Sufficient Adhesion Limitation requires, at least, a showing that a coating does not delaminate during a 24-hour water soak delamination test, which was one of the three tests described in the specification of the '189 Patent (discussed *supra*), and that the term "moisture" as used in the claims means "liquid water."  A716; A717; A719.  Further, DSM asserted that the Sufficient Adhesion Limitation is not satisfied by the wet adhesion test Corning performed.  A717.

In reply, Corning argued that the Sufficient Adhesion Limitation broadly defines a property of the claimed coating composition without specifying a particular procedure for determining that property.  A871.  Therefore, any procedure for determining sufficient adhesion to prevent delamination in the presence of moisture and during handling, including at least the wet adhesion test from the '189 Patent, will satisfy this broad claim limitation.  A871.  Moreover, Corning pointed out that there is no requirement in the claims or the specification that the term "moisture," as it appears in the Sufficient Adhesion Limitation, be narrowly construed as liquid water and exclude exposure to a moist atmosphere.  A871.

16

Corning also submitted a responsive declaration from Dr. Winningham, which addressed the applicability of the wet adhesion test in determining adhesion of a coating and prevention of delamination in the *presence of moisture*. A3344-A3345 ¶¶19-21. In particular, Dr. Winningham stated that the wet adhesion test is directly relevant to measuring adhesion and prevention of delamination in the presence of moisture. A3344 ¶19.

### 3.    The PTAB Issues and Maintains Its Final Decision

On May 9, 2014, the PTAB issued its Final Decision in which it granted Corning's request to cancel claims 5, 13, 17, 29, 33, 37, 45, and 49, denied Corning's request to cancel claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52, and denied DSM's Motion to Amend the claims without prejudice. A77. With respect to the claims that the PTAB refused to cancel, the PTAB focused its analysis on several material property limitations, including the Sufficient Adhesion Limitation, the use of Ebecryl® 284 and the Modulus of Elasticity Limitation, and the Change in Length Limitation. A15-A57.

### a.    The Change in Length Limitation

The PTAB held that Corning did not cite "sufficient evidence demonstrating that its change-in-length measurements were performed in a manner sufficiently rigorous and reliable to prove unpatentability of the challenged claims by a preponderance of the evidence." A51. The PTAB held that because the cited

evidence did not provide a clear explanation of how the change in length measurements were made, it could not assess its reliability.  A54.

### b.    Use of Ebecryl® 284 and the Modulus of Elasticity Limitation

The PTAB held that Shustack does not identify Ebecryl® 284 as the oligomer to be used and that Corning did not show that one of ordinary skill in the art would have interpreted Shustack's description of the oligomer as unambiguously identifying Ebecryl® 284.  A43.  In particular, the PTAB held that Corning did not provide "sufficient evidence to show that one of ordinary skill in the art would have interpreted Shustack's disclosure as identifying EBECRYL® 284 oligomer uniquely or as one of a sufficiently small and closely related set of oligomers as to be, at once, envisaged from the generic disclosure."  A44-A45.

### c.    Sufficient Adhesion Limitation

The PTAB held that, under the BRI, the term "moisture" in the phrase "in the presence of moisture," means liquid water—that is, a condition of 100% relative humidity.  A10.  In support of this holding, the PTAB stated that the written description of the '189 Patent uses the term "moisture" in a context that suggests liquid water and cited the protocols for the wet adhesion test and the elastic modulus test from the specification of the '189 Patent.  A10.  Having decided that "moisture" means liquid water, the PTAB then superimposed, on the

"moisture" limitation, an immersion in liquid water requirement, as in the water soak delamination test. *See* A30-A31.

The PTAB held that Corning relied on test results after exposure to 95% relative humidity (the wet adhesion test), but not to liquid water, and that Corning did not explain how that result is probative of adhesion in the presence of liquid water. A32. On that basis, the PTAB held that Corning failed to show by a preponderance of evidence that the prior art coatings met the Sufficient Adhesion Limitation. A32.

Additionally, the PTAB asserted that Corning did not identify sufficient evidence explaining how a wet adhesion value corresponds to an ability to withstand the hydrodynamic forces that effect delamination. A32. The PTAB also decided not to accept Corning's argument that the '189 Patent itself demonstrated a correlation between wet adhesion and an ability to withstand the hydrodynamic forces that effect delamination. A34-A35.

In response to Corning's Request for Rehearing, asking the PTAB to reconsider its Final Decision, the PTAB declined to modify the Final Decision. A89-A90.

## SUMMARY OF THE ARGUMENT

### A.    Change in Length

The claims and specification of the '189 Patent do not define how to measure for change in length. Without this information, it was entirely proper to construe the Change in Length Limitation as encompassing Corning's test method. The testing Corning conducted and detailed in the record was a "traditional" method of conducting change-in-length measurements, one that Corning's outside expert used previously, and confirmed is accurate to within 2-5%.

By concluding that the claims (and specification), which impose no requirements for rigor with respect to the Change in Length Limitation test methodology, do not encompass Corning's test procedure, the PTAB failed to adhere to the BRI standard. Moreover, the PTAB's determination that Corning did not supply enough evidence of "rigor" in its testing procedure is based on flawed or incorrect reasoning, and thus not entitled to substantial deference.

### B.    Use of Ebecryl® 284

The PTAB determined, with regard to Corning's modulus of elasticity testing, that Corning did not demonstrate that it properly replicated Shustack Example X, because there was a great number of potential oligomers that could have been used. A43-A45. However, the oligomer Corning used in formulating Shustack Example X, Ebecryl® 284, was the only *commercially available* urethane

20

acrylate oligomer with a polyester backbone used as a mixture containing 12% hexanediol acrylate, of which both parties' experts were aware. A1462 n.5; A2758-A2759 ¶¶87-88; A2832, 433:13-24. Only by ignoring the "commercially available" requirement and the very unique description of the oligomer could the PTAB agree with DSM's position. Such an analysis, overlooking the full disclosure of Shustack, is completely improper.

### C.    Sufficient Adhesion Limitation

The Sufficient Adhesion Limitation requires that a coating have "sufficient adhesion" to glass to "prevent delamination" in the "presence of moisture" and "during handling." A9; A137-A138, 68:39-70:4; A139, 71:31-72:62. The specification of the '189 Patent describes three potentially relevant tests—the water soak delamination test (A117, 27:21-37), the dry adhesion test (A117, 28:50-62), and the wet adhesion test (A117-A118, 28:50-29:5). Instead of applying the BRI standard and accepting that Corning's use of one of those three tests was sufficient, the PTAB interpreted the phrase "in the presence of moisture" to be limited to exposure to "liquid water," and excluded all other forms of exposure to moisture. That construction improperly narrowed the scope of the claims. In addition, concluding that "moisture" must be "liquid water—*i.e.*, a condition of 100% relative humidity"—distorts the plain meaning of the word "moisture" and is unsupported by evidence. Having decided that "moisture" means liquid water, the

PTAB compounded its erroneous claim interpretation by superimposing on the "moisture" limitation, an immersion in liquid water requirement, which is also nowhere in the Sufficient Adhesion Limitation.

In addition, the plain meaning of the word "moisture" does not mean immersion in liquid water, but instead is entirely consistent with the wet adhesion test, which is carried out in a very humid environment.

The PTAB also erred in determining that the term "delamination" is only relevant where the coating is exposed to liquid water.  Again, nothing in the '189 Patent supports the PTAB's construction.  The specification uses the term "delamination" in several ways where the delamination described had nothing to do with liquid water.

# ARGUMENT

## I.    STANDARD OF REVIEW

The PTAB's legal conclusions, including the PTAB's construction of claim language, are reviewed *de novo*. *C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371, 1381 (Fed. Cir. 2012); *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012).[1]

Generally, the PTAB's factual determinations are reviewed for substantial evidence. *C.W. Zumbiel Co.*, 702 F.3d at 1381; *In re Abbott Diabetes Care*, 696 F.3d at 1148. Although the "'substantial evidence' standard of review requires a deferential approach to the Board's findings," such deference is unwarranted where the decision "was mainly the result of . . . analytical errors." *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013) (citation omitted). Factual findings are unsupported by substantial evidence where the Board based such findings on "erroneous reasoning in making the factual determinations." *In re Huai-Hung*

---

[1] *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. ___ (2015) (A5457-A5493), does not change the above analysis. *Teva* arises from a district court determination where the BRI standard is not applicable. Thus, *Teva* is not controlling here. Moreover, in *Teva*, the Supreme Court confirmed the *de novo* standard of review "when the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history)." (A5471-A5472). But, where the district court makes factual findings regarding extrinsic evidence, such "subsidiary factfinding must be reviewed for clear error." (A5472). No such "subsidiary factfinding" regarding the extrinsic evidence is at issue in this Appeal.

*Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011); *see also Smith & Nephew, Inc.*, 721

F.3d at 1380.

## II.    THE PTAB ERRED IN DETERMINING THAT CORNING FAILED TO MEET ITS BURDEN REGARDING THE CHANGE IN LENGTH LIMITATION

### A.    The PTAB Improperly Narrowed the Construction of the Change in Length Limitation to Exclude Corning's Testing

Pursuant to 37 C.F.R. § 42.100(b), the PTAB's own rules require it to give

claims the BRI.  The words of claims should be "interpreted according to their

broadest reasonable construction in light of the specification of the patent in which

they appear."  A8; *see also In re Abbott Diabetes Care, Inc.*, 696 F.3d at 1148; *In*

*re Morris*, 127 F.3d 1048, 1054-55 (Fed. Cir. 1997).

The specification and claims of the '189 Patent are silent regarding how to

determine the Change in Length Limitation.  If a particular test, particular aspects

of the test, or a specific level of detail regarding the test methodology was required

by the '189 Patent, they should have been specified in the patent.  Since no such

details or limitations are present in the '189 Patent, any objectively reasonable test

should suffice to test for the Change in Length Limitation.

The record demonstrates that Corning's method of digital image analysis

relying on the tracking of talc particles was a "traditional" method for measuring

change in length, A5274, 202:21-203:2; Dr. Ju used it in his own prior work, *id*.,

and found it "[had] the precision to accurately measure the length changes ... with a reasonable [2-5%] margin of error." A2003 ¶81; A2007 ¶89.

The use of digital images to track temperature-dependent changes in a sample is recognized in the literature. A2701-A2709 ("Sutton"). Sutton details the use of digital image correlation employing computer programs to track the movement of points in a sample rather than human observation. *Id.* Dr. Ju testified that such computerized methods would have an error rate of approximately .1 pixel. A2003-A2005 ¶¶83, 85. Dr. Taylor admitted that a computerized digital image correlation would be acceptable to measure change in length. A4579-A47580 ¶114. Dr. Ju testified, based on his personal experience, that Corning's technique, using human observation, for change-in-length testing had only an error rate of 2-5%. A2006-A2007 ¶89. Thus, Corning's change-in-length testing had more than sufficient accuracy. Given the accuracy and Dr. Ju's acceptance of Corning's analysis of digital images by human observation on a computer monitor using appropriate image analysis software (A1822 ¶57; A4103, 804:13-18), there was no need to analyze the images using digital image correlation. The claims and specification of the '189 Patent certainly impose no such requirement.

Accordingly, in construing the Change in Length Limitation as not encompassing Corning's testing, the PTAB improperly narrowed the limitation and

thus failed to apply the BRI of the limitation.  This was improper and should be overturned.

**B.     The PTAB's Criticism of Corning's Change-in-Length Testing is Without Merit**

In its Final Decision, the PTAB attempted to support its criticism of Corning's change-in-length testing by asserting that Corning's description of that testing was not sufficient to demonstrate that it was carried out with enough rigor. A51.  Since the '189 Patent specification and claims provided no information on how to carry out testing for the Change of Length Limitation, there was nothing for Corning to rigorously follow.  A2001-A2002 ¶¶78-79.  Given DSM's failure to provide this information in the '189 Patent, Corning should not be criticized for using a procedure endorsed by Dr. Ju, who had performed the same experimental procedure in his own work, A5274, 202:21-203:2, and by Dr. Winningham, A1474-A1475 ¶102.

The fact that there is no test required or detailed in the '189 Patent cannot be overstated.  The result is that DSM is free to argue that whatever method is chosen to measure the change in length is the wrong method or that not enough details have been provided.  That is plain error, and the PTAB should not be entitled to substitute its independent scientific determination, where Dr. Ju's testimony regarding the nature of the procedure Corning followed is, effectively, unrebutted.

By holding Corning to a standard that DSM's '189 Patent clearly did not meet and deciding that Corning's testing was not encompassed by the Change in Length Limitation, the PTAB rewards DSM for writing unduly broad and indefinite claims while failing to adhere to its BRI standard of claim interpretation.

       **1.**      **The Evidence Supports Corning's Test Methodology and Description of that Methodology and the PTAB's Ruling Is Based on Erroneous Reasoning**

Though the PTAB is usually accorded deference to its factual determinations, that deference is not appropriate here due to the PTAB's flawed analysis and erroneous reasoning.

       **a.**      **Corning's Testing Procedure Was Explained and Ms. Kouzmina's Knowledge as to the Procedures Employed Was Sufficient**

The record amply describes Corning's change-in-length testing for various coating compositions.  As Corning has explained below, Corning's Ms. Kouzmina asked Mr. Sanford, a capable microscopist, to measure the change in length of the coatings as they were heated.  A3867, 130:19-23.  Mr. Sanford heated talced coating samples on a hot stage under a microscope, which displayed the digital images on a computer screen.  A3866, 126:19-23; A3865, 123:23-124:12; A4102-A4103, 803:12-804:18.  Mr. Sanford "recorded the position of two points on the film, point 1 and point 2, each being characterized by a set of coordinates, X and Y[;] … he correspondingly recorded the same for the same film when it was heated

to 100 degrees C[; a]nd then the distance, … the L, was calculated using the … Pythagorean theory [*sic*]." A3865, 123:6-17. As to how Mr. Sanford selected the two points on the film, Ms. Kouzmina stated that Mr. Sanford would "…choose a point that is easy to track and that is represented by a marked, … particle or a part of the top [*sic*, "talc"] particle that you would record the coordinates off, and then you would follow that spot as a sample is being heated." A3865, 123:24-124:5; A3866, 126:8-127:7. Change in length of the sample was then calculated by comparing the length (in pixels) between two points on the sample when the sample was at two different temperatures. A1823 ¶59.

The PTAB held that "[c]onsideration of further evidence developed and cited during the trial underscores the gaps in Corning's proofs." A52; *see also* A82. Yet, in each such instance, the PTAB's determination turned on flawed legal reasoning or incorrect analysis. In its Decision on Rehearing, the PTAB stated that it did *not* hold that Corning's process was not sufficiently rigorous; "[r]ather, we determined that Corning had not cited sufficient evidence of rigor." A84. In its explanation for that statement, in the very next sentence, the PTAB stated that it was "unable to understand the *calculation process* from the … evidence … in sufficient detail to be persuaded of its probative value." A84. Yet, as Ms.

28

Kouzmina explained, the "*calculation process*" was simply the application of the Pythagorean Theorem ($a^2 + b^2 = c^2$) to the experimental data.[2]  A3865, 123:6-17.

According to the PTAB's own statements, the issue is whether Corning provided enough evidence of its testing, not whether or not its testing was reliable. Therefore, the PTAB implicitly rejected DSM's primary argument that Corning's testing was "unreliable" and was "not a method a person of ordinary skill in the art would deem to be reliable or scientifically sound."  A735.

As to whether Corning provided sufficient "evidence of rigor" for its experimental procedures, neither the claims of the '189 Patent nor the specification thereof define a procedure for Corning to rigorously follow.

The PTAB criticizes Ms. Kouzmina's knowledge of the testing procedure, based on her alleged inability to identify the precise points used to make measurements for a specific experiment.  A52-A53 (citing A3865, 124:9-10). Criticizing Ms. Kouzmina's inability to remember and identify the specific particles and precise paths used in a given film sample in a particular experiment conducted months earlier is unreasonable and does not support a conclusion that she did not adequately explain point selection and tracking.

---

[2] For each pair of data points in A5018, the X and Y coordinates conceptually form the sides of a right triangle with the distance between the two points being the hypotenuse of the right triangle.  As a result, the length of the hypotenuse squared is the sum of the difference in the X coordinates, squared, and the difference in the Y coordinates, squared.

Ms. Kouzmina selected Mr. Sanford to conduct the change-in-length testing because she knew him to be a capable microscopist. A3867, 130:19-23. Mr. Sanford carried out the procedure under Ms. Kouzmina's supervision (A3863, 116:14-16; A3865, 122:9-11; A3867, 130:6-14; A1799 ¶4), and he reported the results to her in writing. A5018; A3867, 132:9-15. As to Mr. Sanford's test procedure, as noted *supra*, Ms. Kouzmina provided more than ample explanation of that process, especially compared to the lack of *any* description of a change-in-length test procedure in the '189 Patent.[3]

### b.    The PTAB Improperly Discounted the Testimony of Dr. Ju

The PTAB also improperly discounted Dr. Ju's testimony, stating that the "evidence Corning cites does not indicate that the procedure Dr. Ju observed during the demonstration was the same procedure that Mr. [Sanford] used when making the measurements Corning relies upon in the Petition." A53. However, Dr. Ju stated unequivocally that his understanding of the process used by Corning to determine change in length when heated was based, in part, on a video demonstration by Mr. Sanford, and this process was "*consistent with the*

---

[3] Additionally, Ms. Kouzmina testified that, to assure herself that the test methodology was accurate and precise, she "looked at the individual measurements for each coating, noted that they were consistent, and the coefficient of thermal expansion that would, …, be corresponding to those measurements of change in length when heated would be in the ballpark expected for coatings used in optical fiber industry." A4103, 806:16-25.

*methodology set forth in the Kouzmina Declaration*." *See* A2002 ¶80; *see also* A5274, 202:4-6.

The PTAB apparently ignored these important facts and, absent evidence to the contrary, should have accepted the testimony of Dr. Ju as to: the ability to accurately use the talc particles as reference points for determining the change in length when heated (A2005-A2006 ¶87); the expected degree of error of such measurements (A2006 ¶¶88-90); the fact that Dr. Ju knows based on his own research that talc particles are inert and do not interfere with properties (A5273, 200:2-9); the fact that Dr. Ju confirmed that the method used by Corning was a "very good" method (A5232, 35:2-10); and the fact that he has used this same type of procedure (microscope and talc particles) for measuring dL/L in "many" projects (A5274, 202:15-203:5).

In criticizing the evidence (by Ms. Kouzmina and Dr. Ju) for failing to articulate how points on each sample were selected and tracked, the PTAB asserts that Corning did not explain with any precision how the talc or ink is used for this purpose. A53. This is wrong. Ms. Kouzmina fully explained how the talc particles allowed for precision in selecting the points to follow. A3866, 126:24-127:7. Moreover, Dr. Ju explained—based on his personal observation—how "these distinct particles or *specific features in these particles* [were used] in the high-resolution .tif images *as reference points* for determining change in length

when heated." A2005 ¶87; A5228, 17:4-9 (Mr. Sanford "illustrated how he could identify the marking or the exact location that he's measuring.").

The PTAB discounts Dr. Ju's testimony, stating that Corning cites no credible evidence as to:  whether Dr. Ju received an answer to his question to Ms. Kouzmina and Mr. Sanford regarding how they could be sure that a pixel being identified could be found with the assistance of a talc particle; what the answer to that question was; or whether Dr. Ju considered the answer reasonable.  A53.  Yet, Dr. Ju's identification of these questions was directly responsive to the question asked by DSM's counsel.  A5228, 19:9-21.  Dr. Ju was not asked about the answers that were given to him, but contrary to the PTAB's conclusion, Dr. Ju explicitly stated that the Corning scientists answered his questions.  A5228, 19:2-8 ("I asked questions, and they answered.").  Moreover, Dr. Ju confirmed that the demonstration he observed was sufficient to allow Mr. Sanford to "illustrate[] how he could identify the marking or the exact location that he's measuring." A5228, 17:7-9.

### c.    The PTAB Raised Additional Issues *Sua Sponte*

The PTAB, on its own, also determined that "[i]t is not clear from this evidence whether the talc particles would have served as faithful position markers, by adhering to the sample, or would have skidded about as the sample expanded against the microscope slide." A54.  Yet, DSM's expert witness, Dr. Taylor,

testified that talc particles will "cling" to the inner primary coatings. A2452, 551:3-18. Moreover, as noted above, Dr. Ju has personal experience in conducting change-in-length tests using talc particles (A5274, 202:15-203:5), a fact not acknowledged by the PTAB in its Final Decision. Thus, Dr. Ju's testimony as to the sufficiency of the testing procedures (*see* A2005-A2007 ¶¶87, 89) and the expected error rate of 2-5% (*see* A2006-A2007 ¶89) is supported by both his personal experience outside of these proceedings and his personal observations of the measurement procedures employed by Mr. Sanford. A5274, 202:15-203:5; A5228, 17:4-9.

Where the '189 Patent claims and specification are silent with respect to how to conduct change-in-length testing, Corning should not be faulted for the procedure it used and described in great detail.

## 2. The PTAB's Rulings Are Inconsistent and Prejudicial

When it instituted this IPR, the PTAB analyzed the Kouzmina Declaration and rejected DSM's argument that her testimony lacked the requisite detail to support Corning's position. A490-A491; A494. The PTAB does not explain how the same facts are sufficient to "show the results of Kouzmina's … testing" (A490) when instituting this IPR and be "entitled to little or no weight" (A52) when rendering its Final Decision. Given the specter of estoppel, 35 U.S.C. § 315(e), granting Corning's Petition on this point and then later holding that the evidence is

"entitled to little or no weight," should not be countenanced. Differing standards do not support the PTAB, because its Final Decision did not expressly "turn" on the preponderance of the evidence standard.

If the PTAB, post-IPR institution, had changed its mind about granting Corning's Petition, it should have terminated the trial under 37 C.F.R. § 42.72. In view of the PTAB's failure to take such action, this Court should overturn the PTAB's determination that the evidence Corning submitted with its Petition is entitled to "little or no weight."

### C.    Conclusion

Based on the evidence presented during trial and lack of guidance in the '189 Patent, the PTAB's decision that Corning's change-in-length testing was not encompassed by the Change in Length Limitation was wrong. The PTAB's determination that Corning failed to demonstrate sufficient "rigor" in its procedures was the product of flawed reasoning and should be overturned.

### III.    THE PTAB'S RULING ON CORNING'S FORMULATION OF SHUSTACK EXAMPLE X COATING WAS THE PRODUCT OF AN ERROR OF LAW AND/OR A FLAWED ANALYSIS

Although acknowledging that Corning's replicated Shustack Example X formulation met the claimed modulus limitations at issue (A43), the PTAB ruled that Corning did not establish that its use of Ebecryl® 284 oligomer in formulating Shustack Example X faithfully replicated that composition. A45. As discussed

below, the PTAB's determination turned on flawed legal reasoning and analysis and, therefore, should be overturned.

### A.    The PTAB Committed Legal Error in Construing the Oligomer Description of Shustack Example X as Constituting a Genus

Shustack at Example X, in lines 25-57, describes the preparation and testing of a *single* formulation.  A1221, 30:25-57.  Shustack recites, unambiguously, that the oligomer used in Example X is one that is "available commercially."  A1221, 30:48-49.  That commercially available oligomer is described by Shustack as an "aliphatic urethane acrylate oligomer with polyester backbone (I) (used as a mixture containing 12% hexanediol acrylate)."  A1221, 30:33-36.  In making Example X, Shustack was not referring to a genus of oligomers but rather a *single* oligomer.

The PTAB expressly credited Dr. Bowman's testimony "that the class of oligomers that would meet Shustack's criteria is 'almost infinite,' because Shustack does not specify details such as molecular weight for the oligomer, the number of acrylate functionalities, the kind of polyester repeat units, and whether the oligomers should be branched."  A44 (citing A4736 ¶65).   In making the assertion that "there are almost infinite possible combinations of structures" that fall within the alleged "large class[]" of potential oligomers (A4736 ¶65), Dr. Bowman's academic exercise in estimating the size of the alleged class is not only wrong, it is entirely irrelevant.  The key fact that the PTAB overlooked in crediting

Dr. Bowman's theoretical exercise is that Shustack Example X utilized a *commercially available* oligomer, not merely one of an "almost infinite" class of hypothetical oligomers existing within the mind of Dr. Bowman. The commercially available qualifier significantly narrows the scope of the oligomer in Example X from the "almost infinite" class, pursuant to Dr. Bowman's testimony, to a much smaller number of compounds. The fact that Example X specifies that the oligomer is used as a mixture containing 12% hexanediol acrylate and the fact that Ebecryl® 284 is formulated in this precise way further demonstrates that Corning used the correct oligomer. A1462 n.5.

Having rested heavily on erroneous and flawed logic, the PTAB's Final Decision is not entitled to deference and its unwarranted findings are not supported by substantial evidence.

The PTAB's Final Decision also discredited the testimony by Dr. Sogah, Corning's expert, "that he is unaware of any other suitable oligomers that are commercially available (Ex. 1068 [A2758-A2759] ¶¶ 86-88)" on the basis that his testimony "does not address the question of whether any other suitable oligomers exist or have been disclosed by Shustack." A44. The PTAB's referral to the mere existence of "other suitable oligomers" further evidences the PTAB's failure to consider the critical limitation in Shustack Example X—that the oligomer is commercially available.

In its Decision on Rehearing, the PTAB further explained its rationale:

In the final written decision, we explained that evidence that no other suitable oligomer is commercially available was not persuasive, because it "does not address whether any other suitable oligomers *exist* or have been disclosed by Shustack." Dec. 44:12-15 (emphasis added). Although our determination was directed to Dr. Sogah's testimony, the reasoning is equally applicable to Dr. Bowman's testimony. We declined to credit the evidence of either witness on this point not because we overlooked it, but because it was not *probative of what the prior art discloses*.

A89. Thus, the PTAB admitted that it failed to consider commercial availability of oligomers meeting the description of Shustack Example X.

The PTAB's reliance on testimony untethered to commercial availability of oligomers and the failure to consider the lack of commercially available oligomers (other than the Ebecryl[®] 284 oligomer) as probative of what Shustack discloses result from clear analytical errors. Based on the evidence of record, discussed below, the PTAB's refusal to accept Corning's replication and analysis of Example X should be overturned.

## B.    Corning Faithfully Reproduced Shustack Example X

In its Petition and the accompanying evidence, Corning described the specific, individual formulation used in preparing Shustack's Example X. A357; A1446 ¶41; A1805-A1806 ¶¶15-16; A1221, 30:25-57. There are several additional pieces of evidence presented during trial that confirm Corning selected the correct "commercially available" oligomer in replicating Shustack Example X.

37

### 1.    Shustack

The oligomer in Shustack Example X is identified as an "aliphatic urethane acrylate oligomer with polyester backbone (I) (used as a mixture) containing 12% hexanediol acrylate)."  A1221, 30:30-42.  Corning in replicating Shustack Example X utilized Ebecryl® 284 as the oligomer component.  A1805-A1806 ¶¶15-16; A1462 ¶74.

Dr. Winningham expressly addresses whether Shustack discloses any other suitable oligomers—it does not.  A1462 n.5.  Because Shustack did not identify the commercially available oligomer of Example X by trade name, Corning identified a *commercially available* oligomer that was contemporaneously identified in another piece of prior art, Duecker, which antedates Shustack.  A1462 n.5.  Duecker identifies Ebecryl® 284 as an "aliphatic polyester urethane diacrylate in 1,6-hexanediol diacrylate (88% oligomer solids)."  A1845, 12:30-40.  As noted above, Shustack identifies the oligomer used in Example X as an "aliphatic urethane acrylate oligomer with polyester backbone (I) (used as a mixture containing 12% hexanediol acrylate)."  Thus, the description of Ebecryl® 284 in Duecker is like that provided in Shustack, and satisfies the very unique description of the oligomer and diluent together as provided in Shustack.  A1139-A1140, 14:17-15:7.  Additionally, both Duecker and Shustack were owned by Borden, Inc. at the time of their publication.  A1834; A1205; A1139, 14:17-21.

Thus, Corning provided ample evidence that it accurately replicated Shustack Example X using the commercially available oligomer Ebecryl® 284.

### 2.     Expert Testimony During Trial

Dr. Sogah testified that Corning used Ebecryl® 284 "as *a commercially available oligomer* that meets [Shustack's] description" and that Corning properly prepared Shustack Example X.  *See* A2758-A2759 ¶¶86-87.   Nearly all of Dr. Bowman's testimony concerning oligomers for Shustack Example X was without regard to a single relevant fact: the explicit statement that the oligomer in Shustack Example X was commercially available.  A1221, 30:48-49.  Despite Dr. Bowman's theoretical calculations, discussed above, when pressed during cross-examination he could not name another *commercially available* oligomer that meets the definition provided by Shustack.  A2832, 433:13-24.  That is entirely consistent with Dr. Bowman's concession that Corning's use of Ebecryl® 284 was an acceptable choice for replicating Shustack Example X.  *Id.*

### C.     Conclusion

Contemporaneous prior art identified a *single* commercially available oligomer meeting the description provided by Shustack Example X, Ebecryl® 284. DSM did not identify any other commercially available oligomer meeting the very unique description of Shustack Example X, and both Dr. Sogah and Dr. Bowman agree that Corning's use of Ebecryl® 284 was appropriate.

Based on the foregoing evidence, the PTAB Final Decision was wrong, and based on flawed reasoning. The evidence shows that Corning faithfully replicated Shustack Example X using the commercially available oligomer Ebecryl® 284. Therefore, the PTAB should have determined that Corning's testing shows that Shustack Example X possesses a modulus of elasticity (A1821-A1822 ¶¶52-55; A1471-A1473 ¶¶96-99) that meets the requirements of claims 2-4, 6-8, 10-12, and 14-16 of the '189 Patent.

## IV. THE PTAB FAILED TO PROPERLY INTERPRET THE SUFFICIENT ADHESION LIMITATION IN ACCORDANCE WITH THE BRI

### A. The PTAB Is Required to Apply the BRI to Claim Terms

The PTAB is required to give claim terms the BRI. Although an inventor may "define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, however, limitations are not to be read into the claims from the specification. *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

Additionally, the PTAB may rely on testimony from persons of skill in the art "to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc). Expert testimony, however, may not result in a claim

construction contrary to the claim construction mandated by intrinsic evidence. *Id.* Thus, while this Court defers to the PTAB's findings concerning the credibility of expert witnesses, *see Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010), the PTAB's reliance on expert testimony cannot result in a claim construction that varies from a construction dictated by intrinsic evidence, an issue this Court reviews *de novo*.

**B.    Corning's Interpretation of the Sufficient Adhesion Limitation Was Reasonable, Comported with the Claims and Specification, and Was Proper under the BRI**

Corning showed that prior art coatings having sufficiently high adhesion to glass when subjected to the wet adhesion test in the '189 Patent "would have sufficient adhesion to the glass fiber to prevent delamination in the presence of moisture and during handling." A374 (citing A1492 ¶121).

The Sufficient Adhesion Limitation broadly identifies a property of the coating composition without specifying a procedure for determining that property. The only test procedure in the specification of the '189 Patent for determining adhesion that involves "moisture" and "handling" (both of which are specific requirements in the Sufficient Adhesion Limitation) is the wet adhesion test. Corning's testing was consistent with the BRI of the Sufficient Adhesion Limitation, and reasonable and appropriate under the circumstances.

Corning's position is supported by the testimony of Dr. Winningham.  Dr. Winningham testified that "[w]hen the bonds between a coating and underlying glass fiber are weakened with moisture, the average force value in the wet adhesion test (which is the result of the test) is lower."  A3344 ¶19.  Additionally, as Dr. Winningham testified, "[w]eakening of the bonds due to moisture can result in delaminations."  A3344 ¶19.   Thus, the wet adhesion test is directly relevant to measuring adhesion and prevention of delamination in the presence of moisture.  A3344 ¶19.

Dr. Winningham's opinions (and Corning's claim construction) are entirely consistent with statements and test data in the '189 Patent.  *See* A104, 2:43-50 ("[A]ny reduction in the adhesion between the inner primary coating and the optical glass fiber increases the possibility of such undesirable delamination, especially in the presence of moisture."); *see also* A118, Table 3 (demonstrating a correlation between higher wet adhesion test results and coating compositions that pass the water soak test, and lower wet adhesion test results and coating compositions that fail the water soak test).

### C.    The PTAB Did Not Properly Apply the BRI to the Sufficient Adhesion Limitation

The PTAB improperly construed the Sufficient Adhesion Limitation in an incorrect and narrower manner.  The PTAB's construction was inconsistent with the BRI, inconsistent with the plain meaning of the words used, and inconsistent

with the very evidence relied upon by the PTAB.  As a consequence of its improper construction of the Sufficient Adhesion Limitation, the PTAB wholly discounted the evidence supporting Corning's Petition.  That is reversible error.

The PTAB determined that Corning did not meet its burden for two reasons. First, the PTAB held that the BRI "of the term 'moisture' is liquid water—that is, a condition of 100% relative humidity."  A10.  Having so construed the term "moisture" as used in the Sufficient Adhesion Limitation, the PTAB found "[a] dispositive question thus arises:  Does Corning show by a preponderance of evidence that the Shustack and Szum coatings exhibit sufficient adhesion to prevent delamination from glass in the presence of liquid water?"  A28.  Since Corning did not expose the prior art samples to "liquid water," the PTAB determined that Corning had not satisfied its burden of proof.  A32.  Second, the PTAB determined that Corning had presented insufficient evidence to "support an inference" (A32), that the "wet adhesion test evaluates for 'delamination.'"  A36. Both findings are fatally flawed, because they rely on an interpretation of the Sufficient Adhesion Limitation that is both incorrect and unduly narrow (particularly under the BRI standard), ignore the plain meaning of the word "moisture," are unsupported by the evidence cited by the PTAB, and lack a factual basis founded in the intrinsic evidence of the '189 Patent.

The claims of the '189 Patent are silent on how to determine what meets the Sufficient Adhesion Limitation, and what is meant by the specific term "moisture" as used in the Sufficient Adhesion Limitation. Likewise, while the specification describes a number of tests, there is nothing there that identifies with clarity, deliberateness, and precision which, if any, of the described tests, in whole or in part, should be used to determine what meets that limitation or what is meant by the term "moisture." The specification also fails to explain with clarity, deliberateness, and precision what results constitute "sufficient adhesion" in accordance with the Sufficient Adhesion Limitation, or what it means to "prevent delamination." All this makes the Sufficient Adhesion Limitation particularly unclear and unduly broad. DSM should not now be allowed to selectively narrow the interpretation of the Sufficient Adhesion Limitation to escape an unpatentability ruling.

Central to its position was DSM's new claim construction of the term "moisture" in the Sufficient Adhesion Limitation. DSM argued that "'in the presence of moisture' means exposure to liquid water—that is, 100% relative humidity—as would be present, for example, in the water soak delamination test described in the '189 patent." A9 (citing A716-A719); A733-A734. Further, DSM argued that the wet adhesion test Corning conducted "does not evaluate for delamination, which is caused by exposure to liquid water." A27 (citing A716-

A717; A4549-A4553 ¶¶59-66).

Though the PTAB indicated that it was giving the Sufficient Adhesion Limitation the BRI (A8), the PTAB adopted DSM's new claim construction argument and imported into the Sufficient Adhesion Limitation an incorrect and narrowing feature found nowhere in the claim. As a result, the term "moisture" was interpreted to mean immersion in "liquid water." A10. This narrowing importation is not supported by the specification; in fact, it is contrary to the specification.

By choosing an incorrect and unduly narrow interpretation of the Sufficient Adhesion Limitation over a broader, reasonable alternative, the PTAB failed to follow its own rules and committed reversible legal error. *See Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed. Cir. 2014) (upholding PTAB's rejection of the examiner's narrow claim interpretation where it was contrary to intrinsic evidence and added "limitations that lack support in any form of intrinsic evidence"); *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1352-53 (Fed. Cir. 2013) (PTAB "erred by narrowing the definition of 'storage stable' to something far short of its broadest reasonable meaning"); *Cisco Sys., Inc. v. Lee*, 557 Fed. Appx. 963, 974-75 (Fed. Cir. 2014), *cert. denied*, No. 14-221, 2014 WL 4206949 (Oct. 14, 2014) (reversing PTAB based on finding that the PTAB narrowed the claim term by reading in an "improper limitation of the claimed multiplexer").

### 1.    Nothing in the '189 Patent Supports the PTAB's Interpretation of "Moisture" as "Liquid Water"

There is no requirement in the claims that the term "moisture" in the Sufficient Adhesion Limitation involves immersion in or exposure to liquid water rather than an atmosphere containing a high level of moisture (*e.g.*, 95% relative humidity). Nor is the term "moisture" in the Sufficient Adhesion Limitation defined as liquid water in the specification. The intrinsic evidence demonstrates that the patentee used the term "moisture" in a broad fashion, encompassing a wide range of moist environments without being limited to only meaning "liquid water." By changing the actual language of the Sufficient Adhesion Limitation from "moisture" to immersion in "liquid water," the PTAB critically and improperly rewrote and *narrowed* the claims, and thus failed to apply the BRI. *See, e.g., Facebook, Inc. v. Pragmatus AV, LLC*, 582 Fed. Appx. 864, 866-67 (Fed. Cir. 2014) (reversing PTAB's claim construction that "unduly narrows the claim term . . . because nothing in the plain language of the claims or in the specification or prosecution history requires such a limitation.").

In fact, the use of the term "moisture" in the claims and specification of the '189 Patent demonstrates that the term "moisture" is not limited to only meaning "liquid water," and certainly not immersion in liquid water. Rather, the specification makes clear that the term "moisture" at least encompasses 95% relative humidity, making the wet adhesion test Corning conducted a reasonable

and acceptable method of determining whether a coating had "sufficient adhesion" in the presence of "moisture" to satisfy the Sufficient Adhesion Limitation.

DSM did not define "moisture"; nor did DSM in any way disclaim the full scope of the term "moisture." Accordingly, there is no reason to depart from the plain and customary meaning of the term. *See, e.g.*, *Facebook*, 582 Fed. Appx. at 866-67 (reversing the PTAB's claim construction in an *inter partes* reexamination for failure to apply the BRI, where the patentee did not define the term at issue and did not disclaim the full scope of the term, yet the PTAB applied an interpretation more narrow than the BRI); *see also In re Shoner*, 341 Fed. Appx. 642, 646 (Fed. Cir. 2009) ("The PTO is required to give claim terms their 'broadest reasonable interpretation consistent with the specification,' and there is nothing in the specification that would explicitly limit the air chamber to a particular structure." (citation omitted)).

The PTAB's conclusion that "moisture" must be "liquid water" distorts the plain meaning of the word "moisture." Inclusion of a wet adhesion test (*i.e.*, 95% relative humidity test results) within the meaning of the Sufficient Adhesion Limitation is entirely consistent with the plain meaning of the words "humidity" and "moisture." This is demonstrated by the reference to "moisture" in the dictionary definition of "humidity" as "a moderate degree of wetness (as of a solid surface or the air) perceptible to the eye or to touch; *moisture,* dampness." *See,*

*e.g.,* Webster's Third New International Dictionary of the English Language Unabridged, (2002), p. 1101.[4] Certainly, the wet adhesion test's use of a very humid environment has a moisture level encompassed by the moisture language in the Sufficient Adhesion Limitation.

In addition, the plain meaning of "moisture" is "liquid (as water) diffused or condensed in relatively small quantity and dispersed through a gas as invisible vapor or as fog or in or on a solid body in insensible form or as sensible dampness or condensed on a cool surface as visible dew." *See, e.g.,* Webster's Third New International Dictionary of the English Language Unabridged, (2002), pp. 1453-54. That definition of "moisture" demonstrates that "moisture" is not commonly understood to mean *only* "liquid water." "Liquid diffused" and liquid "dispersed through a gas" are not immersion in "liquid water"; instead, "liquid diffused" or liquid "dispersed through a gas" comport with Corning's exposing its test samples to 95% relative humidity.

From the dictionary definitions of "humidity" and "moisture," it is clear that Corning's use of the wet adhesion test to prove that the prior art met the Sufficient

---

[4] Consideration of dictionary definitions here is entirely proper. *See Phillips*, 415 F.3d at 1322-23 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)) ("judges are free to consult dictionaries and technical treatises 'at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" (citation omitted)).

Adhesion Limitation was entirely proper.  On the other hand, the PTAB's

conclusion that "moisture" means "liquid water" is not supported by the definitions

of "moisture" and "humidity," but instead distorts the plain meaning of those

words beyond recognition.

### a.    The PTAB's Reference to Dr. Taylor's Testimony is Misplaced

The PTAB's equating 100% relative humidity with liquid water (A10; A32),

is particularly inappropriate since it is unsupported by the evidence of record and is

scientifically incorrect.  The PTAB seems to refer to Dr. Taylor's testimony for

this conclusion, but Dr. Taylor says nothing of the kind.  Instead, as the PTAB

notes (A10), Dr. Taylor simply states that on a surface, "moisture condenses at

100% relative humidity," A4550 ¶61, implying that "moisture" is in the

atmosphere *before* condensing.  Moreover, the formulation of droplets of water on

a surface by condensation does not equate to immersing that surface in a liquid

water bath.  No scientist would equate these concepts, and certainly Dr. Taylor

does not.  Accordingly, the PTAB's conclusions regarding the relationship

between 100% relative humidity and liquid water are unsupported by the evidence

of record or by scientific principles.

To support its finding that "moisture" was limited to "liquid water," the

PTAB primarily pointed to two test descriptions in the specification where the term

"moisture" was used, according to the PTAB, "in a context that suggests liquid

water." A10.  Neither of those test descriptions, however, nor any other uses of the term "moisture" in the '189 Patent (whether cited by the PTAB or not), supports the PTAB's change of the commonly understood term "moisture" to "liquid water."  It does just the opposite.  Both tests use the term "moisture" in a way that it is at least broad enough to encompass 95% relative humidity as used in the wet adhesion test.

### b.    The Wet Adhesion Test Does Not Support the PTAB's Change of "Moisture" to "Liquid Water"

The PTAB cited the procedures of the wet adhesion test as supporting the PTAB's interpretation of moisture as meaning liquid water.  A9.

The wet adhesion test provides that film samples cured on glass microscope slides should be conditioned "at a temperature of 23+/-2° C. and a relative humidity of 95% for a time period of 24 hours."  A117, 28:63-65.  Thereafter, "[a] layer of polyethylene wax/water slurry [is] applied to the surface of the further conditioned film *to retain moisture.*"  A117, 28:65-67.

While the PTAB cites this language as supportive of an interpretation of "moisture" as "liquid water," the reverse is true.  The purpose of the application of a wax/water slurry to the film is to "*retain moisture*" in the film sample after its exposure to 95% relative humidity—not liquid water.  The only "moisture" that could be "retain[ed]" by the wax/water slurry is the "moisture" resulting from the conditioning at 95% relative humidity.

DSM's expert, Dr. Taylor, testified that the moisture referred to in the wet adhesion test was the "*water* molecules that [ ] diffused into the inner primary coating while conditioned at 95 percent for 24 hours." Yet, Dr. Taylor argued that the word "moisture" as used in the wet adhesion test was somehow different than how the word "moisture" was used in the Sufficient Adhesion Limitation. A2431, 469:15-470:18.

There is no support for Dr. Taylor's (or the PTAB's) conflicting interpretations of "moisture." Absent specific evidence to the contrary, and there is none, the word "moisture," without any additional modifiers, should be interpreted the same way across the '189 Patent. *See Phillips*, 415 F.3d at 1314 ("claim terms are normally used consistently throughout the patent"). Thus, the PTAB should not apply one definition to "moisture" as used in the Sufficient Adhesion Limitation and another definition to "moisture" as used in the wet adhesion test.

> ### c.  The Elastic Modulus Test Description Does Not Support the PTAB's Change of "Moisture" to "Liquid Water"

The PTAB also pointed to the elastic modulus test method detailed in the specification, wherein heat is applied to the test samples to remove "moisture"

before conducting the test.  A10 (citing A121, 35:17-18).[5]  Yet, *no* liquid water or

even high-humidity conditioning is discussed in the elastic modulus test

procedures *at all*.  *See* A120-A121, 34:57-35:24.  Thus, the only "moisture" that

the heating step in the test could remove prior to testing was "moisture" present as

a result of *ambient humidity*.

> **d.     Other Uses of the Term "Moisture" in the '189 Patent
> Undercut the PTAB's Interpretation of that Term**

Elsewhere in the '189 Patent, the term "moisture" is likewise used without

expressing any intent to exclude ambient moisture in favor of immersion in liquid

water.  *See* A104, 2:43-50; A116, 25:32-37.  In one instance, the specification of

the '189 Patent separately and distinctly refers to both "water" and "atmospheric

moisture," and indicates that both can have the same effect.  *See* A114, 21:39-47

("Generally, at least one hydrolyzable '-Si-O-R' linkage will be present in the glass

coupling moiety to facilitate coupling to the surface of the optical glass fiber.

Preferably, there is more than one such linkage.  *Hydrolyzable means that this*

*linkage is sensitive to reaction with water* to generate '-Si-OH' linkages.  In turn, '-

Si-OH' linkages are believed to condense to form '-Si-O-Si-' linkages.  *In many*

---

[5] Neither party argued to the PTAB that the elastic modulus test had any relevance
to the Sufficient Adhesion Limitation.  As described in the '189 Patent, the elastic
modulus test is relevant to the glass transition temperature of a coating.  A120,
34:58-60.  Thus, the PTAB independently searched the '189 Patent and referenced
this test in regard to the Sufficient Adhesion Limitation only because it uses the
term "moisture" in the test description.

*cases, hydrolysis may even begin to occur with exposure to atmospheric*

*moisture.*").

The PTAB ascribes some significance to this last instance of using the term "atmospheric moisture" as opposed to simply "moisture." A10. However, the '189 Patent does not distinguish the terms "moisture" and "atmospheric moisture" (*i.e.*, render them mutually exclusive). Under the BRI, the claim limitation "moisture" should be read as encompassing, rather than excluding "atmospheric moisture" and moisture that exists at 95% relative humidity as in the wet adhesion test.

<blockquote>

**e.**    **One Potential Use of the Coating Does Not Dictate that "Moisture" Must Equal Water**
</blockquote>

As purported additional support for its conversion of "moisture" to "liquid water," the PTAB identified language in the '189 Patent stating that "a 'ribbon assembly *can* be buried under ground or water for long distance connections,' … which is consistent with the proposition that an optical fiber coating must endure long periods of immersion in liquid water without delaminating." A10 (quoting A137, 67:43-45).

Since this passage does not even use the term "moisture," it should not limit the breadth of the claim term "moisture" absent an explicit indication or disclaimer. *See, e.g.*, *Facebook*, 582 Fed. Appx. at 866-67. Moreover, this passage is completely irrelevant for the purposes of construing the Sufficient

Adhesion Limitation.  In relying on the statement in the '189 Patent that "a ribbon assembly can be buried," A137, 67:43-45, the PTAB apparently ignored other sections of the specification of the '189 Patent.  In fact, any suggestion that commercial use of ribbon assemblies involve immersion in water without protection is wrong.  It is well known that optical fibers in ribbon assemblies would be "bonded together in a matrix material" (A104, 1:41-47) and that the ribbon is commonly protected in cable jacketing or sheathing.  *See* A1329, 1:14-18.  Further, the PTAB evidently reached this conclusion without considering any evidence on whether the optical fiber itself would be immersed in liquid water or the impact of the matrix material or jacketing/sheathing on the water resistance of the ribbon assembly over "long periods of immersion in liquid water."  A10.  Given that the PTAB specifically "decline[d] to resolve what temperature, *or length of time* of exposure to liquid water the coating must endure, without delaminating" (A10), the reference to the coating possibly experiencing "long periods of immersion in liquid water" (A10) is inappropriate.

### f.    Extrinsic Evidence Does Not Support the PTAB's Narrowed Claim Interpretation

Resorting to extrinsic evidence further undercuts the PTAB's claim construction and supports Corning's construction.  Before Dr. Taylor was involved in this proceeding (where he was asked to testify that "moisture" is "liquid water"), he co-authored a paper in which optical fibers were aged for a period of time at

elevated temperature and 95% relative humidity.  A2433, 476:1-477:2.  In his

paper, Dr. Taylor and his co-authors report that the test showed "[t]he decrease in

modulus of the primary coating after *exposure to moisture* is a result of hydrolysis

of the network structure that decreases the crosslink density."  A2433, 476:24-

477:2.  During his deposition, Dr. Taylor tried to distance his opinions expressed in

this IPR from the language used in his earlier paper by blaming his co-authors for

the choice of language and suggesting that he had perhaps not read the paper

carefully enough before publication.  However, the fact remains that other skilled

scientists—including Dr. Taylor at one point in time—recognize 95% relative

humidity as involving exposure to "moisture."  A2432-A2434, 473:11-480:4.

> ## 2. The PTAB's Determination that the Term "Delamination" Should be Understood Only in Connection with Exposure to Liquid Water is Incorrect

The PTAB ruled that Corning presented insufficient evidence to support an

inference that the wet adhesion test evaluates for "delamination."  A36.  This

determination effectively adopted DSM's argument in its PO Response that the

water soak test is the only method disclosed in the '189 Patent for assessing

"delamination."  A27-A28 (citing A716-A717).  However, this argument was later

abandoned by DSM and was, in fact, contradictory to the position of DSM's

expert, Dr. Taylor.

The wet adhesion tests run by Corning demonstrate that the tested prior art

samples will not delaminate.  It is well known that there is an inverse relationship between glass adhesion and delamination, as discussed in Dr. Winningham's testimony.  A3344 ¶19 ("[T]he wet adhesion test is directly relevant to measuring adhesion and prevention of delamination in the presence of moisture."). Indeed, the end result of the wet adhesion test performed by Corning is delamination of the coating from the underlying glass following exposure of the coating to 95% relative humidity (hydrolytic forces) and subjecting the same to handling (mechanical forces).  A3344 ¶19.

The PTAB's focus on the term "delamination" as only being applicable to the water soak test is not supported by the intrinsic evidence.  While the water soak delamination test described in the '189 Patent requires soaking in water (A117, 27:21-37), the specification elsewhere makes clear that "delamination" may occur in the presence or absence of "moisture."

For example, the '189 Patent raises the concern that some coatings are "easily peelable, as by rubbing with finger pressure, [and thus] the coating has insufficient adhesion to the surface of the optical glass fibers to prevent *delamination* during most uses."  A105, 3:51-54; *see also* A108, 9:65-10:1 (appropriate to adjust adhesion "to ensure *delamination* of the inner primary

coating from the surface of the optical glass fiber during ribbon stripping");[6] A104, 2:47-50 ("…any reduction in the adhesion between the inner primary coating and the optical glass fiber increases the possibility of such undesirable delamination, especially in the presence of moisture.");[7] A113, 19:6-8 ("If the adhesion is reduced, then undesirable delamination of inner primary coating from the surface of the optical glass fiber can occur."); A131, 54:47-50 ("The use of slip agents may cause undesirable delamination of the inner primary coating during use of the ribbon assembly in hot and wet environments, such as tropical environments.").

Consistent with those statements confirming the inverse relationship between adhesion to glass and susceptibility to delamination, Table 3 of the '189 Patent illustrates this inverse relationship with four coatings that exhibit varying degrees of glass adhesion measured by the wet adhesion test (in grams/inch). The stronger the measured strength of glass adhesion, the longer the coating survived

---

[6] "Ribbon stripping" is removing the coating(s) from an optical fiber and does not require the presence of moisture. As described in the '189 Patent, one method uses a ribbon stripping device, which applies heat and pressure to the fiber to soften the coating and allow the coating to be stripped from the fiber. *See* A104, 2:16-28.

[7] This discussion of the impact of reduced adhesion on "delamination" in the presence of "moisture" directly supports Dr. Winningham's testimony that there is a correlation between the wet adhesion test results achieved by a coating and its resistance to delamination in the water soak test. *See* A3344 ¶19. Although the PTAB searched the '189 Patent for mention of "moisture" and "delamination" in preparing its Final Decision (even where those references were not cited by either party), the PTAB failed to acknowledge, let alone address, such references where they undercut the PTAB's narrowed interpretation of the relevant terms.

the water soak test before delaminations were observed.  A118, Table 3; A1175, 50:8-23.

The PTAB refused to consider Table 3 (A34-A35).  It did so in spite of the fact that Dr. Taylor, DSM's expert, relied on Table 3 in his correlation of wet adhesion test results with water soak test results.  A4613 ¶177.  Dr. Taylor compared the wet adhesion results of Szum 5B (one of the prior art coatings on which Corning relied) as reported in Szum (23 grams/inch) with Comp. Ex. B-3 listed in Table 3 of the '189 Patent (20 grams/inch), asserting that they are "comparable," and noted that Comp. Ex. B-3 was partially delaminated after 24 hours.  A4613 ¶177.  The inference Dr. Taylor draws is that Szum 5B would also be expected to partially delaminate after 24 hours given its comparable behavior in the wet adhesion test.  With Dr. Taylor's comments on Table 3 already before it, the PTAB's refusal to consider Corning's arguments regarding that table was entirely improper, particularly when the PTAB scoured the record for references to "moisture" and "delamination" that were not otherwise relied on by either party.

Dr. Taylor's comparison supports Dr. Winningham's testimony (and Corning's position) regarding the correlation between the wet adhesion test and the water soak delamination test.  Additionally, Dr. Taylor's comparison supports Corning's ultimate conclusion.  The Sufficient Adhesion Limitation does not impose any time constraint for determining delamination, and the PTAB even

acknowledged that it did not construe that limitation to require such a time

constraint.  A10.  Dr. Taylor notes that Comp. Ex. B-3 did not exhibit any

delamination after 8 hours (A118, Table 3); hence, by Dr. Taylor's very same

logic, Szum 5B also would have been expected to display a "comparable" behavior

in the water soak test—exhibiting no delamination after 8 hours.

Thus, there is more than sufficient evidence of record correlating the wet

adhesion test and the water soak test, including testimony of both experts.  A3344

¶19; A4613 ¶177.  There is also unambiguous language in the '189 Patent

describing the inverse relationship between adhesion to glass and delamination

(*i.e.*, as adhesion to glass drops, the possibility of delamination increases).  A104,

2:43-50.

There is nothing in the claims or the specification that supports the PTAB's

assertion that "delamination" requires exposure to "liquid water."[8]  Indeed, the end

result of the wet adhesion test performed by Corning is delamination of the coating

from the underlying glass following exposure of the coating to 95% humidity

(hydrolytic forces) and subjecting the same to handling (mechanical forces).

A3344 ¶19.

The multiple instances where the word "delamination" is used and liquid

---

[8] The plain-language understanding of "delamination" is "separation (as of
plywood) into constituent layers."  *See, e.g.,* Webster's Third New International
Dictionary of the English Language Unabridged, (2002), p. 595.  There is nothing
in that commonly understood definition that requires exposure to "liquid water."

water or even moisture is not mentioned demonstrate that the PTAB did not accord

the Sufficient Adhesion Limitation its BRI.  Rather, the term "delamination" is

used broadly, and certainly in such a way that delamination concerns are raised

with "moisture" present in the wet adhesion test Corning performed.  Moreover,

DSM, when arguing that both a water soak delamination test and a wet adhesion

test were required for the Sufficient Adhesion Limitation, acknowledged that the

wet adhesion test does, in fact, determine delamination, at least as the result of

"handling."[9]  The PTAB's improperly narrowed interpretation of "delamination,"

as used in the Sufficient Adhesion Limitation, is not supported by the intrinsic

evidence in the '189 Patent and constitutes reversible error by the PTAB.

Moreover, the PTAB's finding that the water soak test is the only valid

method to measure delamination subverts the Sufficient Adhesion Limitation.  The

Sufficient Adhesion Limitation addresses how delamination of the coating occurs

in response to *both* the "presence of moisture" and during "handling."  The water

soak test does *not* involve any form of "*handling*"; as the name of the test states,

the coated fiber is merely "soaked" in liquid.  The wet adhesion test, chosen by

---

[9] At oral argument, DSM changed its original position that the Sufficient Adhesion
Limitation required "at least the water soak delamination test" and, without
explaining why, argued that *both* the water soak delamination test and the wet
adhesion test Corning conducted were required.  A1155, 30:10-22; *see also* A4553
¶66 ("[t]he 60°C water soak delamination test is used to measure the resistance of
the *coating-glass bonds* to hydrolysis…a peel test measures the resistance of *those
bonds* to a mechanical force applied to the coating.").

Corning, on the other hand, addresses *both* moisture and *handling* (*i.e.* as a result of the peeling).  Corning's test, the wet adhesion test, was set forth in the specification and clearly addresses both of these criteria.  It is reversible error for the PTAB to exclude this test, requiring instead another test that only addresses soaking in water.

### 3.    Conclusion

The Sufficient Adhesion Limitation broadly defines a property of the coating composition without specifying a procedure for determining that property.  The procedure Corning followed was detailed in the specification of the '189 Patent.  Corning demonstrated how a wet adhesion value correlates to an ability to withstand the hydrodynamic and mechanical forces that effect delamination in the presence of moisture and during handling.  Thus, the wet adhesion test is directly relevant to measuring adhesion and prevention of delamination in the presence of moisture and during handling.  A3344 ¶19; *see also* A118, Table 3.

The PTAB's only basis for its decision is the incorrect and improperly narrowed claim construction it gave to the Sufficient Adhesion Limitation.  This was wrong, particularly under the BRI standard, and Corning's use of the wet adhesion test was proper.

## V.    CONCLUSION

For the reasons above, the PTAB's Final Decision should be reversed.

Dated:  January 21, 2015                    Respectfully submitted,

By: */s/ Michael L. Goldman*

LECLAIRRYAN,
A PROFESSIONAL CORPORATION
Michael L. Goldman, Esq.
Richard A. McGuirk, Esq.
70 Linden Oaks, Suite 210
Rochester, New York  14625
Tel:  (585) 270-2100
Fax:  (585) 270-2179

*Attorneys for Appellant*
*Corning Incorporated*

**ADDENDUM**

Final Written Decision
(A1-A78)

Decision – Petitioner's Request for Rehearing 37 C.F.R. § 42.71(d)
(A79-A90)

U.S. Patent No. 6,298,189
(A91-A144)

Trials@uspto.gov                                             Paper 94
Tel: 571-272-7822                              Entered:  May 9, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

CORNING INCORPORATED
Petitioner

v.

DSM IP ASSETS B.V.
Patent Owner

———————————

Case IPR2013-00048
Patent 6,298,189 B1

———————————

Before FRED E. McKELVEY, GRACE KARAFFA OBERMANN,
JENNIFER S. BISK, SCOTT E. KAMHOLZ, and ZHENYU YANG,
*Administrative Patent Judges.*


KAMHOLZ, *Administrative Patent Judge*.


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2013-00048
Patent 6,298,189 B1

# I. INTRODUCTION

## A. Background

Petitioner Corning Incorporated ("Corning") filed a petition (Paper 6, "Pet.") to institute an *inter partes* review of claims 1-52 (the "challenged claims") of U.S. Patent No. 6,298,189 B1 (Ex. 1001 (the "'189 patent")).[1] The Board instituted trial for the challenged claims on the following grounds of unpatentability asserted by Corning:

| Reference(s)[2] | Basis | Claims challenged |
|---|---|---|
| A. Shustack | § 102 | 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 |
| B. Shustack | § 103 | 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 |
| C. Szum '928 | § 102 | 1, 5, 9, 13, 37, 45, and 49 |
| D. Shustack and Jackson | § 103 | 4, 8, 12, 16, 40, 48, and 52 |
| Combination A, B, C, or D; and Chawla | § 103 | 17-20 |
| Combination A, B, C, or D; and Hager | § 103 | 21-24 |
| Combination A, B, C, or D; and Tortorello | § 103 | 25-28 |

---

[1] Case IPR2013-00049 concerns claims 53-66 of the '189 patent.

[2] The petition relies on the following references:  U.S. Patent No. 5,352,712 (Ex. 1003 ("Shustack")); WO 95/15928 (Ex. 1005 ("Szum '928")); U.S. Patent No. 4,900,126 (Ex. 1007 ("Jackson")); U.S. Patent No. 5,696,179 (Ex. 1008 ("Chawla")); U.S. Patent No. 5,182,784 (Ex. 1009 ("Hager")); U.S. Patent No. 5,847,021 (Ex. 1010 ("Tortorello")); WO 97/46380 (Ex. 1011 ("Botelho")); U.S. Patent No. 4,707,076 (Ex. 1012 ("Skutnik")); and U.S. Patent No. 5,408,564 (Ex. 1013 ("Mills")).

Case IPR2013-00048
Patent 6,298,189 B1

| Combination A, B, C, or D; and Botelho | § 103 | 29-32 |
|---|---|---|
| Combination A, B, C, or D; and Skutnik | § 103 | 33-36 |
| Combination A, B, C, or D; and Mills | § 103 | 41-44 |

Decision to Institute 3-4 (Paper 15, "Dec.").

After institution of trial, Patent Owner DSM IP Assets B.V. ("DSM") filed a Patent Owner Response (Paper 46, "Resp."), and Corning filed a Reply to the Patent Owner Response (Paper 65, "Reply"). DSM filed a Supplemental Response (Paper 74, "Supp. Resp.") with leave of the Board, and Corning filed a Supplemental Reply (Paper 75, "Supp. Reply"). DSM filed a Motion for Observations on Cross-Examination of Corning Reply Declarants (Paper 78, "Obs."), and Corning filed a Response to the Observations (Paper 86, "Obs. Resp.").

DSM also filed a Motion to Amend Claims (Paper 47, "Motion to Amend"). In it, DSM proposed claims 67, 68, 69, and 70 to substitute for patented claims 6, 7, 14, and 15, respectively. Motion to Amend 1-6. Corning filed an Opposition to the Motion to Amend Claims (Paper 64, "Opp."). DSM filed a Reply to the Opposition (Paper 76, "Motion Reply").

DSM also filed a Motion to Exclude certain of Corning's evidence (Paper 79, "PO Motion to Exclude"). Corning filed an Opposition (Paper 85, "PO Excl. Opp."), and DSM filed a Reply (Paper 89, "PO Excl. Reply"). Corning filed a Motion to Exclude certain of DSM's evidence (Paper 82, "Pet. Motion to Exclude"). DSM filed an Opposition (Paper 84), and Corning filed a Reply (Paper 90).

Case IPR2013-00048
Patent 6,298,189 B1

Corning relies upon declarations of Dr. Michael Winningham
(Ex. 1014) and Ms. Inna Kouzmina (Ex. 1015) in support of its Petition.
DSM relies upon declarations of Dr. Christopher Bowman (Ex. 2034) and
Dr. Carl Taylor (Ex. 2032) in its Response, along with a deposition of
Dr. Winningham (Exs. 2027-2031) and portions of Ms. Kouzmina's
deposition (Exs. 2024-26).  Corning relies upon declarations of
Dr. Jiann-Wen Woody Ju (Ex. 1035) and Dr. Dotsevi Sogah (Ex. 1068), a
responsive declaration of Dr. Winningham (Ex. 1078), along with
depositions of Dr. Bowman (Exs. 1070-72, 1075-77) and Dr. Taylor
(Exs. 1045-47) and a portion of Ms. Kouzmina's deposition (Ex. 1044) in its
Reply.  DSM relies upon a supplemental declaration of Dr. Bowman in its
Supplemental Response (Ex. 2055).  Corning relies upon depositions of
Dr. Winningham (Ex. 1080)[3] and Dr. Dotsevi Sogah (Ex. 1079) in its
Supplemental Reply.  DSM relies upon depositions of Dr. Winningham (Ex.
2085), Dr. Sogah (Exs. 2073-74), and Dr. Ju (Exs. 2087-88) in its Motion
for Observations on Cross-Examination of Corning Reply Declarants.

Oral argument was conducted on February 11, 2014.  A transcript is
entered as Paper 93 ("Tr.").  Both parties indicated during oral argument that
the oral argument in case IPR2013-00045 relates to this proceeding as well.
Tr. 3:12-14; 24:19-21.  The transcript for case IPR2013-00044 is entered as
Paper 89 in that proceeding.

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written
decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

---

[3] Ex. 1080 is a rough transcript.  DSM submitted an official transcript as
Ex. 2088.

Case IPR2013-00048
Patent 6,298,189 B1

Corning has proved that claims 5, 13, 17, 29, 33, 37, 45, and 49 are unpatentable. Corning has not proved that claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52 are unpatentable.

DSM's Motion to Amend Claims is denied without prejudice.

Corning's Motion to Exclude Evidence is dismissed.

DSM's Motion to Exclude Evidence is dismissed-in-part and denied-in-part.

### B. The Invention

The '189 patent generally relates to radiation-curable coating compositions for optical glass fibers commonly used in data transmission. Ex. 1001, 1:18-19. In particular, the patent describes optical glass fibers coated with two radiation-cured coatings. *Id.* at 1:26-27. An inner primary coating contacts the glass surface of the fiber. *Id.* at 1:28-30. An outer primary coating overlays the inner coating. *Id.* For identification purposes, the outer primary coating may include colorant or, alternatively, a third colored layer, called an ink coating, which is applied to the outer primary coating. *Id.* at 1:53-58. Figure 1, depicting such an optical glass fiber, is reproduced below.

Case IPR2013-00048
Patent 6,298,189 B1



FIG. 1

Figure 1, above, illustrates a longitudinal cross-sectional view of a coated optical glass fiber 7 coated with an inner primary coating 8 and a commercially available outer primary coating 9. *Id.* at 8:8-9, 10:7-9.

To create a cable or ribbon assembly, used in the construction of multi-channel transmission cables, a plurality of coated optical fibers are bonded together in a matrix material. *Id.* at 1:39-47. In order to connect the fibers of multiple ribbons, the surface of a glass fiber must be accessible. *Id.* at 1:53-2:6. This is often accomplished by a process known as "ribbon stripping"—removing the coatings and the matrix material, preferably as a cohesive unit. *Id.* The '189 patent is directed to a ribbon assembly having improved ribbon stripping capabilities. *Id.* at 1:21-23.

As described in the Background of the Invention, the prior art discloses ribbon assemblies composed of multiple optical glass fibers with both an inner and outer coating and an optional outer ink layer. *Id.* at 4:64-

6

Case IPR2013-00048
Patent 6,298,189 B1

5:4.  The two compositions used as the inner and outer coatings are often

modified to provide desired properties—providing bare optical glass fibers,

which, when stripped, are substantially free of residue.  *Id.*

Claims 2 and 5, reproduced below, are illustrative of the claimed

subject matter:

> 2. A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:
>
> said inner primary coating composition comprises propoxylated nonyl phenol acrylate and an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:
>
> (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
>
> (b) a crack propagation of greater than 1.0 mm at stripping temperature;
>
> (c) a glass transition temperature of below 10° C.; and
>
> (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and
>
> said outer primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition after radiation cure having the combination of properties of:
>
> (e) a glass transition temperature of above 40° C.; and

7

**A7**

Case IPR2013-00048
Patent 6,298,189 B1

       (f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

    5. A radiation-curable inner primary coating composition for an optical glass fiber comprising at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said composition, after radiation cure, having the combination of properties of:

       (a) a fiber pull-out friction of less than 20 g/mm at 90° C;

       (b) a crack propagation of greater than 1.0 mm at 90° C;

       (c) a glass transition temperature of below 10° C; and

       (d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity.

## II. DISCUSSION

### A. *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). Claim terms are also given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the

8

**A8**

Case IPR2013-00048
Patent 6,298,189 B1

entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

### 1. *"In the presence of moisture" (claims 1-4 and 9-12)*

Claims 1-4 and 9-12 require an inner primary coating, or a composition after cure, that exhibits "sufficient adhesion to [a] glass fiber to prevent delamination in the presence of moisture and during handling." We refer to that property in our analysis as "the claimed adhesion property."

The parties disagree about the meaning of the term "in the presence of moisture," which appears in the limitation relating to the claimed adhesion property. Corning argues that the term is broad enough to embrace exposure to 95% relative humidity as disclosed in the '189 patent for a wet adhesion test. Pet. 17; *see* Ex. 1001, 28:50-29:5 (disclosing conditions of wet adhesion test). DSM counters that "in the presence of moisture" means exposure to liquid water—that is, 100% relative humidity—as would be present, for example, in the water soak delamination test described in the '189 patent. Resp. 15-18 (citing Ex. 2032 ¶¶ 59-66). That delamination test involves soaking a cured coating sample in a hot water bath for up to 24 hours. Ex. 1001, 27:21-37 (describing conditions of the water soak delamination test); 29:20-58 (Table 3). DSM produces evidence that under conditions of 95% relative humidity, "by definition, there will be no

Case IPR2013-00048
Patent 6,298,189 B1

moisture condensation on the surface of the coating because moisture condenses at 100% relative humidity." Ex. 2032 ¶ 61; *See* Resp. 17.

The evidence supports a conclusion that the broadest reasonable interpretation of the term "moisture" is liquid water—that is, a condition of 100% relative humidity. The written description uses the term "moisture" in a context that suggests liquid water. *See, e.g.*, Ex. 1001, 28:65-67 (applying a "wax/water slurry" to surface of sample film in order "to retain moisture"); 35:17-18 (applying heat to remove "moisture" from samples, suggesting removal of liquid water). Moreover, where the written description discusses water in vapor form, the inventors use the word "humidity" or "atmospheric moisture," but not "moisture" alone. *See, e.g.*, *id.* at 21:47 (referring to "atmospheric moisture"); 28:48, 60, 65 (referring to "humidity"). The '189 patent further discloses that a "ribbon assembly can be buried under ground or water for long distance connections, such as between cities," which is consistent with the proposition that an optical fiber coating must endure long periods of immersion in liquid water without delaminating. Ex. 1001, 67:43-45. In light of the context in which the term "moisture" appears in the specification, we conclude that the inventors used that term in its ordinary sense to refer to liquid water.

The '189 patent, thus, is directed to a coating composition that, after radiation cure, has sufficient adhesion to glass to prevent delamination in the presence of liquid water. We decline to resolve what temperature, or length of time of exposure to liquid water the coating must endure, without delaminating, in order to satisfy the claimed adhesion property. Resolving those conditions is not necessary to our analysis, which focuses on whether Corning's wet adhesion test, conducted under conditions of 95% relative

10

**A10**

Case IPR2013-00048
Patent 6,298,189 B1

humidity, is probative of the extent to which a cured coating delaminates from glass when exposed to liquid water.

### 2. *"Stripping temperature"*

Corning argues that the '189 patent describes stripping temperature as being from about 90°C to about 120°C. Pet. 16 (citing Ex. 1001, 13:32-34). DSM does not contest this construction.

We do not agree with Corning that the '189 patent defines the term "stripping temperature" as "about 90°C to about 120°C." Rather, the patent indicates that stripping temperature is "typically" within this range. Ex. 1001, 13:32-34; *accord id.* at 14:21-25 ("[F]or most coating compositions the design ribbon stripping temperatures are usually about 90° C. to about 120° C., but may be different depending on the specific design parameters for the particular coating composition."). This disclosure is too imprecise to serve as a definition. *See Paulsen*, 30 F.3d at 1480.

The '189 patent does refer repeatedly, however, to 90°C as an exemplary stripping temperature. *E.g.,* Ex. 1001, 31:14-15, 31:41-42, 50:55. The '189 patent also identifies 100°C as an exemplary stripping temperature, particularly in the context of measuring change in length. *Id.* at 14:46-47, 18:44-45. Whatever other temperatures this term encompasses, it certainly encompasses at least the ones specifically identified. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification."). The limitation requires no further construction.

11

**A11**

Case IPR2013-00048
Patent 6,298,189 B1

### 3.  *"Fiber pull-out friction"*

Every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a fiber pull-out friction of less than a specified amount at a specified temperature.  *See, e.g.*, claims 2 and 5, sec. I.B, *supra*.  The parties do not propose express construction of this term, but they do disagree as to certain details of the procedure for testing fiber pull-out friction.  *E.g.*, Resp. 31; Reply 3.

The '189 patent describes a procedure that may be used for testing fiber pull-out friction:

> The fiber pull-out friction test can be performed as follows. The sample consists of a bare, clean optical fiber, one end of which has been embedded in a 250 micron thick sheet of cured inner primary coating to be tested. This assembly is mounted in a suitable instrument such as a Rheometrics RSA-II rheometer, and the temperature raised to a representative ribbon stripping temperature (such as 90° C.), and the fiber pulled slowly out of the sheet at a rate of 0.1 mm/sec. The instrument records and plots force vs distance. The plots typically show a linear region of negative slope, which is the result of a decreasing area of contact between fiber and coating, as the fiber is being withdrawn. The slope is measured, and is the output of the test. Low slope values correspond to a low fiber pull-out friction, and vice versa. Three test samples should be performed and their average used as the final output of the test.

Ex. 1001, 31:35-50.  Although this test is not described as being the only one that can be used to determine fiber pull-out friction, it is specifically identified in the '189 patent.  Consequently, we construe "fiber pull-out

Case IPR2013-00048
Patent 6,298,189 B1

friction" as encompassing at least a fiber pull-out friction measurement
obtained using the procedure disclosed in the above-quoted passage.  *See*
*Oatey*, 514 F.3d at 1276.

### 4. Other terms

Corning proposes constructions for several other terms, Pet. 16-18,
none of which DSM contests.  We have considered Corning's arguments but
determine that the limitations discussed need not be construed in a manner
that departs from their ordinary and customary meanings for purposes of this
decision, and do not need to be construed expressly.

### B. Reliability of Dr. Winningham's Testimony

DSM argues that Dr. Winningham's opinions are unreliable because
he "fails to understand" the legal standards for obviousness.  Resp. 55-57.
In particular, DSM argues that Dr. Winningham gave no consideration to the
relevant time period when addressing who is one of skill in the art for
obviousness purposes.  *Id.*  DSM quotes the following portion of
Dr. Winningham's deposition in support of this argument:

> Q.  Does the time, does the year make any
>      difference in terms of who that skilled scientist
>      would be in that relevant art?
> A. I'm not making that distinction.
> Q. So at any time?
> A. Yes.

*Id.* at 56-57 (quoting Ex. 2029, 424:18-23).

DSM argues both that Dr. Winningham's testimony should be
excluded and given little or no weight.  Resp. 45-47; PO Mot. To Exclude 1-
7.  We address the admissibility of Dr. Winningham's testimony below in
our decision on DSM's motion to exclude evidence.  To the extent that

13

**A13**

Case IPR2013-00048
Patent 6,298,189 B1

DSM's argument goes to the weight to be accorded Dr. Winningham's testimony, it is not persuasive. DSM identifies no particular instances in which Dr. Winningham's silence as to the relevant time period for determining who is one of skill in the art weakens his testimony. We agree with Corning that the thoroughness of Dr. Winningham's testimony outweighs the concern DSM expresses.

We also are not persuaded that Dr. Winningham made the admission that DSM argues. DSM's question appears to address whether Dr. Winningham made any distinctions about the qualifications and experience of a skilled scientist over time, not whether Dr. Winningham based his obviousness opinions on the knowledge of that skilled scientist at the time the invention was made. We do not find Dr. Winningham's supposed admission determinative on the issue of whether he failed to consider the relevant time period in his obviousness opinions.

DSM also argues that Dr. Winningham failed to analyze the underlying test data as rigorously as an independent expert and instead trusted Ms. Kouzmina's statements based on his experience working with her and confidence in her skills. Resp. 57-59. Corning argues that it was appropriate for Dr. Winningham to rely on Ms. Kouzmina based on their long working relationship, that Dr. Winningham had sufficient information on which to base his opinions, and that Drs. Bowman and Taylor did no better in reviewing DSM data. Reply 14-15.

DSM's assertion does not persuade us that all of Dr. Winningham's opinions should be accorded no weight for lacking a basis in underlying data. DSM identifies no evidence that refutes Dr. Winningham's statement that his confidence in Ms. Kouzmina's work is based on their long working

14

Case IPR2013-00048
Patent 6,298,189 B1

relationship.  We credit this statement and accord Dr. Winningham's opinions the weight to which they are entitled.

### C. Material Property Limitations

The crux of Corning's case-in-chief is that the prior art compositions are made of the same chemical substances as are presently claimed, and that Corning's testing of those prior art compositions reveals them to possess inherently the claimed material property limitations.  *See* Pet. 4-5.  DSM argues, among other things, that Corning improperly tested some of the material property limitations.  Resp. 26-35.  DSM's arguments in this regard cut across Corning's various unpatentability challenges, so we address DSM's material property limitation arguments first.

The Board gives consideration to the arguments, and the evidence cited in support of those arguments, that the parties make.  The Board will not scour the record in search of evidence relevant to a particular issue, nor will it attempt to fit evidence together into a coherent explanation that supports an argument.  Such activities are the province of advocacy.  *See Stampa v. Jackson*, 78 USPQ2d 1567, 1571 (BPAI 2005) (quoting *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 111-12 (2d Cir. 1999) ("Appellant's Brief is at best an invitation to the court to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant.  We decline the invitation.")).

### 1. "Fiber pull-out friction"

As discussed above in section II.A.3, every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a fiber pull-out friction of less than a specified amount at a

15

**A15**

Case IPR2013-00048
Patent 6,298,189 B1

specified temperature.  Claims 1, 5, 9, and 13 (and claims 17, 21, 25, 29, 33, 37, 41, 45, and 49 as they depend from claim 5 or claim 13) require a fiber pull-out friction of less than 20 g/mm, whereas all other challenged claims require a fiber pull-out friction of less than 40 g/mm.  Claims 5-8 and 13-16 (and the claims dependent from claims 5 and 13) specify a temperature of 90°C,[4] whereas all other claims specify "stripping temperature."  As discussed above in section II.A.2, we construe "stripping temperature" as encompassing 90°C, because the '189 patent gives this temperature as an example of a stripping temperature.

*a. Summary of Parties' Arguments and Evidence*

We summarize here the arguments that the parties present on the issue of the fiber pull-out friction testing, along with the supporting evidence the parties cite.

In its Petition, Corning's principal evidence concerning fiber pull-out friction is provided in Ms. Kouzmina's declaration.  Ex. 1015 ¶¶ 33-37.  Ms. Kouzmina states that fiber pull-out friction was measured for Shustack Example I and Szum '928 Example 5B, following the procedure described in the '189 patent at column 31, lines 35-50.  *Id.* ¶ 33; Pet. 24, 36 (both citing Ex. 1015 ¶ 37).  Ms. Kouzmina states that a section of bare, clean optical fiber was embedded in a film of inner primary coating, the film being about 250 microns thick.  Ex. 1015 ¶ 34.  The film was then cured with ultraviolet light.  *Id.*  The cured samples were mounted on a compumotor slide and enclosed in a heating chamber.  *Id.* ¶ 35.  The slide was set to a

---

[4] Claim 13 specifies the temperature as "at least at 90°C."

16

**A16**

Case IPR2013-00048
Patent 6,298,189 B1

speed of 0.1 mm/s, and the instrument recorded and plotted force versus

speed.  *Id.* ¶ 36.  Ms. Kouzmina then states:

> The plots typically showed a negative slope as a
> result of the decreasing area of contact between
> fiber and coating, as the coating was withdrawn.
> The slope was measured and was the output of the
> test. The value reported was an average of three
> measurements.

*Id*.  The results indicate that Shustack Example I and Szum '928 Example

5B had fiber pull-out friction measurements of 5.6 g/mm, and 6.6 g/mm,

respectively.  *Id.* ¶ 37.  Corning argues that these results demonstrate that

both Shustack Example I and Szum Example 5B meet every version of the

"fiber pull-out friction" limitation.  Pet. 24-26; 36-37.

DSM filed additional evidence describing Corning's testing procedure

and the data underlying Corning's friction measurements, as part of its

Response.  In particular, DSM filed the procedure, plots, and results of the

testing of Shustack Example I, and the plots for Szum '928 Example 5B.

Exs. 2015, 2042.

The plots from Corning's fiber pull-out friction tests of Shustack

Example I and Szum '928 Example 5B are reproduced below:

17

**A17**

Case IPR2013-00048
Patent 6,298,189 B1



Ex. 2015, 2.



Ex. 2042, 1.

Case IPR2013-00048
Patent 6,298,189 B1

The graphs plot force along the *y* axis and distance along the *x* axis, and each shows results for three samples. Corning's test procedure is as follows:

> Samples were prepared based on conditions stated in the patent. 15mil wet films were casted with a draw down box to cure approximately 250[μ]m film. The actual[] film thickness was approximately 260[μ]m. An arm length of fiber was cut from a reel. Approximately 3 inches in from one end a 1 inch window strip was made. The fiber was taped to a glass microscope slide, so that the window strip was approximately one quarter inch from end of slide. Another slide was positioned opposite of this slide with a one half inch gap, allowing the majority of striped fiber to rest on this slide. The fiber was lifted up and a drop of coating was placed on the slide. The window striped fiber was then placed back down on the drop of coating and taped to the glass slide. The film was cast over the striped fiber to encase the bare glass fiber. This film was then cured at 1 J/cm$^2$ UV dose. The striped glass fiber encased in film was cut to a 1 cm gauge length. Samples were mounted on the motorized slide for strip force test, with the 'wet pull out' sample holder. A heating chamber was mounted on the motorized slide to enclose the test sample. The temperature was controlled at 90°C by a temperature controller with a thermal couple. The slide was manually controlled by the indexer to maintain a speed of 0.1 mm/sec. Data was collected using LabNotebook software.

Ex. 2015, 1. For Shustack Example I, the slope was "measured from the region of the graph in which the force appears to be in a linear relationship with the displacement." *Id.* That region is reported as extending from

19

Case IPR2013-00048
Patent 6,298,189 B1

2.76 mm to 7 mm.  *Id.*  The slope in that region is given as -5.625 (average

of three samples), which Ms. Kouzmina reported in her declaration as 5.6

g/mm.  *Id.*; Ex. 1015 ¶ 37.

DSM argues that the plot data underlying the reported friction values

indicates that a "cohesive failure" occurred during testing, thereby rendering

Corning's testing unreliable.  Resp. 26-31.  DSM explains that a cohesive

failure is the separation of one portion of a coating from another, so that the

pull-out friction test measures the friction between the torn surfaces of the

separated coating portions, rather than the friction between the inner primary

coating and the optical fiber.  *Id.* at 27-28 (citing Ex. 2032 ¶¶ 77-85).

Dr. Taylor states that a properly run fiber pull-out friction test should result

in a plot with a "substantial linear region of negative slope."  Ex. 2032 ¶ 80.

DSM argues, citing Dr. Taylor, that the plots do not include any

"substantially smooth linear region."  Resp. 31 (citing Ex. 2032 ¶¶ 86-90;

Exs. 2036-37).[5]  DSM reasons that because a cohesive failure during pull-

out testing would result in a plot lacking a linear region of negative slope,

the absence of a linear region from Corning's data indicates that there was a

cohesive failure.  *Id.*

Dr. Taylor identifies several factors in Corning's test procedure that

may explain what he perceives as an absence of a substantial linear region in

these plots.  Resp. 31 (citing Ex. 2032 ¶¶ 86-90).  First, Dr. Taylor states that

---

[5] Dr. Taylor does not describe Corning's plots as lacking any "substantially
smooth linear region."  Instead, he states that they "have no linear region
from which to measure a slope" and that they lack any "substantial linear
region."  Ex. 2032 ¶ 86.

Case IPR2013-00048
Patent 6,298,189 B1

the Corning employee who performed the tests, Mr. Aaron Gleason, does not mention cleaning the bare optical fiber with a "solvent wipe." Ex. 2032 ¶¶ 87, 90 (citing Ex. 2015, 1). According to Dr. Taylor, a bare optical fiber must be cleaned by wiping it with a solvent capable of extracting residue left behind when the original coating on the fiber is stripped off. Ex. 2032 ¶¶ 78, 79. Dr. Taylor states that the cleaning step is necessary before the bare fiber is embedded in a test coating, because the residue could interfere with adhesion between the bare fiber and the test coating, thereby lowering the friction measurement. *Id.* ¶ 79.

Second, Dr. Taylor states that Mr. Gleason made no effort to position the bare fiber in the drop of test coating or to define the shape of the coating. *Id.* ¶¶ 88, 90 (citing Ex. 2015, 1). According to Dr. Taylor, positioning the bare fiber too close to the edge of the test coating could cause tearing during the fiber pull-out friction test. Ex. 2032 ¶ 82. Dr. Taylor states that if the fiber is positioned closer to one edge of the coating than another, the thinner side of the coating will be able to absorb less energy than the thicker side and will be more likely to tear during the test. *Id.*

Third, Dr. Taylor states that a sudden drop in force after an initial maximum indicates that the pulling force caused a tear or cohesive failure in the coating, such that the subsequent friction measurements are artificially low. *Id.* ¶ 83.

Fourth, Dr. Taylor states that Corning used an instrument that was designed for a "pull-out" test, rather than one designed for a fiber pull-out friction test. *Id.* ¶¶ 89, 90 & n.3. According to Dr. Taylor, Corning's experimental setup prevented the application of any "normal force" (i.e., clamping or squeezing) on the test sample. *Id.* ¶ 90 n.3. Dr. Taylor states

that the coating must be squeezed against the fiber to an extent sufficient to ensure that the full surfaces of the coating and the fiber are in contact and therefore contribute to the friction generated during the pull-out; otherwise, the friction measured will be artificially low.  *Id.* ¶¶ 85, 90 n.3.  Dr. Taylor also states that an inadequate normal force may manifest itself as considerable noise in the signal, due to "slip-stick" behavior induced by inadequate clamping.  *Id.* ¶ 84.

DSM also argues that it made its own preparations of Shustack Example I and Szum '928 Example 5B, tested them for fiber pull-out friction, and measured average friction values of 26 g/mm and 23 g/mm, respectively.  Resp. 41-43 (citing Ex. 2032 ¶¶ 77-85, 91-98, 130-149).  DSM argues that because Corning's fiber pull-out friction testing was flawed, the only reliable evidence of record concerning fiber pull-out friction is DSM's, and this data demonstrates that neither Shustack Example I nor Szum '928 Example 5B exhibits a fiber pull-out friction within the scope of claims 1, 5, 9, 13, and various claims dependent from claims 5 and 13.  Resp. 44-45.

In reply, Corning argues that its test procedure followed the procedure described in the '189 patent.  Reply 2-3.  Corning also argues that an independent review by Dr. Ju, a new reply witness for Corning, confirms that Corning's fiber pull-out friction plots exhibit a linear region of negative slope indicating a friction of less than 20 g/mm, and that there is no evidence of cohesive failure during the tests.  *Id.* at 3 (citing Ex. 1035 ¶¶ 16, 32-39).  In response to DSM's own testing of Shustack Example I and Szum '928 Example 5B, Corning argues that DSM's measurements are artificially high, because DSM's testing employee clamped the samples with an unspecified and unmeasured force, thereby imposing an external normal force that

Case IPR2013-00048
Patent 6,298,189 B1

exaggerated the friction measurement. *Id.* at 4-5 (citing Ex. 1035 ¶¶ 40, 50, 52, 53, 57-77; Ex. 1045, 160:8-17, 163:20–164:7, 170:16–171:10, 212:25–213:21, 250:15–253:10, 258:8–259:3; Ex. 1046, 365:17-23).

In its Motion for Observations on cross-examination of Corning reply declarants, DSM cites numerous passages from its deposition of Dr. Ju to attack Dr. Ju's declaration testimony concerning fiber pull-out friction testing in general, and Corning's and DSM's testing in particular. Obs. 1-8.

### b. Analysis

The issue between the parties as to Corning's fiber pull-out friction plots is whether they exhibit a linear region of negative slope. Corning argues that they do, and the description in Exhibit 2015 that a region of the Shustack Example I plot showing a "linear relationship" was used to calculate slope bears out this argument. *See* Ex. 2015, 1. DSM, in contrast, argues that Corning's plots lack "a substantially smooth linear region" but offers little evidence to support this assertion beyond Dr. Taylor's statements that the plots "have no linear region from which to measure a slope" and that they lack any "substantial linear region." *See* Resp. 31; Ex. 2032 ¶ 86. Dr. Taylor gives no credible explanation for the basis on which he reaches these conclusions. Even if Dr. Taylor provided some underlying facts or data for this conclusion, Dr. Taylor's statements do not support DSM's argument that there is no substantially *smooth* linear region.

As between the conflicting evidence on this point, we credit Corning's evidence, particularly from Exhibit 2015, in which Corning's Mr. Gleason identifies the region of linear relationship as extending between displacements of 2.76 mm and 7 mm. DSM does not explain why this determination is invalid. We agree with Corning that the plots for Shustack

23

**A23**

Case IPR2013-00048
Patent 6,298,189 B1

Example I show a linear region of negative slope from 2.76 mm to 7 mm. To be sure, the signal is noisy, and the plots are jagged, but that does not mean that a linear relationship is not discernible in that region.

All of DSM's critiques of the Corning test procedure hinge on its assertion that Corning's plots lack a linear region. *See* Resp. 31. Because we determine that DSM has not provided credible evidence showing that Corning's plots lack a linear region, we determine that DSM has not shown that its critiques of Corning's procedure are relevant.

Moreover, even when we consider the merits of DSM's critiques, we do not find them persuasive. DSM's argument that the bare fiber must be wiped with a solvent to remove residue is unsupported. Dr. Taylor simply asserts this to be the case, without providing credible support. *See* Ex. 2032 ¶ 78. The '189 patent says simply that the fiber must be clean. Ex. 1001, 31:36. Ms. Kouzmina says that the fiber was clean. Ex. 1015 ¶ 34. DSM has not explained how Ms. Kouzmina's evidence fails to show that Corning followed the '189 patent's instructions.

DSM's critique of Corning's positioning of the fiber in the test coating similarly is based on silence in Corning's evidence, rather than evidence that Corning did not comply with the test procedure described in the '189 patent. Corning's technician "encased" a section of bare fiber in the test coating. Ex. 2015, 1. DSM does not explain credibly how "encasing" the fiber in the coating is inferior to, or even materially different from, "embedding" the fiber, as indicated in the '189 patent.

DSM's argument that a "sudden drop" in measured force after the initial maximum indicates a torn coating or cohesive failure is not persuasive because it is not directed to Corning's test data. *See* Ex. 2032 ¶ 83. It is

24

**A24**

Case IPR2013-00048
Patent 6,298,189 B1

instead a theoretical statement by Dr. Taylor. Dr. Taylor does not state that he observes a sudden drop in Corning's plots. *See id.* Even if we were to infer that Dr. Taylor considers the Corning plots to exhibit sudden drops, DSM's argument is not persuasive, because Dr. Taylor does not explain what he means by a "sudden drop," in terms of either timing or magnitude (i.e., how sudden is "sudden," and how far is a "drop"). Dr. Taylor also does not identify underlying facts or data to support his assertion that a sudden drop is indicative of a torn coating or cohesive failure. Although we have no reason to doubt that Dr. Taylor's knowledge and experience in the relevant art qualify him as a credible expert witness, we assign little or no weight to assertions of his that are not substantiated by some evidence—such as citation to a scholarly work or to his own experience—concerning how he knows or believes the assertions to be true.

DSM's argument that insufficient normal force results in artificially low friction measurements similarly is not persuasive because it is supported by no more than Dr. Taylor's assertions to that effect. *See* Ex. 2032 ¶¶ 84-85, 90 & n.3. Dr. Taylor does not provide any credible basis for his conclusion that some degree of clamping is necessary to ensure complete engagement of the friction-bearing surfaces and to avoid slip-stick behavior. Although Dr. Taylor points out that Corning used a sample holder for a pull-out test (as opposed to a fiber pull-out friction test), and that no normal force is applied during a pull-out test (*id.* at 90 & n.3), it does not follow from this that some normal force is required to be applied during a fiber pull-out friction test. Again, we assign little or no weight to Dr. Taylor's assertions in this regard because they are unsupported by some evidence of how he knows or believes them to be true.

25

**A25**

Regarding DSM's own fiber pull-out friction testing, we agree with Corning that DSM's use of an unquantified clamping force brings the reliability of DSM's results into doubt. Dr. Taylor describes the clamping process as follows:

> The sample was placed into a DMA instrument with the embedded fiber end in the lower clamp, which was tightened to firmly hold the coating film in the clamp during the test and apply an adequate level of normal force to the coating film.

Ex. 2032 ¶ 95. Dr. Taylor does not explain how firmly the clamp was tightened or how much normal force would be considered "adequate." DSM argues that the amount of normal force has no effect on the measurement of fiber pull-out friction and that Dr. Ju admitted as much in deposition. Tr. 43:22-44:9; Obs. ¶ 6 (citing Ex. 2090, 164:23–168:2). We do not agree that Dr. Ju admits that normal force has no effect on friction under the conditions of the fiber pull-out friction test. The cited passage of Dr. Ju's deposition largely involves DSM's counsel reading passages from various scientific papers to Dr. Ju and eliciting agreements from Dr. Ju that the papers' statements are correct. Dr. Ju qualifies each of his agreements by saying "[w]ithin the scope of that paper" or something similar. *E.g.*, Ex. 2090, 166:3. The last of these exchanges concerns the following statement from page 19 of Exhibit 2095, following an equation giving a relation between contact area and load: "This explains that for soft rubber sliding on a smooth surface, perfect contact, the frictional force is more or less constant, independent of the load, W." Ex. 2090, 167:10-13. Dr. Ju states: "Within this specific condition as stated in that statement after equation 3.5, within the context of the consideration in this report, I think I would agree. But you

must satisfy those conditions that [are] described following this -- the sentence after equation 3.5." *Id.* at 167:17-22. We read Dr. Ju's answer as an agreement to the findings in Exhibit 2095, but as not an admission that the conclusion given applies to the conditions of Corning's testing. DSM does not identify other, credible, evidence to show that frictional force is independent of load under the conditions of Corning's fiber pull-out friction test.

For these reasons, we credit Corning's testing evidence over DSM's. We are persuaded that Corning has shown that Shustack Example I and Szum '928 Example 5B each inherently possess a fiber pull-out friction within the scope of every challenged claim.

### 2. *"Sufficient Adhesion"*

As discussed above in section II.A.1, each of claims 1-4 and 9-12 requires an inner primary coating, or a composition after cure, that exhibits "sufficient adhesion to [a] glass fiber to prevent delamination in the presence of moisture and during handling." Corning argues that the prior art compositions disclosed in Shustack (Example I) and Szum '928 (Example 5B) meet this limitation. Corning bases this argument on the results of wet adhesion tests carried out under conditions of 95% relative humidity on coatings prepared according to Shustack Example I and Szum '928 Example 5B. Pet. 24-26 (citing Ex. 1014 ¶¶ 119, 121; Ex. 1015 ¶ 51), 36-37 (citing Ex. 1014 ¶¶ 141, 144; Ex. 1015 ¶ 51).

DSM responds that the wet adhesion test does not evaluate for delamination, which is caused by exposure to liquid water, and that a different test—the water soak delamination test—is the only method

Case IPR2013-00048
Patent 6,298,189 B1

disclosed in the '189 patent for assessing delamination.  Resp. 15-16 (citing Ex. 2032 ¶¶ 59-66).  DSM also comes forward with its own test results, which allegedly show that the Szum coating, in fact, delaminates when subjected to the conditions of the water soak delamination test disclosed in the '189 patent.  Resp. 43-44.

A dispositive question thus arises:  Does Corning show by a preponderance of evidence that the Shustack and Szum coatings exhibit sufficient adhesion to prevent delamination from glass in the presence of liquid water?  For the reasons set forth below, we answer that question in the negative.  We first address the conditions set forth in the '189 patent for the wet adhesion test and the water soak delamination test.  We then consider whether the wet adhesion test, which Corning performed on the Shustack Example I and Szum '928 Example 5B coatings, is probative of the claimed adhesion property.  Finally, we explain why an evaluation of DSM's water soak delamination test data is not necessary to our analysis.

*a. The Wet Adhesion Test*

The '189 patent describes a wet adhesion test for evaluating a cured coating sample on a glass substrate.  Ex. 1001, 28:50-58.  The wet adhesion test is conducted "at a temperature of 23±2° C. and a relative humidity of 50±5% for a time period of 7 days."  *Id.* at 28:59-61.  A portion of the sample film is then "further conditioned at a temperature of 23±2° C. and a relative humidity of 95% for a time period of 24 hours."  *Id.* at 28:62-65.  During that step, "[a] layer of polyethylene wax/water slurry [is] applied to the surface of the further conditioned film to retain moisture."  *Id.* at 28:65-77.

28

**A28**

Case IPR2013-00048
Patent 6,298,189 B1

The written description makes plain that the wet adhesion test assesses a cured coating that is conditioned at 95% relative humidity. *Id.* at 28:62-65. Corning acknowledges that fact. *See, e.g.*, Pet. 17 (citing Ex. 1015 ¶ 107) ("The term 'wet adhesion' is described in the '189 patent at col. 28, lines 46-51 as adhesion at 95% relative humidity."). Corning raises no argument that application of a layer of "wax/water slurry" to the surface of the coating represents an exposure to 100% relative humidity. Ex. 1001, 28:65-67; *see* Reply 6 (stating that the wet adhesion test described in the '189 patent relates to conditioning "at 95% relative humidity—not liquid water immersion." (citing Ex. 1001, 28:65-67)).

After conditioning the sample at 95% relative humidity, the sample that appears "uniform and free of defects" is "peeled back from the glass." Ex. 1001, 29:6-10. The wet adhesion test is performed on the peeled-back sample using a device that includes "a horizontal support and a pulley." *Id.* at 29:1-5. With the glass secured to the horizontal support, a wire is "attached to the peeled-back end of the sample, run along the specimen and then run through the pulley in a direction perpendicular to the specimen." *Id.* at 29:9-14. A wet adhesion value is determined by clamping the free end of the wire "in the upper jaw of the testing instrument," which is activated "until the average force value, in grams force/inch," becomes "relatively constant." *Id.* at 29:14-17. The '189 patent discloses that "[t]he preferred value for wet adhesion is at least about 5 g/in." *Id.* at 29:17-18.

On this record, we find that the wet adhesion test assesses the mechanical force required to peel a cured coating away from a glass substrate, after conditioning the coating at 95% relative humidity.

Case IPR2013-00048
Patent 6,298,189 B1

### b. *The Water Soak Delamination Test*

The '189 patent also discloses a water soak delamination test in which "coated microscope slides [are] soaked in [] water." *Id.* at 27:32, 43. The samples are soaked in a beaker of deionized water that is placed in a 60° C. hot water bath. *Id.* at 27:43-45. The samples are "observed for delamination periodically. The time when the first signs of delamination" appear is recorded. *Id.* at 27:45-47.

Table 2 in the '189 patent specification describes a "hot water soak" in which samples are "aged for 4 hours at 60° C.," the water bath is "shut-off for about 70 hours," and then the temperature is "brought back to 60° C. for an additional 48 hours." *Id.* at 28:8-10, 14-16. The degree of delamination observed after the hot water soak is reported in Table 2 as "none" or "delam. [a]fter 1 hour at 60° C." *Id.* at 27:66; 28:8-10. Table 3 similarly reports results for a delamination test that is described as a "60[°] C Water Soak." *Id.* at 29:45. Delamination results are reported in terms such as "No Delamination After 24 Hours," "Slight Delamination After 15 Minutes," and "No Delamination After 8 Hours; Slight Delamination After 24 Hours." *Id.* at 29:45-52.

On this record, we find that the water soak delamination test assesses the ability of a cured coating to withstand the hydrodynamic forces that cause delamination of a cured coating from a glass substrate in the presence of liquid water.

### c. *Corning Fails to Establish that the Szum Coating Inherently Exhibits the Claimed Adhesion Property*

The '189 patent discloses that the wet adhesion test evaluates the force required to peel a coating away from a glass substrate, after the coating

30

Case IPR2013-00048
Patent 6,298,189 B1

has been conditioned at 95% relative humidity.  Ex. 1001, 29:1-18.
The '189 patent identifies a different test—a water soak delamination test—
for evaluating the extent of delamination that occurs when a cured coating is
exposed to liquid water.  *Id.* at 27:21-37.  In DSM's view, Corning fails to
establish sufficiently that the wet adhesion test, or "[p]eel test," can "be used
to reliably determine what the results of a delamination test would be."
Resp. 32.  We agree.

Corning prepared the Szum coating and subjected it to substantially
the same wet adhesion test that is described in the written description of
the '189 patent.  *Compare* Ex. 1015 ¶¶ 48-51 (describing the wet adhesion
test procedure performed on the Shustack Example I and Szum '928
Example 5B coatings) *with* Ex. 1001, 28:50–29:18 (describing a wet
adhesion test procedure performed on an inventive example).  The '189
patent instructs, however, that coating samples are subjected to a water soak
test and "examined for delamination" prior to conducting the wet adhesion
test.  Ex. 1001, 28:45-46.  Specifically, the wet adhesion test is performed
"[i]n addition" to the water soak delamination test."  *Id.* at 28:44-48.  It is
the delamination test that ascertains "[t]he time when the first signs of
delamination" appear in a coating sample that is immersed in water.  *Id.*
at 27:22-37.

Although the '189 patent describes a sequence of testing that includes
both a delamination test and a wet adhesion test, Corning comes forward
with no evidence that the Szum coating was subjected to a delamination test.
*Id.*; *see* Ex. 1015 ¶¶ 48-50 (Corning's test procedures).  Dr. Winningham
was unaware of any delamination test performed by Corning on the Szum
coating.  Resp. 33 (citing Ex. 2029, 469:17–471:17).  Corning relies on wet

Case IPR2013-00048
Patent 6,298,189 B1

adhesion values for the Shustack Example I and Szum '928 Example 5B coatings that are expressed as a grams-per-inch mechanical force required to peel each coating away from a glass substrate after conditioning at 95% relative humidity.  Ex. 1015 ¶¶ 51.

   On this record, we find that Corning relies on test results obtained for the Szum coating after exposure to conditions of 95% relative humidity, but not to liquid water.  As explained in our claim construction analysis, exposure to 95% relative humidity is not "in the presence of moisture" (i.e., liquid water) as specified in the challenged claims.  Corning argues that the Shustack Example I and Szum '928 Example 5B coatings exhibit wet adhesion values of 77 g/in and 44 g/in, respectively, "when conditioned at 95% relative humidity," but does not explain how those results are probative of adhesion in the presence of liquid water—that is, 100% relative humidity.  *See*, *e.g.*, Pet. 26 (citing Ex. 1014 ¶ 121); *see* Ex. 2032 ¶ 48 (moisture condenses at 100% relative humidity).  On that basis, we determine that Corning fails to show by a preponderance of evidence that the Szum and Shustack coatings meet the claimed adhesion property.

   A second independent basis supports our determination.  Corning comes forward with evidence insufficient to support an inference that the results of a 95% relative humidity wet adhesion test correspond to an ability to withstand the hydrodynamic forces that effect delamination.  Corning argues that Dr. Winningham "has confirmed that a coating composition with an adhesion to glass of either 23 g/in or 44 g/in, as in Szum, would have sufficient adhesion to the glass fiber to prevent delamination in the presence

Case IPR2013-00048
Patent 6,298,189 B1

of moisture and during handling." Pet. 26 (citing Ex. 1014 ¶ 121), 37 (citing Ex. 1014 ¶ 144).[6] Dr. Winningham's opinion on that point is unsupported and, therefore, unpersuasive. *See* Ex. 1014 ¶¶ 121, 144 (reciting opinion without objective proof).

In that regard, Dr. Winningham repeats, verbatim, attorney argument set forth in the petition, but identifies no objective evidence explaining how a wet adhesion value, which indicates a mechanical force required to peel a coating away from a glass substrate, correlates to an ability to withstand the hydrodynamic forces that effect delamination. *Id.* Dr. Winningham's bare opinion is entitled to little weight in the absence of objective, evidentiary support. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) (finding lack of factual support for expert opinion "may render the testimony of little probative value in a validity determination").

During cross-examination, Dr. Winningham testified about the differences between a water soak delamination test and a wet adhesion test, which he refers to in his testimony as "a peel test":

> Q. If one was concerned about the ability of a coating to delaminate from a substrate when exposed to water, would performing a peel test not give sufficient information to satisfy the interested person?

---

[6] In addition to the experimental test results tending to establish a wet adhesion value of 44 g/in for the Szum coating, Corning points to the reference itself for a teaching that the Szum coating exhibits "an adhesion to glass at 95% relative humidity of 23 g/in." Pet. 37 (citing Ex. 1005, 25:12).

Case IPR2013-00048
Patent 6,298,189 B1

A. I think those tests measure — are looking at different things or measuring different things, so I'm not sure if — I can't say categorically that a peel test is going to tell you what's going to happen in a water delamination test. Different tests.

Ex. 2029, 460:12-21; *see* Resp. 32 (citing this testimony).

Dr. Winningham also testified that the water soak delamination test evaluates the "hydrodynamic forces" that work to delaminate a coating from a glass substrate, whereas "a peel test" evaluates the "mechanical forces" exerted, where "one is applying a — mechanical force to a film and pulling the film off a substrate." Ex. 2029, 459:3-18. That testimony of Corning's witness is consistent with the explanation of the relevant hydrodynamic forces that is provided by DSM's witness, Dr. Taylor. *See* Ex. 2032 ¶¶ 65-66.

At the oral hearing, Corning's counsel directed our attention to test results reported in Table 3 of the '189 patent and, for the first time, argued that those results establish "a clear correlation between the films that passed the hot water soak test . . . and films that have a certain wet adhesion." IPR2013-00045, Paper 89, 10:15-17 (Transcript). That argument, and Corning's reliance on Table 3, is not set forth in the petition or the reply. *See* Pet. 26, 37; Reply 5-7. We deem Corning to have waived that argument raised by counsel for the first time at the oral hearing. *Cf. Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1320-21 n.3 (Fed. Cir. 2005) (arguments not raised in an opening brief are deemed waived).

34

**A34**

Case IPR2013-00048
Patent 6,298,189 B1

That argument also is unpersuasive because it is unsupported by convincing, objective evidence that explains a relationship between the wet adhesion values and the water soak delamination results reported in Table 3. In that regard, Corning asks us to infer a relationship between wet adhesion values (reported as a grams-per-inch mechanical force) and water soak delamination results (reported as an observation, for example, of slight delamination after 15 minutes) from Table 3. *See* IPR2013-00045, Paper 89 10:15-17; Ex. 1001, 29:43-52 (Table 3). That is a leap we will not undertake in the absence of persuasive evidence, such as a technical article or expert testimony, explaining some relationship between those disparate tests. Pet. 26, 37; Reply 5-7 (identifying no such evidence).

Because the issue is not discussed in the briefs, moreover, we have no evidence as to how the wet adhesion value obtained for the Szum coating, which never endured a hot water soak, is comparable to the wet adhesion values reported in Table 3, which appear to relate to coating samples that endured both a hot water soak and the wet adhesion test. *See* Ex. 1001, 28:45-59 (wet adhesion test is performed "[i]n addition" to water soak delamination test); *see also id.* at 29:6-8 (after conditioning, "samples that appeared to be uniform and free of defects" were selected for the wet adhesion test, implying that samples that delaminated were excluded from such testing).

In sum, two independent reasons support our determination that the wet adhesion test results advanced by Corning fail to show adequately that the Szum coating has "sufficient adhesion . . . to prevent delamination in the presence of moisture" within the meaning of the challenged claims. First, the wet adhesion test assesses a property of the coating after conditioning

35

Case IPR2013-00048
Patent 6,298,189 B1

at 95% relative humidity, which is not "in the presence of moisture."

Second, Corning identifies no persuasive evidence from which we

reasonably can discern that the wet adhesion test evaluates for

"delamination."

> #### d. DSM's Delamination Test Results are Not Necessary to our Analysis

DSM presents evidence that the Szum '928 Example 5B coating

exhibits insufficient adhesion to prevent delamination in the presence of

liquid water. Specifically, DSM contends that it formulated a coating

according to Szum '928 Example 5B and subjected it to the water soak

delamination test described in the '189 patent. Resp. 43-44 (citing Ex. 2032

¶¶ 104-07). DSM reports that the Szum coating "experienced delaminations,

visible to the unaided eye," and that those "delaminations appeared as water-

filled voids or 'blisters' between the inner primary coating and the glass."

Id.[7]

Corning bears the burden of showing by a preponderance of evidence

that the Shustack Example I and Szum '928 Example 5B coatings inherently

disclose the claimed adhesion property. We need not resolve whether DSM

properly formulated the Szum '928 Example 5B coating or whether DSM's

test results accurately reflect the ability of that coating to withstand

---

[7] Corning does not discuss DSM's adhesion testing of Szum '928 Example
5B in its Reply. Corning argues, in case IPR2013-00049, that DSM's results
are unreliable because DSM failed to follow the correct procedure for
preparing the Szum coating. IPR2013-00049, Paper 68 (Reply) 7-8. In
particular, Corning argues that DSM used the wrong photoinitiator in its
formulation, which negatively affected the ability of the Szum coating to
withstand delamination. Id. (citing Ex. 1068 ¶¶ 95-105).

Case IPR2013-00048
Patent 6,298,189 B1

delamination in the presence of moisture.  Our decision rests on Corning's
failure to show sufficiently that its wet adhesion test results, which relate to
the mechanical force sufficient to peel a coating away from a glass substrate
after conditioning at 95% relative humidity, are probative of whether either
of the Shustack or Szum coatings has "sufficient adhesion . . . to prevent
delamination in the presence of moisture" (i.e., liquid water).

Based on the record developed at trial, Corning fails to show by a
preponderance of evidence that either Shustack Example I or Szum '928
Example 5B inherently discloses the claimed adhesion property.  Because
each of claims 1-4 and 9-12 includes a limitation directed to that property,
each claim survives Corning's challenge based on anticipation by, or
obviousness over, Shustack, obviousness over Shustack and Jackson, and
anticipation by, or obviousness over, Szum '928.

### 3.  *"Adhesion to glass of at least 12 [or 5] g/in when conditioned at 95% relative humidity"*

Claims 5-8 each require that the inner primary coating, or the inner
primary coating composition after cure, have an "adhesion to glass of at least
12 g/in when conditioned at 95% relative humidity."  Claims 13-16 have the
same limitation, except the numerical value is 5 g/in instead on 12 g/in.[8]

Unlike the "sufficient adhesion" limitation discussed above, this
limitation is directed unambiguously to the wet adhesion test described in
the '189 patent at column 28, line 50, to column 29, line 18.  Corning argues
that Shustack Example I and Szum '928 Example 5B exhibit wet adhesion

---

[8] Claim 13 has an apparent typographical error of "which conditioned"
instead of --when conditioned--.

37

**A37**

values, when tested in accordance with the procedure described in the '189 patent, of 77 g/in and 44 g/in, respectively.  Pet. 24, 26, 36-37; Ex. 1015 ¶¶ 48-51.  DSM does not challenge Corning's evidence as to the wet adhesion levels of Shustack Example I and Szum '928 Example 5B.

Upon consideration of Corning's evidence, we are persuaded that Shustack Example I and Szum '928 Examples 5B inherently possess the adhesion to glass property recited in claims 5-8 and 13-16.

### 4.  "Crack propagation"

Every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a crack propagation of greater than 1.0 mm (claims 1-8) or 0.7 mm (claims 9-16) at stripping temperature (claims 1-4, 9-12) or 90°C (claims 5-8, 13-16).  As discussed above in section II.A.2, we construe "stripping temperature" as encompassing 90°C, because the '189 patent gives this temperature as an example of a stripping temperature.

Corning argues that Shustack Example I and Szum '928 Example 5B exhibit crack propagation values, when tested in accordance with the procedure described in the '189 patent at column 31, lines 7-20, of 1.5 mm and 1.3 mm, respectively.  Pet. 24, 36; Ex. 1015 ¶¶ 38-42.  DSM does not challenge Corning's evidence as to the crack propagation property of Shustack Example I and Szum '928 Example 5B.

Upon consideration of Corning's evidence, we are persuaded that Shustack Example I and Szum '928 Examples 5B each inherently possesses a crack propagation within the scope of every challenged claim.

Case IPR2013-00048
Patent 6,298,189 B1

### 5. *"Glass transition temperature" of inner primary coating*

Every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a glass transition temperature of below 10°C (claims 1-8) or 0°C (claims 9-16). Corning argues that Shustack Example I and Szum '928 Example 5B exhibit glass transition temperatures, when tested in accordance with the procedure described in the '189 patent at column 34, line 57 to column 35, line 24, of -38.9°C and -34.9°C, respectively. Pet. 24, 36; Ex. 1015 ¶¶ 43-47. DSM does not challenge Corning's evidence as to the glass transition temperature of the inner primary coating for Shustack Example I or Szum '928 Example 5B.

Upon consideration of Corning's evidence, we are persuaded that Shustack Example I and Szum '928 Examples 5B each inherently possesses a glass transition temperature for the inner primary coating within the scope of every challenged claim.

### 6. *"Glass transition temperature" of outer primary coating*

Each of claims 2-4, 6-8, 10-12, and 14-16 requires that the outer primary coating, or the outer primary coating composition after cure, have a glass transition temperature of above 40°C. Corning argues that Shustack Examples X and XI have glass transition temperatures of 48.5°C and 46.8°C, respectively, when measured according to the procedure described in the '189 patent at column 34, line 57 to column 35, line 24. Pet. 28;

Case IPR2013-00048
Patent 6,298,189 B1

Ex. 1015 ¶¶ 43-47.[9,10]  DSM does not challenge Corning's evidence as to the glass transition temperature of the outer primary coating for Shustack Examples X or XI.[11]

Upon consideration of Corning's evidence, we are persuaded that Shustack Examples X and XI each inherently possesses a glass transition temperature for the outer primary coating within the scope of claims 2-4, 6-8, 10-12, and 14-16.

### 7.  *"Modulus of elasticity" of outer primary coating*

Each of claims 2-4, 6-8, 10-12, and 14-16 requires that the outer primary coating, or the outer primary coating composition after cure, have a modulus of elasticity of either (a) between about 10 MPa to about 40 MPa (claims 2-4 and 6-8) or (b) greater than 25 MPa (claims 10-12 and 14-16), at either (1) stripping temperature (claims 2-4 and 10-12) or (b) 100°C (claims 6-8 and 14-16).  As discussed above in section II.A.2, we construe "stripping

---

[9] Corning conceded at oral argument that it no longer bases any challenges on Shustack Example IX.  IPR2013-00048, Paper 93, 3:3-10.  We give that example no further consideration.

[10] Corning also argues that Szum '928 Example 2 meets the recited glass transition temperature of the outer primary coating (Ex. 1015 ¶ 47), but Corning does not challenge any of claims 2-4, 6-8, 10-12, or 14-16 for anticipation by Szum '928.

[11] DSM's experts argue that the glass transition temperatures of Corning's reproductions of Shustack Examples X and XI may have been affected by Corning's choice of oligomer.  *E.g.*, Ex. 2034 ¶¶ 65-76; Ex. 2032 ¶¶ 131-132.  We address that argument in the context of the "modulus of elasticity" limitation discussion in section II.C.7.

Case IPR2013-00048
Patent 6,298,189 B1

temperature" as encompassing 100°C, because the '189 patent gives this temperature as an example of a stripping temperature.

Corning argues that Shustack Examples X and XI meet this limitation. Pet. 28; Ex. 1015 ¶ 52-55.  Corning's expert, Dr. Winningham, acknowledges, however, that the express disclosure in Shustack does not identify what oligomer is used to make those examples.  Ex. 1014 ¶ 74 n.5. Shustack describes the oligomer used in Example X as "aliphatic urethane acrylate oligomer with polyester backbone (I) (used as a mixture containing 12% hexanediol acrylate)."  Ex. 1003, 30:32-36.  Dr. Winningham states that EBECRYL® 284 aliphatic urethane acrylate oligomer was disclosed in EP 0 407 004, prior to publication of Shustack, as having all the properties specified by Shustack, including preparation in 12% hexanediol acrylate. Ex. 1014 ¶ 74 n.5.[12]  Dr. Winningham states that EBECRYL® 284 oligomer would have been "suitable" for use in Shustack Example X.  *Id.*

Corning argues that Shustack Examples X and XI, as synthesized using the EBECRYL® 284 oligomer, have moduli of elasticity of 30 MPa and 18 MPa at about 100°C, respectively, when measured according to the procedure described in the '189 patent at column 34, line 57 to column 35, line 24.  Pet. 28; Ex. 1015 ¶¶ 52-55.

DSM argues that Corning's reproductions of Shustack Examples X and XI are not reliable indicators of the inherent modulus of elasticity in the prior art compositions, because Corning arbitrarily selected EBECRYL® 284 urethane acrylate as the oligomer it used to synthesize them.

---

[12] EP 0 407 004 is of record as Exhibit 1018.  EBECRYL® 284 oligomer is disclosed at, e.g., page 12, lines 34-35.

Case IPR2013-00048
Patent 6,298,189 B1

Resp. 37-40, 47-49.  In particular, DSM argues that Shustack does not specify which oligomer was used to make Examples X and XI and that Corning's selection of EBECRYL® 284 aliphatic urethane oligomer was arbitrary.  *Id.*  According to DSM, "many possible oligomers . . . fall within the broad category" that could be used in Shustack Examples X and XI.  *Id.* at 40.  DSM argues that Shustack's disclosure of a genus does not amount to disclosure of the species within that genus.  *Id.* at 39-40 (citing *Metabolite Labs., Inc. v. LabCorp*, 370 F.3d 1354, 1367 (Fed. Cir. 2004)).  Dr. Bowman opines:

> Within these large classes of oligomers, there are almost infinite possible combinations of structures. For example, there is no disclosed range of molecular weight for the oligomer. (*See* [Ex. 1003] at 18:35–19:41, 29:30–31:30). There is no disclosure regarding the number of acrylate functionalities. (*See id.*) There is also no discussion of the kind of polyester or polyether repeat units that should be used or whether the oligomers should be branched or not. (*See id.*) These variables have significant effects on the glass transition temperature and the modulus, and would, in many cases, affect the thermal expansion characteristics of these coatings. Molecular weight and functionality, in particular, would have a significant effect on glass transition temperature and modulus.

Ex. 2034 ¶ 65.  Dr. Bowman also argues that were "many aliphatic urethane oligomers with polyester backbones known to a person of ordinary skill in the art at the time that would have resulted in a coating with a modulus of greater than 40 MPa at 100°C."  Ex. 2034 ¶ 74.  DSM concludes that following Shustack's express disclosure for Examples X and XI does not

42

**A42**

Case IPR2013-00048
Patent 6,298,189 B1

lead unavoidably to a coating composition having the recited modulus of elasticity upon cure.  Resp. 40.  For these reasons, argues DSM, Shustack Examples X and XI do not inherently disclose this property.  *Id.*

Corning argues, in reply, that Dr. Bowman concedes that EBECRYL® 284 oligomer is an acceptable choice for synthesizing Shustack Examples X and XI, and that Corning's reply expert, Dr. Sogah, can identify no other commercially-available oligomer that meets the criteria specified in Shustack.  Reply 10 (citing Ex. 1068 ¶¶ 86-88; Ex. 1070, 433:13-24).

Upon consideration of the parties' arguments and evidence, we agree with DSM that Corning has not shown that Shustack Examples X and XI inherently possess the claimed modulus of elasticity.  Shustack does not identify EBECRYL® 284 aliphatic urethane acrylate as the oligomer to be used, and we agree with DSM that Corning has not shown that one of ordinary skill in the art would have interpreted Shustack's description of the oligomer as unambiguously identifying the EBECRYL® 284 oligomer.

Corning's argument that Shustack inherently discloses the modulus of elasticity limitations is predicated on the assertion that Shustack Examples X and XI necessarily possess moduli of elasticity within the scopes of claims 2-4, 6-8, 10-12, and 14-16.  *See* Pet. 28.  But the only evidence Corning offers in support of this argument is modulus testing upon versions of Shustack Examples X and XI made with the EBECRYL® 284 oligomer.  Corning's evidence is persuasive to show that Examples X and XI formulated with the EBECRYL® 284 oligomer possess the required modulus.  It is not persuasive, however, to show that Examples X and XI, *as disclosed in Shustack*, inherently disclose this property.  We reach this

43

**A43**

Case IPR2013-00048
Patent 6,298,189 B1

conclusion because Corning has not shown that either (a) one of ordinary skill in the art would have, at once, envisaged EBECRYL® 284 oligomer from the disclosure in Shustack, or (b) every oligomer that meets the requirements specified in Shustack Example X would, if used to make that example, result in a coating with the required modulus of elasticity.

As to issue (a), Corning does not address expressly in its Petition the issue of what oligomer Shustack discloses for Examples X and XI. Instead, Corning argues (through Dr. Winningham and Dr. Bowman) that EBECRYL® 284 oligomer is a suitable choice because it meets Shustack's requirements. *See* Ex. 1014 ¶ 74 n.5; Ex. 1070, 433:13-24. But suitability, without more, does not establish that EBECRYL 284 oligomer is the oligomer Shustack discloses for Examples X and XI. Dr. Sogah's evidence that he is unaware of any other suitable oligomers that are commercially available (Ex. 1068 ¶¶ 86-88) does not address the question of whether any other suitable oligomers exist or have been disclosed by Shustack.

The disclosure of a genus may be read as a disclosure of the constituent species if one of ordinary skill in the art could "at once envisage" them from the generic disclosure. *In re Petering,* 301 F.2d 676, 681 (CCPA 1962). We credit Dr. Bowman's testimony that the class of oligomers that would meet Shustack's criteria is "almost infinite," because Shustack does not specify details such as molecular weight for the oligomer, the number of acrylate functionalities, the kind of polyester repeat units, and whether the oligomers should be branched. *See* Ex. 2034 ¶ 65. Corning has not come forward with sufficient evidence to show that one of ordinary skill in the art would have interpreted Shustack's disclosure as identifying the EBECRYL® 284 oligomer uniquely or as one of a sufficiently small and

Case IPR2013-00048
Patent 6,298,189 B1

closely related set of oligomers as to be, at once, envisaged from the generic disclosure.

As to issue (b), we further credit Dr. Bowman's testimony that the unspecified details in Shustack's oligomer description may have substantial effects on the material properties that a resulting coating would possess, including glass transition temperature and modulus of elasticity. *See* Ex. 2034 ¶¶ 65-76. Put another way, Corning has not shown that the properties of a coating made with the EBECRYL® 284 oligomer is indicative of the properties that would result from making Shustack Example X or XI with another oligomer. Without such a showing, Corning has not established that the properties it relies upon from Shustack are inherent in Shustack.

For these reasons, we determine that Corning has not shown that Shustack discloses the modulus of elasticity limitations of claims 2-4, 6-8, 10-12, and 14-16.

### 8. *"Ratio of the Change in Length"*

Each of claims 2, 6, 10, and 14 requires that "the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature." Claims 3, 4, 7, 8, 11, 12, 15, and 16 require the same ratio but refer to the inner primary coating and outer primary coating directly, rather than to the coating compositions after cure. Every challenged claim requires, therefore, a ratio of the changes in length of less than 2 between 25°C and stripping temperature. As discussed above in

45

Case IPR2013-00048
Patent 6,298,189 B1

section II.A.2, we construe "stripping temperature" as encompassing 100°C, because this temperature is given as an example of a stripping temperature.

### a. Summary of Parties' Arguments and Evidence

In its Petition, Corning's principal evidence concerning the change-in-length ratio is provided in Ms. Kouzmina's declaration. Ex. 1015 ¶¶ 56-61. Ms. Kouzmina states that change in length was measured for each of Shustack Examples I, X, and XI, and Szum '928 Examples 2 and 5B, following the procedures described in the '189 patent at column 14, lines 42-57. *Id.* ¶¶ 56-59; Pet. 29 (citing Ex. 1015 ¶ 60). Ms. Kouzmina states that the testing was carried out using an optical microscope with a heated stage. Ex. 1015 ¶ 57. Ms. Kouzmina then explains the process used to test the samples and to obtain images of the samples at 25°C and 100°C. *Id.* ¶ 58. In particular, Ms. Kouzmina explains that each test sample film was lightly coated with talc particles to prevent sticking, placed on a microscope slide, and then on the heated microscope stage. *Id.* The sample was held at 25°C for ten minutes, and then an image of the sample was captured through the microscope's objective lens. *Id.* The image had a resolution of 2080×1536. *Id.* The sample was then heated to 100°C and imaged again. *Id.*

Ms. Kouzmina then addresses how change in length of each sample was calculated. *Id.* ¶ 59. The entirety of Ms. Kouzmina's evidence as to how the change in length was calculated is contained in paragraph 59 of her declaration:

> 59.   Change in length of the sample was calculated by comparing the length between two points on the sample when the sample was at two different temperatures.

Case IPR2013-00048
Patent 6,298,189 B1

*Id.* The changes of length thus calculated for each sample are reported in paragraph 60, and the ratios between the changes of length of various samples are reported in paragraph 61. Ms. Kouzmina reports that the ratio of changes in length is less than 2 for all combinations in which Shustack Example I or Szum '928 Example 5B provides the inner primary coating, and Shustack Example X or XI, or Szum '928 Example 2, provides the outer primary coating. *Id.* ¶ 61; Pet. 22, 30, 40 (citing Ex. 1015 ¶ 61).

DSM argues the procedure Corning followed for determining the change in length was unreliable and scientifically unsound, because it relied on "subjective 'eyeballing'" by Earl Sanford, the Corning microscopist who performed the work.[13] Resp. 34. DSM cites the following deposition testimony of Ms. Kouzmina:

> Q. Do you know how [Mr. Sanford] chose the two points on the film?
> **A. I do not know which specifically points were used for each photograph. But I have a general idea.**
> Q. What's your general idea?
> **A. A general idea is that you would choose a point that is easy to track and that is represented by a marked, you know, particle or a part of the top particle that you would record the coordinates off, and then you would follow that spot as a sample is being heated.**
> Q. So do you know how the precise spots were chosen and how they were tracked?
> MR. McGUIRK:· Objection to form.

---

[13] Mr. Sanford's first name is indicated at Ex. 1035 ¶ 80.

Case IPR2013-00048
Patent 6,298,189 B1

> **A. I don't know exactly how the precise paths were chosen. It was Mr. Sanford's discretion, and tracked just visually following the selected spot in the microscope and then recording its position.**

Ex. 1044, 123:18–124:12.[14]

DSM also relies on declaration testimony from Dr. Taylor, who dismisses the measurement procedure as "an unmitigated exercise of human discretion (*e.g.*, eye-balling specific pixels . . . )." Ex. 2032 ¶ 111. Dr. Taylor states further that the quality of the measurement is "entirely dependent on the test operator's precision (or lack thereof) in identifying the same two points in two different images in which all the points have moved. In my opinion, such a test is unreliable at best and unacceptable as a[n] art-recognized methodology." *Id.*

Dr. Taylor also argues that Corning's data is unreliable because the samples were not completely free to expand. *Id.* ¶ 115. Dr. Taylor reasons that the samples would have adhered to the microscope slides on which they were placed during testing, because the samples become tacky when heated. *Id.*

Finally, Dr. Taylor argues that Corning's measurements suffer from a relative error of at least 75%. *Id.* ¶ 122. Dr. Taylor reaches this conclusion based on the following facts:

---

[14] Corning does not seek to exclude testimony elicited from the objected-to question. The objection is dismissed as moot.

Case IPR2013-00048
Patent 6,298,189 B1

1. The change in length observed in each test was on the order of 20 pixels. *Id.* ¶ 117 (citing Ex. 2050).
2. In the PDF file format images provided by Corning, features that might be used as landmarks for measuring length are about 8×8 pixels. *Id.* ¶¶ 119-121.
3. The microscopist's measurement is subject, therefore, to an uncertainty of ±4 pixels on each end, for a total of ±8 pixels per measurement. *Id.* ¶ 122.
4. Because two measurements are compared to determine the change of length, the uncertainty is doubled to ±16 pixels. *Id.*
5. 16 pixels is 75% of the 20-pixel change noted in most experiments. *Id.*

Corning argues, in reply, that neither the challenged claims, nor any other part of the '189 patent, specifies the proper way in which to conduct a change-in-length test. Reply 7-8 (citing Ex. 1046, 563:13–564:17; Ex. 1035 ¶¶ 78-90). Corning also argues that its measurement procedure was sound. *Id.* at 8 (citing Ex. 1035 ¶ 82). In particular, Corning argues that (a) the samples were not constrained from free expansion, because the talc dusting prevented sticking (*id.* (citing Ex. 1035 ¶ 82)); and (b) Dr. Taylor's error estimation of 75% is grossly exaggerated, because the PDF file format images he used had far lower resolution than the original TIF file format images (*id.* at 8-9 (citing Ex. 1035 ¶¶ 84, 85, 88)). Corning's reply expert, Dr. Ju, estimates the error rate for an experienced microscopist, such as Mr. Sanford, to be on the order of 2-5%. Ex. 1035 ¶ 89.

Corning also argues that Dr. Taylor failed to consider that specific talc particles, which are distinguishable on the high-resolution TIF file format

49

Case IPR2013-00048
Patent 6,298,189 B1

images, were used as reference points for determining change in length.

Reply 4 (citing Ex. 1035 ¶¶ 84-88).[15]

Dr. Ju states as follows in paragraphs 86 and 87 of his declaration:

> 86. Further, Dr. Taylor fails to recognize that Corning utilized distinct talc particles as the reference points for determining the change in length value, as explained by Ms. Kouzmina in her deposition:
>
> > Q. What was done to ensure that the same spots were being measured at the different temperatures?
> >
> > A. (Kouzmina). Precision of picking the spot and the talc particles or ink were assisting in that task.
> >
> > Q. So the talc and the ink were used to help pinpoint the spots?
> >
> > A. (Kouzmina). Correct.
>
> [Ex. 1044] at 126:24–127:7.
>
> 87. As noted in Dr. Taylor's own testimony, talc particles vary in size and shape ("some pictures I've seen of individual talc particles appear that they're not necessarily just round, you know, they can be elongated structures and so forth," [Ex. 1046] at 548:5–8). Corning was able to use these distinct particles or specific features in these particles in the high-resolution .tif images as reference points for determining change in length when heated.

Ex. 1035 ¶¶ 86, 87.

---

[15] Corning does not cite paragraph 87, but the context makes clear that paragraph 87 is also relied upon.

Case IPR2013-00048
Patent 6,298,189 B1

In its Motion for Observations on Cross-Examination, DSM cites Exhibit 2090 (deposition of Dr. Ju) as relevant to Dr. Ju's declaration testimony. Obs. ¶ 15 (citing Ex. 2087, 17:12–19:1). In particular, DSM points out that Dr. Ju's understanding of Corning's measurement procedure was based on his observation by videoconference of a demonstration of the procedure that Mr. Sanford performed. Ex. 2090, 17:12–19:1. DSM suggests that Dr. Ju would have been able to judge neither the precision of Mr. Sanford's measurements nor his ability to distinguish talc particles over a videoconference connection. Obs. ¶ 15. Corning responds with other citations to Dr. Ju's deposition, in which Dr. Ju states that he could see the image pixels and talc particles and that he asked Mr. Sanford, Ms. Kouzmina, and others questions about the testing procedure, including "how they were sure that the pixel that they were identifying could be found with the assistance of [a] talc particle." Obs. Resp. ¶ 11 (quoting Ex. 2090, 17:23-24; 19:13-19).

### b. Analysis

Upon consideration of the evidence summarized above in section II.C.8.a, we determine that Corning has not shown that the various asserted prior art coating compositions, when cured, necessarily would have possessed the recited ratio of changes of length. Corning has not cited sufficient evidence demonstrating that its change-in-length measurements were performed in a manner sufficiently rigorous and reliable to prove unpatentability of the challenged claims by a preponderance of the evidence.

As noted above, the only evidence in the Petition concerning how changes in length were calculated is provided in paragraph 59 of Ms. Kouzmina's declaration. Ms. Kouzmina does not explain what points

Case IPR2013-00048
Patent 6,298,189 B1

were selected on each sample for each length measurement, how those points were selected, or how the points were tracked between images at different temperatures, in order to be certain that the same points on the sample were measured.

An explanation of the experimental methods used to generate results is an essential part of experiment-based expert testimony. It forms part of the "underlying facts or data" on which the expert testimony should be based. *See* 37 C.F.R. § 42.65(a). Those underlying facts or data were not supplied in the relevant portion of Ms. Kouzmina's declaration—paragraph 59—and Ms. Kouzmina's testimony on that issue is, therefore, entitled to little or no weight. No Petition evidence other than paragraph 59 of Ms. Kouzmina's declaration addresses the change-of-length calculation. Consequently, we determine that the Petition evidence is insufficient to show that the prior art composition inherently exhibit the claimed change-in-length property.[16]

Consideration of further evidence developed and cited during the trial underscores the gaps in Corning's proofs. First, none of Corning's witnesses actually performed the change-in-length experiments or saw them performed first-hand. *See* Ex. 2022, 124:9-12; Ex. 1035 ¶¶ 80-82. At best, Ms. Kouzmina's knowledge of how the experiments were conducted was

---

[16] Dr. Winningham addresses the change-in-length determination in his declaration. Ex. 1014 ¶¶ 100-04. Corning does not cite to this evidence in its Petition or other briefing, therefore, we do not give it further consideration. Even if considered, it would not be persuasive, because Dr. Winningham provides no more detailed explanation of the measurement and calculation procedures than does Ms. Kouzmina.

52

**A52**

Case IPR2013-00048
Patent 6,298,189 B1

based on her incomplete understanding of Mr. Sanford's work.  *See* Ex. 2022, 124:9-10.

Dr. Ju observed a demonstration by Mr. Sanford, but the evidence Corning cites does not indicate that the procedure Dr. Ju observed during the demonstration was the same procedure that Mr. Stanford used when making the measurements Corning relies upon in the Petition.  Corning thus cites no credible evidence to show that Ms. Kouzmina's and Dr. Ju's testimony accurately portray the procedure actually used by Mr. Sanford.

But even if we were to accept that the testimony evidence of Ms. Kouzmina and Dr. Ju in fact describes the process that Mr. Sanford actually used to calculate change in length, we are not provided enough information to permit us to assess the reliability of the measurements produced by Mr. Sanford.  In particular, the cited evidence does not make clear how points on each sample were selected or how they were tracked. Although both Ms. Kouzmina and Dr. Ju refer to the use of talc particles or ink as reference points, they do not explain with any precision how the talc or ink is used for this purpose.  *See* Ex. 1035 ¶ 86 (quoting Ex. 1044, 126:24-127:7).[17]  Dr. Ju testified that he asked Mr. Sanford and Ms. Kouzmina how they could be sure that a pixel being identified could be found with the assistance of a talc particle (*see* Ex. 2090, 19:13-19), but Corning cites no credible evidence as to whether Dr. Ju received an answer to that question, what the answer was, or whether Dr. Ju considered the answer reasonable.  Questions remain, consequently, about precisely what

---

[17] Exhibit 1044 is identical to Exhibit 2022.

Case IPR2013-00048
Patent 6,298,189 B1

Mr. Sanford did.  Conspicuously absent is any evidence from Mr. Sanford himself on these crucial points of fact.

For example, even if we were to accept that talc particles were used for identification and tracking, it is still not clear from the cited evidence how reliable that method would be.  According to Corning, the talc was applied to prevent the sample from sticking to the microscope slide.  Reply 3 (citing Ex. 1035 ¶ 82).  It is not clear from this evidence whether the talc particles would have served as faithful position markers, by adhering to the sample, or would have skidded about as the sample expanded against the microscope slide.  Corning has not pointed us to credible evidence from which we can understand how the talc particles in fact behaved during this testing or how Mr. Sanford perceived them to behave.

Because the cited evidence does not provide a clear explanation of how the change-in-length measurements were made, we cannot assess its reliability.  We find Corning's evidence concerning the change-in-length measurement to be not credible.  For these reasons, Corning fails to show by a preponderance of evidence that any combination of coatings, in which Shustack Example I or Szum '928 Example 5B provides the inner primary coating, and Shustack Example X or XI, or Szum '928 Example 2, provides the outer primary coating, meets the "ratio of the change in length" limitation.  Because each of claims 2-4, 6-8, 10-12, and 14-16 recites this limitation, each of these claims survives Corning's challenges.

*D. Supplemental Response and Reply*

In its Supplemental Response, DSM asserts that "Corning's GPC [gel permeation chromatography] data does not prove that Corning properly synthesized the prior art oligomers."  Supp. Resp. at 5.  DSM argues that the

Case IPR2013-00048
Patent 6,298,189 B1

GPC data is relevant to this challenge, because Corning used oligomer RT-38 to replicate Szum '928 Example 5B. *Id.* at 6 (citing Ex. 2075).

According to Dr. Bowman, when synthesizing an oligomer, the presence of a significant amount of low molecular weight starting materials would indicate an incomplete synthesis. Ex. 2052 ¶ 7. Dr. Bowman also states that unreacted starting materials can detrimentally impact the functional properties of the resulting coating composition. *Id.* In Dr. Bowman's view, the starting materials of Corning's sample co-eluted with the tracer, which made it "difficult, if not impossible, to determine from these [GPC] spectra whether the oligomer functionalization reaction is complete in Corning's oligomer compositions." *Id.* ¶ 12. Dr. Bowman estimates "there might be 30 or 40 percent of small molecular weight compounds that are present in those [Corning oligomers]." Ex. 1071 171:16-19.

Corning disagrees. Supp. Reply 3. Dr. Sogah, an expert for Corning, explains: "The main purpose of analyzing a GPC chromatogram that is run on a GPC designed to assess oligomer formation is to see if oligomer peaks appear in the high molecular-weight region of the chromatogram." Ex. 1068 ¶ 56. Dr. Sogah states that a skilled polymer chemist would not analyze the low molecular-weight region to confirm oligomer formation. *Id.* ¶ 57. "Even if a skilled scientist were to focus on the low molecular-weight region of the GPC chromatogram[,] . . . there is no information available in the Corning GPC chromatograms in this region to indicate that the oligomer has not been properly formed." *Id.* ¶ 58; *see id.* ¶¶ 59-60. In Dr. Sogah's opinion, given the highly reactive nature of the reagents used in the oligomer formation, together with the long reaction time Corning used to prepare the

Case IPR2013-00048
Patent 6,298,189 B1

oligomers, it would be "highly unlikely" that the unreacted starting materials would be present in amounts of 30-40%, as Dr. Bowman alleges. *Id.* ¶¶ 64-66. Dr. Sogah further points out:

> Additionally, oligomers in general are fairly viscous, to the point that this viscosity is observable to the naked eye. Having 30-40% unreacted HEA [the starting material], or any other liquid, in the final product of an oligomer synthesis would certainly affect the viscosity of the resulting product. A skilled chemist with experience synthesizing oligomers would immediately recognize that such a resulting product does not have the viscosity and other physical attributes associated with a typical oligomer. For example, HEA is volatile and has a very strong, pungent odor which a skilled chemist would almost certainly notice when handling this material. For all the reasons stated above, I think it would be highly unlikely that a skilled chemist with experience in synthesizing oligomers would be confused into thinking that the final "oligomer" product being synthesized actually contained 30-40% small molecular weight compounds, such as unreacted HEA.

*Id.* ¶ 68.

We find Dr. Sogah's explanation more persuasive. First, after Corning submitted Dr. Sogah's declaration rebutting Dr. Bowman's opinion, DSM cross-examined Dr. Sogah extensively, *see* Exs. 2076-77, but did not call our attention to any of his deposition testimony in its Motion for Observations on Cross-examination of Corning Reply Declarants. *See* Paper 63.

More importantly, DSM's scientists do not appear to have given consideration to the low-molecular-weight region of the GPC spectrum. *See*

Ex. 1075, 144:6-147:22.  Indeed, when DSM's scientist presented the oligomer test data to Dr. Bowman, she did not include data of the low-molecular-weight region.  *See id.* at 146:12-15 ("So the one that I'm sure had been done before it was the di -- the diisocyanate diacrylate.  They had run that before.  She thought she knew where it should show up, but couldn't pull out that data."); *id.* at 146:20-25 ("And I think the same thing was true of the lauryl acrylate as was true of the diisocyanate diacrylate.  She knew from her experience where it would show up, but I again indicated I needed more than her experience, that I wanted see that run as a sample itself . . . .").  Dr. Bowman's account confirms Dr. Sogah's position, i.e., when analyzing a GPC chromatogram to assess oligomer formation, a skilled polymer chemist would focus on the oligomer peaks in the high-molecular-weight region, and not the peaks of the starting materials or tracer in the low-molecular-weight region.  Ex. 1068.

We find that Corning has established that it prepared the oligomer it used for testing properly.  DSM has not presented enough evidence to lead us to doubt the quality of Corning's oligomer preparation.

### E.  Unpatentability Challenges

#### 1.  Anticipation of claims 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 by Shustack

##### a.  Claims 1-3, 6-7, 9-11, and 14-15

Shustack does not anticipate claims 1-3 and 9-11, because Corning has not shown that Shustack Example I possesses the "sufficient adhesion" limitation, as discussed above in section II.C.2.

Shustack does not anticipate claims 2, 3, 6, 7, 10, 11, 14, and 15, because Corning has not shown that Shustack's inner and out coatings

Case IPR2013-00048
Patent 6,298,189 B1

possess the "change in length" limitation, as discussed above in section II.C.8.

Shustack also does not anticipate claims 2, 3, 6, 7, 10, 11, 14, and 15, because Corning has not shown that Shustack Examples X and XI possess the modulus of elasticity limitations recited in these claims, as discussed above in section II.C.7.

### b. Claims 38, 39, 46, 47, 50, and 51

Shustack does not anticipate claims 38, 39, 46, 47, 50, and 51, because these claims depend from claims that Shustack does not anticipate.

### c. Claims 5 and 13

Shustack anticipates claims 5 and 13. Corning has shown that Shustack Example I possesses all the structural limitations and material property limitations of these claims, as discussed above in sections II.C.1, II.C.3, II.C.4, and II.C.5.

### d. Claims 37, 45, and 49

Each of these multiple dependent claims depends from claim 5 or claim 13.

#### (1) Claim 37

Claim 37 requires that at least one oligomer be a radiation curable oligomer comprising at least one terminal linear moiety. Corning argues that the hydroxyethyl acrylate (HEA) end groups, which Shustack discloses may be used as end groups in Example I (Ex. 1003, 10:42), are terminal linear moieties, because they do not contain cyclic or branched units. Pet. 29 (citing Ex. 1014 ¶ 129). The '189 patent identifies HEA as a radiation-curable oligomer. Ex. 1001, 53:40-42. DSM does not challenge Corning's evidence as to this claim.

58

Case IPR2013-00048
Patent 6,298,189 B1

Upon consideration of Corning's argument and evidence, we are persuaded that Shustack Example I anticipates claim 37, because the oligomer used in Example I may be terminated with HEA end groups, which are terminal linear moieties.

*(2) Claim 45*

Claim 45 requires that "at least one oligomer is a urethane oligomer having at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a urethane group, wherein the concentration of said urethane groups is about 4% by weight or less, based on the total weight of said inner primary coating composition." Corning argues that the HEA end groups are radiation-curable (i.e., polymerizable) and are linked to the polybutadiene polymeric block of the urethane acrylate oligomer. Pet. 29-30 (citing Ex. 1014 ¶ 130). Ms. Kouzmina reports that the concentration of urethane groups of the Shustack Example I coating composition is 2.6% by weight. *Id.* at 30 (citing Ex. 1015 ¶ 66). DSM does not challenge Corning's evidence as to this claim.

Upon consideration of Corning's argument and evidence, we are persuaded that Shustack Example I anticipates claim 45, because the chemical structure of the Shustack Example I oligomer, and the composition's urethane concentration, are within the scope of the claim.

*(3) Claim 49*

Claim 49 requires that "at least one oligomer is comprised of at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a linking group, and

Case IPR2013-00048
Patent 6,298,189 B1

wherein said at least one polymeric block has a calculated molecular weight of at least about 2000."

Corning's argument for this claim is similar to that for claim 45. Pet. 30. Corning argues further that Shustack discloses a hydrocarbon polyol molecular weight range of 500 to 4000. *Id.* (citing Ex. 1003, 9:29-34). Corning argues that one of ordinary skill in the art would have selected a polyol with a molecular weight of about 3000 in order to achieve a soft inner primary coating. *Id.* (citing Ex. 1014 ¶ 130). DSM does not challenge Corning's evidence as to this claim.

We are not persuaded by Corning's argument that the claim is anticipated because one of ordinary skill would have selected a molecular weight of 3000. Corning offers no credible evidence to support this argument beyond an unsupported assertion of its truth by Dr. Winningham. *See* Ex. 1014 ¶ 130. We conclude, therefore, that Corning has not demonstrated that Shustack anticipates claim 49.

In summary, we conclude that Shustack anticipates claims 5, 13, 37, and 45, but not claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-51.

> ### 2. *Obviousness of claims 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 over Shustack*

Corning argues that, to the extent different coatings disclosed in Shustack are not expressly disclosed as combinable as inner and outer primary coating compositions, it would have been obvious to combine them. Pet. 31.

As discussed above in section II.E.1.a, we have determined that claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-51 are not anticipated by Shustack because of deficiencies in Corning's evidence supporting that

Case IPR2013-00048
Patent 6,298,189 B1

challenge.  Those deficiencies taint Corning's obviousness challenge and are not remedied by the combinations of different coatings in Shustack.  We determine that Corning has not demonstrated that claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-51 would have been obvious over Shustack.

Claims 5, 13, 37, and 45 relate only to an inner primary coating composition and, as such, do not rely on combination with an outer primary coating composition.  Corning's challenge in this regard appears to be misplaced.  Nevertheless, as anticipation is the "epitome" of obviousness, *In re McDaniel*, 293 F.3d 1379, 1385 (Fed. Cir. 2002), and we have determined that Corning has proved the anticipation of these claims by Shustack, we also determine that claims 5, 13, 37, and 45 would have been obvious over Shustack, for the reasons given above with regard to anticipation.

### 3. *Anticipation of claims 1, 5, 9, 13, 37, 45, and 49 by Szum '928*

Szum '928 does not anticipate claims 1 and 9, because Corning has not shown that Szum '928 Example 5B possesses the "sufficient adhesion" limitation, as discussed above in section II.C.2.

Szum '928 anticipates claims 5 and 13.  Corning has shown that Szum '928 Example 5B possesses all the structural limitations and material property limitations of these claims, as discussed above in sections II.C.1, II.C.3, II.C.4, and II.C.5.

Szum '928 anticipates claim 37, because the oligomer of Example 5B includes HEA end groups, which, as discussed above, are terminal linear moieties within the scope of claim 37.

Szum '928 anticipates claim 45.  Corning argues that the radiation-curable HEA groups are linked to a polypropylene polymer block of the

61

Case IPR2013-00048
Patent 6,298,189 B1

oligomer, and that the coating is calculated to have a urethane concentration of 3.2% by weight. Pet. 38 (citing Ex. 1014 ¶ 153; Ex. 1015 ¶ 68). DSM does not challenge Corning's argument or evidence.

Szum '928 anticipates claim 49. Corning argues that Szum '928 discloses that the molecular weight of the polypropylene glycol polymeric block in the urethane oligomer is "about 2000." *Id.* (citing Ex. 1005, 23:16-17). DSM does not challenge Corning's argument or evidence. The claim requires a molecular weight of "at least about 2000." We determine, under the facts of this case, that the disclosure of "about 2000" meets the limitation of "at least about 2000."

In summary, we conclude that Szum '928 anticipates claims 5, 13, 37, 45, and 49, but not claims 1 and 9.

### 4. *Obviousness of claims 4, 8, 12, 16, 40, 48, and 52 over Shustack and Jackson*

Claims 4, 8, 12, 16, 40, 48, and 52 relate to ribbon assemblies. Corning relies on Shustack for disclosure of all limitations except those relating to the ribbon assembly structure and argues that it would have been obvious to form a ribbon assembly as taught by Jackson using individual fibers configured as taught by Shustack. Pet. 39-41.

Corning has not shown that Shustack Example I possesses the "sufficient adhesion" limitation of claims 4 and 12, as discussed above in section II.C.2.

Corning has not shown that Shustack's inner and out coatings possess the "change in length" limitation of claims 4, 8, 12, and 16, as discussed above in section II.C.8.

Case IPR2013-00048
Patent 6,298,189 B1

Corning has not shown that Shustack Examples X and XI possess the modulus of elasticity limitations recited in claims 4, 8, 12, and 16, as discussed above in section II.C.7.

Because Corning relies on Shustack to teach these limitations, the deficiencies noted above undermine Corning's obviousness challenge and are not remedied by the combination with Jackson. We determine that Corning has not demonstrated that claims 4, 8, 12, and 16 would have been obvious over Shustack and Jackson. Claims 40, 48, and 52 each depend from claim 8 or claim 16 and are not unpatentable over Shustack and Jackson, as well.

> 5. *Obviousness of claims 17-20 over Chawla in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 17-20 each require that at least one inner primary coating composition oligomer is radiation-curable and comprises at least one glass coupling moiety, at least one slip agent moiety, and at least one radiation-curable moiety. The claims are each multiple dependent claims and differ in their dependencies. Claim 17 depends from claim 5 or claim 13, claim 18 depends from claim 6 or claim 14, claim 19 depends from claim 7 or claim 15, and claim 20 depends from claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose an oligomer with the features of claims 17-20. Pet. 42. Corning argues that Chawla discloses silane-oligomers that meet the limitations of claims 17-20, and also that the silane-oligomers are useful on optical fibers and have good strength and water-resistance characteristics. *Id.* at 42-45 (citing Ex. 1008, 2:1-12; 2:67–3:17; 3:34-40; 7:42-47; 8:59-67; 9:10-13; 12

Case IPR2013-00048
Patent 6,298,189 B1

tbl.4; 9:57-65; 10:12-19; Ex. 1014 ¶¶ 182, 183, 187).  Corning also argues

that Chawla discloses inclusion of as little silane-oligomer as about 5% by

weight.  *Id.* at 44 (citing Ex. 1008 7:42-44).  Corning argues that it would

have been obvious to include Chawla's silane-oligomers in a small amount

(about 5% by weight) in Shustack's or Szum '928's coating compositions to

obtain these benefits, and that inclusion of a small amount of them would

not be expected to change the resulting material properties.  *Id.* at 43-44

(citing Ex. 1014 ¶¶ 183-186).

     DSM argues, in response, that Chawla discloses including silane-

oligomers in coating compositions at preferably above 15% by weight, and

up to 95% by weight, and that none of Chawla's examples includes silane-

oligomers at less than 10% by weight.  Resp. 51.

     Upon consideration of the parties' argument and evidence, we agree

with Corning that it would have been obvious to include a small amount of

Chawla's silane-oligomer in the coating composition of Shustack Example I

or Szum '928 Example 5B in order to improve strength and water resistance,

without otherwise significantly affecting the compositions' other material

properties.  DSM's argument does not address Chawla's disclosure that as

little as 5% silane-oligomer may be added.  Even if inclusion of larger

amounts of silane-oligomer might not have been obvious, due to effects on

the claimed material properties, the claims encompass small additions that

would have been obvious.  *See In re Lintner*, 458 F.2d 1013, 1015 (CCPA

1972) ("Claims which are broad enough to read on obvious subject matter

are unpatentable even though they also read on nonobvious subject

matter."); *In re Muchmore*, 433 F.2d 824, 826 (CCPA 1970) (affirming

64

Case IPR2013-00048
Patent 6,298,189 B1

obviousness rejection where claim "reads on both obvious and unobvious subject matter.").

We determine that Corning has demonstrated the unpatentability of claim 17, as dependent from claim 5 and from claim 13, for obviousness over Shustack and Chawla and over Szum '928 and Chawla. Claims 18-20 depend from claims that Corning has not shown to be unpatentable over Shustack, over Shustack and Jackson, or over Szum '928. We determine that Corning has not shown that claims 18-20 are unpatentable.

> 6. *Obviousness of claims 21-24 over Hager in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 21-24 each require that the inner primary coating composition further include a soluble wax that is soluble in the inner primary coating composition. The claims are each multiple dependent claims and differ in their dependencies. Claim 21 depends from claim 5 or claim 13, claim 22 depends from claim 6 or claim 14, claim 23 depends from claim 7 or claim 15, and claim 24 depends from claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose a soluble wax as recited in claims 21-24. Pet. 45. Corning argues that Hager discloses a soluble wax that one of ordinary skill in the art would expect to be soluble in the claimed inner primary coating compositions. Pet. 45-46 (citing Ex. 1014 ¶¶ 190-194). Corning further argues that one of ordinary skill in the art would have included Hager's soluble wax in an in inner primary coating composition of Shustack or Szum '928 because Hager teaches that such waxes are "useful on optical fibers and improve the water

65

**A65**

Case IPR2013-00048
Patent 6,298,189 B1

resistance of the coating against wicking to the coated fiber strand."
Pet. 45-46 (citing Ex. 1009, 1:19-21, 4:18-19; Ex. 1014 ¶ 191).

DSM argues that Hager's coatings are directed to use on fibers that are used as overwraps for optical fiber cables, not to the optical fibers themselves. Resp. 51-52 (citing Ex. 1009, 1:5-10).

We agree with DSM that Hager is directed to coatings for overwrap fibers, not optical fibers. The portions of Hager that Corning cites do not indicate that Hager's waxes are useful when coated directly onto optical fibers. Hager consistently distinguishes fibers used as protective overwraps from optical fibers. *See* Ex. 1009, 1:5-10, 4:63-68. Corning has not explained why it would have been obvious to incorporate Hager's waxes into inner primary coating compositions for optical fibers.

For these reasons, we determine that Corning has not shown that claims 21-24 are unpatentable for obviousness over Shustack and Hager, Szum '928 and Hager, or Shustack, Jackson, and Hager.

> 7. *Obviousness of claims 25-28 over Tortorello in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 25-28 each require that at least one inner primary coating composition oligomer is a radiation-curable silicone oligomer and comprises a silicone compound and at least one radiation-curable moiety. The claims are each multiple dependent claims and differ in their dependencies. Claim 25 depends from claim 5 or claim 13, claim 26 depends from claim 6 or claim 14, claim 27 depends from claim 7 or claim 15, and claim 28 depends from claim 8 or claim 16.

Case IPR2013-00048
Patent 6,298,189 B1

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose an oligomer with the features of claims 25-28. Pet. 48. Corning argues that Tortorello discloses the claimed silicone oligomers, and that one of ordinary skill in the art would have incorporated Tortorello's oligomers in the inner primary coating compositions of Shustack or Szum '928 in order to be able to adjust various properties, including the glass transition temperature. Pet. 48-49 (citing Ex. 1010, 2:24-38, 5:9-16; Ex. 1014 ¶¶ 197-199, 202). Corning argues that one skilled in the art would not have expected inclusion of Tortorello's oligomer to affect the claimed properties of the inner primary coating compositions, because Tortorello indicates that even small amounts (as little as 5%) can be introduced. *Id.* at 50 (citing Ex. 1010, 7:30-31; Ex. 1014 ¶ 201).

Corning's argument does not persuade us that the claims are unpatentable. Corning argues that it would have been obvious to add Tortorello's silicone to be able to adjust glass transition temperature, yet Corning also argues that adding Tortorello's oligomer would *not* change the glass transition temperature so as to move it outside the claimed range. Corning has not explained why it would have been obvious to add an ingredient to a coating composition in so a small quantity as to have little or no effect on precisely the property that the ingredient is intended to change.

For these reasons, we determine that Corning has not shown that claims 25-28 are unpatentable for obviousness over Shustack and Tortorello, Szum '928 and Tortorello, or Shustack, Jackson, and Tortorello.

67

**A67**

Case IPR2013-00048
Patent 6,298,189 B1

      8. *Obviousness of claim 29-32 over Botelho in combination*
         *with Shustack, or with Szum '928, or with Shustack and*
         *Jackson*

Claims 29-32 each require that the inner primary coating composition
include a non-radiation-curable, silicone compound. The claims are each
multiple dependent claims and differ in their dependencies. Claim 29
depends from claim 5 or claim 13, claim 30 depends from claim 6 or claim
14, claim 31 depends from claim 7 or claim 15, and claim 32 depends from
claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not
disclose a non-radiation-curable, silicone compound. Pet. 51. Corning
argues that Botelho discloses inclusion of silicone in an inner primary
coating composition. Pet. 52 (citing Ex. 1011, 5:18-21, 10:15-21, 11:24-28;
Ex. 1014 ¶¶ 205-07, 209). Corning argues that it would have been obvious
to include silicone in an inner primary coating composition because Botelho
suggests this and "attributes several benefits of the disclosed primary
coatings." *Id.* (citing Ex. 1011, 5:22-35; Ex. 1014 ¶¶ 206-07). Corning does
not identify in its petition what benefits Botelho attributes to the inclusion of
silicone in an inner primary coating composition. Corning argues that
Botelho discloses adding silicone in an amount as little as 2% by weight, an
amount that would not be expected to alter the claimed material properties
so that they were outside the claimed ranges. *Id.* at 51-52 (citing Ex. 1011,
11:3-13; Ex. 1014 ¶ 208).

DSM argues that Botelho does not disclose "any metrics for
evaluating stripping performance." Resp. 53 (citing Ex. 1011 in its entirety).

Case IPR2013-00048
Patent 6,298,189 B1

Upon consideration of the parties' arguments and evidence, we agree with Corning that it would have been obvious to include a small amount of silicone compound in Shustack's or Szum '928's inner primary coating composition to improve, e.g., strippability. We agree with Corning that Botelho discloses inclusion of silicone compound for this purpose. *See* Ex. 1011, 5:22-35, 24:2-3. Whether Botelho discloses metrics for evaluating stripping performance is of little moment to the obviousness determination.

We determine that Corning has demonstrated the unpatentability of claim 29, as dependent from claim 5 and from claim 13, for obviousness over Shustack and Botelho and over Szum '928 and Botelho. Claims 30-32 depend from claims that Corning has not shown to be unpatentable over Shustack, over Shustack and Jackson, or over Szum '928. We determine that Corning has not shown that claims 30-32 are unpatentable.

> 9. *Obviousness of claims 33-36 over Skutnik in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 33-36 each require that the inner primary coating composition include a radiation-curable fluorinated oligomer, a radiation-curable fluorinated monomer, or a non-radiation-curable fluorinated compound. The claims are each multiple dependent claims and differ in their dependencies. Claim 33 depends from claim 5 or claim 13, claim 34 depends from claim 6 or claim 14, claim 35 depends from claim 7 or claim 15, and claim 36 depends from claim 8 or claim 16.

Case IPR2013-00048
Patent 6,298,189 B1

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose the fluorinated materials recited in claims 33-36.  Pet. 54.[18] Corning argues that Skutnik discloses use of radiation-curable fluorinated monomers, specifically, a fluorinated monoene.  *Id.* (citing Ex. 1012, 1:67–2:19, 2:29-34; Ex. 1014 ¶¶ 213, 217).  Corning argues that Skutnik discloses several benefits of including a fluorinated monoene in an inner primary coating composition, such as improved thermal stability, electrical resistivity, mechanical and moisture protection, and refractive index control. *Id.* at 55 (citing Ex. 1012, 2:34-41, 11:59-63; Ex. 1014 ¶ 214).  Corning argues that Skutnik discloses inclusion of fluorinated monoenes at a level of as little as 10%, a level at which one of ordinary skill would not expect the claimed material properties to exceed the claimed ranges.  *Id.* at 55-56 (citing Ex. 1012, 2:19-22; Ex. 1014 ¶ 216).

DSM argues that Corning bases its assertions on the extreme low end of fluorinated monoene concentration disclosed in Skutnik, and that the claimed material properties would be altered significantly at the higher concentrations Skutnik discloses.  Resp. 54 (citing Ex. 2032 ¶¶ 234-236). Dr. Taylor states that "if the [weight percent] of the fluorinated monomer were increased above the extreme low end of the disclosed range, a person of ordinary skill in the art would expect the properties of the coating to change in unpredictable ways."  Ex. 2032 ¶ 236.

---

[18] Corning states only that Shustack, Szum '928, and Jackson fail to disclose the radiation-curable, fluorinated monomer.  For purposes of this decision, we interpret Corning's argument as acknowledging that Shustack, Szum '928, and Jackson do not disclose any of the materials listed in claims 33-36.

Case IPR2013-00048
Patent 6,298,189 B1

Upon consideration of the parties' arguments and evidence, we agree with Corning that it would have been obvious to include a small amount of fluorinated monoene in Shustack's or Szum '928's inner primary coating composition to improve various properties.  DSM asserts that inclusion of fluorinated monoene above 10% by weight would have undesirable effects. Even if it were the case that inclusion of larger amounts of fluorinated monoene would not have been obvious, due to effects on the claimed material properties, the claims encompass small additions that would have been obvious.  *See In re Lintner*, 458 F.2d at 1015.

We determine that Corning has demonstrated the unpatentability of claim 33, as dependent from claim 5 and from claim 13, for obviousness over Shustack and Skutnik and over Szum '928 and Skutnik.  Claims 34-36 depend from claims that Corning has not shown to be unpatentable over Shustack, over Shustack and Jackson, or over Szum '928.  We determine that Corning has not shown that claims 33-36 are unpatentable.

10. *Obviousness of claims 41-44 over Mills in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 41-44 each require that the inner primary coating composition include a solid lubricant.  The claims are each multiple dependent claims and differ in their dependencies.  Claim 41 depends from claim 5 or claim 13, claim 42 depends from claim 6 or claim 14, claim 43 depends from claim 7 or claim 15, and claim 44 depends from claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose a solid lubricant.  Pet. 57.  Corning argues that Mills discloses the use of a solid lubricant in an interfacial layer outside the inner and outer primary coatings, though not within the inner primary coating.  *Id.* at 57-58.

71

**A71**

Corning argues that it would have been obvious to include a small amount of solid lubricant in an inner primary coating composition of Shustack or Szum '928 in view of Mills's disclosure that lubricant improves strippability of coatings on optical fibers. *Id.* at 58 (citing Ex. 1013, 3:10-28; Ex. 1014 ¶¶ 222, 223). Corning argues that other references disclose the desirability of including lubricants in coatings. *Id.* (citing, e.g., Ex. 1008, 7:37-41; Ex. 1010, 14:66–15:12; Ex. 1014 ¶ 222).

DSM argues that Mills addresses use of solid lubricant only in an interfacial layer, not in the glass-contacting inner primary coating. Resp. 55 (citing Ex. 2032 ¶¶ 237-239). According to Dr. Taylor, Mills's focus is on strippability of outer coatings from a fiber, not the glass-contacting inner primary coating. Ex. 2032 ¶ 239. DSM also argues, through Dr. Taylor, that introducing solid lubricant into the inner primary layer would not have been obvious because the particles of solid lubricant may harm the glass fiber. *Id.*

Corning's argument and evidence do not persuade us that the claims are unpatentable. We agree with DSM that Mills's solid lubricants are intended specifically for use in an interfacial layer that overlies the inner primary and outer primary coatings. *See* Ex. 1013, 2:65-3:3 (first protective layer is made of low-modulus inner coating and higher-modulus outer coating). Corning identifies no disclosure in Mills to indicate that solid lubricants are suitable additives to the first protective layer. Corning relies instead on generic disclosure in other references that the primary layer may include lubricants. But these other references do not address solid lubricants in particular. Corning's argument is not directed, therefore, to the particular feature claimed. We credit Dr. Taylor's testimony that solid lubricant may

Case IPR2013-00048
Patent 6,298,189 B1

not be a suitable additive in an inner primary coating because of damage it may cause to the glass fiber.  *See* Ex. 2032 ¶ 239.

For these reasons, we determine that Corning has not shown that claims 41-44 are unpatentable for obviousness over Shustack and Mills, Szum '928 and Mills, or Shustack, Jackson, and Mills.

## III.    MOTION TO AMEND

"A motion to amend may cancel a challenged claim or propose a reasonable number of substitute claims."  37 C.F.R. § 42.121(a)(3).  DSM moves to substitute claims 67, 68, 69, and 70 for original claims 6, 7, 14, and 15, respectively.  Mot. to Amend 1-6.  The overall framework of our amendment process is geared towards deciding motions to amend where the claims sought to be replaced are under a continuing threat of cancellation by virtue of the patentability challenge upon which trial is instituted.  *See* 35 U.S.C. § 316(d) (tethering amendments to "challenged" patent claims and contemplating amendments that "materially advance" settlement of an ongoing dispute); *see also* 37 C.F.R. § 42.121(a)(2)(i) (an amendment may be denied where it "does not respond to a ground of unpatentability involved in the trial").  Absent some showing of special circumstances, we are not convinced that our charter of deciding cases quickly and efficiently favors dedicating our limited resources to evaluating the patentability of DSM's proposed substitute claims, after we have resolved the main controversy in DSM's favor.

Having determined that none of DSM's claims 6, 7, 14, and 15 is proved unpatentable, we deny without prejudice the motion to amend.  *See* Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767 (indicating that a

73

**A73**

motion to amend may be denied, without prejudice, if it is determined that patent owner's original claims are not unpatentable).

## IV.    MOTIONS TO EXCLUDE EVIDENCE

### A.  *DSM's Motion*

DSM moves to exclude Dr. Winningham's testimony as unreliable, based on an argument that he failed to review data underlying his opinions and, further, failed to apply the correct legal standard for obviousness.  PO Mot. to Exclude 1-6.  Whether a witness's testimony fails to include underlying facts or data on which an opinion is based goes to the weight that should be accorded the testimony, and not its admissibility.  *See* 37 C.F.R. § 42.65(a).  DSM's arguments concerning the legal standard for obviousness that Dr. Winningham applied is not persuasive, for reasons discussed above in section II.B.  We deny the motion to exclude as to Dr. Winningham's evidence.

DSM also moves to exclude certain test results and testimony relating to fiber pull-out and change-in-length testing.  *Id.* at 7-12.  As to the fiber pull-out friction testing, DSM argues that Corning failed to explain how the test was performed.  *Id.* at 7-9.  We disagree with DSM.  Again, whether a witness's testimony fails to include underlying facts or data on which an opinion is based goes to weight, not admissibility.  DSM's motion to exclude is denied as to this evidence.  As to the change-in-length measurements and calculations, *id.* at 9-11, we explain above in section II.C.8.b that Corning's evidence is not persuasive.  Because we consider that evidence on its merits and decide the issue in DSM's favor, we need not

Case IPR2013-00048
Patent 6,298,189 B1

reach the question of admissibility. The motion is dismissed as to the change-in-length evidence.

DSM also moves to exclude paragraphs 10-39 and 60-91 of the declaration of Dr. Ju (Ex. 1035), and paragraphs 16-30, 86-89, and 95 of the declaration of Dr. Sogah (Ex. 1068) that Corning submitted with its Reply, along with the Reply itself for its reliance on that evidence. PO Mot. to Exclude 12-15. We do not rely on the challenged reply evidence to reach our final decision. Therefore, we dismiss as moot the motion to exclude as to the Reply and the challenged reply evidence.

On this record, DSM's motion to exclude evidence is dismissed-in-part and denied-in-part.

### B. Corning's Motion

Corning also moves to exclude evidence. Pet. Mot. to Exclude 1-14. Specifically, Corning seeks to exclude testimony relating to the water soak delamination tests that DSM performed on prior art coatings, as well as opinions relating to DSM's fiber pull-out friction tests. *Id.* We rely on none of that evidence to reach our final decision. Here again, we decline to exclude evidence that does not underlie our decision.

On this record, Corning's motion to exclude evidence is dismissed as moot.

## V. CONCLUSION

Corning has proved, by a preponderance of the evidence, that claims 5, 13, 17, 29, 33, 37, 45, and 49 of the '189 patent are unpatentable. Corning has failed to prove, by a preponderance of the evidence, that claims

Case IPR2013-00048
Patent 6,298,189 B1

1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52 are
unpatentable.

In particular, we determine that:

1. Shustack anticipates and renders obvious claims 5, 13, 37, and
   45, but not claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-
   51;

2. Szum '928 anticipates claims 5, 13, 37, 45, and 49, but not
   claims 1 and 9;

3. Claims 4, 8, 12, 16, 40, 48, and 52 are not unpatentable for
   obviousness over Shustack and Jackson;

4. Claim 17, but not claims 18-20, is unpatentable for obviousness
   over Shustack and Chawla and over Szum '928 and Chawla;

5. Claims 21-24 are not unpatentable for obviousness over
   Shustack and Hager, Szum '928 and Hager, or Shustack,
   Jackson, and Hager;

6. Claims 25-28 are not unpatentable for obviousness over
   Shustack and Tortorello, Szum '928 and Tortorello, or
   Shustack, Jackson, and Tortorello;

7. Claim 29, but not claims 30-32, is unpatentable for obviousness
   over Shustack and Botelho and over Szum '928 and Botelho;

8. Claim 33, but not claims 34-36, is unpatentable for obviousness
   over Shustack and Skutnik and over Szum '928 and Skutnik;
   and

9. Claims 41-44 are not unpatentable for obviousness over
   Shustack and Mills, Szum '928 and Mills, or Shustack, Jackson,
   and Mills.

76

**A76**

Case IPR2013-00048
Patent 6,298,189 B1

VI.    ORDER

For the reasons given, it is

ORDERED that claims 5, 13, 17, 29, 33, 37, 45, and 49 of U.S. Patent No. 6,298,189 B1 are determined to be UNPATENTABLE;

FURTHER ORDERED claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52 of U.S. Patent No. 6,298,189 B1 are not determined to be unpatentable;

FURTHER ORDERED that DSM's motion to amend claims is *denied*, without prejudice;

FURTHER ORDERED that DSM's motion to exclude evidence is *dismissed-in-part* and *denied-in-part*;

FURTHER ORDERED that Corning's motion to exclude evidence is *dismissed*; and

FURTHER ORDERED that because this is a final decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Case IPR2013-00048
Patent 6,298,189 B1

For PETITIONER:
Michael L. Goldman
Jeffrey Townes
LeClairRyan, A Professional Corporation
Michael.Goldman@leclairryan.com
Jeffrey.Townes@leclairryan.com

For PATENT OWNER:
Sharon A. Israel
Joseph Mahoney
Mayer Brown, LLP
SIsrael@mayerbrown.com
JMahoney@mayerbrown.com

Trials@uspto.gov                                           Paper 96
Tel: 571-272-7822                              Entered:  July 11, 2014


UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CORNING INCORPORATED
Petitioner

v.

DSM IP ASSETS B.V.
Patent Owner

_____

Case IPR2013-00048
Patent 6,298,189 B1

_____


Before FRED E. McKELVEY, GRACE OBERMANN,
JENNIFER S. BISK, SCOTT E. KAMHOLZ, and
ZHENYU YANG, *Administrative Patent Judges.*


KAMHOLZ, *Administrative Patent Judge*.


DECISION
Petitioner's Request for Rehearing
*37 C.F.R. § 42.71(d)*

IPR2013-00048
Patent 6,298,189 B1

## I.   INTRODUCTION

Petitioner Corning Incorporated ("Corning") requests reconsideration of the Board's final written decision ("Dec."), dated May 9, 2014 (Paper 94), to the extent we denied Corning's request for cancellation of claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52 of U.S. Patent No. 6,298,189 B1 (the "'189 patent"), which is assigned to Patent Owner DSM IP Assets B.V. ("DSM").  Request for Rehearing 1 (Paper 95 ("Req.")).  We have considered Corning's request, but we decline to modify the final written decision.

## II.   STANDARD OF REVIEW

A party challenging a final written decision by way of a request for rehearing must identify specifically all matters the party believes the Board misapprehended or overlooked.  37 C.F.R. § 42.71(d).  The challenging party bears the burden of showing that the decision should be modified.  *Id.*

## III.  DISCUSSION

Corning challenges the final written decision with respect to our determinations that Corning failed to demonstrate that the prior art discloses the claimed "ratio of the change in length" and the "modulus of elasticity" of the outer primary coating.

### A.  *Ratio of change in length*

Corning identifies several points for reconsideration, which we consider in turn.

IPR2013-00048
Patent 6,298,189 B1

### 1. Experimental methods

Corning argues that we erred in determining that Corning's petition evidence, as to how it carried out the "change in length" experiments, was sufficient to institute trial yet insufficient to warrant cancellation of the relevant claims. Req. 2-3. According to Corning, if the evidence had been sufficient to institute *inter partes review*, it should also have been sufficient for Corning to prevail in the final written decision. *Id.* at 3. Corning argues that it is unfairly prejudiced by this supposed discrepancy, particularly in view of the estoppel that attaches upon the issuance of a final written decision. *Id.* (citing 35 U.S.C. § 315(e)).

This argument is unpersuasive, because the standard for instituting *inter partes* review is different from the standard for a petitioner to prevail in the final written decision. The standard for institution is set forth in 35 U.S.C. § 314(a), which provides as follows:

> THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

The petitioner's burden to prevail in the final written decision, in contrast, is set forth in 35 U.S.C. § 316(e), which provides as follows:

> EVIDENTIARY STANDARDS.—In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.

3

**A81**

IPR2013-00048
Patent 6,298,189 B1

The standards differ in that institution requires the petitioner to show merely a *reasonable likelihood* that it would prevail, whereas actually to prevail requires the petitioner to prove its case by a *preponderance of the evidence*. *Compare* 35 U.S.C. § 314(a) *with* 35 U.S.C. § 316(e). Showing a reasonable likelihood of prevailing is less stringent a standard than prevailing by a preponderance of the evidence. It is possible that a case strong enough to show a reasonable likelihood of prevailing, on the incomplete record available at the time the institution decision is made, is insufficient to prove unpatentability by a preponderance of the evidence on the complete record. It is also possible that weaknesses in the petitioner's case become more fully apparent only when considered in the context of the full record developed during the course of trial.

In the present case, consideration of evidence developed and cited during trial highlighted gaps in Corning's petition evidence, as we discussed in the final written decision. Dec. 52-53. In particular, we determined that paragraph 59 of the declaration of Ms. Inna Kouzmina (Ex. 1015), which was the only source of evidence in the Petition addressing the change-in-length calculation, was entitled to little or no weight, because it lacked a meaningful explanation of the experimental method used. *Id.* at 51-52. We did not overlook our determination that Corning's petition evidence was sufficient for instituting *inter partes* review; rather, we explained that the insufficiency of the evidence was underscored upon consideration of the full record. *Id.*

IPR2013-00048
Patent 6,298,189 B1

### 2. Dr. Winningham's testimony regarding change-in-length experiments

Corning argues that we should have given consideration to Dr. Winningham's testimony in paragraphs 100-104 of his declaration (Ex. 1014).  Req. 3 (citing Dec. 52 n.16).

This argument is unpersuasive.  Although Corning argues that paragraphs 100-104 provide the foundation for paragraphs 128 and 132, which themselves *are* cited in the Petition (*see* Pet. 23, 29), Corning still does not identify where in its Petition or other briefing it cited paragraphs 100-104, nor does Corning identify where paragraphs 100-104 are cited as foundation for paragraphs 128 and 132.  Moreover, we observed in the final written decision that, even if we gave these paragraphs consideration, they would not have been persuasive, because they provide no more detailed explanation of the measurement and calculation procedures than the evidence we did consider.  Dec. 52 n.16.

### 3. Witnesses lacking first-hand knowledge

Corning argues that we criticized its witnesses' evidence on the basis that the witnesses did not perform or observe first-hand the experiments reported, and that Ms. Kouzmina had an "incomplete understanding" of how the experiments were performed.  Req. 4 (quoting Dec. 53).  Corning asserts that this criticism is at odds with our earlier ruling that declaration testimony directed to experimental testing need not come from the person who actually conducted the testing.  Req. 4 (citing Paper 55, 4 (Dec. on Mot. for Discovery)).

We disagree.  Corning notes correctly that our rules do not require that the declarant attesting to testing evidence be the person who actually

IPR2013-00048
Patent 6,298,189 B1

conducted the test. *See* 37 C.F.R. § 42.65(b). We did not discount
Ms. Kouzmina's testimony on the basis that she did not perform the tests
reported in her declaration. Rather, we gave her testimony full
consideration, but we accorded it little weight, because it did not explain the
methods Corning employed in conducting the experiments. Dec. 51-52. We
noted the fact that Ms. Kouzmina did not have first-hand knowledge of the
tests as part of our more general observation that Corning failed to provide
convincing evidence of how the change-in-length calculations actually were
carried out. *See id.* at 52-53.

### 4. *Rigorousness of testing procedure*

Corning argues that we dismissed its testing procedure as
insufficiently rigorous, and that this was inappropriate because the
'189 patent does not describe or claim a measurement procedure for Corning
to have followed rigorously. Req. 4. Corning argues that the silence in
the '189 patent justified Corning's use of a procedure that was endorsed by
Dr. Winningham and by Dr. Jiann-Wen Woody Ju (a Corning reply
witness). Req. 4-5.

This argument is unpersuasive. We did not determine that Corning's
testing procedure was not rigorous. Rather, we determined that Corning had
not cited sufficient evidence of rigor. Dec. 51:20-23. We explained that we
were unable to understand the calculation process from the petition
evidence, or the additional evidence cited during the trial, in sufficient detail
to be persuaded of its probative value. *Id.* at 51-54. The lack of specificity
in the '189 patent as to how to perform the calculation does not excuse
Corning from its burden of proof. Furthermore, we did not "substitute [our]

6

**A84**

IPR2013-00048
Patent 6,298,189 B1

independent scientific determination" for Dr. Ju's testimony. *See* Req. 5.
On the contrary, we considered Dr. Ju's testimony fully and found it
inadequate to support a finding that the procedure followed by Corning was
sufficiently rigorous.

### 5. Ms. Kouzmina's level of understanding

Corning argues that we failed to appreciate that Ms. Kouzmina's
direct declaration and cross-examination deposition testimony demonstrated
her good understanding of the testing procedure. Req. 5-8 (citing Ex. 1015
¶¶ 4, 59; Ex. 1044, 116:14-16, 122:9-11, 123:6-18, 123:24–124:5, 124:9-10,
124:12, 126:8–127:7, 129:2-16, 130:6-14, 130:19–131:17, 132:9-15, 133:14-
21; Ex. 2025, 806:16-25).

This argument is unpersuasive. We summarized what we considered
to be all of the significant evidence the parties cited on the issue of change-
in-length testing (Dec. 46-51) and explained the reasoning underlying our
finding that Ms. Kouzmina did not have a complete understanding of the
procedure. Dec. 52-53. A rehearing request is not an opportunity for a party
to re-argue its case.

Moreover, Corning has not identified where in the record it cited the
evidence from Ms. Kouzmina's deposition that it now relies upon in support
of this argument. Corning did not cite any of the above-listed passages from
Ms. Kouzmina's deposition in its Reply (Paper 65), in any subsequent
papers, or at oral argument. We cannot have overlooked or misapprehended
evidence that was not brought to our attention.

7

**A85**

IPR2013-00048
Patent 6,298,189 B1

### 6. Basis for Dr. Ju's testimony

Corning argues that we improperly discounted the testimony of its reply witness, Dr. Ju. Req. 8. In particular, Corning argues that we overlooked testimony in paragraph 80 of Dr. Ju's declaration, in which he stated that his understanding of the change-in-length testing process was based on his review of Ms. Kouzmina's declaration and portions of her deposition, and upon a video-conference demonstration by Corning's microscopist, Mr. Earl Sanford. *Id.* at 8-9 (citing Reply 7 (citing Ex. 1035 ¶¶ 78-90)).

This argument is unpersuasive. We cited paragraph 80 (Dec. 49) and have no reason to doubt that Dr. Ju based his opinion on the sources of information listed there. But Corning does not explain how this testimony overcomes the reasons we gave for finding Dr. Ju's evidence unpersuasive. *See* Dec. 53. We discussed, in the final written decision, why both sources of information are insufficient to indicate that Dr. Ju's understanding of the process reflects what happened during actual testing by Mr. Sanford. Dec. 52-53. First, we determined that Ms. Kouzmina had an incomplete understanding of the procedure. *Id.* To the extent Dr. Ju relies on Ms. Kouzmina's evidence, it suffers from the same weakness. Second, we determined that nothing in Dr. Ju's evidence establishes that the procedure demonstrated to Dr. Ju was the same procedure used to make the measurements reported in Ms. Kouzmina's declaration. *Id.* at 53.

Corning also argues that we overlooked certain cross-examination deposition testimony by Dr. Ju. Req. 9 (citing Ex. 2090, 202:4-6) ("Q. Is your understanding of the DL over L test that was conducted described in your declaration? A. Yes."). Corning does not identify where in the record it

cited this evidence, and we need not consider it further. But even upon consideration, we determine that it amounts to no more than a confirmation by Dr. Ju that his declaration includes a description of his understanding of the change-in-length test. Corning does not explain how this evidence addresses the problems we discussed in the final written decision.

### 7.  Use of talc particles to track points

Corning argues that we should credit Dr. Ju's testimony as to the reliability and accuracy of talc-based measurements, as well as his testimony that Corning's method was "very good." Req. 9-10 (citing Ex. 1035 ¶¶ 87-90; Ex. 2090, 35:2-10, 200:2-9, 202:15–203:5). Corning also argues that Ms. Kouzmina "fully explained" how talc particles can be used for precise measurements. Req. 10 (referring to discussion of Ms. Kouzmina's deposition testimony, identified above in section III.A.5).

We disagree. As we explained in the final written decision, even if we accept Dr. Ju's (and Ms. Kouzmina's) testimony as accurate descriptions of the actual measurement process, the cited testimony does not provide enough information about that process to assess its reliability and accuracy. Dec. 53-54. Dr. Ju, through his testimony, assures us that he discussed the method with Mr. Sanford and Ms. Kouzmina (Paper 86 ¶ 11 (citing Ex. 2090, 19:13-19), and that he is satisfied that Corning's method is adequately reliable and accurate (Reply 7 (citing Ex. 1035 ¶¶ 78-90)). But we require more than a witness's assurances that his opinions are supported by facts. We require the facts themselves. Dec. 52 (citing 37 C.F.R. § 42.65(a)). In the evidence Corning cited during the proceeding, neither Dr. Ju nor Ms. Kouzmina actually describes the precise steps carried out for

IPR2013-00048
Patent 6,298,189 B1

the measurement procedure in sufficient detail to permit us to make a determination as to reliability and accuracy. Dec. 53-54. For this reason, we determined that Corning's evidence on change-in-length measurements was not credible, and we declined, therefore, to credit that evidence. Dec. 54. Corning's new reliance on Ms. Kouzmina's deposition testimony is inappropriate for a rehearing request.

Corning also argues that we erred in discounting Dr. Ju's testimony by raising, on our own initiative, testimony from Dr. Ju's deposition that he had asked questions of Ms. Kouzmina and Mr. Sanford, concerning how they were sure that they could find a particular pixel using a talc particle, but did not indicate whether he received answers or what those answers were. Req. 10-11 (citing Dec. 53).

We did not raise this issue on our own initiative. Corning cited this passage from Dr. Ju's deposition in its Response to DSM's Motion for Observations. Paper 86 ¶ 11 (citing Ex. 2090, 19:13-19). We considered this evidence because Corning cited it. We explained that this evidence was not persuasive, by itself, because it does not fill the factual gaps in Corning's explanation of the change-in-length testing. Dec. 53. Corning does not explain persuasively why that determination was in error.

### 8. Additional issues

Corning asserts that we addressed in the final written decision an issue not briefed by the parties, specifically, that it is not clear from the cited evidence whether talc particles can serve as faithful position markers. Req. 11 (citing Dec. 54). Corning argues that we overlooked several pieces

10

**A88**

IPR2013-00048
Patent 6,298,189 B1

of evidence in the record relevant to this issue.  Req. 11-12 (citing Ex. 1035 ¶¶ 87, 89; Ex. 1046, 551:3-18; Ex. 2090, 202:15–203:5).

This argument is not persuasive.  We addressed this issue for the purpose of illustrating the sorts of questions that the gaps in Corning's cited evidence on change-in-length testing leave open.  Dec. 54.  Whether uncited evidence of record addresses the issue is irrelevant.  As we explained in the final written decision, we will not scour the record in search of relevant evidence.  Dec. 15.

*B. Modulus of elasticity of the outer primary coating*

Corning argues that we overlooked Dr. Bowman's inability to identify any other available oligomer suitable for use in Shustack Examples X and XI, other than EBECRYL® 284 oligomer, the one Corning actually used when it prepared those examples.  Req. 14.

We disagree.  In the final written decision, we explained that evidence that no other suitable oligomer is commercially available was not persuasive, because it "does not address whether any other suitable oligomers *exist* or have been disclosed by Shustack."  Dec. 44:12-15 (emphasis added).  Although our determination was directed to Dr. Sogah's testimony, the reasoning is equally applicable to Dr. Bowman's testimony.  We declined to credit the evidence of either witness on this point not because we overlooked it, but because it was not probative of what the prior art discloses.

IV.  CONCLUSION

For the reasons given, we determine that Corning has not carried its burden of demonstrating that the Board misapprehended or overlooked any

11

IPR2013-00048
Patent 6,298,189 B1

matters in rendering the final written decision.  We decline to modify the final written decision.

V.  ORDER

Accordingly, it is

ORDERED that the request for rehearing is *denied*.

For PETITIONER:
Michael L. Goldman
Jeffrey Townes
Edwin Merkel
LeClairRyan, A Professional Corporation
Michael.Goldman@leclairryan.com
Jeffrey.Townes@leclairryan.com
Edwin.Merkel@leclairryan.com

For PATENT OWNER:
Sharon A. Israel
Joseph Mahoney
Mayer Brown, LLP
SIsrael@mayerbrown.com
JMahoney@mayerbrown.com



US006298189B1

(12) **United States Patent**   (10) **Patent No.:**   **US 6,298,189 B1**
    Szum et al.                  (45) **Date of Patent:**   *Oct. 2, 2001

(54) **RADIATION-CURABLE OPTICAL GLASS FIBER COATING COMPOSITIONS, COATED OPTICAL GLASS FIBERS, AND OPTICAL GLASS FIBER ASSEMBLIES**

(75) Inventors: **David M. Szum**, Elmhurst; **Chander P. Chawla**, Batavia; **James R. Petisce**, West Dundee; **John T. Vandeberg**, Barrington; **George Pasternack**, Riverwoods; **Timothy E. Bishop**, Algonquin; **Paul E. Snowwhite**, Elgin; **Edward P. Zahora**, Naperville, all of IL (US); **Stephen C. Lapin**, Waterford, WI (US)

(73) Assignee: **DSM N.V.**, Heerlen (NL)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/035,771**

(22) Filed: **Mar. 6, 1998**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/877,585, filed on Jun. 17, 1997, now abandoned, which is a continuation-in-part of application No. 08/840,893, filed on Apr. 17, 1997, now abandoned, which is a continuation-in-part of application No. 08/745,790, filed on Nov. 8, 1996, now abandoned.

(51) Int. Cl.$^7$ ................................................ **G02B 6/22**

(52) U.S. Cl. ............................................ **385/128**; 385/145

(58) **Field of Search** ...................................... 385/123, 124, 385/126–128, 141, 144, 145

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,984,172 | 10/1976 | Miller | 385/71 |
| 4,472,021 | 9/1984 | Ansel et al. | 385/141 |
| 4,474,830 | 10/1984 | Taylor | 427/513 |
| 4,496,210 | 1/1985 | Ansel et al. | 385/128 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2171504 | 9/1996 | (CA) . |
| 4302327 | 8/1994 | (DE) . |
| 0104864 A2 | 4/1984 | (EP) . |
| 0104864 B1 | 4/1984 | (EP) . |
| 0116140 | 8/1984 | (EP) . |
| 0260842 | 3/1988 | (EP) . |
| 0307218 | 3/1989 | (EP) . |
| 0407004 | 1/1991 | (EP) . |
| 0527266 | 2/1993 | (EP) . |
| 0535828 | 4/1993 | (EP) . |

(List continued on next page.)

OTHER PUBLICATIONS

W.W. King et al, "Thermomechanical Mechanism for Delamination of Polymer Coatings from Optical Fibers", Journal of Electronic Packaging, Jun. 1997, vol. 119, pp. 133–137.

(List continued on next page.)

*Primary Examiner*—John D. Lee
(74) *Attorney, Agent, or Firm*—Pillsbury Winthrop LLP

(57) **ABSTRACT**

Optical fiber coatings are disclosed having excellent ribbon stripping and adhesion behavior. The coatings are radiation-curable. The excellent stripping and adhesion behavior can be achieved by several means which include by use of additives, by use of radiation-curable oligomers having higher molecular weight, or by use of coatings having certain thermal properties. Combination of means can be employed. Stripping behavior can be measured by crack propagation and fiber friction measurements.

**66 Claims, 11 Drawing Sheets**



CORNING INCORPORATED 1001
Corning v. DSM
IPR2013-00048

## US 6,298,189 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,624,994 | 11/1986 | Ansel | 525/440 |
| 4,636,223 | 1/1987 | Mehl et al. | 8/471 |
| 4,660,927 | 4/1987 | Kondow et al. | 385/141 |
| 4,822,850 | 4/1989 | Yashuda et al. | 528/28 |
| 4,844,604 | 7/1989 | Bishop et al. | 385/115 |
| 4,900,126 | 2/1990 | Jackson et al. | 385/114 |
| 4,913,859 | 4/1990 | Overton et al. | 428/375 |
| 5,011,260 | 4/1991 | Marx et al. | 385/100 |
| 5,033,335 | 7/1991 | Yatsu et al. | 81/9.4 |
| 5,037,763 | 8/1991 | Petisce | 436/172 |
| 5,093,386 | 3/1992 | Bishop et al. | 522/96 |
| 5,104,433 | 4/1992 | Chapin et al. | 65/432 |
| 5,146,531 | 9/1992 | Shustack | 385/128 |
| 5,219,896 | 6/1993 | Coady et al. | 522/96 |
| 5,227,410 | 7/1993 | Eckberg et al. | 522/75 |
| 5,240,971 | 8/1993 | Eckberg et al. | 522/31 |
| 5,302,627 | 4/1994 | Field et al. | 522/13 |
| 5,345,528 * | 9/1994 | Katz et al. | 385/123 |
| 5,352,712 | 10/1994 | Shustack | 522/31 |
| 5,373,578 | 12/1994 | Parker | 385/128 |
| 5,379,363 | 1/1995 | Bonicel et al. | 385/114 |
| 5,384,342 | 1/1995 | Szum | 522/172 |
| 5,473,720 * | 12/1995 | Ali et al. | 385/128 |
| 5,492,733 | 2/1996 | D'Anna et al. | 427/517 |
| 5,502,145 | 3/1996 | Szum | 528/28 |
| 5,787,218 | 7/1998 | Ohtaka et al. | 385/123 |
| 5,907,023 | 5/1999 | Chawla | 528/49 |
| 5,913,004 | 6/1999 | Takase et al. | 385/123 |
| 5,949,940 | 9/1999 | Botelho et al. | 385/114 |
| 5,977,202 | 11/1999 | Chawla et al. | 522/172 |
| 6,014,488 | 1/2000 | Shustack | 385/128 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0565798 | 10/1993 | (EP) . |
| 0732625 | 9/1996 | (EP) . |
| 0780712 | 6/1997 | (EP) . |
| 0262340 A2 | 4/1988 | (EP) . |
| 58-115402 | 7/1983 | (JP) . |
| 59-074506 | 4/1984 | (JP) . |
| 59-074507 | 4/1984 | (JP) . |
| 60-262115 | 12/1985 | (JP) . |
| 02-062505 | 3/1990 | (JP) . |
| 3-35210 | 2/1991 | (JP) . |
| 08-143806 | 6/1996 | (JP) . |
| 94/19185 | 9/1994 | (WO) . |
| 95/23772 | 9/1995 | (WO) . |
| 96/11965 | 4/1996 | (WO) . |
| 96/12749 | 5/1996 | (WO) . |
| 96/23828 | 8/1996 | (WO) . |
| 96/30182 | 10/1996 | (WO) . |
| 98/21157 | 5/1998 | (WO) . |
| 99/31161 | 6/1999 | (WO) . |

### OTHER PUBLICATIONS

Mills, G., "Testing of 4– And 8– Fiber Ribbon Strippability", 427 International Wire & Cable Symposium Proceedings (1992), pp. 472–475.

Toler, et al., "Factors Affecting Mechanical Stripping Of Polymer Coatings From Optical Fibers", International Wire & Cable Symposium Proceedings (1989), pp. 509–512.

"Union Carbide ® Organofunctional Silane Products and Applications" (1991, 1992), total of 19 pages.

Blyler, et al., "Coatings and Jackets", *Optical Fiber Telecommunications,* 1979, Chapter 10, pp. 299–341.

Wu, *Polymer Interface and Adhesion,* Marcel Dekker, 1982, pp. 406–434.

"Release Agents", *Encyclopedia of Polymer Science, 2nd* Ed., vol. 14, Wiley–Interscience, 1988, pp. 411–421.

Jackson, et al., "An Enhanced Ribbon Structure For High Fiber Count Cables In The Loop", International Wire & Cable Symposium Proceedings (1989), 569–573.

Gadonna, et al., "Methods For The Characterization Of The State Of Fibre Primary Coating", EFOC/LAN, 10th Annual Conference, Paris (1992) (Jun.), pp. 248–251.

Jackson, et al., "Design And Performance Of Compact 204–Fiber Ribbon Cable", Optical Fiber Communication Conference (1990) (Jan.), vol. 1, paper WM10.

Kohtala, et al., "optical Fiber Ribbon Cable Manufacture", Wire Industry, Oct. 1991, pp. 627–630.

Schmid, et al., "The Effect of UV Curable Secondary Buffers On The Strippability Of Commercially Available Fibers", Wire Journal International (1991), pp. 63–66.

Apicella, et al., Adhesion Of Coatings On Glass: A New Measurement Method, EFOC Proceedings, (Jun. 1991) pp. 100–104.

Yuca, et al., "The Effect Of Coating Cure On The Mechanical Characteristics of Optical Fibers", International Wire & Cable Symposium Proceedings, (1990), pp. 715–721.

Cuomo, et al., "Behavior Of Optical Fibre Stripping Force Under Different Aging Test Conditions", EFOC Proceedings (Jun. 1991), pp. 27–30.

Abel, et al., "Dynamic Water Sensitivity Of UV Acrylate Inks And Matrix Coating, and Its Relationship To The Water Soak Performance Of Optical Fibre Ribbons", EFOC & N, Fiber Optic Communications, (1993), pp. 298–302.

Moses, et al., "A Test For Optical Fiber Coating Strippability", International Wire & Cable Symposium Proceedings (1987), pp. 163–168.

Jackson, et al., "Fiber Protective Coating Design Parameters For Current Telecommunication Applications", 10th NFOEC Proceedings, (Jun. 1994), pp. 93–100.

Sommer, et al., One Duel Coating System For Fiber To Meet All Needs: Long Time Loop, And Ribbon Cable, 12th EFOC & N Proceedings, Jun. 1994), pp. 155–157.

Aloisio, et al. "A Vasoelastic Analysis Of Termally Induced Residual Stress In Duel Coated Optical Fibers", International Wire & Cable Symposium Proceedings (1995), pp. 139–145.

Petisce, et al., "Effect of novel cleaning solvents on Optical Fiber Coatings", International Wire & Cable Symposiium Proceedings (1994), pp. 126–133.

Edwards, et al., "Ultraviolet–Cured Coatings For Optical Fibres– The Effect Of Coatings Design On Fibre Reliability", SPIE–The International Society For Optical Engineering Proceedings, Fiber Optics Reliability And Testing: Benign And Adverse Environments, vol. 2074, (1993), pp. 120–128.

Lawson, "Contributions And Effects Of Coatings On Optical Fibers", Proceedings—Optical Fibers In Adverse Environments, vol. 404, pp. 109–118 (SPIE).

Wei, "Degradation Of Fiber Strength During Coating Stripping", International Wire & Cable Symposium Proceedings (1989), pp. 199–204.

Szum, et al., "New Method For Measuring The Contribution Of UV Cured Coatings Toward Color Changes Upon Aging Of UV Cured Inks", International Conference on Plastics in Telecommunications (PIT VI), (Sep. 1992), pp. P10/1–P10/8.

Nuyken, et al., "Oxetane Photopolymerization– A System With Low Volume Shrinkage", Macromol. Symp. 107, 125–138, (1996).

Properties of the R1055 coating composition, which was commercially available before Nov. 1995.

Properties of the 950–106 coating composition, which was commercially available before Nov. 1995.

Properties of the 3471–1–129 coating composition, which was commercially available before Nov. 1995.

* cited by examiner

## FIG. 1





*FIG. 2*



*FIG. 3*



*FIG. 4*

# FIG. 5







*FIG. 6*



*FIG. 7*



*FIG. 8*



*FIG. 9*



*FIG. 10*



*FIG. 11*

US 6,298,189 B1

1

# RADIATION-CURABLE OPTICAL GLASS FIBER COATING COMPOSITIONS, COATED OPTICAL GLASS FIBERS, AND OPTICAL GLASS FIBER ASSEMBLIES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part application of U.S. patent application Ser. No. 08/877,585, filed Jun. 17, 1997, abandoned, which is itself a continuation-in-part application of U.S. patent application Ser. No. 08/840,893, filed on Apr. 17, 1997, abandoned, which is itself a continuation-in-part application of U.S. patent application Ser. No. 08/745,790 filed on Nov. 8, 1996, abandoned, all of which are hereby incorporated in their entirety by reference.

## FIELD OF THE INVENTION

The invention relates to radiation-curable inner and outer primary optical glass fiber coating compositions. The invention also relates to coated optical glass fibers and optical glass fiber assemblies. More particularly, the invention relates to a ribbon assembly having improved ribbon stripping capabilities.

## BACKGROUND OF THE INVENTION

Optical glass fibers are usually coated with two superposed radiation-cured coatings, which together form a primary coating. The coating which contacts the glass surface is called the inner primary coating and the overlaying coating is called the outer primary coating.

The inner primary coating is usually a soft coating having a low glass transition temperature (hereinafter "Tg"), to provide resistance to microbending. Microbending can lead to attenuation of the signal transmission capability of the coated optical glass fiber and is therefore undesirable. The outer primary coating is typically a harder coating providing desired resistance to handling forces, such as those encountered when the coated fiber is cabled.

For the purpose of multi-channel transmission, optical glass fiber assemblies containing a plurality of coated optical fibers have been used. Examples of optical glass fiber assemblies include ribbon assemblies and cables. A typical optical glass fiber assembly is made of a plurality of coated optical glass fibers which are bonded together in a matrix material. For example, the matrix material can encase the optical glass fibers, or the matrix material can edge-bond the optical glass fibers together.

Optical glass fiber assemblies provide a modular design which simplifies the construction, installation and maintenance of optical glass fibers by eliminating the need to handle individual optical glass fibers.

Coated optical glass fibers for use in optical glass fiber assemblies are usually coated with an outer colored layer, called an ink coating, or alternatively a colorant is added to the outer primary coating to facilitate identification of the individual coated optical glass fibers. Such ink coatings and colored outer primary coatings are well known in the art. Thus, the matrix material which binds the coated optical glass fibers together contacts the outer ink layer if present, or the colored outer primary coating.

When a single optical glass fiber of the assembly is to be fusion connected with another optical glass fiber, or with a connector, an end part of the matrix layer can be removed to separate each of the optical glass fibers.

Desirably, the primary coatings on the coated optical glass fibers, and the ink coating if present, are removed simultaneously with the matrix material to provide bare portions on the surface of the optical glass fibers (hereinafter referred to as "ribbon stripping"). In ribbon stripping, the matrix material, primary coatings, and ink coating, are desirably removed as a cohesive unit to provide a clean, bare optical glass fiber which is substantially free of residue. This residue can interfere with the optical glass fiber ribbon mass fusion splicing operation, and therefore usually must be removed by wiping prior to splicing. However, the step of removing the residue can cause abrasion sites on the bare optical glass fiber, thus compromising the strength of the connection. The superior stripping functionality of ribbon assemblies to provide clean, residue-free, bare optical glass fibers during ribbon stripping according to this invention has heretofore been believed to be unobtainable.

A common method for practicing ribbon stripping at a terminus of the ribbon assembly is to use a heated stripping tool. Such a tool consists of two plates provided with heating means for heating the plates to about 90 to about 120 C. An end section of the ribbon assembly is pinched between the two heated plates and the heat of the tool softens the matrix material and the primary coatings on the individual optical glass fiber. The heat-softened matrix material and heat-softened primary coatings present on the individual optical glass fibers can then be removed to provide bare optical glass fiber ends, at which the fusion connections can be made. A knife cut is often used to initiate a break in the matrix material to the inner primary coating. Typically, only about a 1 to 4 cm section of the matrix material and coatings on the optical glass fibers need be removed. Identification of the bare individual optical glass fibers achieved by tracing back along the bare optical fiber until the ink coating or colored outer primary coating is seen.

U.S. Pat. No. 5,373,578 discloses a ribbon assembly containing a plurality of coated optical glass fibers. Each of the optical glass fibers is coated with an inner primary coating which is adjacent to the optical glass fiber, with an outer primary coating and an ink coating on the outer primary coating. The inner primary coating is modified so that adhesion between the inner primary coating and the optical glass fiber is reduced. This reduction in adhesion facilitates easy removal of the heat-softened primary coating when using a heat stripping method. While this patent discloses, at column 5, lines 10–13, that the adhesion between the inner primary coating and the optical glass fiber should be sufficient to prevent delamination of the inner primary coating from the optical glass fiber, any reduction in the adhesion between the inner primary coating and the optical glass fiber increases the possibility of such undesirable delamination, especially in the presence of moisture. Delamination of the inner primary coating from the optical glass fiber can lead to degraded strength of the optical glass fiber as well as signal transmission attenuation disadvantages.

Published European patent application 0262340 discloses a ribbon cable having a "peel layer" as the outermost coating layer on each of optical glass fibers contained within the ribbon cable. During ribbon stripping, the peel layer is destroyed and the matrix material is removed from the coated optical glass fibers. However, after ribbon stripping, the optical glass fibers are still coated with the primary coatings. That is, the primary coatings are not simultaneously removed with the matrix material in the ribbon assemblies disclosed in this publication.

U.S. Pat. No. 5,011,260 discloses a ribbon cable having a "decoupling layer" disposed between the coated optical glass fibers and the matrix material. In this manner, the

3

4

matrix material may be easily removed from the coated optical glass fibers by application of low stripping force. This patent includes a general statement that the coatings on the optical glass fiber can be simultaneously removed with the matrix material during ribbon stripping. However, this patent fails to teach how to solve the problems associated with the residues remaining on the bare optical glass fibers after ribbon stripping conventional ribbon assemblies.

Published European patent application 0407004 discloses a ribbon cable containing a matrix material having sufficient adhesion to the ink coated optical glass fibers to remain adhered thereto during normal use but is easily strippable therefrom without damaging the integrity of the ink layer on the coated optical glass fibers. Thus, the ribbon assembly disclosed in this publication does not have the capability of removing the primary coatings on the optical glass fibers simultaneously with removal of the matrix material during ribbon stripping, so as to provide residue-free bare optical glass fibers.

Published European patent application 0527266 discloses a ribbon cable containing a lubricating "interfacial layer" which separates the matrix material from the coated optical glass fibers. The interfacial layer facilitates easy removal of the matrix material from the coated optical glass fibers. While this publication discloses at page 3, line 15, that the buffer layer and first protective coating can be stripped in one step, there is no disclosure teaching how to accomplish such an operation. Furthermore, the lubricating interfacial layer will inhibit simultaneous removal of the first protective coating with the matrix material. Thus, this publication does not teach how to make a ribbon assembly having the capability of removing the primary coatings on the optical glass fibers simultaneously with the matrix material during ribbon stripping, so as to provide residue-free bare optical glass fibers.

U.S. Pat. No. 4,900,126 discloses a ribbon cable in which the bonding adhesive forces between the ink layer and the primary coatings on the optical glass fibers are greater than the bonding between the ink layer and the matrix material. In this manner, the matrix material can be easily removed from the ink coated optical glass fibers without removing the ink layer. However, this patent does not address the problems associated with removing the primary coating layers simultaneously with the matrix material.

U.S. Pat. No. 4,660,927 teaches a silicone-coated optical fiber in which the soft silicone coating is easily peeled from the surface of the optical glass fibers by finger pressure. The coating contains a first siloxane component having aliphatic unsaturated groups and a second siloxane component having mercaptoalkyl groups. Because such a coating is easily peelable, as by rubbing with finger pressure, the coating has insufficient adhesion to the surface of the optical glass fibers to prevent delamination during most uses. Furthermore, this patent does not address the problems of ribbon stripping, but rather only the stripping of a single optical glass fiber. It is generally known that three coating systems (inner primary coating, outer primary coating, and ink coating) having acceptable single fiber strippability will exhibit dramatically different levels of strippability characteristics when used in ribbon form.

U.S. Pat. No. 4,496,210 provides a radiation-curable optical fiber coating composition containing a polysiloxane. However, this patent does not address the problems associated with ribbon stripping.

Japanese Patent Application H3-35210 teaches to combine a liquid lubricant, such as liquid silicone oil or liquid aliphatic oil, with a mercaptosilane compound in an inner primary coating composition. During stripping, when the bond between the surface of the optical glass fiber and inner primary coating is broken the liquid lubricant invades the boundary between the surface of the optical glass fiber and the inner primary coating. The liquid lubricant must not have a high compatibility with the inner primary coating or it will not bleed out of the inner primary coating during stripping. However, this document fails to teach a system to adjust the level of fiber friction between the adjacent surfaces of the optical glass fiber and the inner primary coating to a level which provides a resistive force that is less than the cohesive strength of the inner primary coating. Thus, while this document teaches that the inner primary coating can be stripped more easily by incorporating liquid lubricant compounds, the inner primary coating will still leave unwanted residue on the surface of the optical glass fiber if the above described fiber friction forces are at a level which provide a resistive force that is greater than the cohesive strength of the inner primary coating.

One primary coating composition available from JSR Corporation, designated as R-1055, is specified as having, inter alia, a viscosity of 5000 cps @$25°$ C., a glass transition temperature of $-4°$ C., a shrinkage value of 2.9%, a tensile strength value of 0.21 kg/mm$^2$, a tensile elongation value of 195%, an adhesion force of 20 g/cm and a Young's modulus @$23°$ C. of 0.12 kg/mm$^2$. When this composition was tested in accordance with the test methods herein, it had a measured crack propagation value of 1.56 mm (standard deviation 0.2), and a fiber pull-out friction value of 26.3 g/mm (standard deviation 1.65).

There are many test methods which may be used to determine the performance of a ribbon assembly during ribbon stripping. An example of a suitable test method for determining the stripping performance of a ribbon is disclosed in the article by Mills, G., "Testing of 4- and 8-fiber ribbon strippability", 472 International Wire & Cable Symposium Proceedings (1992), the complete disclosure of which is incorporated herein by reference.

Many attempts have been made to understand the problems associated with ribbon stripping and to find a solution to increase ribbon stripping performance. The following publications attempt to explain and solve the problems associated with ribbon stripping: K. W. Jackson, et. al., "The Effect of Fiber Ribbon Component Materials on Mechanical and Environmental Performance", 28 International Wire & Symposium Proceedings (1993); H. C. Chandon, et. al., "Fiber Protective Design for Evolving Telecommunication Applications", International Wire & Symposium Proceedings (1992); J. R. Toler, et. al., "Factors Affecting Mechanical Stripping of Polymer Coatings From Optical Fibers", International Wire & Cable Symposium Proceedings (1989); and W. Griffioen, "Strippability of Optical Fibers", EFOC & N, Eleventh Annual Conference, Hague (1993).

The ability of a ribbon assembly to ribbon strip cleanly so as to provide bare optical glass fibers that are substantially free of residue is still unpredictable and the factors affecting ribbon stripping are not fully understood. There is still a need for an understanding of how the problems of ribbon stripping occur and a solution to these problems.

## SUMMARY OF THE INVENTION

It is an objective of the present invention to provide a novel ribbon assembly having improved ribbon stripping capabilities. It is another objective of the present invention to provide a novel ribbon assembly which after ribbon

US 6,298,189 B1

5

6

stripping provides bare optical glass fibers which are substantially free of residue, that must be removed prior to forming connections to the respective selected bare optical fibers.

Surprisingly, the above objects and other objects are and have been obtained by the following. The present invention provides a novel ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein said inner primary coating is adapted to provide the combination of properties of:

   (i) sufficient adhesion to said optical glass fiber to prevent delamination during handling and in the presence of moisture; and

   (ii) a fiber friction force between said optical glass fiber and said inner primary coating which has been so adjusted as to allow the inner primary coating to slide readily off from the optical glass fiber while leaving substantially no residue on the surface of said optical glass fiber during ribbon stripping, when a stripping force which is less than the cohesive strength of said inner primary coating is applied to said ribbon assembly.

Also provided is a novel ribbon assembly comprising:

a plurality of optical glass fibers, at least one coated optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said coated optical glass fibers together,

and wherein said inner primary coating is adapted to provide a fiber pull-out friction of about 30 grams/millimeter or less at a rate of about 0.1 mm/sec in combination with a crack propagation characteristic of at least about 1 millimeter at a rate of 0.1 mm/sec.

The present invention further provides a coated optical glass fiber comprising:

an optical glass fiber;

an inner primary coating on the surface of said optical glass fiber;

an outer primary coating substantially co-extensive with the external surface of said inner primary coating, wherein said inner and outer primary coatings are so formulated and selected so as to provide a ratio of (i) the change in length of the inner primary coating from an ambient temperature to a ribbon stripping temperature to (ii) the change in length of the outer primary coating from said ambient temperature to said ribbon stripping temperature of less than about 1.5:1; and

optionally an ink coating adjacent to said outer primary coating.

The invention further relates to a ribbon assembly containing at least one of these coated optical glass fibers.

The present invention further relates to a novel radiation-curable oligomer which can be used to adjust the fiber friction to a level such that the resulting adhesive resistive force level is less than the cohesive strength of the inner primary coating. The novel radiation-curable oligomer comprises:

at least one glass coupling moiety;

at least one slip agent moiety; and at least one radiation-curable moiety, wherein said glass coupling, glass

adhesion, and radiation curable moieties are each covalently linked to said oligomer.

Also provided is a radiation-curable, inner primary coating composition containing the composite oligomer, a coated optical glass fiber made from the coating composition, and a ribbon assembly containing at least one such coated optical glass fiber.

The present invention also provides a radiation-curable, inner primary coating composition comprising at least one radiation-curable oligomer or monomer and a wax. Preferably, the wax is present in an amount sufficient to provide a fiber friction between an inner primary coating formed from said coating and an optical glass fiber such that there is exhibited a resistive force that is less than the cohesive strength of said coating formed from said composition. The invention also provides a coated optical glass fiber having an inner primary coating which contains a wax, and a ribbon assembly which contains at least one such coated optical glass fiber.

The present invention further provides a coated optical glass fiber having an inner primary coating which has been formulated from a radiation-curable, inner primary coating composition containing a radiation-curable silicone oligomer or a silicone compound. Preferably, the radiation-curable silicone oligomer or silicone compound is present in an amount sufficient to provide the fiber friction between the inner primary coating and the optical glass fiber such that there is exhibited a resistive force which is less than the cohesive strength of the inner primary coating. The invention also provides a ribbon assembly which contains at least one such coated optical glass fiber.

The present invention also provides a coated optical glass fiber having an inner primary coating which has been formulated from a radiation-curable, inner primary coating composition containing a radiation-curable fluorinated oligomer or a fluorinated compound. Preferably, the radiation-curable fluorinated oligomer or fluorinated compound is present in an amount sufficient to provide a fiber friction between the inner primary coating and the optical glass fiber such that there is exhibited a resistive force that is less than the cohesive strength of the inner primary coating. The invention further provides a ribbon assembly which contains at least one such coated optical glass fiber.

The present invention also provides a radiation-curable, inner primary coating composition comprising at least one radiation-curable oligomer or monomer and a solid lubricant which is substantially insoluble in the composition. Preferably, the solid lubricant is present in an amount sufficient to provide a fiber friction between an inner primary coating formed from said coating and an optical glass fiber such that there is exhibited a resistive force which is less than the cohesive strength of said coating formed from said composition. The invention also provides a coated optical glass fiber having an inner primary coating which contains a solid lubricant, and a ribbon assembly which contains at least one such coated optical glass fiber.

The present invention further provides a ribbon assembly comprising a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating, and a matrix material bonding said plurality of coated optical glass fibers together. The inner primary coating is formulated from a radiation-curable inner primary coating composition containing at least one radiation-curable urethane oligomer comprising at least one polymeric block and at least one functional group capable of polymerization in the presence of actinic radiation connected to said

**A106**

US 6,298,189 B1

7

8

at least one polymeric block. The coating composition has a concentration of urethane groups which is selected to provide said inner primary coating with a fiber friction force level between said optical glass fiber and said inner primary coating in combination with a crack propagation level that provides the inner primary coating with the functional capability of sliding off of the optical glass fiber and leaving substantially no residue on the surface of said optical glass fiber during ribbon stripping when a stripping force which is less than the cohesive strength of said inner primary coating is applied to said ribbon assembly.

The present invention further provides a ribbon assembly comprising a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating, and a matrix material bonding said plurality of coated optical glass fibers together. The inner primary coating is formulated from a radiation-curable inner primary coating composition containing at least one radiation-curable oligomer comprising at least one polymeric block and at least one functional group capable of polymerization in the presence of actinic radiation connected to said at least one polymeric block. The polymeric block has a molecular weight which is selected to provide said inner primary coating with a fiber friction force level between said optical glass fiber and said inner primary coating in combination with a crack propagation level that provides the inner primary coating with the functional capability of sliding off of the optical glass fiber and leaving substantially no residue on the surface of said optical glass fiber during ribbon stripping when a stripping force which is less than the cohesive strength of said inner primary coating is applied to said ribbon assembly.

The invention also provides a radiation-curable, inner primary coating composition formulated from a composition comprising at least one urethane oligomer having at least one polymeric block and at least one functional group capable of polymerization in the presence of actinic radiation connected to said at least one polymeric block. The coating composition has a concentration of urethane groups that is so selected to provide said inner primary coating with a fiber friction force level between an optical glass fiber and an inner primary coating formed from said coating composition in combination with a crack propagation level which provides the inner primary coating with the functional capability of sliding off the optical glass fiber and leaving substantially no residue on the surface of said optical glass fiber during ribbon stripping when a stripping force which is less than the cohesive strength of said inner primary coating is applied to said inner primary coating.

The present invention further provides a radiation-curable, inner primary optical glass fiber coating composition formulated from a composition comprising at least one radiation-curable oligomer having at least one polymeric block and at least one functional group capable of polymerization in the presence of actinic radiation connected to said at least one polymeric block. The polymeric block has a molecular weight so selected to provide said inner primary coating with a fiber friction force level between said optical glass fiber and said inner primary coating in combination with a crack propagation level that provides the inner primary coating with the functional capability of sliding off of the optical glass fiber and leaving substantially no residue on the surface of said optical glass fiber during ribbon stripping when a stripping force which is less than the cohesive strength of said inner primary coating is applied to said inner primary coating.

The present invention also provides coated optical glass fibers containing at least one inner primary coating formed from the above radiation-curable, inner primary coating compositions.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a longitudinal cross-sectional view of a coated optical glass fiber.

FIG. 2 illustrates a representative graph of the normalized strip force required to slide an optical fiber ribbon coating composite along the surface of an optical glass fiber.

FIG. 3 illustrates the ratchet effect of an inner primary coating sliding off an optical glass fiber during ribbon stripping.

FIG. 4 is a graph of the change in length L ("dL") for a commercially available outer primary coating as the temperature is increased.

FIG. 5 illustrates a partial cross-sectional view of a coated optical glass fiber.

FIG. 6 illustrates a hypothetical contour plot for determining the predicted strip cleanliness.

FIG. 7 illustrates a graph of the fiber pull-out friction versus urethane concentration.

FIG. 8 illustrates a graph of the fiber pull-out friction versus urethane concentration.

FIG. 9 illustrates a graph of the fiber pull-out friction versus urethane concentration.

FIG. 10 illustrates a graph of the fiber pull-out friction versus urethane concentration.

FIG. 11 illustrates a graph of the fiber pull-out friction versus urethane concentration.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The invention will now be explained in detail with reference to the attached drawings.

Based on extensive experimentation, it is now believed that ribbon stripping functionally involves two phases, a first adhesion breaking phase and a second frictive sliding phase. This can be characterized by the following equation (1):

$$F_{stripping} = F_{adhesive} + F_{friction} \qquad (1)$$

where

$F_{stripping}$ is the stripping force applied to the inner primary coating;

$F_{adhesive}$ is the force required to break the adhesive forces between the optical glass fiber and the inner primary coating; and

$F_{friction}$ is a function of the normal force the inner primary coating exerts against the surface of the optical glass fiber and the coefficient of friction of the inner primary coating.

$F_{friction}$ is equal to $F_{static}$, defined as the condition when the inner primary coating is in a static position, and $F_{friction}$ is equal to $F_{kinetic}$ defined as when the inner primary coating is in motion relative to the optical glass fiber.

During the adhesion breaking phase, the adhesive force between the inner primary coating and the surface of the optical glass fiber must be broken to delaminate the inner primary coating from the surface of the optical glass fiber. Once that adhesive force is broken, and the inner primary coating is delaminated from the surface of the optical glass fiber, the fiber friction force between the inner primary

US 6,298,189 B1

9                                                              10

coating and the surface of the optical glass fiber must then be overcome to remove the inner and outer primary coatings, along with the matrix material, from the optical glass fiber.

The adhesive force between the inner primary coating and the surface of the optical glass fiber is generally increased by an increase in the following:

(1) covalent bonding, for example from glass adhesion promoters;

(2) weak molecular interactions, such as Van der Waal's attractions, hydrogen-bonding, electrostatic, and the like;

(3) static coefficient of friction;

(4) surface energy of the inner primary coating and surface energy of the optical glass fiber;

(5) surface roughness; and

(6) adhesive bonding area.

The adhesive force between the inner primary coating and the surface of the optical glass fiber is generally decreased by an increase in the temperature.

The fiber friction force between the inner primary coating and the surface of the optical glass is generally increased by an increase in one or more of the following:

(1) the normal force of the inner primary coating against the surface of the optical glass fiber at the ribbon stripping temperature;

(2) the static and kinetic coefficient of friction at the ribbon stripping temperature;

(3) surface roughness; and

(4) frictive area.

The normal force includes weak molecular interactions, such as Van der Waal's attractions, hydrogen-bonding, electrostatic, and the like, between the surface of the optical glass fiber and the inner primary coating. In general, the fiber friction force is decreased with an increase in temperature.

The rigidity and integrity of the outer primary coating at the ribbon stripping temperature can also affect the frictive force. During ribbon stripping the outer primary coating, ink coating, and other rigid coating layers, such as the matrix material, provide the stiffening backbone which allows for intact removal of the matrix material and inner and outer primary coatings to provide a cohesive tube (hereinafter referred to as "coating tube"). If the rigidity and integrity are insufficient, the outer primary coating can buckle during ribbon stripping, which can significantly increase the fiber friction force and/or induce shearing stresses causing integrity failure of the inner primary coating resulting in undesirable residue on the surface of the optical glass fiber.

Preferably, the adhesion between the matrix material and the ink coating or colored outer primary coating is greater than the adhesion between the inner primary coating and the surface of the optical glass fiber to ensure that the inner primary coating delaminates from the surface of the optical glass fiber during ribbon stripping. Similarly, both the adhesion between the ink coating and the outer primary coating, and the adhesion between outer primary coating and the inner primary coating, should be greater than the adhesion between the inner primary coating and the surface of the optical glass fiber to ensure that the inner primary coating delaminates from the surface of the optical glass fiber, as well as to provide a cohesive coating tube during ribbon stripping. Usually, the adhesion between the matrix material and the colored outer primary coating or ink coating, as well as the adhesion between each of the coating layers is sufficient to ensure delamination of the inner primary coating from the surface of the optical glass fiber during ribbon

stripping because the matrix material and coating layers mainly comprise organic materials. In general, layers of materials having similar properties, such as an adjacent organic layer/organic layer bond, tend to bond more easily together than layers having dissimilar properties, such as an organic layer/inorganic layer bond.

FIG. 1 illustrates an optical glass fiber 7 coated with an inner primary coating 8 and a commercially available outer primary coating 9. The length of the inner primary coating in FIG. 1 shown at 20 has been selected to be 35 mm because this is a typical length of the coatings stripped from the ends of the optical glass fibers during ribbon stripping. When a typical ribbon stripping tool is applied to a ribbon assembly, pressure is applied to the ribbon assembly between heated plates. At the ends of the plates near the cut made in the matrix material and inner and outer primary coatings, the inner primary coating can form an initial delamination site on the optical glass fiber, shown at 27 and 28 (referred to as debond area). Because the areas 27 and 28 of the inner primary coating are delaminated, they must be subtracted from that area of the inner primary coating which is still bonded to the surface of the optical glass fiber when measuring the adhesive bonding area between the inner primary coating and the surface of the optical glass fiber. The radius of the optical glass fiber is 62.5 microns, shown at 22. The radius of the outer surface of inner primary coating is 95 microns, shown at 24. The radius of the outer surface of the outer primary coating is 125 microns, shown at 26. From FIG. 1, the adhesive bonding area is equal to the glass surface area (13.744 mm$^2$) minus the debond area. The frictive area is the total glass surface area of the section to be stripped during ribbon stripping (13.744 mm$^2$).

It is believed that during ribbon stripping the inner primary coating may ratchet off the optical glass fiber, as shown in FIG. 2. FIG. 2 is a demonstration of the adhesive force and fiber friction force being overcome by the stripping force applied to the inner primary coating during the ribbon stripping process. As stripping force is applied from the stripping tool to the inner primary coating, the stripping force increases to a level at which the adhesive force between the inner primary coating and the surface of the optical glass fiber is overcome, which is shown at 1. At this level, the inner primary coating begins to delaminate from the surface of the optical glass fiber. Then, the stripping force decreases as the inner primary coating delaminates from the optical glass fiber, shown generally at 2. Once delamination has completed, shown at 3, the inner primary coating slides along the surface of the optical glass fiber and the stripping force decreases to the level shown at 4. As the inner primary coating is being slid off of the optical glass fiber the stripping force required to slide the inner primary coating against the optical glass fiber ratchets between the higher static fiber friction force and the lower kinetic fiber friction force.

The static fiber friction force is a function of the static coefficient of friction of the inner primary coating and the normal force of the inner primary coating against the optical glass fiber. The kinetic fiber friction force is a function of the kinetic coefficient of friction of the inner primary coating and the normal force of the inner primary coating against the optical glass fiber. The static fiber friction force resists initial sliding movement and the kinetic fiber friction force resists subsequent sliding movement. In other words, once the adhesive bond is broken and the static fiber friction force is overcome, shown at 3, the inner primary coating slides a set distance until the kinetic fiber friction force prevents further motion and the inner primary coating becomes momentarily

US 6,298,189 B1

<div style="display:flex">
<div>

11

stuck in place against the surface of the optical glass fiber, shown at **4**. As the stripping force increases, and before the inner primary coating resumes its motion relative to the optical glass fiber, the potential energy is stored in the inner primary coating which produces a tensile force and a stripping force within the inner primary coating. The tensile force is opposed to the normal force and the stripping force is opposed to the fiber friction force.

The motion force ("$F_{motion}$") of the inner primary coating is a vector sum of the tensile force ("$F_{tensile}$") and the stripping force ("$F_{stripping}$"). The resistive force ("$F_{resistive}$") is a vector sum of the fiber friction force ("$F_{friction}$") and the normal force ("$F_{normal}$") on the inner primary coating against the surface of the optical glass fiber.

Once the motion force ("$F_{motion}$") exceeds the resistive force ("$F_{resistive}$"), the inner primary coating begins to slide, shown at **5**. The inner primary coating quickly slides a set distance and then becomes momentarily stuck, shown at **6**. The distance the inner primary coating slides along the surface of the optical glass fiber between the points **5** and **6** in FIG. **2** is referred to as slip-stick distance. The slip-stick distance will vary and be dependent upon the materials used in the inner primary coating and optical glass fiber, and will also be dependent upon random probability due to non-homogeneity in the inner primary coating and optical glass fiber surface.

FIG. **3** further explains the ratcheting effect during ribbon stripping by way of example. As shown in FIG. **3**, a partial longitudinal cross-section of an optical glass fiber is shown at **7**. A two-dimensional vector explanation will be used herein for ease of explanation. However, it is understood that a coated optical glass fiber is a three-dimensional object and all of the described vectors need to be extended an additional dimension.

The optical glass fiber is coated with an inner primary coating shown at **8**, and an outer primary coating shown at **9**. The thickness "Y" of the inner primary coating is about 37.5 microns, shown at **12**. As stripping force is indirectly applied to the inner primary coating in the direction shown at **10**, the inner primary coating is deformed a pre-slip distance "X", shown at **11**, at which point the inner primary coating delaminates and begins to ratchet along the surface of the optical glass fiber. The stripping force required to make the inner primary coating begin to ratchet along the surface of the optical glass fiber can be calculated as follows. The length of the tensile deformation of the deformed inner primary coating at the level of strip force required to make the inner primary coating begin to slide after being momentarily stuck to the surface of the optical glass fiber "Z" is shown at **13**. The % elongation of the deformed inner primary coating can be calculated from the values Z and Y using the following equation (2):

$$(Z-Y)/Y = \% \text{ elongation} \qquad (2)$$

From a stress/strain curve, one skilled in the art can readily use the % elongation to calculate the tensile force ($F_{tensile}$) required to initiate sliding of the inner primary coating from a static position.

The vector for the static fiber friction force $F_{friction}$ is shown at **19**. When $F_{motion}$ is greater than $F_{resistive}$, the inner primary coating will begin to slide from a static position. $F_{motion}$, shown at **15**, is the vector sum of $F_{tensile}$, shown at **14**, and $F_{stripping}$, shown at **16**. $F_{resistive}$, shown at **17**, is the vector sum of $F_{friction}$, shown at **19**, and $F_{normal}$, shown at **18**.

If either of the vector components $F_{striping}$ or $F_{tensile}$ is greater than the corresponding inner primary coating resistive vector components (shear strength and tensile strength,

</div>
<div>

12

respectively), then the inner primary coating will cohesively fail during ribbon stripping leaving an undesirable residue of inner primary coating material on the surface of the optical glass fiber.

Similarly, if either of the vector components $F_{friction}$ or $F_{normal}$ is greater than the inner primary coating resistive vector components (shear strength and tensile strength, respectively), then the inner primary coating will cohesively fail during ribbon stripping leaving an undesirable residue of inner primary coating material on the surface of the optical glass fiber.

More generally, the inner primary coating will cohesively fail if $F_{resistive}$ is greater than the cohesive strength of the inner primary coating. Thus, to prevent such residue, the $F_{friction}$ and $F_{normal}$ should be so adjusted as to provide a $F_{resistive}$ that is less than the cohesive strength of the inner primary coating.

The term "cohesive strength" of the inner primary coating is used herein to mean the amount of force necessary to destroy the integrity of the inner primary coating. Thus, a higher cohesive strength will require a greater amount of force to destroy the integrity of the inner primary coating. The cohesive strength can be measured using any one of (1) the shear strength of the inner primary coating, (2) the tensile strength of inner primary coating, or (3) the crack propagation of the inner primary coating. Preferably, the cohesive strength is measured using the crack propagation test, as described herein below.

This residue can interfere with the optical glass fiber ribbon mass fusion splicing operation, and therefore must be removed prior to splicing by wiping. The step of removing the residue can cause abrasion sites on the bare optical glass fiber, thus compromising the strength of the connection.

Once the adhesive bonds have been broken and the inner primary coating has been delaminated from the surface of the optical glass fiber, the ability of a ribbon assembly to strip cleanly during ribbon stripping and to provide bare optical glass fibers which are substantially free of residue can be understood using the following simplified equation (3):

$$F_{friction} = C_f \times F_{normal} \qquad (3)$$

where

$F_{friction}$ is the static frictive force between the inner primary coating and the optical glass fiber;

$C_f$ is the static coefficient of friction of the inner primary coating on the surface of the optical glass fiber, and

$F_{normal}$ is the normal force of the inner primary coating against the surface of the optical glass fiber.

Hereinafter, the use of the term "fiber friction" in the specification and claims refers to the static fiber friction force.

In general, the lower the fiber friction, the lower the resistive force, and the easier the inner primary coating can be removed from the surface of the optical glass fiber without leaving a residue. From equation 3, it is evident that the fiber friction can be reduced by decreasing either or both the static coefficient of friction or the normal force.

Each inner primary coating has a specific cohesive strength which maintains the integrity of the inner primary coating. The greater the cohesive strength of the inner primary coating the greater the amount of energy required to break apart or fracture the inner primary coating. Thus, an inner primary coating having a higher cohesive strength can withstand greater stripping forces during ribbon stripping, without breaking apart and leaving residue on the surface of

</div>
</div>

US 6,298,189 B1

13

the optical glass fiber, than an inner primary coating having a lower cohesive strength.

From the above discussion, it is clear that if the fiber friction is at a level which provides a resistive force that is greater than the cohesive strength of the inner primary coating, then the inner primary coating will break apart leaving residue on the surface of the optical glass fiber. Thus, when selecting or formulating the inner and outer primary coatings, the fiber friction level should be adjusted taking into account the cohesive strength of the inner primary coating so that fiber friction provides resistive force that is less than the cohesive strength of the inner primary coating.

Minimizing the Normal Force

From the above equations, the fiber friction force between the optical glass fiber and inner primary coating can be lowered by reducing the normal force of the inner primary coating against the surface of the optical glass fiber. In general, the greater the normal force, the greater the fiber friction force between the optical glass fiber and the inner primary coating. In other words, the harder the inner primary coating is pressing against the surface of the optical glass fiber, the harder it will be to slide the inner primary coating against the surface of the optical glass fiber and the greater the chances of leaving residue from the inner primary coating on the surface of the optical glass fiber. Since the normal force is a component of the fiber friction, lowering the normal force will lower the fiber friction. The normal force should therefore be adjusted or selected so as to provide a normal force vector component and a fiber friction vector component that provides a vector sum (resistive force) which is less than the cohesive strength of the inner primary coating.

During ribbon stripping, the inner primary and outer primary coatings are heated, typically to about 90 C. to about 120 C. Because inner primary coatings usually have a lower Tg than that of outer primary coatings, inner primary coatings usually expand to a greater extent than the outer primary coatings during ribbon stripping. Thus, when the inner and outer primary coatings are heated, the inner primary coating expands to a greater extent than the outer primary coating causing a pressure build-up within the inner primary coating and between the surface of the optical glass fiber and the outer primary coating. This pressure buildup in the inner primary coating increases the normal force of the inner primary coating against the optical glass fiber, thereby increasing the fiber friction force between the inner primary coating and the surface of the optical glass fiber. Thus, the resistive force will be increased by an increase in the normal force vector component and an increase in the fiber friction vector component.

It is believed that the inner primary coating expands to a greater extent than the outer primary coating during ribbon stripping, at least in part due to the following reason. At temperatures below the Tg of the polymeric coating, the polymers present in the coating tend to act "glass-like", and therefore have a low coefficient of expansion. However, at temperatures above the Tg of the polymeric coating, the polymers tend to act "rubber-like" and therefore have a higher coefficient of expansion than when below the Tg of the polymeric coating. As the temperature of the ribbon assembly is raised during ribbon stripping the polymer present in the inner primary coating will usually be at a temperature above their Tg and be more "rubber-like" well before the polymers present in the outer primary coating reach their Tg. Thus, as the applied stripping temperature is raised, the "rubber-like" polymer present in the inner primary coating will expand to a much greater extent, than the "glass-like" polymer in the outer primary coating.

14

The Tg of the inner primary coating and that of the outer primary coating usually cannot be matched because the outer primary coating should have a higher Tg to provide the tough protective properties required of the outer primary coating. In general, the Tg of the outer primary coating is above 60° C., whereas the Tg of the inner primary coating is usually below about 10° C., preferably below about 0° C., more preferably below about –10° C., and most preferably below about –20° C.

However, it has been found that the relative expansion characteristics of the inner and outer primary coatings can be adjusted without substantially affecting the Tg of the coatings. The expansion characteristics of the desired inner and outer primary coatings should first be measured as follows. The change in expansion from the ambient working temperature of the ribbon assembly to the ribbon stripping temperature measured in one plane "dL" is divided by an initial length of the one plane measured at the ambient working temperature of the ribbon assemble "L", hereinafter referred to as "(dL/L)". Ambient working temperatures of ribbon assemblies are usually about 0° C. to about 30° C. It will be appreciated that for most coating compositions the design ribbon stripping temperatures are usually about 90° C. to about 120° C., but may be different depending on the specific design parameters for the particular coating composition.

The inner and/or outer primary coatings should be selected or reformulated so as to maximize the (dL/L) of the outer primary coating and while minimizing the (dL/L) of the inner primary coating. Ideally, the (dL/L) of the outer primary coating should be greater than that of the inner primary coating whereby the outer primary coating will theoretically exert a normal force on the inner primary coating in a direction away from the optical glass fiber during ribbon stripping. However, such high (dL/L) values for the outer primary coating in combination with retention of the desired toughness properties of the outer primary coating are usually unattainable. Nevertheless, increasing the (dL/L) of the outer primary coating can significantly reduce the increase in normal force on the inner primary coating during ribbon stripping to provide a clean optical glass fiber which is substantially free of residue.

FIG. 4 is a graph of the change in L ("dL") for a commercially available outer primary coating as the temperature is increased. In particular, for an L of 23.2 mm, the dL for a temperature change from 25 C. (example of ambient temperature) to 100 C. (example of ribbon stripping temperature) can be calculated as follows:

$$dL/L = (delta\ L)/L$$
$$= (0.4)/23.2$$
$$= .01724$$

The dL/L value is independent of the length of the coating selected for the measurement. Thus, for different L values, the dL/L will be constant.

The normal force on the inner primary coating against the optical glass fiber, which is caused by the differential in expansion between the inner primary coating and outer primary coating during ribbon stripping, can be calculated as follows. FIG. 5 illustrates a cross-sectional view of a glass optical fiber 7, coated with an inner primary coating 8 and an outer primary coating 9. The outer primary coating 9 is the same as that in FIGS. 1 and 4. The radius of the outer surface of the inner primary coating at 25 C. is 95 microns, shown at 40. The radius of the inner surface of the outer

A110

US 6,298,189 B1

15

primary coating at 25 C. is 95 microns, also shown at **40**. As the temperature of the ribbon assembly is increased to 100 C. during ribbon stripping, the inner primary coating and outer primary coating expand.

The radius of the inner surface of the outer primary coating at 100 C. is 96.379 microns, shown at **42**. This value was calculated as follows. The (dL/L) for the outer primary coating material heated from 25 C. to 100 C. is 0.01724, as calculated from FIG. 4. The radius of the inner surface of the outer primary coating at 25 C. (95 microns) is multiplied by (1+dL/L) for a temperature change of 25 C. to 100 C. (1.01724) which provides a radius of the inner surface of the outer primary coating at 100 C. of 96.638 microns. However, this value must be corrected to take into account the expansion in the thickness of the outer primary coating. The outer primary coating has as thickness of 30 microns at 25 C. To obtain the thickness at 100 C., the thickness at 25 C. (30 microns) is multiplied by (1+dL/L) for a temperature change of 25 C. to 100 C. (1.01724), which provides a thickness of 30.5172 microns. Thus, the thickness of the outer primary coating expands 0.5172 microns when heated from 25 C. to 100 C. One half of this expansion occurs in the direction of the inner primary coating. This assumes that the inner primary coating will not substantially resist the expansion of the inner primary. Thus, one half of 0.5172 must be subtracted from the value obtained above for the radius of inner surface of the outer primary coating at 100 C. (96.638 microns) to obtain a corrected value of 96.379 microns. The change in radius over the temperature change from 25 C. to 100 C. "dR" divided by the radius at 25 C. "R" is then calculated to provide the value (dR/R).

The above measurements can be performed on the inner primary coating selected to provide a value (dR/R) for the inner primary coating. The radius of the inner primary coating at 100 C. is shown at **44**. The normal force on the inner primary coating against the optical glass fiber, which is caused by the differential in expansion between the inner primary coating and outer primary coating during ribbon stripping is shown at **46**.

The % expansion of the inner primary coating can be calculated from the following:

$$((dR/R)_{inner\ primary} - (dR/R)_{outer\ primary}) \times 100\%$$

From a stress/strain curve, one skilled in the art can easily use the % expansion to calculate the pressure of the inner primary coating against the optical glass fiber, which is caused by the differential in expansion between the inner and outer primary coating during ribbon stripping. Multiplying the pressure by the surface area of the inner primary coating against the optical glass fiber provides the normal force of the inner primary coating against the surface of the optical glass fiber.

Preferably, the $(dR/R)_{inner\ primary}$ is decreased and/or the $(dR/R)_{outer\ primary}$ is increased to reduce the differential in expansion between the inner and outer primary coating during ribbon stripping, thereby reducing the normal force of the inner primary coating against the surface of the optical glass fiber.

Based on the above, it has been found that the normal force can be decreased by reducing the pressure increase of the inner primary coating during ribbon stripping, by reformulating the inner primary coating and/or outer primary coating to provide one or more of the following properties:

(1) decreasing the elastic modulus (at ribbon stripping temperature) of the outer primary coating so that it can stretch to a greater extent to relieve more of the pressure build-up of the inner primary coating during ribbon stripping,

16

(2) increasing the (dL/L) of the outer primary coating so that the outer primary coating expands to a greater extent to allow for more expansion of the inner primary coating during ribbon stripping, and/or

(3) decreasing the (dL/L) of the inner primary coating to reduce the pressure build-up of the inner primary coating.

The elastic modulus (at ribbon stripping temperature) of the outer primary coating can be decreased by reducing the crosslink density of the outer primary coating. The elastic modulus is determined by the Elastic Modulus Test method, as discussed in the DESCRIPTION OF TEST METHODS, below. Preferably, the elastic modulus of the outer primary coating is adjusted to be between about 10 to about 40 MPa, more preferably between about 10 to about 20 MPa, at the ribbon stripping temperature. Outer primary coatings having an elastic modulus in the range of between about 15 to about 40 MPa, more preferably between about 30 and 40 MPa, have also been found suitable as well as outer primary coatings having an elastic modulus of greater than about 25 MPa. While it has been found that the crosslink density of the outer primary coating can usually be reduced without causing undesirable effects, the Tg of the outer primary coating should remain high, to provide the outer primary coating with the necessary toughness related properties to protect the optical glass fiber. For example, to reduce the crosslink density of the outer primary coating without reducing the Tg to unacceptably low values, monofunctional monomers or oligomers, which when cured exhibit a high Tg, can be used. Monofunctional is understood herein as including monomers and oligomers having an average of about 1 functional group capable of polymerization upon exposure to actinic radiation. A high Tg is herein understood to be at least about 40 C., preferably at least about 50 C.

Examples of suitable high Tg producing monofunctional monomers and oligomers include, for example, isobornyl acrylate and vinylcaprolactam. Such monomers can be utilized in amounts of about 1% to about 80%, preferably about 10 to about 50% by weight of the total composition.

Very high Tg producing multifunctional monomers or D oligomers, such as tris-hydroxyethylisocyanurate triacrylate can also be used in amounts up to about 30%, preferably to about 20% by weight, because they are effective at greatly increasing the Tg of the outer primary coating without excessively increasing the crosslink density.

The (dL/L) of the outer primary coating can be significantly increased by incorporating a monomer or oligomer which when cured exhibits a high (dL/L). For example, a suitable (dL/L), at the desired ribbon stripping temperature, for the outer primary coating has been found to be at least about 0.017, preferably at least about 0.02, and most preferably at least about 0.023. These amounts can be expressed as percentage increases in the length by multiplying by 100. Therefore, the outer primary coating preferably increases in length over the change in temperature from ambient temperature to ribbon stripping temperature ("dL/L") of at least about 1.7%, more preferably at least about 2%, and most preferably at least about 2.3%. If the coefficient of friction of the inner primary coating and/or the dL/L of the inner primary coating are sufficiently low enough, the dL/L of the outer primary coating can be less than 1.7% and still provide a fiber friction and normal force that will result in a resistive force that is less than the cohesive strength of the inner primary coating.

The high (dL/L) producing monomer or oligomer should be added in an amount sufficient to provide a cured outer primary coating with the desired level of (dL/L). For

US 6,298,189 B1

17                                                    18

example, the high (dL/L) monomer or oligomer can be added in an amount of about 10 to about 70% by weight, more preferably about 10 to about 50% by weight.

Examples of suitable high (dL/L) monomers or oligomers include isobornyl acrylate, vinylcaprolactam, tricyclodecane dimethanol diacrylate, and the adduct of 2 moles of hydroxyethylacrylate and I mole of isophorone diisocyanate.

The (dL/L) of the inner primary coating can be decreased by increasing the crosslink density of the inner primary coating. However, when reformulating the inner primary coating to increase the crosslink density, the Tg of the inner primary coating should remain low to provide the optical glass fiber with adequate protection from microbending. It has been found that the crosslink density can be increased by using multifunctional monomers and oligomers. Examples of suitable multifunctional monomers and oligomers include, hexanedioldiacrylate, trimethyolpropane triacrylate, and tripropyleneglycol diacrylate.

The ratio of the dL/L (inner primary) to the dL/L (outer primary) at the desired ribbon stripping temperature should be low enough to provide a fiber friction and normal force that results in a resistive force between the inner primary coating and the optical glass fiber that is less than the cohesive strength of the inner primary coating. In general, the lower the ratio of dL/L (inner primary) to dL/L (outer primary) the less the normal force that will be applied to the inner primary coating against the surface of the optical glass fiber. Thus, the ratio of the dL/L (inner primary) to dL/L (outer primary) required to provide a fiber friction force that results in a resistive force lower than the cohesive strength of the inner primary coating will depend upon the coefficient of friction of the inner primary coating. The lower the coefficient of friction of the inner primary coating, the greater the ratio of dL/L (inner primary) to dL/L (outer primary) that can be tolerated and still provide a fiber friction and normal force which results in a resistive force that is less than the cohesive strength of the inner primary coating.

It has been found that a suitable ratio for the dL/L (inner primary) to the dL/L (outer primary) at the desired ribbon stripping temperature is less than about 2, preferably less than about 1.7, and most preferably less than about 1.5.

The outer primary coating can also exert a force on the inner primary coating, which is caused by shrinkage of the outer primary coating during radiation curing of the outer primary coating. Thus, to reduce this force oligomers and monomers can be selected to provide a radiation-curable composition that exhibits reduced shrinkage during radiation-curing.

If an ink coating is present, the ink coating can also exert a normal force on the inner primary coating in a manner similar to the normal force exerted by the outer primary coating. However, the force exerted by the ink coating will generally be significantly less than the force exerted by the outer primary coating because the ink coating is generally about an order of magnitude thinner than the outer primary coating. The thickness of the ink layer is usually only about 3 to about 8 microns.

If desired, the normal force exerted by the ink coating can be adjusted in a similar manner as adjusting the normal force exerted by the outer primary coating, because the ink coating in general is also formed from monomers and oligomers similar to those used to form the outer primary coating. In particular, the (dL/L) of the ink coating can be adjusted to be closer to the (dL/L) of the inner primary coating by reformulating the ink coating to utilize monomers and/or oligomers that result in a coating having a (dL/L) closer to the (dL/L) of the inner primary coating, as described herein above in reference to the outer primary coating.

The invention will be further explained by the following non-limiting example.

COMPARATIVE EXAMPLES A-1 to A-2

The compositions shown in Table 1 represent commercially available coating compositions. Comparative Example A-1 is an example of an outer primary coating and Comparative Example A-2 is an example of an inner primary coating.

TABLE 1

| Component (Amount in % by weight of total composition) | Comp. Example A-1 | Comp. Example A-2 |
|---|---|---|
| Oligomer H-(T-PTMG650)$_{1-1.4}$-T-H | 39 | |
| Oligomer H-(I-PTGL2000)$_2$-I-H | | 51.41 |
| Bisphenol A Diglycidylether Diacrylate | 29 | |
| Isobornyl Acrylate | 10 | 6.86 |
| Hexanediol Diacrylate | 8.5 | |
| Phenoxyethyl Acrylate | 10 | |
| Lauryl Acrylate | | 5.95 |
| Ethoxylated Nonylphenol Acrylate | | 20.91 |
| Tripropyleneglycol Diacrylate | | 5.81 |
| Vinyl Caprolactam | | 6.11 |
| Diethylamine | | .1 |
| Gamma Mercaptopropyl Trimethoxy Silane | | 1 |
| Thiodiethylene bis(3,5-di-tert-butyl-4-hydroxy) hydrocinnamate | .5 | .31 |
| 2,4,6-Trimethylbenzoyl diphenyl phosphine oxide | 2 | 1.54 |
| 1-Hydroxycyclohexylphenyl Ketone | 1 | |

The oligomers were formed by reacting the following components:
H = Hydroxyethyl Acrylate
T = Toluene Diisocyanate
I = Isophorone Diisocyanate
PTGL2000 = 2000 molecular weight polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol (Mitsui, NY)
PTMG650 = 650 molecular weight polytetramethyleneglycol diol (Dupont)

The compositions were suitably cured by exposure to UV light from a Fusion D lamp. The dL/L for each coating was measured over the temperature range of 25 C. (ambient temperature) to 125 C. (highest usual stripping temperature).

For Comparative Example A-1, the dL/L for a temperature change from ambient temperatures (25 C.) to ribbon stripping temperatures (100 C.) was 1.42%.

For Comparative Example A-2, the dL/L for a temperature change from ambient temperatures (25 C.) to ribbon stripping temperatures (100 C.) was 2.3%.

Thus, the ratio of the dL/L (inner primary) to dL/L (outer primary) was about 1.6, which would be acceptable if the coefficient of friction of the inner primary coating was low enough. However, the inner primary coating exhibited too high of a coefficient of friction, because the fiber friction estimated by using the fiber pull-out friction method described herein below was too great. The fiber pull-out friction was 39 g/mm, which resulted in a resistive force that was greater than the cohesive strength of the inner primary coating. Therefore, substantial amounts of inner primary coating residue were left on the optical glass fiber after ribbon stripping using the above inner and outer primary coatings.

Coefficient of Friction of Inner Primary Coating

From the above equations, fiber friction between the optical glass fiber and inner primary coating can also be adjusted by reducing the coefficient of friction of the inner primary coating against the surface of the optical glass fiber. By reducing the coefficient of friction of the inner primary

US 6,298,189 B1

<table>
<tr><td>19</td><td>20</td></tr>
</table>

coating, the "rubber-like" drag of the inner primary coating on the optical glass fiber is reduced.

Preferably, the coefficient of friction of the inner primary coating is reduced without reducing the adhesion of the inner primary coating to the surface of the optical glass fiber. If the adhesion is reduced, then undesirable delamination of inner primary coating from the surface of the optical glass fiber can occur.

It has been found that the fiber friction can be adequately adjusted to a value which provides resistive force below the cohesive strength of the inner primary coating by adjusting the coefficient of friction of the inner primary coating with the use of one or more of the novel slip additives described herein. Surprisingly, the coefficient of friction can be reduced to such a level without substantially reducing the adhesion of the inner primary coating to the optical glass fiber as follows.

Preferably, the ratio of the dL/L (inner primary) to the dL/L (outer primary) is adjusted in combination with adjusting the coefficient of friction of the inner primary coating to provide a fiber friction value which results in a resistive force that is less than the cohesive strength of the inner primary coating.

In practice, ribbon assemblies are generally stripped using a heated stripping tool. However, using the inventive concepts described herein, the present invention includes ribbon assemblies which surprisingly can be ribbon stripped at much lower temperatures, such as ambient temperatures, to provide bare optical glass fibers which are substantially free-of-residue. It has been found that if the fiber friction between the inner primary coating and the surface of the optical glass fiber and/or the normal force is adjusted to a level which provides a resistive force lower than the cohesive strength of inner primary coating, the ribbon assembly will be ribbon strippable. Therefore, if a ribbon assembly which is adapted to provide ribbon strippability at ambient temperatures is desired, the fiber friction can be adjusted to a level to provide a resistive force that is less than the cohesive strength of the inner primary coating using slip agents as discussed herein. Alternatively, if the ribbon assembly is adapted to provide ribbon strippability at temperatures greater than ambient temperatures, the resistive force can be adjusted to a level lower than the cohesive strength of the inner primary coating by adjusting the ratio of the dL/L (inner primary) to the dL/L (outer primary) to provide a lower normal force and fiber friction, and/or adjusting the coefficient of friction of the inner primary coating using slip agents to provide a lower fiber friction.

Novel Radiation-Curable, Silicone-Silane Oligomer

This invention also provides a novel type of radiation-curable oligomer that can be used to adjust the fiber friction between the inner primary coating and the surface of the optical glass fiber. The radiation-curable oligomer comprises a glass coupling moiety, a slip agent moiety, and a radiation curable moiety, each moiety being linked to a single composite oligomer molecule through covalent bonding to provide a composite oligomer. Such linkage of all three moieties is heretofore unknown. Linkage of these moieties can be direct so that no intermediate linking group between the oligomer and the moiety is required. Alternatively, however, the linkage can be indirect by using intermediate linking groups.

A variety of glass coupling, slip agent, and radiation curable moieties are known in the art. The present invention can be practiced with use of various embodiments using different combinations of these moieties to produce a composite oligomer. A person skilled in the art will easily be able to prepare combinations of these various moieties from the present disclosure and general knowledge in the art.

Radiation-curing can occur by reaction of the composite oligomer's radiation-curable moieties with themselves or with radiation-curable moieties bound to other components of a formulation. In general, curing of the composite oligomer occurs in concert with other radiation-curable components. Radiation-curing, in the present invention, is associated with reaction of the radiation-curable moiety, not with the glass coupling or slip agent moieties. For example, although the glass coupling moiety will be reactive, and is often sensitive to hydrolysis and condensation reactions, these types of reactions are not the principal cure mechanism.

The molecular weight of the oligomer is not limited. In general, however, the molecular weight of the oligomer in its uncured state is usually between about 200 and about 10,000, preferably between about 500 and about 5,000. Molecular weight as used throughout this disclosure generally means number average molecular weight when measured, or the theoretical calculated molecular weight based on the reactants and reaction conditions used to make the composite oligomer.

There is no particular limitation on the molecular architecture of the composite oligomer, although in general, linear or substantially linear oligomeric structures are used rather than non-linear, cyclic, or branched structures. To the extent that the inventive concept can be practiced, however, branched or other non-linear structures are also envisioned and are not excluded. A substantially linear structure means that there is a single, dominant linear oligomeric backbone which is "capped" at the two ends of the backbone. The amount of branching units in the backbone is generally less than about 10 mole %, and preferably, less than about 5 mole %. The linear backbone may contain one or more types of repeat units, although preferably, one major type of repeat unit is used. Nevertheless, block or random copolymeric structures can be used if necessary. With a substantially linear backbone, the number of branch points in the backbone will be kept to a minimum, and preferably, will not be used. Synthetic simplicity in the oligomer structure is preferred to the extent that cost-performance can be achieved.

The term "glass coupling moiety" can be readily understood by a person skilled in the art and is understood to mean a functional group which is known or has the ability to improve adhesion to an inorganic surface or at an inorganic-organic interface, and in particular, a glass surface or at a glass-polymer interface. Such glass coupling moieties are associated with conventional coupling agents or adhesion promoters, as known to those skilled in the art. These conventional coupling agents generally have (1) an organic functional group which bonds with, or is at least associated with, the organic material at the interface, and (2) an inorganic component which bonds, usually covalently, to the inorganic material at the interface. Although the complexities of such bonding are not fully understood, usually, bonding to the inorganic surface occurs following hydrolysis and/or condensation reactions.

Exemplary conventional silane coupling agents are disclosed in E. P. Plueddemann's *Silane Coupling Agents*, Plenum Press (1982), the complete disclosure of which is hereby incorporated by reference. Non-silane types of coupling agents are also known and include, for example, chromium, orthosilicate, inorganic ester, titanium, and zirconium systems. Although the present invention is preferably practiced with use of silane glass coupling moieties, the invention is not so restricted, and a person skilled in the art

US 6,298,189 B1

21

is enabled by the present disclosure to use these other systems as well.

In the present invention, the glass coupling moieties are not part of a conventional coupling agent, but are incorporated covalently into the oligomer in a manner which preserves their coupling function to the inorganic surface or at the inorganic-organic interface. In a preferred embodiment, for example, the organic component of a conventional coupling agent is linked covalently, either directly or indirectly, with the composite oligomer together with the slip agent and radiation curable moieties. After this linkage, the glass coupling moiety will still have its inorganic component effective for bonding with the inorganic surface or at the inorganic-organic interface. However, the invention is not so limited, and the glass coupling moiety is not necessarily linked to the composite oligomer by reaction of the organic functional group of a conventional coupling agent.

Silane coupling moieties are preferred. These moieties can be created by covalently linking a conventional coupling agent or adhesion promoter with the oligomer. Representative types of silane coupling moieties have been disclosed in the aforementioned Plueddemann reference and the product information publication from Union Carbide entitled "UNION CARBIDE® Organofunctional Silanes Products and Applications" (1991, 1992), the complete disclosure of which is hereby incorporated by reference. The inorganic component of the conventional silane coupling agent is generally represented by the formula:

$$-Si(OR)_3$$

where R is a conventional lower, and preferably, a $C_1$–$C_4$, alkyl group such as methyl or ethyl which imparts at least some hydrolyzability to the silane. Other types of R groups are also known in the art, however, and the invention is not particularly limited by the particular R group or silane structure to the extent that glass coupling can occur. Generally, at least one hydrolyzable "—Si—O—R" linkage will be present in the glass coupling moiety to facilitate coupling to the surface of the optical glass fiber. Preferably, there is more than one such linkage. Hydrolyzable means that this linkage is sensitive to reaction with water to generate "—Si—OH" linkages. In turn, "—Si—OH" linkages are believed to condense to form "—Si—O—Si—" linkages. In many cases, hydrolysis may even begin to occur with exposure to atmospheric moisture. Hydrolysis of silanes and glass surfaces in the context of optical fiber coatings is discussed in, for example: (i) the chapter entitled "Coating and Jackets", Chapter 10, Blyler et al. *Optical Fiber Telecommunications*, 1979, pgs. 299–341, and (ii) S. Wu, *Polymer Interface and Adhesion*, Marcel Dekker, 1982, pgs. 406–434, the complete disclosures of which are hereby incorporated by reference.

Common organic functionalities of the silane coupling agents include, for example, amino, epoxy, vinyl, methacryloxy, isocyanato, mercapto, polysulfide, and ureido. Using synthetic methods known in the art, the organic functionality can be reacted with the oligomer to yield a covalent linkage between the glass coupling moiety and the oligomer. In a preferred embodiment, for example, mercaptopropyl silane is linked with an oligomer containing an isocyanate group to form a thiourethane adduct between the mercapto group and the isocyanate group. Although a strong linkage is preferred, the present invention encompasses the possibility that although a covalent linkage is formed, the covalent linkage may not be strong and may, for example, be

22

sensitive to disruption with the application of heat. However, as long as the glass coupling moiety produces the desirable effect of promoting adhesion, the covalent linkage is sufficient. If necessary, catalysts may be used to promote linkage formation.

Slip agents when used to practice this invention do not substantially affect the adhesion of the inner primary coating to the surface of the optical glass fiber. Instead, the slip agents reduce the sliding force of the inner primary coating against the surface of the optical glass fiber, once the bonds between the surface of the optical glass fiber and inner primary coating are broken (i.e. after the inner primary coating has been delaminated).

Slip agents are also known in the art as, among other things, release, antiblocking, antistick, and parting agents. Slip agents are commonly oligomeric or polymeric and are usually hydrophobic in nature, with the most common examples including silicones (or polysiloxanes), fluoropolymers, and polyolefins. If desired, the slip agent moiety can include silicones, fluoropolymers, and/or polyolefins in combination with polyesters, polyethers and polycarbonates. Slip agents are disclosed in, for example, the article entitled "Release Agents" published in the *Encyclopedia of Polymer Science*, 2nd Ed., Vol. 14, Wiley-Interscience, 1988, pgs. 411–421, the complete disclosure of which is hereby incorporated by reference. Although slip agents operate over a wide variety of interfaces, the present invention is particularly concerned with an interface of a glass surface, and in particular, a glass-organic coating interface between the inner primary coating and the surface of the optical glass fiber. A slip agent can be covalently incorporated into the composite oligomer as a slip agent moiety.

In a preferred embodiment, the slip agent moiety is the principal component of the oligomer in terms of weight percent because the slip agent moiety itself is usually oligomeric in nature, and the glass coupling and radiation-curable moieties are usually of lower molecular weight. For example, the slip moiety can be up to about 95 wt. % of the total composite oligomer weight when the three moieties are directly linked together. However, when an oligomeric backbone is present, the slip agent usually can be up to about 85 wt. % of the composite oligomer weight. As with the molecular weight of the composite oligomer of the present invention, the molecular weight of the slip agent moiety is not strictly limited, but will generally be between about 150 and about 9,500, preferably, between about 400 and about 4500.

As with the molecular architecture of the oligomer, there is no particular limitation on the molecular architecture of the slip agent moiety, although in general, substantially linear structures can be used. Non-linear or branched structures, however, are not excluded. Oligomeric slip agent moieties, when present, may contain different kinds of repeat units, although preferably, there is one main type of repeat unit.

Oligomeric silicone slip agent moieties are preferred, and oligomeric silicones comprising substantial portions of methyl side groups are particularly preferred. The side groups preferably impart hydrophobic character to the silicone. Other preferred side groups include ethyl, propyl, phenyl, ethoxy, or propoxy. In particular, dimethylsiloxane repeat units represented by the formula, "—OSi($CH_3$)$_2$—" are preferred.

In a preferred embodiment, the end groups on a substantially linear silicone oligomer can be linked with a radiation curable moiety at one end and a slip agent moiety at the other

**A114**

US 6,298,189 B1

23

24

end. Such linkage can involve intermediate linkage groups. Although linkage at the silicone oligomer end group is preferred, the silicone moiety can be tailored for linkage with slip agent and radiation-curable moieties at other points in the oligomer molecule besides the end groups. For example, functional groups can be incorporated throughout the molecular structure of the silicone oligomer that are linked with the radiation- curable and slip agent moieties. Examples of functionalized silicones which can be incorporated into the oligomer include polyether, polyester, urethane, amino, and hydroxyl.

Other types of slip agent moieties including those made from fluorinated slip agents can also be used. Examples of suitable fluorinated slip agents include FC-430, FX-13, and FX-189 (Minnesota Mining and Manufacturing), Fluorolink E (Ausimont), and EM-6 (Elf Atochem).

Generally, the composite oligomer of the present invention is surface active because of the glass coupling moieties, and in particular, may tend to concentrate at coating interfaces, such as the glass-coating interface, if not bound in the inner primary coating. However, the covalent binding of the composite oligomer after cure, due to the radiation-curable moiety, may retard such surface activity or migration. Surface activity means that the composite oligomer, when placed in a formulation, tends to migrate to the surface of the formulation rather than be dispersed evenly throughout the formulation.

The radiation-curable moiety should help ensure that the composite oligomer is covalently linked within a radiation-curable coating so that the composite oligomer cannot be extracted or volatilized from the cured coating without breaking covalent bonds.

The radiation-curable moiety can include any functional group capable of polymerizing under the influence of, for example, ultraviolet or electron-beam radiation. One type of radiation-curable functionality is, for example, an ethylenic unsaturation, which in general is polymerized through radical polymerization, but can also be polymerized through cationic polymerization. Examples of suitable ethylenic unsaturation are groups containing acrylate, methacrylate, styrene, vinylether, vinyl ester, N-substituted acrylamide, N-vinyl amide, maleate esters and fumarate esters. Preferably, the ethylenic unsaturation is provided by a group containing acrylate, methacrylate or styrene functionality. Most preferably, the ethylenic unsaturation is provided by a group containing acrylate functionality.

Another type of functionality generally used is provided by, for example, epoxy groups, or thiol-ene or amine-ene systems. Epoxy groups, in general, can be polymerized through cationic polymerization, whereas the thiol-ene and amine-ene systems are usually polymerized through radical polymerization. The epoxy groups can be, for example, homopolymerized. In the thiol-ene and amine-ene systems, for example, polymerization can occur between a group containing allylic unsaturation and a group containing a tertiary amine or thiol.

The amount or number of glass coupling, slip agent, and radiation curable moieties in the composite oligomer is not particularly limited provided that advantages of the present invention can be achieved and the inventive concept is practiced. Thus, a single molecule of the composite oligomer can contain multiple numbers of glass coupling, slip agent, or radiation-curable moieties, although in a preferred embodiment, a single oligomeric molecule contains one glass coupling, one slip agent, and one radiation- curable moiety.

The glass coupling, slip agent, and radiation curable moieties should be covalently linked together in the oligo-

mer. There is no particular limitation to how this linkage is effected provided that advantages of the present invention are achieved and the inventive concept practiced. Linkage may entail direct linkage to the oligomer, or alternatively, indirect linkage to the oligomer. Intermediate linking groups will generally operate by way of two functional groups on a linking compound which can link, for example, the radiation- curable moiety with the slip agent moiety, or link the glass coupling moiety with the slip agent moiety.

Representative linking compounds include diisocyanate compounds, wherein linkage occurs by formation of urethane, thiourethane, or urea links by reaction of hydroxyl, thiol, and amino groups respectively, with isocyanate. Such diisocyanate compounds are well-known in the polyurethane and radiation curable coating arts. Aromatic or aliphatic diisocyanates can be used, although aliphatic diisocyanates are preferred. Other linkages can be through, for example, carbonate, ether and ester groups. Preferably, urethane, urea or thiourethane groups are used as the linking groups.

The oligomer, therefore, preferably comprises within its structure at least one linkage represented by

$$—NH—CO—X—$$

wherein X is an oxygen, sulfur, or nitrogen atom. Urethane and thiourethane groups are most preferred. Urethane groups, for example, can hydrogen bond.

Although the present invention is not limited to one particular molecular architecture for the composite oligomer, in a preferred embodiment which makes use of intermediate linking groups, the composite oligomer can be represented by the following generic structure:

$$R—L_1—A—L_2—C$$

wherein

A represents the slip agent moiety,

R represents a radiation-curable moiety,

C represents the glass coupling moiety, and

$L_1$ and $L_2$ represent linking groups.

$L_1$ and $L_2$ can be independently any group capable of providing a covalent link between the "R" moiety and the "A" moiety or between the "C" moiety and the "A" moiety. Based on the disclosure provided herein, one skilled in the art will easily be able to understand what linking groups are suitable for the particular "A", "C" and "R" groups selected.

In particular, urethane and thiourethane linking groups are preferred. Urethane and thiourethane linking groups are formed by, for example, (i) linking a hydroxyl end-capped oligomer with a low molecular weight diisocyanate compound at both oligomer ends without extensive coupling of the oligomer, (ii) linking the isocyanate end-capped oligomer with a low molecular weight hydroxyacrylate compound, or (iii) linking the isocyanate end-capped oligomer with a low molecular weight mercapto compound.

The linking groups, however, are considered optional. In other words, the oligomer also can be represented by the following generic structures:

$$R—L_1—A—C,$$

$$R—A—L_2—C,$$

or

$$R—A—C.$$

US 6,298,189 B1

25

Although the present invention is disclosed in terms of the aforementioned groups or moieties, other groups can in principle be incorporated into the molecular structure to the extent that the advantages of the present invention can be achieved and the inventive concept practiced.

A preferred embodiment of the present invention is the preparation of a composite oligomer with use of the following ingredients: a silicone oligomer having two hydroxyl end groups (slip agent moiety), isophorone diisocyanate (linkage), hydroxyethyl acrylate (radiation-curable moiety), and mercaptopropyl silane (glass coupling moiety). isophorone diisocyanate (IPDI) serves to end-cap both ends of the silicone diol oligomer and provide a linking site with the hydroxyethyl acrylate at one end of the silicone oligomer and with the mercaptopropyl silane at the other end.

A preferred application for the composite oligomer is as an oligomeric additive, or even as a main oligomeric component, in a radiation-curable coating, and in particular, an inner primary, optical glass fiber coating. The amount of oligomeric additive incorporated into the radiation curable matrix is not particularly limited but will be sufficient or effective to achieve the specific performance objectives of the particular application. In general, however, a suitable amount will be between about 0.5 wt. % and about 90 wt. %, preferably, between about 0.5 wt. % and about 60 wt. %, and more preferably, between about 0.5 wt. % and about 30 wt. % with respect to the total weight of the radiation-curable coating formulation. In general, higher molecular weight composite oligomers will be present in a radiation-curable coating in greater weight percentages than lower molecular weight composite oligomers.

The composite oligomer functions to tailor the properties of formulations which exhibit too great a coefficient of friction or too low adhesion. Specifically, the composite oligomer can increase the adhesion if the adhesion is unacceptably low, and in particular unacceptably low in the presence of moisture. Alternatively, the composite oligomer can reduce the coefficient of friction of a coating. Conventional coupling additives and slip agents cannot perform this dual function.

If desired, although a reduction in the number of additives is desirable, the composite oligomer can be used in conjunction with conventional coupling and slip agents to improve absolute performance or cost-performance. In a preferred embodiment, for example, the composite oligomeric can be used in conjunction with a functional organosilane compound such as, for example, mercaptopropyl silane. For example, a hydroxybutylvinylether adduct with $OCN$—$(CH_2)_3Si(OCH_3)_3$ can also be used together with the composite oligomer.

The composite oligomer can be incorporated into a wide variety of radiation-curable formulations. There are no particular limitations provided that the inventive concept is practiced and advantages accrue. One skilled in the art of formulating radiation-curable coatings will easily be able to incorporate the composite oligomer therein to provide the desired properties.

In optical glass fiber coating applications, for example, other formulation components generally include:

(i) at least one multi-functional radiation-curable oligomer, which is a different oligomer than the composite oligomer of the present invention, to provide a cross-linked coating;

(ii) at least one reactive diluent to adjust the viscosity to a level acceptable for application to optical glass fibers, and

(iii) at least one photoinitiator.

Additives such as antioxidants, and as already noted, coupling and slip agents may also be utilized.

Radiation-curing is generally rapidly effected with use of ultraviolet light, although the present invention is not so limited, and a person of skill in the art can determine the best cure method. Radiation-curing results in polymerization of at least some of the radiation-curable moieties present in the composite oligomer which covalently links the composite oligomer to itself or, more preferably, other radiation- curable components in the formulation. The chemical processes which occur upon mixing and curing formulations are in some cases complex and may not be fully understood. The present invention, however, is not limited by theory and can be readily understood and practiced by persons of skill in the art. The formulations of the present invention, just like the composite oligomer, can be in pre-cured, partially cured, and in cured states. The term component, which defines additives and compounds used to prepare the formulations, generally refers to starting materials before mixing. After mixing, interactions or even reactions between the components may occur.

The composite oligomer can be incorporated into inner primary coating compositions, outer primary coating compositions, ink compositions and matrix forming compositions. The composite oligomer also can be incorporated into so-called single coating systems.

In general, the coating substrate will be an inorganic or glass substrate, although in principle, other substrates such as polymeric substrates may also be effectively used. The substrate preferably has the capacity to couple with the glass coupling moiety of the oligomeric additive. In a preferred application, the coating substrate is an optical glass fiber, and in particular, a freshly drawn, pristine optical glass fiber. Freshly prepared optical glass fiber is known in the art to be responsive to glass coupling agents. Exemplary methods of coating optical fibers are disclosed in, for example, U.S. Pat. Nos. 4,474,830 and 4,913,859, the complete disclosures of which are hereby incorporated by reference.

The present inventions will be further explained by use of the following non-limiting examples.

EXAMPLE 2-1 AND COMPARATIVE
EXAMPLES B-1 AND B-2

Synthesis of Novel Composite Oligomer

A 1,000 mL four-necked flask was charged with isophorone diisocyanate (55.58 g). 2,6-di-tertbutyl-4-methylphenol (0.12 g) and dibutyltin dilaurate (0.24 g) were added to the flask. 14.51 grams of Hydroxyethyl acrylate was added over a 90 minute period while maintaining the temperature below 40 C. At the end of 90 minutes, the temperature was increased to 40 C., and the mixture was stirred at 40 C. for one hour. The temperature was allowed to decrease to about 30 C. Mercaptopropyl silane (28.13 g of an 87.1% pure product) was added over 90 minutes during which time the temperature was maintained below 40 C. After the addition of mercaptopropyl silane, the temperature was increased to 40 C., and the reaction mixture was stirred at 40 C. for 17–18 hours. 300 g of a 50% ethoxylated polydimethylsiloxane diol of 1200 equivalent weight Q4-3667 (Dow Corning) was then added, and the temperature was increased to 70 C. After about six hours, the isocyanate content was measured to be about zero percent. The temperature was decreased to 50 C. Based on the reaction conditions and reactants, a composite silicone silane acrylate oligomer was formed having the following structure:

H-I-(Q4-3667)-I-M

wherein:

US 6,298,189 B1

27

H=hydroxyethylacrylate,

I=isophorone diisocyanate,

Q4-3667=the above described silicone diol, and

M=mercaptopropyl silane

Preparation of Pre-Cured Formulation

The components shown in Table 2 were combined, except for the composite oligomer and the silane coupling agent. The components were heated to about 60 C. and mixed to form homogeneous mixtures. The composite oligomer and silicone coupling agent were mixed therein and the mixture was heated for approximately 15 minutes at 60 C. to form an improved radiation-curable, inner primary, optical glass fiber coating composition, Example 2-1. The mixtures for Comparative Examples B-1 and B-2 were prepared similarly. Drawdowns of the compositions were made and then suitably cured by exposure to UV light to form cured coatings. The cured coatings were tested for resistance to delamination and fiber pull-out residue using the following methods.

Water Soak Delamination Test

A drawdown of each inner primary coating composition was made to form a 75 micron film of the inner primary coating composition on microscope slides and then cured by exposure to 1.0 J/sq cm, from a Fusion D lamp, 120 W/cm, under a nitrogen atmosphere. Then, a drawdown of each outer primary coating was made to form a 75 micron film of the outer primary coating composition over the cured 75 micron inner primary film, and then cured in the same manner as the inner primary coating.

Deionized water was placed in a 500 ml beaker and the coated microscope slides were soaked in the water. The beaker containing the coated slides was then placed in a 60 C. hot water bath. The films were observed for delamination periodically. The time when the first signs of delamination appeared were recorded.

Fiber Pull-Out Residue Test

The operation of stripping coatings from optical fibers to leave a bare glass surface was simulated by pulling four bare glass fibers out of a layer of cured inner primary coating. Microscopic examination of the pulled-out fibers at low magnification (e.g., 10×) clearly revealed the presence or absence of debris on the glass surface. If debris was present, the amount of debris was noted. The results of these tests are provided in Table 2.

TABLE 2

| Component (Amount is % by weight based on total weight of composition) | Ex. 2-1 | Comp. Ex B-1 | Comp. Ex B-2 |
|---|---|---|---|
| Urethane acrylate oligomer | 53.2 | 56 | 53.87 |
| Isodecyl Acrylate | 13.3 | 14 | 13.47 |
| Ethoxylated-nonylphenol Monoacrylate | 24.22 | 25.5 | 24.53 |
| Silicone Silane Oligomer H-I-Q4-3667-I-A189 | 5 | 0 | 0 |
| Q4-3667 (Dow Coming) | 0 | 0 | 3.8 |
| Photoinitiator | 2.85 | 3 | 2.89 |
| Antioxidant | 0.47 | 0.5 | 0.48 |
| γ-Mercapto-propyl Trimethoxy-Silane | 0.95 | 1.0 | 0.96 |
| Fiber Pull-out Residue Test | no residue | lot of residue | no residue |
| Delamination, | none | none | delam. |

28

TABLE 2-continued

| Component (Amount is % by weight based on total weight of composition) | Ex. 2-1 | Comp. Ex B-1 | Comp. Ex B-2 |
|---|---|---|---|
| if any, after the hot water soak* | | | After 1 hour at 60 C |

The oligomers were formed by reacting the following monomers:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
Q4-3667 = ethoxylated polydimethylsiloxane diol, MW of 1200 (Dow Corning)
*Samples were aged for 4 hours at 60 C. Then the water bath was shut-off for about 70 hours. The temperature was then brought back to 60 C for an additional 48 hours.

Comparative Example B-1 was a formulation which did not contain the composite oligomer of the present invention, but which contained a silane coupling agent. However, poor results were obtained in the pull-out test because adhesion was too strong.

Comparative Example B-2 was a formulation which contained a conventional silicone slip agent. The silicone slip agent improved the results of the pull-out test compared to Comparative Example A, but only at the expense of hydrolytic interfacial adhesion.

Example 2-1 was a formulation that contained the composite oligomer of the present invention. The composite oligomer remarkably improved the results of the pull-out test but not at the expense of hydrolytic interfacial adhesion.

EXAMPLES 2-2 AND 2-3, AND COMPARATIVE EXAMPLES B-3 AND B-4

These Examples and Comparative Examples were conducted to demonstrate the effect of the composite oligomer on glass plate adhesion. The formulations shown in Table 3 were prepared in the same manner as in Example 2-1 and Comparative Examples B-1 and B-2. The silicone silane acrylate oligomer was prepared in the same manner as in Example 2-1, except that a silicone diol HSi-2111 (Tego Chemie) was used instead of Q4-3667 (Dow Corning).

Films of the coating materials (75 microns thick) were prepared on microscope slides and then cured by exposure to UV light. A commercially available outer primary coating was formed on top of the coatings. The films were soaked in water at 60 C. and then examined for delamination. In addition, dry and wet adhesion was measured at 50% and 95% relative humidity (RH), respectively. The results are summarized in Table 3.

Dry (50% RH) and wet (95% RH) adhesion can be measured by recognized test methods. For example, as explained in U.S. Pat. No. 5,336,563 (Coady et al.) and U.S. Pat. No. 5,384,342 (Szum), the wet and dry adhesion was tested on cured film samples prepared by drawing down, with a Bird Bar, a 75 micron film of the coating compositions on glass microscope slides and cured by exposure to 1.0 J/sq cm, from a Fusion D lamp, 120 W/cm, under a nitrogen atmosphere, as noted above in Example 2-1.

The samples were then conditioned at a temperature of 23±2° C. and a relative humidity of 50±5% for a time period of 7 days. A portion of the film was utilized to test dry adhesion. Subsequent to dry adhesion testing, the remainder of the film to be tested for wet adhesion was further conditioned at a temperature of 23±2° C. and a relative humidity of 95% for a time period of 24 hours. A layer of polyethylene wax/water slurry was applied to the surface of the further conditioned film to retain moisture.

A117

US 6,298,189 B1

29

The adhesion test was performed utilizing apparatus which included a universal testing instrument, e.g., an Instron Model 4201 commercially available from Instron Corp., Canton, Mass., and a device, including a horizontal support and a pulley, positioned in the testing instrument.

After conditioning, the samples that appeared to be uniform and free of defects were cut in the direction of the draw down. Each sample was 6 inches long and 1 inch wide and free of tears or nicks. The first one inch of each sample was peeled back from the glass. The glass was secured to the horizontal support with the affixed end of the specimen adjacent the pulley. A wire was attached to the peeled-back end of the sample, run along the specimen and then run through the pulley in a direction perpendicular to the specimen. The free end of the wire was clamped in the upper jaw of the testing instrument which was then activated. The test was continued until the average force value, in grams force/inch, became relatively constant. The preferred value for wet adhesion is at least about 5 g/in.

TABLE 3

| Component (Amount in parts by weight) | Ex. 2-2 | Ex. 2-3 | Comp. Ex. B-3 | Comp. Ex. B-4 |
|---|---|---|---|---|
| Oligomer C H-I-(PTHF2000-I)$_2$-H | 49.22 | 49.22 | 49.22 | 49.22 |
| Ethoxylated nonylphenol Acrylate | 24.76 | 24.76 | 24.76 | 24.76 |
| Lauryl Acrylate | 16.64 | 16.64 | 16.64 | 16.64 |
| 2,4,6-trimethylbenzoyl Diphenyl Phosphine Oxide | 3.0 | 3.0 | 3.0 | 3.0 |
| Thiodiethylene bis (3,5-di-Tert-Butyl-4-Hydroxy) hydrocinnamate | 0.46 | 0.46 | 0.46 | 0.46 |
| gamma-Mercaptopropyl Trimethoxy Silane | 0.92 | — | 0.92 | |
| Silicone Silane Acrylate Oligomer H-I-HSi2111-I-M | 5 | 5 | — | — |
| Adhesion at 50% RH (g/in) | 45 | 14 | 27 | 9 |
| Adhesion at 95% RH (g/in) | 34 | 12 | 20 | 4 |
| 60 C Water Soak | No Delamination After 24 Hours | Slight Delamination After 15 Minutes | No Delamination After 8 Hours; Slight Delamination After 24 Hours | Delamination After 15 Minutes |

The oligomers were formed by reacting the following monomers:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
M = Mercapto Silane
PTHF2000 = 2000 molecular weight Polytetramethylene Ether Glycol (BASF)
HSi2111 = a silicone diol having a MW of 1000 (Tego Chemie)

The results in Table 3 indicate that the composite oligomer is not only able to improve adhesion to the glass surface, but is also able to act synergistically with a conventional silane coupling agent.

EXAMPLE 2-4

The formulation shown in Table 4 was prepared in the same manner as in Example 2-1. The silicone silane acrylate oligomer was the same as that prepared in Example 2-1.

30

A film of the coating material (75 micron thick) was prepared on glass plates and then cured by exposure to UV light in the same manner as above. The tensile strength, elongation and modulus were measured.

A 75 micron film of the coating material was also prepared and suitably cured. The crack propagation was then measured. A fiber pull-out friction test was also conducted, as described herein. The predicted ribbon strip cleanliness was calculated. The results are shown in Table 4.

TABLE 4

| Component (Amount in % by weight of total composition) | Example 2-4 |
|---|---|
| H-I-(PTGL2000-I)$_2$-H | 49.24 |
| Ethoxylated Nonylphenol Acrylate Ester | 25.46 |
| Diphenyl (2,4,6-trimethylbenzoyl) Diphenyl Phosphine Oxide and 2-Hydoxy-2-Methyl-1-Phenyl-1-Propanone blend | 3 |
| Lauryl Acrylate | 16 |
| Thiodiethylene bis (3,5-di-Tert-Butyl-4-Hydroxy) hydrocinnamate | 0.5 |
| H-I-HSI2111-I-M | 5 |
| Mercaptopropyl trimethoxy silane | 0.8 |
| Test Results | |
| Viscosity, mpa.s at 25 C | 7000 |
| Tensile Strength, MPa | 0.8 |
| Elongation, % | 230 |
| Modulus, MPa | 1 |
| Dose @ 95% Modulus, J/cm$_2$ | 0.64 |
| E' = 1000 MPa, ° C. | −66 |
| E' = 100 MPa, ° C. | −50 |
| Peak TAN Delta ° C. | −40 |
| E$_0$, MPa | 1.3 |
| Strip Cleanliness Predicted | 3 |
| Crack Propagation, mm | 1.49 |
| Fiber pull-out Friction, g/min | 18.5 |

The oligomers were formed by reacting the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
M = Mercaptopropyl trimethoxy silane
PTGL2000 = 2000 molecular weight polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol (Mitsui, NY)
HSI2111 = a silicone diol having a MW of 1000 (Tego Chemie, or Gold Schmidt Chemical Corp.)

From the above test data, surprisingly, the novel silicon silane acrylate oligomer can be used to provide an inner primary coating having a fiber friction that provides a resistive force that is less than the cohesive strength of the inner primary coating. This finding is based on the predicted strip cleanliness being about 3. A value of about 3 or less is very good and will usually provide a bare optical glass fiber which is suitable for connection to another optical glass fiber or component of a light transmission assembly, without having to wipe residue from the bare optical glass fiber.

DESCRIPTION OF TEST METHODS USED HEREIN

Predicted Strip Cleanliness Test Method

The predicted strip cleanliness is the predicted degree of cleanliness of a bare optical glass fiber after the inner primary coating has been removed during ribbon stripping. A lower number is better.

Surprisingly, it has been found that the degree of cleanliness of a bare optical glass fiber of a selected ribbon assembly can be predicted by measuring the following two properties of the inner primary coating:

(1) fiber pull-out friction; and
(2) crack propagation.

The crack propagation is a measure of the cohesive strength of the inner primary coating. The greater the cohesive strength of the inner primary coating the greater the

US 6,298,189 B1

31

amount of energy required to break apart the inner primary coating. Thus, an inner primary coating having a higher cohesive strength can withstand greater stripping forces during ribbon stripping without breaking apart and leaving residue on the surface of the optical glass fiber, than an inner primary coating having a lower cohesive strength.

The crack propagation can be measured as follows. First make a 75 micron thick drawdown of the inner primary composition and then cure the film by exposing it to 1.0 J/cm² of UV from a Fusion D lamp under a nitrogen atmosphere. Cut three test strips of dimensions 35 mm long, 12 mm wide, and 75 micron thick. A cut 2.5 mm long is made in the side of each strip. A strip is mounted in a RSA-II rheometer, the temperature brought to 90 C. (representative ribbon stripping temperature), and a constant extension rate of 0.1 mm/second is applied to the test strip. The measure of cohesive strength is the increase in length L before the crack propagates across the width of the test strip. The gauge length is constant at 23.2 mm. The value reported is currently the average of three measurements.

The fiber pull-out friction of the inner primary coating is an estimate of the fiber friction between the inner primary coating and the bare optical glass fiber. In general, the lower the fiber pull-out friction of the inner primary coating the lower the fiber friction between the optical glass fiber and the inner primary coating, the lower the resistive force, and the easier the inner primary coating will slide off of the optical glass fiber. Also, the lower the fiber friction, the less force that will be applied to the inner primary coating to conduct ribbon stripping. The less the force being applied to the inner primary coating, the lower the chance that the cohesiveness of the inner primary coating will fail, thus leaving inner primary coating residue on the surface of the optical glass fiber.

The fiber pull-out friction test can be performed as follows. The sample consists of a bare, clean optical fiber, one end of which has been embedded in a 250 micron thick sheet of cured inner primary coating to be tested. This assembly is mounted in a suitable instrument such as a Rheometrics RSA-II rheometer, and the temperature raised to a representative ribbon stripping temperature (such as 90° C.), and the fiber pulled slowly out of the sheet at a rate of 0.1 mm/sec. The instrument records and plots force vs distance. The plots typically show a linear region of negative slope, which is the result of a decreasing area of contact between fiber and coating, as the fiber is being withdrawn. The slope is measured, and is the output of the test. Low slope values correspond to a low fiber pull-out friction, and vice versa. Three test samples should be performed and their average used as the final output of the test.

Prior to using the information from the crack propagation and coefficient of friction measurements as a prediction method, calibration is required. Calibration consists of obtaining test data on at least five inner primary coatings of known cleanliness performance, and fitting the data to a three-dimensional surface using statistical procedures in a suitable statistical/plotting computer program. A convenient two-dimensional representation of the three-dimensional surface is a contour plot, in which each contour represents a fixed value of the cleanliness rating, and the vertical and horizontal axes are output values of the fiber pull-out friction and crack propagation tests, respectively.

The cleanliness ratings should be expressed on a quantitative scale, for example, a scale of 1 to 5. An example of a suitable quantitative scale is the "Mill's" test described in the background section herein above, the complete disclosure of which is incorporated herein by reference. When

32

referring to strip cleanliness and predicted strip cleanliness herein, the numerical values correspond to those of the Mill's test.

After the calibration contour plot has been obtained, a point is plotted on it, using data from crack propagation and fiber pull-out friction measurements of an inner primary coating formulation for which a cleanliness prediction is desired. A prediction of cleanliness is obtained by noting the position of the point relative to the contour lines closest to it.

The following hypothetical example illustrates the calibration step, and the use of the contour plot thus produced, to obtain a predicted ribbon-stripping cleanliness. Eight inner primary coatings A through H, are prepared, and coated on an optical fiber in the usual manner, all having the same outer primary coating over the respective inner primary coatings. Coated fiber representing each of the eight inner primary coatings are then coated with an ink layer, and then assembled into a ribbon assembly. The type of ink and matrix material for ribbon assembly should be identical for all eight specimens. Three ribbon assemblies of each sample can be stripped at the desired ribbon stripping temperature. The cleanliness of each sample is evaluated using the Mill's test, in which 1 is best and 5 is worst. The final rating for each of the eight specimens is the average of the ratings of the three replicates. The hypothetical results are shown in Table 5.

TABLE 5

| | HYPOTHETICAL | | |
|---|---|---|---|
| Coating | Fiber Friction (g/mm) | Crack Propagation (mm) | Rating |
| A | 2 | 1.1 | 1.6 |
| B | 30 | 0.8 | 5 |
| C | 35 | 1.6 | 3.7 |
| D | 20 | 1.7 | 2.8 |
| E | 7 | 2.3 | 1.8 |
| F | 25 | 2.0 | 1.5 |
| G | 4 | 1.6 | 1.6 |
| H | 22 | 1.0 | 3.9 |

Next, samples for fiber pull-out friction and crack propagation are prepared from the inner primary coating made from the selected inner primary composition, and output values for each test obtained, by the methods described herein. At this point, there are three data values associated with each of the eight samples. Hypothetical values, chosen to be typical of actual cases, are recorded in Table 5. The contour plot produced by a statistical software program is shown in FIG. 6.

This contour plot is used as follows. For example, a sample of an experimental inner primary coating is measured by the Fiber Pull-Out Friction and Crack Propagation tests, and the resulting data values were 10 and 1 respectively. The point corresponding to those values is located on the contour plot, and it is seen to fall between the contour values of 2.5 and 3. From its location relative to the two lines, the predicted cleanliness rating is estimated to be about 2.7.

A value of about 3 or less is considered acceptable for optical glass fiber connections.

Viscosity Test Method

The viscosity was measured using a Physica MC10 Viscometer. The test samples were examined and if an excessive amount of bubbles was present, steps were taken to remove most of the bubbles. Not all bubbles need to be

**A119**

US 6,298,189 B1

33                                                                     34

removed at this stage, because the act of sample loading introduces some bubbles.

The instrument was set up for the conventional Z3 system, which was used. The samples were loaded into a disposable aluminum cup by using the syringe to measure out 17 cc. The sample in the cup was examined and if it contains an excessive amount of bubbles, they were removed by a direct means such as centrifugation, or enough time was allowed to elapse to let the bubbles escape from the bulk of the liquid. Bubbles at the top surface of the liquid are acceptable.

The bob was gently lowered into the liquid in the measuring cup, and the cup and bob were installed in the instrument. The sample temperature was allowed to equilibrate with the temperature of the circulating liquid by waiting five minutes. Then, the rotational speed was set to a desired value which will produce the desired shear rate. The desired value of the shear rate is easily determined by one of ordinary skill in the art from an expected viscosity range of the sample.

The instrument panel read out a viscosity value, and if the viscosity value varied only slightly (less than 2% relative variation) for 15 seconds, the measurement was complete. If not, it is possible that the temperature had not yet reached an equilibrium value, or that the material was changing due to shearing. In the latter case, further testing at different shear rates will be needed to define the sample's viscous properties. The results reported are the average viscosity values of three test samples.

Tensile Strength, Elongation and Modulus Test Method

The tensile strength, elongation and modulus of cured samples was tested using a universal testing instrument, Instron Model 4201 equipped with a personal computer and software "Series IX Materials Testing System." The load cells used were 2 and 20 pound capacity. The ASTM D638M was followed, with the following modifications.

A drawdown of each material to be tested was made on a glass plate and cured using a UV processor. The cured film was conditioned at 22 to 24° C. and 50±5% relative humidity for a minimum of sixteen hours prior to testing.

A minimum of eight test specimens, having a width of 0.5±0.002 inches and a length of 5 inches, were cut from the cured film. To minimize the effects of minor sample defects, sample specimens were cut parallel to the direction in which the drawdown of the cured film was prepared. If the cured film was tacky to the touch, a small amount of talc was applied to the film surface using a cotton tipped applicator.

The test specimens were then removed from the substrate. Caution was exercised so that the test specimens were not stretched past their elastic limit during the removal from the substrate. If any noticeable change in sample length had taken place during removal from the substrate, the test specimen was discarded.

If the top surface of the film was talc coated to eliminate tackiness, then a small amount of talc was applied to the bottom surface of test specimen after removal from the substrate.

The average film thickness of the test specimens was determined. At least five measurements of film thickness were made in the area to be tested (from top to bottom) and the average value used for calculations. If any of the measured values of film thickness deviates from the average by more than 10% relative, the test specimen was discarded. All specimens came from the same plate.

The appropriate load cell was determined by using the following equation:

$$[A \times 145] \times 0.0015 = C$$

Where:

A=Product's maximum expected tensile strength (MPa);

145=Conversion Factor from MPa to psi;

0.00015=approximate cross-sectional area (in$^2$) of test specimens; and

C=lbs.

The 2 pound load cell was used for materials where C=1.8 lbs. The 20 pound load cell was used for materials where 1.8<C<18 lbs. If C>19, a higher capacity load cell was required.

The crosshead speed was set to 1.00 inch/min (25.4 mm/min), and the crosshead action was set to "return at break". The crosshead was adjusted to 2.00 inches (50.8 mm) jaw separation. The air pressure for the pneumatic grips was turned on and adjusted as follows: set approximately 20 psi(1.5 Kg/cm$^2$) for primary optical fiber coatings and other very soft coatings; set approximately 40 psi(3 Kg/cm$^2$) for optical fiber single coats; and set approximately 60 psi(4.5 Kg/cm$^2$) for secondary optical fiber coatings and other hard coatings. The appropriate Instron computer method was loaded for the coating to be analyzed.

After the Instron test instrument had been allowed to warm-up for fifteen minutes, it was calibrated and balanced following the manufacturer's operating procedures.

The temperature near the Instron Instrument was measured and the humidity was measured at the location of the humidity gage. This was done just before beginning measurement of the first test specimen.

Specimens were only analyzed if the temperature was within the range 23±1.0 C. and the relative humidity was within 50±5%. The temperature was verified as being within this range for each test specimen. The humidity value was verified only at the beginning and the end of testing a set of specimens from one plate.

Each test specimen was tested by suspending it into the space between the upper pneumatic grips such that the test specimen was centered laterally and hanging vertically. Only the upper grip was locked. The lower end of the test specimen was pulled gently so that it has no slack or buckling, and it was centered laterally in the space between the open lower grips. While holding the specimen in this position, the lower grip was locked.

The sample number was entered and sample dimensions into the data system, following the instructions provided by the software package.

The temperature and humidity were measured after the last test specimen from the current drawdown was tested. The calculation of tensile properties was performed automatically by the software package.

The values for tensile strength, % elongation, and (secant or segment) modulus were checked to determine whether any one of them deviated from the average enough to be an "outlier." If the modulus value was an outlier, it was discarded. If there were less than six data values for the tensile strength, then the entire data set was discarded and repeated.using a new plate.

Elastic Modulus Test Method

The elastic modulus (E'), the viscous modulus (E"), and the tan delta (E"/E'), which is an indication of the material's Tg, of the examples were measured using a Rheometrics Solids Analyzer (RSA-11), equipped with: 1) A personal computer having MS-DOS 5.0 operating system and having Rhios® software (Version 4.2.2 or later) loaded; 2) A liquid nitrogen controller system for low-temperature operation.

The test samples were prepared by casting a film of the material, having a thickness in the range of 0.02 mm to 0.4 mm, on a glass plate. The sample film was cured using a UV

US 6,298,189 B1

35

processor. A specimen approximately 35 mm (1.4 inches) long and approximately 12 mm wide was cut from a defect-free region of the cured film. For soft films, which tend to have sticky surfaces, a cotton-tipped applicator was used to coat the cut specimen with talc powder.

The film thickness of the specimen was measured at five or more locations along the length. The average film thickness was calculated to ±0.001 mm. The thickness cannot vary by more than 0.01 mm over this length. Another specimen was taken if this condition was not met. The width of the specimen was measured at two or more locations and the average value calculated to ±0.1 mm.

The geometry of the sample was entered into the instrument. The length field was set at a value of 23.2 mm and the measured values of width and thickness of the sample specimen were entered into the appropriate fields.

Before conducting the temperature sweep, moisture was removed from the test samples by subjecting the test samples to a temperature of 80 C. in a nitrogen atmosphere for 5 minutes. The temperature sweep used included cooling the test samples to about −60 C. or about −80 C. and increasing the temperature at about 1 /minute until the temperature reached about 60 C. to about 70 C. The test frequency used was 1.0 radian/second.

Soluble Wax

Wax can be added as a slip agent to adjust the fiber friction between the inner primary coating and the surface of the optical glass fiber to a value that results in a resistive force that is less than the cohesive strength of the inner primary coating. However, conventional waxes exhibit incompatibility problems with inner primary coatings. Many waxes do not dissolve well in inner primary coatings and therefore they tend to separate out from solution. Furthermore, conventional waxes tend to cause the resulting inner primary coating to be hazy in appearance, which is undesirable. The term "soluble wax" is used herein to designate those waxes which are sufficiently soluble in the inner primary coating composition at the concentration required to provide the desired level of fiber friction. The term "wax" is understood to include waxes as defined in Hawley's "Condensed Chemical Dictionary", 11th edition, the said definition being incorporated herein by reference.

It has been found that by selecting modified waxes or by modifying the waxes, the incompatibility problems can be substantially avoided. In selecting a modified wax, the solubility of the modified wax in the desired inner primary composition should first be considered. Usually, waxes tend to be insoluble in inner primary coating compositions. The solubility of the wax in the inner primary coating will depend mainly upon the following:

(1) the relative polarity of the wax and the polarity of the monomers and oligomers present in the inner primary composition,

(2) the respective types of functional groups present in the wax and the monomers and oligomers present in the inner primary composition, and

(3) the similarity between the molecular structure of the wax and the oligomers or monomers present in the inner primary composition, such as aliphatic/aromatic, unsaturated/saturated, linear/branched, etc., entities.

For example, the solubility of the wax can be increased by incorporating functional groups which are similar to those present in the oligomers or monomers present in the inner primary composition. If the inner primary composition contains monomers or oligomers having ester groups, then ester groups can be incorporated into the molecular backbone structure of the wax or the ester groups can be grafted

36

onto the backbone of the wax. Alternatively, wax-like, long-chain fatty esters can be used. Commercial examples of suitable fatty esters include:

Laneto-50 and 100 (PEG-75 lanolin),
Laneto-AWS (PPG-12-PEG-50 lanolin),
Ritacetyl (acetylated lanolin),
Ritahydrox (hydroxylated lanolin),
Ritasol (isopropyl lanolate),
Ritalan (lanolin oil),
Ritalan AWS (PPG-12-PEG-65-lanolin oil),
Ritawax (lanolin alcohol),
Supersat (hydrogenated lanolin),
Forlan C-24 (choleth-24 and Ceteth-24),
Ritachol 1000 (cetearyl alcohol, polysorbate 60, PEG-150-stearate, and steareth-20),
Ritapro 100 (cetearyl alcohol, steareth-20, and steareth-10),
Pationic ISL (sodium isostearoyl lactylate),
Pationic CSL (calcium stearoyl lactylate),
Pationic SSL (sodium stearoyl lactylate),
Pationic SBL (sodium behenoyl lactylate),
Pationic 138C (sodium lauroyl lactylate),
Pationic 122A (sodium caproyl lactylate),
Pationic SCL (sodium cocoyl lactylate),
Ritox 36 (laureth-23),
Ritox 52 (PEG-40 stearate),
Rita CA (cetyl alcohol),
Rita SA (stearyl alcohol), and
Rita Cetearyl Alcohol 70/30, (RITA Corp.). Preferably, the fatty ester modified wax is isocetyl stearate.

If the inner primary composition contains monomers or oligomers having alkoxy or hydroxy groups, then to increase the solubility of the wax, alkoxy or hydroxy groups can be incorporated into the molecular backbone structure of the wax or the alkoxy groups can be grafted onto the backbone of the wax. Commercial examples of such modified waxes include the Unilin™ series of alcohol modified waxes from Petrolite, and

Ritawax (lanolin alcohol),
Ritachol 1000 (cetearyl alcohol, polysorbate 60, PEG-150-stearate, and steareth-20),
Ritapro 100 (cetearyl alcohol, steareth-20, and steareth-10),
Rita CA (cetyl alcohol),
Rita SA (stearyl alcohol), and
Rita Cetearyl Alcohol 70/30, (RITA Corp.). Preferably, the alkoxy modified wax is polypropyleneglycol$_{12}$ polyethyleneglycol$_{50}$lanolin.

As another example, if the inner primary composition contains monomers or oligomers having amine groups, then to increase the solubility of the wax, amine groups can be incorporated into the molecular backbone structure of the wax or the amine groups can be grafted onto the backbone of the wax. An example of such a modified wax is the Armeen™ series of amine modified waxes (Armak), such as
Armeen TD (tallowamine),
Armeen O, OL or OD (oleylamines),
Armeen SD (soyaamine),
Armeen 18 (octadecylamine),
Armeen HT, HTD or 2HT (hydrogenated tallow),
Armeen T or TM-97 (tallowamine),
Armeen 12D (dodecylamine),
Armeen C or CD (cocoamine),
Armeen 16D (hexadecylamine),
Armeen 2C (dicocoamine),
Armeen M2C (methyldicocoamine),
Armeen DM12D (dimethyldodecylamine),
Armeen DMCD or DMMCD (dimethylcocoamine),
Armeen DM14D (dimethyltetradecylamine),

US 6,298,189 B1

<table>
<tr><td>37</td><td>38</td></tr>
</table>

Armeen DM16D (dimehylhexadecylamine),
Armeen DM18D (dimethyloctadecylamine),
Armeen DMHTD (dimethyl(hydrogenatedtallow)amine,
Armeen DMTD (dimethyltallow amine),
Armeen DMSD (dimethylsoyamine) or
Armeen DMOD (dimethyltallow amine).

Preferably, the amine substituted wax is methyl di(hydrogenated tallow)amine.

An example of a further functional group that can be incorporated into the wax includes carboxylic acids. Suitable examples of saturated modified waxes include capric acid, lauric acid, myristic acid, palmitic acid, and stearic acid. Examples of suitable unsaturated waxes include oleic acid, ricinoleic acid, linoleic acid, and linolenic acid.

The functional groups present on the modified wax do not necessarily have to be identical with those present in the oligomers or monomers of the inner primary coating composition in order to achieve increased solubility. Functional groups having similar properties, such as hydrogen bonding, polarity, etc., can be mixed and matched as desired to increase solubility.

The solubility of the wax can also be increased by modifying a wax or selecting a wax having a similar molecular structure to that of the monomers and oligomers present in the inner primary composition. For example, if the monomers and oligomers contain aromatic groups, the wax can be selected or modified to contain aromatic groups. If the monomers or oligomers contain substantial amounts of unsaturation, then the wax can be modified or selected to contain substantial amounts of unsaturation. Furthermore, if the monomers or oligomers are substantially linear, then a substantially linear wax can utilized. Commercial examples of substantially linear waxes include Polymekon, Ceramer 67 and 1608, and Petrolite C-400, CA-11, WB-5, WB-11, and WB-17 (Petrolite).

Based on the teachings provided herein, one skilled in the art will be able to modify or select the desired wax, and to use the selected wax in an amount to provide the desired level of fiber friction between the inner primary coating and the surface of the optical glass fiber. The amount of the wax present in the inner primary composition will depend on (1) the ability of the wax to impart the desired reduction in the fiber friction between the inner primary coating and the surface of the optical glass fiber, and (2) the solubility of the wax in the inner primary composition. The greater the solubility of the wax in the inner primary composition, the greater the amount of wax that can be present. The greater the ability of the wax to reduce fiber friction, the less wax that will be required. Preferably, the amount of wax present is about the minimum amount necessary to provide a level

of fiber friction necessary to result in a resistive force that provides a clean, residue free optical glass fiber after ribbon stripping. As discussed above, the fiber friction level that results a resistive force level which will provide a clean, optical glass fiber after ribbon stripping depends on the cohesive strength of the inner primary coating. The greater the cohesive strength of the inner primary coating, the greater the amount of resistive force that can be tolerated and still provide a clean, bare optical glass fiber after ribbon stripping. The amount of wax necessary to provide a fiber friction that results in such a level of resistive force can be readily determined by one skilled in the art by making test samples of ribbon assemblies having different concentrations of the selected wax in the inner primary coating. The amount of wax required should be determined using complete ribbon structures because, as discussed hereinabove, the presence of the outer primary coating will have an effect on the strippability of the inner primary coating.

Suitable amounts of wax can also be approximated by using the fiber pull-out friction and crack propagation test methods described herein, in which the amounts of wax that provide a predicted strip cleanliness of less than about 3 are preferred.

It has been found that suitable amounts of modified wax include from about 0.01% to about 10% by weight of the total inner primary composition, more preferably about 0.01% to about 5%, and most preferably about 0.01% to about 2%.

If desired, the wax can be further modified to include a radiation-curable functional group that can copolymerize with radiation-curable monomers and oligomers present in the inner primary composition. An example of such a radiation-curable functional wax is stearyl acrylate. The radiation-curable functional group in general does not have to be an acrylate group, but can be any known radiation-curable functional group, including those described herein.

The invention will be further explained by the following non-limiting examples illustrating the use of waxes.

EXAMPLES 3-1 THROUGH 3-4

The components shown in Table 6 were combined to form four inner primary coating compositions. Drawdowns of the inner primary coating compositions were made and then cured by exposure to UV light from a Fusion D lamp, under a nitrogen atmosphere. The crack propagation and fiber friction for each of the films were tested in the same manner as above, and the predicted strip cleanliness was calculated. The results are shown in Table 6.

TABLE 6

| COMPONENT (Amount in % by weight of total composition) | Example 3-1 | Example 3-2 | Example 3-3 | Example 3-4 |
|---|---|---|---|---|
| Linear Urethane Acrylate Oligomer Having a Weight Average Molecular Weight of 5,000, | 23 | — | — | — |
| Urethane Acrylate Oligomer H-I-PTGL2000-I-PTGL2000-I-H | — | 51.9 | 42.3 | 42.3 |
| Lauryl Acrylate | — | 16 | — | — |
| Ethoxylated Nonylphenol Acrylate | 64.4 | 25.6 | 46.2 | 46.2 |
| Glyceryl Propoxy Triacrylate | 8 | — | — | — |
| Phenoxyethyl Acrylate | — | — | 5 | 5 |
| 2,4,6,-Trimethyl PhenylbenzoylDiphenyl Phosphine Oxide | 3 | 3 | 3 | 3 |

US 6,298,189 B1

39                                                                        40

TABLE 6-continued

| COMPONENT (Amount in % by weight of total composition) | Example 3-1 | Example 3-2 | Example 3-3 | Example 3-4 |
|---|---|---|---|---|
| Thiodiethylene bis (3,5-di-tert-butyl-4-hydroxy) hydrocinnamate | .5 | 0.5 | 0.5 | 0.5 |
| Polyethylene/maleic anhydride copolymer wax (ceramer 1608) | .1 | — | — | — |
| Methyl di(hydrogenated tallow) Amine | — | 2 | — | — |
| Isocetyl Stearate | — | — | 2 | — |
| PPG$_{12}$PEG$_{50}$ Lanolin | — | — | — | 2 |
| Mercaptopropyl Trimethoxy Silane | 1 | 1 | 1 | 1 |
| Test results | | | | |
| Clarity | Clear | Clear | Clear | Clear |
| Viscosity (mPa.s, 25 C) | | 7650 | 6760 | 7390 |
| Fiber Friction (g/mm) | | 7.7 | 11.4 | 7.2 |
| Crack Propagation (mm) | | 1.53 | 1.56 | 1.69 |
| Predicted Strip Cleanliness | | 2.1 | 2.5 | 1.9 |
| Fiber Pull-out Residue Test | 2.3 | | | |

The oligomers were formed by reacting the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
PTGL2000 = 2000 molecular weight polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol (Mitsui, NY), the methyl group provides branching which reduces the orientation of the polymers formed from the oligomer

The fiber pull-out residue test was the same test as used previously except that the evaluation was quantified on a scale of 0 to 10, where 0 is the best (no visible residue under 10x magnification) and 10 is the worst (lots of visible residue without use of magnification).

The test results in Table 6 demonstrate that modified waxes can be used to adjust the fiber friction to a level that provides a resistive force less than the cohesive strength of the inner primary coating, which is shown by the excellent predicted strip cleanliness values of less than about 3.

Radiation-Curable, Silicone Containing Oligomers and Use of Non-Radiation-Curable Silicone Compounds

Radiation-curable, silicone containing monomers and oligomers can also be used to adjust the level of fiber friction and thereby improve ribbon strippability of the inner primary coating. The radiation-curable, silicone oligomer comprises a silicone compound to which at least one radiation-curable functional group is bound. Preferably, two or more radiation-curable functional groups are connected to the silicone entity.

Preferably the radiation-curable functional group is capable of copolymerizing with the radiation-curable monomers and oligomers present in the inner primary composition when exposed to suitable radiation. Therefore, the selection of the functional group will depend on the monomer or oligomer present in the inner primary composition. One skilled in the art will readily be able to determine which functional groups will cross-link with the monomer or oligomer present in the inner primary composition. While not being limited thereto, examples of suitable functional groups are groups containing vinyl, acrylate, methacrylate, maleate, vinyl ether, or acrylamides, as well as those described herein above.

Examples of commercially available silicone compounds containing a radiation-curable functional group are silicone acrylates Ebecryl 350 and Ebecryl 1360 (Radcure Industries), Tego Rad 2100, 2200, 2500, and 2600 (Tego Chemie), and Coat-O-Sil 3503 (OSI Specialties).

Alternatively, based on the teachings herein, one skilled in the art will be able to modify known silicone compounds to include the required radiation-curable functionality. For example, a silicone compound provided with hydroxy func-

tionality can be reacted with a diisocyanate compound and a compound containing a hydroxy and a radiation-curable functionality to provide a radiation-curable functionality to said silicone compound. Specific examples include reacting a silicone compound containing a hydroxy functionality with a diisocyanate and hydroxyethylacrylate to provide an acrylate functionality on the silicone compound, or isocyanate and hydroxybutylvinylether to provide a vinyl ether functionality on the silicone compound. Example of suitable silicone compound containing hydroxyl functionality include: polydimethylsiloxane diol of 1200 equivalent weight Q4-3667, DC 193 and DC 1248 (Dow Corning), HSi2111 (Tego Chemie), and Coat-O-Sil 3500 and 3505 (Osi Specialties).

Alternatively, non-radiation-curable silicone compounds (hereinafter referred to as "non-reactive silicone") can be used to adjust the fiber friction and thereby improve ribbon strippability of the inner primary coating.

U.S. Pat. No. 4,496,210, which is incorporated herein by reference, discloses examples of suitable non-reactive silicones that can be used. Non-reactive silicones can be used separately or in conjunction with the radiation-curable silicone oligomers described herein.

The radiation-curable silicone oligomer and/or non-reactive silicone should be present in an amount to provide a fiber friction that results in a resistive force that is less than the cohesive strength of the inner primary composition. The amount of radiation-curable silicone oligomer and/or non-reactive silicone is preferably the minimum amount required to provide a fiber friction that results in a resistive force less than the cohesive strength of the inner primary composition. Such minimum amount can easily be determined by making test runs of inner primary compositions in which the amount of radiation-curable silicone oligomers and/or non-reactive silicones present is varied. The lowest amount of radiation-curable silicone oligomers and/or non-reactive silicones present which provides a fiber friction that results in a resistive force that is less than the cohesive strength of the inner primary coating is the preferred amount.

A long chain silicone compound containing on average about one radiation-curable functional group (monofunctional) bound near a terminus of the silicone

**A123**

US 6,298,189 B1

41

compound can provide further advantages. The end of the long silicone chain furthest from the radiation-curable functional group can be mechanically bound in the inner primary coating. However, upon heating during ribbon stripping, it is believed that the end of the long silicone chain furthest from the radiation-curable functional group can become unbound and diffuse toward the optical glass fiber/inner primary coating interface which is in the direction the heat is propagating. This diffusion of silicone increases at the critical moment during ribbon stripping to facilitate the clean removal of the entire coating system. The silicone acts as a lubricant between the surface of the optical glass fiber and the inner primary coating.

The thickness of an inner primary coating usually varies from about 10 microns to about 35 microns. Thus, a mono-functionalized silicone fluid having a molecular chain length of about 50,000 to about 350,000 Daltons can diffuse toward the glass/inner primary coating interface during ribbon stripping.

Suitable amounts of radiation-curable silicone oligomers and/or non-reactive silicones can also be closely approximated by using the friction and crack propagation test methods described herein, in which the amounts of radiation-curable silicone oligomers and/or non-reactive silicones that provide a predicted strip cleanliness of less than about 3 are preferred.

The amount of radiation-curable silicone oligomer and/or non-reactive silicones will also depend on the selection of the inner primary composition, in particular the initial fiber friction of the selected inner primary coating composition. Generally, the higher the initial fiber friction (no slip additive), the greater the amount of radiation-curable silicone oligomer and/or non-reactive silicone that will be required to lower the fiber friction to a level that provides a resistive force lower than the cohesive strength of the inner primary coating.

In general, the radiation-curable silicone oligomers can be used in greater amounts than non-reactive silicones because it is believed that the radiation-curable silicone oligomer will become bound in the inner primary coating during curing, whereas the non-reactive silicone is free to migrate throughout the cured inner primary coating. Alternatively, the radiation-curable silicone oligomer can be the main oligomer used for forming the inner primary coating. It has been found that suitable amounts of radiation-curable silicone oligomer are between about 0.1 to about 90% by weight, preferably about 0.1 to about 60% by weight, and more preferably about 0.1 to about 30% by weight. In general, higher molecular weight radiation-curable silicone oligomers will be present in a radiation-curable coating in greater weight percentages than lower molecular weight composite oligomers.

Suitable amounts of mono-functionalized monomers have been found to be about 0.1 to about 20% by weight, more preferably about 0.1 to about 10% by weight, and most preferably about 0.1 to about 5% by weight.

Suitable amounts of non-reactive silicone are between about 0.01 to about 10% by weight, preferably about 0.01 to about 5% by weight, and more preferably about 0.01 to about 1% by weight.

The invention will be further explained by the following non-limiting examples illustrating the use of silicone entities.

EXAMPLE 4-1

The components shown in Table 7 were combined to form an inner primary coating composition. A film of the coating

42

material (75 micron thick) was prepared on glass slides and then cured by exposure to UV light in the same manner as above. The tensile strength, elongation and modulus were measured.

A 75 micron film of the coating material was also prepared and suitably cured. The crack propagation was then measured. A friction test was also conducted, as described herein. The predicted ribbon strip cleanliness was calculated. The results are shown in Table 7.

TABLE 7

| Component (Amount is % by weight of total composition) | Example 4-1 |
|---|---|
| Oligomer H-DesW-PTHF2900-DesW-H | 47.5 |
| Ethoxylated Nonylphenol Acrylate | 29 |
| Lauryl Acrylate | 14.2 |
| 2,4,6-Trimethyl Phenylbenzoyl Diphenyl Phosphine Oxide | 3 |
| Silicone Oligomer H-I-HSi2111-I-H | 5 |
| γ-Mercaptopropyltrimethoxy Silane | .8 |
| Thiodiethylene Bis (3,5-di-tert-Butyl-4-Hydoxy) Hydocinnamate | .5 |
| Test Results | |
| Viscosity, mPa.s (25 C) | 6040 |
| Tensile Strength, Mpa | 1 |
| Elongation, % | 140 |
| Modulus, Mpa | 1.4 |
| Dose at 95%, Modulus, J/Sq CM | .38 |
| Crack Propagation (mm) | 1.7 |
| Fiber Pull-Out Friction (g/mm) | 17.1 |
| Predicted Strip Cleanliness | 2.5–3 |

The oligomers were formed by reacting the following components:
H = Hydroxyethyl Acrylate
DesW = bis 4,4-(isocyanatocyclohexyl)methane
I = Isophorone Diisocyanate
PTHF2900 = 2900 molecular weight Polytetramethylene Ether (BASF)
HSi2111 = a silicone diol having a MW of 1000 (Tego Chemie)

EXAMPLES 4-2 THROUGH 4-10

The components shown in Table 8 were combined to form 11 different inner primary coating compositions. The viscosity and clarity of the compositions was determined.

Films of the coating materials (75 micron thick) were prepared on microscope slides and then cured by exposure to UV light in the same manner as above. The tensile strength, elongation and modulus were measured.

Additional films of the coating materials were also prepared and suitably cured. The crack propagation was then measured. A friction test was also conducted, as described herein. The predicted ribbon strip cleanliness was calculated. The results are shown in Table 8.

US 6,298,189 B1

43      44

TABLE 8

| Component (Amount is % by weight of total composition) | Ex. 4-2 | Ex. 4-3 | Ex. 4-4 | Ex. 4-5 | Ex. 4-6 | Ex. 4-7 | Ex. 4-8 | Ex. 4-9 | Ex. 4-10 |
|---|---|---|---|---|---|---|---|---|---|
| Oligomer H-I-PTHFCD2000-I-PTHFCD2000-I-H | 45.67 | | | | | | | | |
| Oligomer H-(I-PPG1025)1.06-(-PERM) 1.14-I-H | | | 54.86 | | | | | | |
| Oligomer H-I-PTGL2000-I-H | | | | | 60.65 | | | | |
| Oligomer H-I-PPG2010-I-PPG2010-I-H | | 67.5 | | 70 | | | | | |
| Oligomer H-I-PTGL2000-I-PTGL2000-I-H | | | | | | 51.02 | 49.23 | | 43 |
| Oligomer (H-I)$_3$-TPE4542 | | | | | | | | 78 | |
| Ethoxylated Nonylphenol Acrylate Ester | 34.48 | | 24.99 | | 32.85 | 20.14 | 24.75 | 16 | 50.5 |
| Lauryl Acrylate | 14.35 | | 13.72 | | | 6.92 | 16.64 | | |
| Isodecyl Acrylate | | | | | | | | | |
| Phenoxyethyl Acrylate | | | | | | 16.62 | | | |
| 2.5 Mole Propoxylated Nonyl Phenol Acrylate | | 25.00 | | 23.5 | | | | | |
| 25:75 weight/weight of Bis(2,6-Dimethoxybenzoyl) (2,4,4-Trimethylpentyl) Phosphine Oxide and 2-Hydroxy-2-Methyl-1-Phenyl Propanone | | | 2.94 | 3 | | | | | |
| 2,4,6-trimethylbenzoyl Diphenyl Phosphine Oxide | 3 | | | | 2.5 | 3 | 3 | 1 | 3 |
| 1-Hydroxycyclohexyl Phenyl Ketone | | 4 | | | | | | | |
| Octadecyl 3,5-Bis(1,1-Dimethylethyl)-4-Hyroxybenzenepropanone | .5 | .5 | | | | | | | |
| Thiodiethylene bis (3,5-di-Tert-Butyl-4-Hydroxy)hydrocinnamate | | | .49 | | .5 | .3 | | | .5 |
| Ditridecylthiodipropionate | | 1 | | 1 | | | | | |
| Free Silicone, DC-193 (Dow Corning) | | 1 | 2 | 1 | | | | 2 | 2 |
| Free Silicone, DC-190 (Dow Corning) | 1 | | | | | | | | |
| Teograd 2100 silicone acrylate | | | | | 2.5 | 1 | 5 | | |
| L-77 Polyethylene oxide modified Dimethylsiloxane | | | | | | | | | |
| 1-Propanethiol,3-(Trimethoxysilyl) | 1 | 1 | .98 | 1 | 1 | 1 | .92 | 1 | 1 |
| Clarity When Made | clear | clear | clear | clear | | | | clear | |
| Clarity After 24 Hours at 4 C. | clear | | clear | clear | | | | | |
| Clarity After 24 Hours at −20 C. | clear | | clear | clear | | | | | |
| Clarity After 3 Days at 60 C. | clear | | clear | clear | | | | | |
| Viscosity (mPa · s, 25 C.) | 8700 | | 5600 | 8000 | 9520 | 7170 | 6240 | 8200 | |
| Dose @ 95% Modulus (J/sq. cm) | | .77 | .46 | .45 | .32 | | | .2 | |
| Tensile Strength (Mpa) | | .4 | | | 1.5 | .6 | 1.1 | | |
| Elongation (%) | | 50 | | | 100 | 140 | 180 | | |
| Modulus (MPa) | | 1.2 | | | 2.7 | 1.1 | 1.3 | 2.4 | |
| Fiber Friction (g/mm) | 3.1 | 4.9 | 2.7 | 4.4 | 21 | 18.4 | 18.5 | 3 | 3.4 |
| Fiber Friction (g/mm) After 7 days, 60 C., dose 95% of dose required for complete cure | | | 1 | 1.4 | | | | | |
| Crack Propagation (mm) | 2.1 | 1.49 | 1 | 1.4 | 1.21 | 1.82 | 1.47 | 1.1 | 1.9 |
| Crack propagation (mm) after 7 days, 60 C., dose 95 of dose required for complete cure | | | 1.1 | | | | | | |
| Predicted Strip Cleanliness | 1.5–2 | 1.5 | 2.2 | 1.5 | 3.6 | 3 | 3 | 1.5 | 1.5 |

The oligomers were formed by reacting the following components:
H = Hydroxyethyl Acrylate

TABLE 8-continued

| Component (Amount is % by weight of total composition) | Ex. 4-2 | Ex. 4-3 | Ex. 4-4 | Ex. 4-5 | Ex. 4-6 | Ex. 4-7 | Ex. 4-8 | Ex. 4-9 | Ex. 4-10 |
|---|---|---|---|---|---|---|---|---|---|

I = Isophorone Diisocyanate
PTHFCD2000 = is PolyTHF containing some carbonate linkages
PPG1025 = is Polypropyleneoxidediol having an average molecular weight of 1000 (Arco)
PPG2010 = is Polypropyleneoxidediol having an average molecular weight of 2000 (BASF)
PTGL2000 = 2000 molecular weight polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol (Mitsui, NY)
TPE4542 = polypropylene glycol ethylene oxide endcapped triol (BASF)
Perm = Permanol KM10-1733 polycarbonate/polyether copolymer diol

The test results in Table 8 demonstrate that the radiation-curable silicone oligomers and non-reactive silicones can be used to adjust the fiber friction to a level that provides a resistive force less than the cohesive strength of the inner primary coating, which is shown by the predicted strip cleanliness values of about 3 or less.

Radiation-curable Fluorinated Oligomers and Fluorinated Materials

The fiber friction between the inner primary coating and the surface of the optical glass fiber can also be significantly reduced by incorporating radiation-curable fluorinated oligomers, monomers and/or non-radiation curable fluorinated materials into the inner primary coating composition. The radiation-curable, fluorinated oligomer or monomer comprises a fluorinated compound to which at least one radiation-curable functional group is bound. Preferably, two or more radiation-curable functional groups are connected to the fluorinated entity.

Preferably the radiation-curable functional group is capable of copolymerizing with the radiation-curable monomers and oligomers present in the inner primary composition when exposed to suitable radiation. Therefore, the selection of the functional group will depend on the monomer or oligomer present in the inner primary composition. One skilled in the art will easily-be able to determine which functional groups will cross-link with the monomer or oligomer present in the inner primary composition. While not being limited thereto, examples of suitable radiation-curable functional groups are groups containing vinyl, acrylate, methacrylate, maleate, vinyl ether, or acrylamides, as well as those described herein above.

Examples of commercially available fluorinated compounds containing at least one radiation-curable functional group include perfluoro ethyl acrylate (DuPont), 2-(N-Ethylperfluoro Octane Sulfonamido)Ethyl Acrylate (3M), 1H,1H-pentadecafluoroctyl acrylate (Oakwood Research Chemicals), as well as methacrylate or N butyl acrylate versions of these.

Based on the teachings herein, one skilled in the art will be able to modify a fluorinated compound to include the required radiation-curable functionality. For example, a fluorinated compound provided with hydroxy functionality can be reacted with a diisocyanate compound and a compound containing a hydroxy and a radiation-curable functionality to provide a radiation-curable functionality to said fluorinated compound. Specific examples include reacting a fluorinated compound containing a hydroxy functionality with a diisocyanate and hydroxyethylacrylate to provide an acrylate functionality on the fluorinated compound, or isocyanate and hydroxybutylvinylether to provide a vinyl ether functionality on the fluorinated compound. Examples of suitable fluorinated compounds containing hydroxyl functionality include Fluorolink E (Ausimont), 2-methyl-4,4,4-trifluorobutanol, 1H,1H-pentadecafluoro-1-octanol, 1H,1H-

pentafluoropropanol-1, and 1H,1H,12H,12H-perfluoro-1,12-dodecanediol (Oakwood Research Chemicals).

Alternatively, non-radiation-curable fluorinated compounds (hereinafter referred to simply as "fluorinated compounds") can be used to adjust the fiber friction and thereby improve ribbon strippability of the inner primary.

The fluorinated compounds can be used separately or in conjunction with the radiation-curable silicone oligomers or monomers described herein.

The radiation-curable fluorinated oligomer or monomer and/or fluorinated compounds should be present in an amount to provide a fiber friction that results in a resistive force that is less than the cohesive strength of the inner primary composition. The amount of radiation-curable fluorinated oligomer and/or fluorinated compound is preferably the minimum amount required to provide a fiber friction that results in a resistive force less than the cohesive strength of the inner primary composition. Such minimum amount can easily be determined by making test runs of inner primary compositions in which the amount of radiation-curable fluorinated oligomers or monomers and/or fluorinated present is varied. The lowest amount of radiation-curable fluorinated oligomers or monomers and/or fluorinated compounds present which provides a fiber friction that results in a resistive force less than the cohesive strength of the inner primary coating is the preferred amount.

Suitable amounts of radiation-curable fluorinated oligomers or monomers and/or fluorinated compounds can also be closely approximated by using the friction and crack propagation test methods described herein, in which the amounts of radiation-curable fluorinated oligomers or monomers and/or fluorinated compounds that provide a predicted strip cleanliness of less than about 3 are preferred.

The amount of radiation-curable fluorinated oligomer or monomers and/or fluorinated compounds will also depend on the selection of the inner primary composition, in particular the initial fiber friction of the selected inner primary coating composition. Generally, the higher the initial fiber friction (no slip additive), the greater the amount of radiation-curable fluorinated oligomer or monomer and/or fluorinated compounds that will be required to lower the fiber friction to a level that provides a resistive force lower than the cohesive strength of the inner primary coating.

In general, the radiation-curable fluorinated oligomers or monomers can be used in greater amounts than non-reactive fluorinated compounds because it is believed that the radiation-curable fluorinated oligomers or monomers will become bound in the inner primary coating during curing, whereas the non-reactive fluorinated compounds are free to migrate throughout the cured inner primary coating. Alternatively, the radiation-curable fluorinated oligomer or monomer can be the main oligomer used for forming the inner primary coating. It has been found that suitable amounts of radiation-curable fluorinated oligomer or mono-

US 6,298,189 B1

47

mer are between about 0.1 to about 90% by weight, preferably about 0.1 to about 60% by weight, and more preferably about 0.1 to about 30% by weight. In general, larger molecular weight oligomers can be used in greater amounts than lower molecular weight oligomers or monomers.

Suitable amounts of fluorinated compounds have been found to be between about 0.01 to about 10% by weight, preferably about 0.01 to about 5% by weight, and more preferably about 0.01 to about 1% by weight.

The invention will be further explained by the following non-limiting examples illustrating the use of fluorinated materials.

### EXAMPLES 5-1 THROUGH 5-3

The components shown in Table 9 were combined to form 5 different inner primary coating compositions. The viscosity and clarity of the compositions were determined.

Films of the coating materials (75 micron thick) were prepared on glass slides and then cured by exposure to UV light in the same manner as above. The tensile strength, elongation and modulus were measured.

Additional films of the coating materials were also prepared and suitably cured. The crack propagation was then measured. A friction test was also conducted, as described herein. The predicted ribbon strip cleanliness was calculated. The results are shown in Table 9.

TABLE 9

| Component (% by weight based on total composition) | Ex. 5-1 | Ex. 5-2 | Ex. 5-3 |
|---|---|---|---|
| Oligomer H-(I-PPG1025)$_{1.06}$ (-PERM)$_{1.14}$-I-H | 54.32 | | 55.58 |
| Oligomer H-(T-PPG2010)$_2$-I-H | | 67.75 | |
| Ethoxylated Nonylphenol Acrylate Ester | 24.74 | | 25.31 |
| Isodecyl Acrylate | 13.58 | | 13.9 |
| 2.5 Mole Propoxylated Nonyl Phenol Acrylate | | 25 | |
| 25:75 weight/weight of Bis(2,6- Dimethoxybenzoyl) (2,4,4-Trimethylpentyl) Phosphine Oxide and 2-Hydroxy-2-Methyl-1-Phenyl Propanone | 2.91 | 3 | |
| 1-Hydroxycyclohexyl Phenyl Ketone | | 4 | |
| Octadecyl 3,5-Bis (1,1-Dimethylethyl)-4-Hyroxybenzenepropanone | | 0.50 | |
| Thiodiethylene bis (3,5-di-tert-butyl-4-hydroxy) Hydrocinnamate | .48 | | .5 |
| Ditridecylthiodipropionate | | 1.00 | |
| Foralkyl EM-6 Tridecafluorooctyl Mecaptan (Elf Autochem) | 3.00 | | |
| Fluorosulfonamide (3M) | | 0.75 | .75 |
| mercaptopropyl trimethoxy silane | 0.97 | 1 | 1 |
| Clarity as made | Clear | Clear | Clear |
| Clarity after 24 hours at 4° C. | | | Clear |
| Clarity after 24 hours at - 20° C. | | | Clear |
| Clarity after 3 days at 60° C. | | | Very Few Incom pat's 6200 |
| Viscosity (mPas, 25 C) | | | |
| Dose @ 95% Modulus (J/sq.cm) | .77 | 0.50 | .47 |
| Tensile Strength (MPa) | | 0.50 | |
| Elongation (%) | | 88 | |
| Modulus (MPa) | | 1.20 | |
| Fiber Friction (g/mm) | 25.5 | 8.2 | 10.5 |

48

TABLE 9-continued

| Component (% by weight based on total composition) | Ex. 5-1 | Ex. 5-2 | Ex. 5-3 |
|---|---|---|---|
| Fiber Friction (g/mm) After 7 days, 60 C, at dose of 95% of dose for complete cure | | | 1.1 |
| Crack Propagation (mm) | 1.32 | 1.54 | 1.1 |
| Crack Propagation (mm) after 7 days, 60 C, at dose of 95% of dose for complete cure | | | 1.1 |
| Predicted Strip Cleanliness | 3.0 | 2.0 | 2.6 |

Table Notes:
The oligomers were formed by reacting the following components:
H = Hydroxyethyl Acrylate; I = Isophorone Diisocyanate
PPG1025 = is Polypropyleneoxidediol having an average molecular weight of 1000 (Arco)
PPG2010 = is Polypropylene diol having an average molecular weight of 2000 (BASF)
PTGL2000 = 2000 molecular weight polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol (Mitsui, NY)
Perm = permanol KM10-1733 polycarbonate/polyether copolymer diol

### Solid Lubricants

Surprisingly, it has been found that solid lubricants can be added to the inner primary composition to reduce the fiber friction between the inner primary coating and the surface of the optical glass fiber. The term "solid lubricant" is used herein to mean that the lubricant is substantially insoluble in the inner primary composition and that the particle or flake shape of the solid lubricant is substantially maintained after curing of the inner primary coating composition.

Usually the solid lubricant is non-reactive with the components of inner primary coating composition. Examples of suitable non-reactive solid lubricants are the following, but not limited thereto:

solid organic lubricants including organic polysaccharides such as sodium alginate, polyolefins, polyvinyl alcohol, nylon such as Orgasol (Elf Atochem), solid Teflon particles, and hard waxes such as Rad Wax; solid inorganic lubricants including molybdenum disulfide, graphite, silicates such as talc, clays such as kaolin and mica, silica, and boron nitride.

However, if desired, a reactive solid lubricant can be used. Reactive solid lubricants contain a radiation-curable functional group. Preferably, the radiation-curable functional group is capable of copolymerizing with the radiation-curable monomers or oligomers present in the inner primary composition. The radiation-curable functional group can be, for example, any of the radiation-curable functional groups described herein. Specific examples of suitable reactive solid lubricants include zinc acrylate, molybdenum acrylate, aluminum acrylate, barium acrylate, and chromium acrylate.

The particle size is preferably small enough to avoid microbending caused by the solid particles exerting stresses on the surface of the optical glass fiber during use. Furthermore, the particle size is preferably small enough to avoid causing the inner primary coating to be hazy in appearance. Examples of suitable particle sizes have been found to be about 10 microns or less, preferably about 5 microns or less, and most preferably less than about 2 microns.

Alternatively to the particle size, the hardness of the solid lubricant is preferably low enough to avoid microbending caused by the solid particles exerting stresses on the surface of the optical glass fiber during use. In general, a softer solid lubricant will be less likely to cause such microbending.

US 6,298,189 B1

49

Based on the teachings provided herein, one skilled in the art will easily be able to use the selected solid lubricant in an amount to provide the desired level of fiber friction between the inner primary coating and the surface of the optical glass fiber. The amount of the solid lubricant present in the inner primary composition will depend on the ability of the solid lubricant to impart the desired reduction in the fiber friction between the inner primary coating and the surface of the optical glass fiber, and the amount the fiber friction must be reduced to provide a fiber friction level that results in a resistive force less than the cohesive strength of the inner primary coating. In general, the greater the ability of the solid lubricant to reduce fiber friction, the less solid lubricant that will be required. Preferably, the amount of solid lubricant present is about the minimum amount necessary to provide a level of fiber friction necessary to provide a clean, residue free optical glass fiber after ribbon stripping. As discussed above, the fiber friction level that will provide a clean, optical glass fiber after ribbon stripping will depend on the cohesive strength of the inner primary coating. The greater the cohesive strength of the inner primary coating, the greater the amount of fiber friction, and resulting resistive force, that can be tolerated and still provide a clean, bare optical glass fiber after ribbon stripping. The amount of solid lubricant necessary to provide such a level of fiber friction can be easily determined by one skilled in the art by making test samples of ribbon assemblies having different concentrations of the selected solid lubricant in the inner primary coating. The amount of solid lubricant required should be determined using complete ribbon structures because, as discuss herein above, the presence of the outer primary coating will have an effect on the strippability of the inner primary coating.

Suitable amounts of solid lubricant can also be closely approximated by using the fiber pull-out friction and crack propagation test methods described herein, in which the amounts of solid lubricant that provides a predicted strip cleanliness of less than about 3 are preferred.

It has been found that suitable amounts of solid lubricant include from about 0.1% to about 20% by weight of the total inner primary composition, more preferably about 0.1% to about 10%, and most preferably about 0.1% to about 5%.

Preferably, a surfactant is used in combination with the solid lubricant. Examples of a suitable surfactants include: fluorosulfonamide surfactant (3M), 3,6-dimethyl-4-octyne-3,6-diol (Air Products), linear copolymer of vinylpyrolidine and long chain alpha olefin (International Specialty Products), Solsperse high MW polymeric dispersing agents (Zeneca), and other well-known anionic, cationic and nonionic surfactants.

The invention will be further explained by the following non-limiting examples.

EXAMPLES 6-1 THROUGH 6-3

The components shown in Table 10 were combined to form 8 different inner primary coating compositions. The viscosity and clarity of the compositions was determined.

Films of the coating materials (3 mil) were prepared on microscope slides and then cured by exposure to UV light in the same manner as above. The tensile strength, elongation and modulus were measured. 75 mm films of the coating materials were also prepared and suitably cured. The crack propagation was then measured. A fiber pull-out friction test was also conducted, as described herein. The predicted ribbon strip cleanliness was calculated. The results are shown in Table 10.

50

### TABLE 10

| Component (Amount is % by weight of total composition) | Ex. 6-1 | Ex. 6-2 | Ex. 6-3 |
|---|---|---|---|
| Oligomer H-(I-PTGL2000)₂-I-H | 36.1 | 42.3 | 36.1 |
| Ethoxylated Nonylphenol Acrylate | 44.4 | 46.1 | 43.9 |
| Phenoxyethyl Acrylate | 5 | 5 | 5 |
| 2,4,6-trimethylbenzoyl Diphenyl Phosphine Oxide and 2-Hydoxy-2-Methyl-1-Phenyl-1-Propanone blend | 3 | 3 | 3 |
| Thioethylene bis(3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | .5 | .5 | .5 |
| y-Mercaptopropyltrimethoxy Silane | 1 | 1 | 1 |
| Rad Wax 62EB (33% PE wax in epoxy acrylate) | 10 | | |
| Fluorosulfonamide Surfactant FC-430 (3M) | | .1 | .5 |
| Fluoro A (Micronized PTFE) | | 2 | 10 |
| Test results | | | |
| Clarity (opaque?) | yes | yes | yes |
| Color | white | white | white |
| Viscosity, mPa.s at 25° | 5440 | 7960 | 7520 |
| Film opacity, 3 mil | opaque | cloudy | cloudy |
| Fiber friction (g/min) | 15.2 | 8.2 | 6.6 |
| Crack propagation (mm) | | 1.96 | 2.2 |
| Predicted Strip Cleanliness | | 2.2 | 2.4 |

The oligomers were formed by reacting the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
PTGL2000 = 2000 molecular weight polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol (Mitsui, NY)
Perm = Permanol KM10-1733 polycarbonate/polyether copolymer diol

The test results in Table 10 demonstrate that solid lubricants can be used to reduce the friction to a level that results in a resistive force less than the cohesive strength of the inner primary coating, which is shown by the predicted strip cleanliness values of about 3 or less.

Use of Novel Slip Agents

The above described novel slip agents can be used alone, in combinations of novel slip agents, as novel slip agents with conventional slip agents, and as novel slip agents in combination with the adjusting the normal force as desired to provide the desired level of fiber friction.

Based on the above experimental data, the composition of the inner primary coating can surprisingly be formulated or selected to provide a fiber friction of about 40 (g/mm) or less, preferably about 30 (g/mm) or less, and more preferably about 20 (g/mm), and most preferably about 10 (g/mm) or less at the desired ribbon stripping temperature, in combination with a crack propagation of the inner primary coating which is greater than about 0.7 mm, preferably greater than about 1 mm, more preferably greater than about 1.5 mm, and most preferably greater than about 2 mm, at the desired/design ribbon stripping temperature, such as 90° C. Table 11 and example 11-1 illustrates a practice according to this invention.

### TABLE 11

| Component (% weight based on total weight of composition) | Example 11-1 |
|---|---|
| Oligomer H- (I-PTGL2000)₂-I-H | 50.3 |
| Isobornyl Acrylate | 10 |
| Ethoxylated Nonylphenol Acrylate Ester | 15.1 |
| Thiodiethylene bis (3,5-di-tert-butyl-4-Hydroxy) | 0.5 |

US 6,298,189 B1

51

## TABLE 11-continued

| Component (% weight based on total weight of composition) | Example 11-1 |
|---|---|
| Hydrocinnamate | |
| Phenoxy Ethyl Acrylate | 20 |
| 2,4,6-Trimethylbenzoyl Diphenyl Phosphine Oxide | 3 |
| Silicone Fluid¹ | 0.1 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 |
| Test Results | |
| Predicted Strip Cleanliness | 2.5 |
| Fiber Friction (g/mm) | 18.5 |
| Crack Propagation (mm) | 2.07 |

The oligomers and monomers were formulated from the following components:
H = Hydroxyethylacrylate
I = Isophoronediisocyanate
PTGL2,000 = polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol having the molecular weight (2,000), (Mitsui, NY)
Silicone Fluid = Byk333 (BYK Chemie) which is polydimethylsiloxane with terminal polyethylene oxide groups

## Linear Oligomers

If desired, ribbon strippability can also be improved by increasing the ability of the inner primary coating to transmit force applied during ribbon stripping. In general, the more efficient the inner primary coating is at transmitting the force applied during the ribbon stripping operation, the less stripping force that need be applied to remove the inner primary coating.

It has now also been found that the use of linear oligomers can improve the effectiveness, and consequently the efficiency, of the inner primary coating to transmit the ribbon stripping forces applied during ribbon stripping operations. In general, to the extent that the molecular structure of the oligomer is designed to be more linear, the more densely the oligomers will pack together when forming the inner primary coating. It has been found that as the oligomers become more densely packed, the more efficiently the inner primary coating can transmit the stripping force applied during ribbon stripping.

The ability of a ribbon assembly to strip cleanly during ribbon stripping can be further improved if the polymers bound in the outer primary coating have the ability to orient upon heating.

Examples of linear, radiation-curable oligomers according to the present invention that provide enhanced strippability can be illustrated by the following formula (4):

$$R^1—L—[R^2—L]_n—R^3 \qquad (4)$$

wherein:

R¹ and R³ are organic groupings having radiation-curable functional groups as defined herein, and R² is an optional organic radical;

L is a linking group, providing a bridging group such as a urethane, thio-urethane, urea or ester grouping, as defined herein, preferably urethane;

R² is a substantially linear carbon-containing entity; and n is about 1 to about 40, preferably about 1 to about 20, and most preferably about 1 to about 10, wherein the molecular weight of $[R^2—L]_n$ is about 500 to about 20,000, preferably about 1,000 to about 10,000, and most preferably about 1,500 to about 6,000.

When n is 1, $[R^2—L]$ can contain, for example, a polyolefin, polyether, polycarbonate, or polyester structure having a molecular weight of about 500 to about 20,000. When n is from about 2 to about 5, $[R^2—L]$ can include a

52

polyolefin, polyether, polycarbonate, or polyester having a molecular weight of about 500 to about 10,000. When n is from about 5 to about 30, $[R^2—L]$ can represent a polyolefin, polyether, polycarbonate, or polyester having a molecular weight of about 500 to about 4,000.

The linear oligomers according to this invention can be used in an amount suitable to provide the desired level of ribbon stripping performance. The desired amount can easily be found and determined by one skilled in the art by testing different amounts of the selected linear oligomer(s) in an inner primary coating, and optionally in an outer primary coating as well, on optical glass fibers encased in a ribbon assembly. It has generally been found that the linear oligomers according to this invention can be used in amounts of about 0.1 to about 90 wt. %, preferably about 5 to about 80 wt. %, more preferably about 5 to about 60 wt. %, based on the total weight of the inner primary or outer primary composition.

## EXAMPLES 7-1 THROUGH 7-2

The components shown in Table 12 were combined to form an inner primary coating composition. The compositions were cured and the fiber pull-out friction of the cured coating was measured, as defined herein. The test results are shown in Table 12.

## TABLE 12

| Component (Amount is % by weight of total composition) | Example 7-1 | Example 7-2 |
|---|---|---|
| Oligomer H- (I-PTHF2000)ₙ-I-H | 52.26 | 52.26 |
| Ethoxylated Nonylphenol Acrylate | 15.7 | 15.67 |
| Lauryl Acrylate | 15.19 | 16.19 |
| n-Vinyl Formamide Isobornyl Acrylate | 11.8 | 0 |
| n-Vinyl Formamide Ethylhexyl Acrylate | 0 | 10.8 |
| 25:75 weight/weight of Bis (2,6-Dimethoxybenzoyl) (2,4,4-Trimethylpentyl) Phosphine Oxide and 2-Hydroxy-2-Methyl-1-Phenyl Propanone | 3.7 | 3.7 |
| gamma-Mercaptopropyl Trimethoxy Silane | 0.92 | 0.92 |
| Thioethylene Bis(3,5 di-tert-butyl-4-hydroxyl) Hydrocinnamate (antioxidant) | .46 | .46 |
| Test Results | | |
| Fiber Pull-Out Residue Test | 0.875 | 1.25 |

The oligomer was formed by reacting the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
PTHF2000 = 2000 molecular weight Polytetramethylene Ether Glycol (BASF)

## Terminal Linear Moieties

It has been found that the use of radiation-curable oligomers containing at least one terminal linear moiety can also improve the efficiency of the inner primary coating to transmit the stripping force applied during the ribbon stripping operation.

Examples of radiation-curable oligomers according to the present invention that provide enhanced strippability can be illustrated by the following formula:

$$R^4—x—L—x—[R^5—x—L—x]_n—R^6$$

wherein

R⁴ is a substantially linear long chain alkyl terminating in at least one hydroxyl group;

each L represents, independently, a molecular bridging group, preferably derived from a diisocyanate precourser reactant;

**A129**

US 6,298,189 B1

53

each x represents a resulting reacted linking group, such as, inter alia, a urethane, thio-urethane, or urea entity. Alternatively, ester linkages can also be utilized;

$R^5$ is a linear or a branched or cyclic hydrocarbon or polyether moiety derived from a a diol and having a molecular weight of from 150 to 10,000, preferably from 500 to 5,000, and most preferably from 1,000 to 2,000 Daltons;

$R^6$ is an end group carrying a radiation-curable functional group as defined herein, preferably an acrylate or methacrylate, and also having an hydroxyl linkage to the L entity.

$R^4$ preferably has at least about 80%, more preferably at least about 90%, of its carbon atoms in a straight line; and,

n may represent a number from zero to 30.

Preferably, $R^4$ is an alkyl radical with of from about $C_9$ to about $C_{20}$, since longer carbon chains may decrease the resistance against oil. Suitable examples of alkyls are lauryl, decyl, isodecyl, tridecyl, and stearyl. Most preferred is lauryl.

$R^5$ can contain a branched or cyclic aliphatic group having about 6 to about 15 carbon atoms. In particular $R^5$ can be the aliphatic component of a diisocyanate compound such as isophorone diisocyanate, DesW, TMDI, and HXDI. If $R^5$ is a branched component, preferably, the extent of branching units is at least about 10 mole %, and more preferably at least about 20 mole %, based on the total number of carbon atoms in $R^5$.

The oligomers according to above formula can be made, for example, by reacting in a first reaction one mole of a diisocyanate compound (for forming $R^5$) with (1) one mole of a long chain alkyl containing a hydroxy group (for forming $R^4$) or (2) one mole of a compound containing a hydroxy functional group and a radiation-curable functional group (for forming $R^6$). The urethane linking group "x" attached to "L" is formed by the reaction of the isocyanate group with a hydroxyl group. In a second reaction, the remaining isocyanate group is reacted with the other as yet unreacted hydroxyl group of the compound. Reactions of hydroxy functional compounds with isocyanate functional molecules are well known in the art, and can be catalyzed if needed, with known catalysts. Suitable examples of reactants containing a radiation-curable functional group and a hydroxy group are hydroxyethylacrylate or 2-hydroxypropylacrylate. Suitable examples of linear long chain alkyls include lauryl alcohol, decyl alcohol, isodecyl alcohol, tridecyl alcohol, and stearyl alcohol.

The resulting radiation-curable oligomer can be used in optical glass fiber coatings, in particular in inner primary coatings, as a monomer that enhances the strippability of the final coating, and that yields a coating composition which may have a high cure speed.

The radiation-curable oligomers according to this invention can accordingly be used in amounts suitable to provide the desired level of ribbon stripping performance. The desired amount can easily be determined by one skilled in the art by simple testing of different amounts of the selected linear oligomer(s) in an inner primary coating, and optionally in an outer primary coating as well, on optical glass fibers encased in a ribbon assembly. It has been found that the oligomers provided by this invention can generally be used in amounts of about 1 to about 90 wt. %, preferably about 5 to about 80 wt. %, and most preferably about 5 to about 60 based on the total weight of the inner primary or outer primary composition.

## EXAMPLE 8-1 AND COMPARATIVE EXAMPLES H-1 THROUGH H-3

The components shown in Table 13 were combined to inner primary coating compositions.

54

75 micron thick films of the coating materials were prepared and suitably cured. The fiber pull-out friction test was conducted, as described herein, and the test results are shown in Table 13.

TABLE 13

| Component (Amount is % by weight of total composition) | Comp. Example H-1 | Comp. Example H-2 | Comp. Example H-3 | Example 8-1 |
|---|---|---|---|---|
| Oligomer H- (I-PTHF2000)₂-I-H | 52.26 | 52.26 | 52.56 | 52.56 |
| Ethoxylated Nonylphenol Acrylate | 15.67 | 15.67 | 15.67 | 15.67 |
| Lauryl Acrylate | 3.39 | 10.79 | 10.79 | 7.15 |
| n-Vinyl Formamide Isobornyl Acrylate | 23.6 | 0 | 0 | 0 |
| n-Vinyl Formamide Ethylhexyl Acrylate | 0 | 16.2 | 21.6 | 0 |
| n-Vinyl Formamide Butyl Acrylate | 0 | 0 | 0 | 19.84 |
| 25:75 weight/weight of Bis (2,6-Dimethoxybenzoyl) (2,4,4-Trimethylpentyl) Phosphine Oxide and 2-Hydroxy-2-Methyl-1-Phenyl Propanone | 3.7 | 3.7 | 3.7 | 3.7 |
| gamma-Mercaptopropyl Trimethoxy Silane | 0.92 | 0.92 | 0.92 | 0.92 |
| Thioethylene Bis (3,5 di-tert-butyl-4-hydroxyl) Hydrocinnamate (antioxidant) | 0.46 | 0.46 | 0.46 | 0.46 |
| Test Results | | | | |
| Fiber Pull-Out Residue Test | 1.5 | 0.75 | 1 | 0.65 |

The oligomer was formed by reacting the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
PTHF2000 = 2000 molecular weight Polytetramethylene Ether Glycol (BASF)

The test results in Table 13 demonstrate that as the length of the linear moiety is increased, the fiber pull-out friction decreases.

### Aromatic Groups

Ribbon strippability can also be enhanced by incorporating a high concentration of aromatic groups in the oligomers and monomers used to form the inner primary coating. It will be appreciated that coating compositions comprising about 0.1 or more moles of aromatic groups per 100 grams of total composition, calculated using the molecular weights of the compositional components, are regarded as having a high concentration of aromatic groups. It is believed that the planarity of the phenyl ring next to the surface of the optical glass fiber may allow for the good slidability of the inner primary coating off the optical glass fiber during ribbon stripping.

## EXAMPLE 9-1

The components shown in Table 14 were combined to form an inner primary coating composition.

A 75 micron thick film of the coating material was prepared and suitably cured. The crack propagation was then measured. A friction test was also conducted, as described herein. The results are shown in Table 14.

US 6,298,189 B1

55

TABLE 14

| Component (Amount is % by weight of total composition) | Example 9-1 |
|---|---|
| Oligomer H-I-(PTGL2000-I)₂-H | 51.54 |
| Ethoxylated Nonylphenol Acrylate | 20.86 |
| Phenoxyethyl Acrylate | 16.8 |
| Lauryl Acrylate | 7 |
| 25:75 weight/weight of Bis (2,6-Dimethoxybenzoyl) (2,4,4-Trimethylpentyl) Phosphine Oxide and 2-Hydroxy-2-Methyl-1-Phenyl Propanone | 2.5 |
| Thiodiethylene Bis (3,5-di-tert-butyl-gamma-hydroxy) Hydrocinnamate | 0.3 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 |
| Test Results | |
| Crack Propagation (mm) | 1.49 |
| Fiber Pull-Out Friction (g/mm) | 10 |
| predicted Strip Cleanliness | 2 |

The oligomer was formed by reacting the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
PTGL2000 = 2000 molecular weight polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol (Mitsui, NY)

High Molecular Weight Polymeric Blocks and Reduced Concentration of Urethane

Radiation-curable, inner primary optical glass fiber coating compositions (hereinafter referred to as "inner primary compositions") are now well known in the art. Such inner primary compositions usually contain at least one radiation-curable oligomer, and optionally reactive diluents, photoinitiators, and additives, as described herein above.

It has now been found that by reformulating the radiation-curable oligomer used in the inner primary composition, an inner primary coating can be formed having a significantly increased crack propagation in combination with a significantly decreased fiber friction. Furthermore, it has been found that the crack propagation can be increased and the fiber friction decreased to levels which provide the inner primary coating with the ability to strip cleanly from the surface of an optical glass fiber during ribbon stripping, without the use of substantial amounts of slip agents in the inner primary coating. In some instances, the use of slip agents can be substantially avoided. The term slip agents includes components which are separate and distinct from the radiation-curable oligomer as well as slip agent moieties that can be bound to the radiation-curable oligomer. The use of slip agents may cause undesirable delamination of the inner primary coating during use of the ribbon assembly in hot and wet environments, such as tropical environments, which can lead to microbending and attenuation of the signal transmission. Thus, by substantially avoiding the use of slip agents to provide a ribbon-strippable inner primary coating, the present invention can provide a ribbon-strippable inner primary coating which exhibits enhanced resistance to such undesirable delamination.

Radiation-curable, oligomers comprising a carbon containing backbone to which at least one radiation-curable functional group is bound are well known in the art. Usually, the carbon containing backbone of the radiation-curable oligomer contains one or more polymeric blocks each having a molecular weight up to about 2000 and being connected together via coupling groups. Thus, an oligomer having a molecular weight of about 6000, will usually contain three polymeric blocks each having a molecular weight of about 2000 which are connected via coupling groups. The radiation-curable functional groups are also

56

usually connected to the carbon-containing backbone via coupling groups.

By extensive experimentation, it has now been found that as the molecular weight of the polymeric blocks is increased, the crack propagation of the inner primary coating increases and the fiber friction of the inner primary coating decreases. The molecular weight of the polymeric blocks should be adjusted up to level which provides an inner primary coating having a fiber friction and crack propagation that are suitable for ribbon stripping. For example, the molecular weight of the polymeric block can be adjusted upward to level which provides an inner primary coating having a combination of fiber friction and crack propagation that provides a predicted strip cleanliness of about 3 or less, and preferably about 2 or less. Alternatively, the molecular weight of the polymeric block can be adjusted upward to level which provides an inner primary coating having a fiber friction of about 30 g/mm or less at a rate of 0.1 mm/sec in combination with a crack propagation of at least about 1.3 mm at a rate of 0.1 mm/sec, at a ribbon stripping temperature. Preferably, the fiber friction is about 25 g/mm or less and more preferably about 20 g/mm or less. Preferably, the crack propagation is at least about 1.5 mm and more preferably at least about 2 mm. The crack propagation is usually below about 4, but can be higher.

It has been found that by using polymeric blocks having a molecular weight greater than 2000, preferably at least about 2500, and most preferably at least about 3000, inner primary coatings having a fiber friction and a crack propagation as described above can be provided. The molecular weight of said polymeric block is usually less than about 10,000, preferably less than about 8,000.

The coupling groups can be any group capable of providing a link between polymer blocks and/or between radiation-curable functional groups and polymer blocks. Examples of suitable coupling groups are urethane, urea and thiourethane. For purposes of practicing the present invention, which relates to adjusting the crack propagation and fiber friction using the molecular weight of the polymeric blocks and/or urethane concentration, the following groups are not considered coupling groups when determining the molecular weight of the polymeric blocks: carbonate, ether, and ester groups. Thus, when determining the molecular weight of the polymeric block, ether groups, carbonate groups, and ester groups are considered part of the polymeric block. Polymeric compounds separated by urethane, thiourethane and urea groups are considered separate polymeric blocks. Urethane is the preferred coupling group.

Usually, urethane groups are used as the coupling groups in the radiation-curable oligomer. For example, if an oligomer having a number average molecular weight about 6000 comprising 3 polymer blocks, each having a number average molecular weight of about 2000, and containing 2 radiation-curable functional groups, will have four urethane linkages. Two of the urethane linkages connect the radiation-curable groups to the polymeric blocks and two of the urethane linkages connect the three polymeric blocks together.

It has now been found that as the concentration of urethane linkages present in the inner primary composition is decreased, the crack propagation of the inner primary coating increases and the fiber friction of the inner primary coating decreases. Thus, the term urethane concentration represents the weight percentage of all urethane linkages present in the inner primary coating composition, based on the total weight of the inner primary coating composition.

Based on this discovery, the urethane concentration should be adjusted downward to a level which provides an

US 6,298,189 B1

<table>
<tr><td>57</td><td>58</td></tr>
</table>

inner primary coating having a fiber friction and crack propagation that are suitable for ribbon stripping the desired ribbon assembly. For example, the urethane concentration can be adjusted downward to a level which provides an inner primary coating having a combination of fiber friction and crack propagation that provides a predicted strip cleanliness of about 3 or less, and preferably about 2 or less. It has been found that if the concentration of urethane linkages is about 4% by weight or less, inner primary coatings having a fiber friction and a crack propagation that exhibit a predicted strip cleanliness of about 3 or less can be provided. Preferably, the urethane concentration is about 3.5% by weight or less, more preferably about 2.5% or less by weight, and most preferably about 2% or less by weight. The urethane concentration effect on fiber friction and crack propagation is more pronounced for higher molecular weight oligomers, such as about 3,000 to about 10,000, more preferably about 3,500 to about 8,000. Thus, preferably the urethane oligomer has a molecular weight of about 3,000 to about 10,000 in combination with a urethane concentration of about 4% by weight or less, more preferably, a molecular of about 3,500 to about 8,000 in combination with a urethane concentration of about 3.5% or less, and most preferably, a molecular weight of about 3,500 to about 8,000 in combination with a urethane concentration of about 3% or less.

The polymeric blocks can comprise for example polyolefins, polyolefins, polycarbonates, polyesters, polyamides or copolymers thereof. Preferably, the polymeric blocks comprise polyethers.

The radiation-curable functional groups used can be any functional group capable of polymerization when exposed to actinic radiation. Suitable radiation-curable functional groups are now well known and within the skill of the art.

Commonly, the radiation-curable functionality used is ethylenic unsaturation, which can be polymerized through radical polymerization or cationic polymerization. Specific examples of suitable ethylenic unsaturation are groups containing acrylate, methacrylate, styrene, vinylether, vinyl ester, N-substituted acrylamide, N-vinyl amide, maleate esters, and fumarate esters. Preferably, the ethylenic unsaturation is provided by a group containing acrylate, methacrylate, or styrene functionality, and most preferably acrylate or methacrylate.

Another type of radiation-curable functionality generally used is provided by, for example, epoxy groups, or thiol-ene or amine-ene systems. Epoxy groups can be polymerized through cationic polymerization, whereas the thiol-ene and amine-ene systems are usually polymerized through radical polymerization. The epoxy groups can be, for example, homopolymerized. In the thiol-ene and amine-ene systems, for example, polymerization can occur between a group containing allylic unsaturation and a group containing a tertiary amine or thiol.

The radiation-curable oligomer can be easily formed by reacting a polymeric polyol, a compound containing a radiation-curable functional group and a hydroxyl group, and a polyisocyanate. The general reaction of isocyanate functional groups with hydroxyl groups to form urethane linkages is well known in the art. Thus, one skilled in the art will be able to make the improved oligomer according to the present invention based on the disclosure provided herein.

Examples of suitable polymeric polyols that can be used to form the radiation-curable oligomer include polyether diols, polyolefin diols, polyester diols, polycarbonate diols, and mixtures thereof. Polyether and polycarbonate diols, or combinations thereof, are preferred. The polymeric block is the residue of the polymeric polyol after reaction to form the radiation-curable oligomer.

If a polyether diol is used, preferably the polyether is a substantially non-crystalline polyether. Preferably, the polyether comprises repeating units of one or more of the following monomer groups:

$$—(O—CH_2—CH_2)—;\quad —(CH_2—CH—O)—;$$
$$\underset{CH_3}{|}$$

$$—(CH_2—CH_2—CH_2—O)—;$$

$$—(CH_2—CH_2—CH_2—CH_2—O)—;$$

$$—(CH_2—CH—CH_2—CH_2—O)—;$$
$$\underset{CH_3}{|}$$

$$—(CH—CH_2—CH_2—CH_2—O)—;$$
$$\underset{CH_3}{|}$$

$$—(CH—CH_2—O)—;\quad and$$
$$\underset{CH_2—CH_3}{|}$$

$$—(CH_2—\underset{CH_3}{\overset{CH_3}{C}}—O)—.$$

Thus, suitable polyethers can be made from epoxy-ethane, epoxy-propane, tetrahydrofuran, methyl-substituted tetrahydrofuran, epoxybutane, and the like. Commercial examples of a suitable polyether polyols that can be used are PTGL2500, PTGL3000, PTGL3500, and PTGL4000 (Hodogaya Chemical Company).

If a polyolefin diol is used, the polyolefin is preferably a linear or branched hydrocarbon containing a plurality of hydroxyl end groups. The hydrocarbon provides a hydrocarbon backbone for the oligomer. Preferably, the hydrocarbon is a non-aromatic compound containing a majority of methylene groups (—CH$_2$—) and which can contain internal unsaturation and/or pendent unsaturation. Examples of suitable hydrocarbon diols include, for example: hydroxyl-terminated; fully or partially hydrogenated 1,2-polybutadiene; copolymers of 1,4-polybutadiene; copolymers of 1,2-polybutadiene; polyisobutylene polyol; mixtures thereof, and the like. Preferably, the hydrocarbon diol is a substantially, fully hydrogenated 1,2-polybutadiene-ethene copolymer or 1,2-polybutadiene-ethene copolymer.

Examples of polycarbonate diols are those conventionally produced by the alcoholysis of diethylene carbonate with a diol.

Examples of polyester diols include the reaction products of saturated polycarboxylic acids, or their anhydrides, and diols. Commercial examples are the polycaprolactones, commercially available from Union Carbide under the trade designation Tone Polylol series of products, for example, Tone 0200, 0221, 0301, 0310, 2201, and 2221. Tone Polyol 0301 and 0310 are trifunctional.

Any organic polyisocyanate, alone or in admixture, can be used as the polyisocyanate. Examples of suitable diisocyanates include:

isophorone diisocyanate (IPDI);
toluene diisocyanate (TDI);
diphenylmethylene diisocyanate;
hexamethylene diisocyanate;
cyclohexylene diisocyanate;
methylene dicyclohexane diisocyanate;
2,2,4-trimethyl hexamethylene diisocyanate;
m-phenylene diisocyanate;

**A132**

US 6,298,189 B1

59

4-chloro-1,3-phenylene diisocyanate;
4,4'-biphenylene diisocyanate;
1,5-naphthylene diisocyanate;
1,4-tetramethylene diisocyanate;
1,6-hexamethylene diisocyanate;
1,10-decamethylene diisocyanate;
1,4-cyclohexylene diisocyanate; and
polyalkyloxide and polyester glycol diisocyanates such as
polytetramethylene ether glycol terminated with TDI and
polyethylene adipate terminated with TDI, respectively.
Preferably, the isocyanates are TDI or IPDI.

If other oligomers, monomers, and/or additives containing urethane linkages are used in admixture with the above described radiation-curable oligomer to form an inner primary composition, the concentration of urethane linkages present in each other oligomer, monomer or additive should be included in the urethane concentration calculation. Examples of common monomers containing urethane linkages include:
trimethylolpropane triacrylate,
the triacrylate or methacrylate from hexane-2,4,6 triol, or from glycerol, ethoxylated glycerol, or propoxylated glycerol,
hexanediol diacrylate,
1,3-butylene glycol diacrylate,
neopentyl glycol diacrylate,
1,6-hexanediol diacrylate,
neopentyl glycol diacrylate,
polyethylene glycol-200 diacrylate,
tetraethylene glycol diacrylate,
triethylene glycol diacrylate,
pentaerythritol tetraacrylate,
tripropylene glycol diacrylate,
ethoxylated bisphenol-A diacrylate,
trimetylolpropane diacrylate,
di-trimethylolpropane tetraacrylate,
triacrylate of tris(hydroxyethyl) isocyanurate,
dipentaerythritol hydroxypentaacrylate,
pentaerythritoltriacrylate,
ethoxylated trimethylolpropane triacrylate,
triethylene glycol dimethacrylate,
ethylene glycol dimethacrylate,
tetraethylene glycol dimethacrylate,

60

polyethylene glycol-2000 dimethacrylate,
1,6-hexanediol dimethacrylate,
neopentyl glycol dimethacrylate,
polyethylene glycol-600 dimethacrylate,
1,3-butylene glycol dimethacrylate,
ethoxylated bisphenol-A dimethacrylate, trimethylolpropane trimethacrylate,
diethylene glycol dimethacrylate,
1,4-butanediol diacrylate,
diethylene glycol dimethacrylate,
pentaerythritol tetramethacrylate,
glycerin dimethacrylate,
trimethylolpropane dimethacrylate,
pentaerythritol trimethacrylate,
pentaerythritol dimethacrylate,
pentaerythritol diacrylate, and
the like and mixtures thereof.
Mono(meth)acrylates such as cyclohexyl(meth)acrylate,
isobornyl(meth)acrylate,
lauryl(meth)acrylate,
alkoxylated phenolacrylate,
isooctyl-acrylate,
2-ethylhexyl-acrylate,
hydroxyethyl acrylate, and
tetrahydrofurfuryl(meth)-acrylate.

The Invention will be further explained by the following non-limiting examples illustrating the use of block polymeric formulations.

EXAMPLES 10-1 THROUGH 10-14 AND
COMPARATIVE EXAMPLES J-1
THROUGH J-11

Inner primary compositions were made by combining the components shown in Tables 15 and 16, in the same manner as described herein above. The viscosity of the compositions was measured as described above, and the results are shown in Tables 15 and 16. The inner primary compositions were cured by exposure to UV radiation and the fiber friction and crack propagation properties were measured, in the same manner as described herein above. The test results are shown in Tables 15 and 16.

TABLE 15

| Component (% by weight of total composition) | Ex. 10-1 | Ex. 10-2 | Ex. 10-3 | Ex. 10-4 | Ex. 10-5 | Ex. 10-6 | Ex. 10-7 | Ex. 10-8 | Ex. 10-9 | Ex. 10-10 | Ex. 10-11 | Ex. 10-12 | Ex. 10-13 | Ex. 10-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oligomer H-I-PPG3025-I-H | 49.38 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oligomer H-I-PPG4025-I-H | 0 | 49.38 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oligomer H-I-PTGL3000-I-H | 0 | 0 | 64.38 | 0 | 0 | 49.38 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oligomer H-I-PTGL3500-I-H | 0 | 0 | 0 | 64.38 | 0 | 0 | 49.38 | 0 | 0 | 39.38 | 45.23 | 45.23 | 65.33 | 64.68 |
| Oligomer H-I-PTGL4000-I-H | 0 | 0 | 0 | 0 | 64.38 | 0 | 0 | 49.38 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oligomer H-(I-PTGL2000)₂-I-H | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50.54 | 0 | 0 | 0 | 0 | 0 |
| Phenoxy Ethyl Acrylate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 0 | 25.13 | 20.1 | 0 |
| Ethoxylated Nonylphenol Acrylate Ester | 40.32 | 40.32 | 25.32 | 25.32 | 25.32 | 40.32 | 40.32 | 40.32 | 15.16 | 50.21 | 25.13 | 20.1 | 0 | 0 |
| Isobornyl Acrylate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 10.5 | 6.97 |
| Lauryl Acrylate | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 5.99 | 0 | 0 | 0 | 5.97 |
| Thiodiethylene bis(3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 |
| 2,4,6-Trimethylbenzoyl Diphenyl Phosphine Oxide and 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

US 6,298,189 B1

61      62

TABLE 15-continued

| Component (% by weight of total composition) | Ex. 10-1 | Ex. 10-2 | Ex. 10-3 | Ex. 10-4 | Ex. 10-5 | Ex. 10-6 | Ex. 10-7 | Ex. 10-8 | Ex. 10-9 | Ex. 10-10 | Ex. 10-11 | Ex. 10-12 | Ex. 10-13 | Ex. 10-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone Bis(2,6-Dimethoxybenzyl) (2,4,4-Trimethylpentyl) Phosphine Oxide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 3 | 3 | 3 | 3 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| Test Results | | | | | | | | | | | | | | |
| Viscosity mPa · s (25 C.) | 1200 | 1190 | 25350 | 321350 | 16840 | 9380 | 17680 | 7050 | 5570 | 4530 | 7220 | 5540 | 10670 | 9440 |
| Urethane Concentration (%)[1] | 2.01 | 1.76 | 2.99 | 2.65 | 2.24 | 2.29 | 2.03 | 1.72 | 2.67 | 1.62 | 1.86 | 1.86 | 2.69 | 2.66 |
| Fiber Pull-Out Friction (g/mm) | 19.3 | 10.8 | 23.23 | 21.27 | 27.63 | 21.84 | 14.04 | 16.15 | 25.3 | 13.4 | 15.8 | 15.2 | 25.6 | 21.6 |
| Crack Propagation (mm) | 1.5 | 2.18 | 1.66 | 1.63 | 1.82 | 1.76 | 2.32 | 2.31 | 2.04 | 2.6 | 2 | 2.9 | 1.6 | 1.8 |

[1]The urethane concentration can be calculated from (1) the amount of NCO present in the urethane linkages of the oligomer, (2) the molecular weight of the oligomer, which can be measured by conventional methods, and (3) the amount of oligomer in the composition. The polyol molecular weights in Table I are estimated rather than measured molecular weights.

TABLE 16

| Component (% by weight based on total weight of composition) | Comp. Ex. J-1 | Comp Ex. J-2 | Comp Ex. J-3 | Comp Ex. J-4 | Comp Ex. J-5 | Comp Ex. J-6 | Comp Ex. J-7 | Comp Ex. J-8 | Comp Ex. J-9 | Comp. Ex. J-10 | Comp. Ex. J-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Oligomer H-I-PTGL2000-I-H | 0 | 83.7 | 68.7 | 79.7 | 79.7 | 74.7 | 69.7 | 67.7 | 79.7 | 49.38 | 64.38 |
| Oligomer H-(I-PERM1000)$_{1.4}$-(I-PPG1025)$_{1.06}$-I-H | 56 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| isodecyl acrylate | 14 | | | | | | | | | | |
| HI | 0 | 0 | 0 | 0 | 0 | 5 | 10 | 15 | 0 | 0 | 0 |
| Phenoxy Ethyl Acrylate | | 0 | 0 | 5 | 0 | 10 | 10 | 7 | 0 | 0 | 0 |
| Ethoxylated Nonylphenol Acrylate Ester | 25.5 | 6 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 40.32 | 25.32 |
| Isobornyl Acrylate | 0 | 0 | 0 | 5 | 10 | 0 | 0 | 0 | 10 | 0 | 0 |
| Lauryl Acrylate | 0 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Thiodiethylene bis(3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | .5 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 | .3 |
| 2,4,6-Trimethylbenzoyl Diphenyl Phosphine Oxide and 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone | 0 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 3 | 3 |
| 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone bis(2,6-Dimethoxybenzyl) (2,4,4-Trimethylpentyl) Phosphine Oxide | 3 | 0 | 0 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 0 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Test Results | | | | | | | | | | | |
| Viscosity mPa · s (25 C.) | 6000 | | | | | | | | | 5050 | 10310 |
| Urethane Concentration (%) | 4.9 | 5.38 | 4.42 | 5.12 | 5.12 | 5.31 | 5.49 | 5.87 | 5.12 | 3.53 | 4.30 |
| Fiber Pull-Out Friction (g/mm) | 44 | 41.97 | 34.84 | 41.8 | 40.2 | 44.6 | 40.4 | 39.9 | 44.9 | 34.84 | 41.17 |
| Crack Propagation (mm) | 1 | 1.32 | 1.45 | 1.21 | 1.25 | 1.05 | 1.2 | 1.17 | 1.2 | 1.45 | 1.32 |

The oligomers in Tables 15 and 16 were formulated from the following components:

H = Hydroxyethylacrylate
I = Isophoronediisocyanate
HI = Hexane diisocyanate
PTGL2000 = polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol having the molecular weight of 2000 (Mitsui, NY)
PPG1025 = polypropyleneoxide diol having an average molecular weight of 1025, (BASF)
Perm 1000 = Permanol KM10-1733 polycarbonate/polyether copolymer diol having an average molecular weight of 1000

As can be seen from Examples 10-6 through 10-8, and Comparative Example J-10, as the concentration of urethane decreases, the crack propagation increases and the fiber friction decreases. Furthermore, as the molecular weight of the polymeric blocks increases, the crack propagation increases and the fiber friction decreases.

Similarly, as can be seen from Examples 10-3 through 10-5, and Comparative Example J-11, as the concentration of urethane decreases, the crack propagation increases and the fiber friction decreases. Furthermore, as the molecular weight of the polymeric blocks increases, the crack propagation increases and the fiber friction decreases. Examples 10-3 through 10-5 used significantly more of the radiation-curable oligomer than Examples 10-6 through 10-8, and the same trend in fiber friction and crack propagation was clearly demonstrated. Based on this experimental evidence, the trend in fiber friction and crack propagation is dependent mainly upon the oligomer. Furthermore, these Examples used a polyether polymeric block.

US 6,298,189 B1

63

Examples 10-1 and 10-2 demonstrate that when a polypropylene oxide polymeric block is used as a polyether polymeric block, the crack propagation and fiber friction are

64

propagation properties were measured, in the same manner as described herein above. The test results are shown in Table 17.

TABLE 17

| Component (% by weight based on total weight of composition) | Exmp. 10-15 | Exmp. 10-16 | Exmp. 10-17 | Exmp. 10-18 | Exmp. 10-19 | Exmp. 10-20 | Exmp. 10-21 | Exmp. 10-22 |
|---|---|---|---|---|---|---|---|---|
| Oligomer H-(I-PTGL2000)$_2$-I-H | 23.71 | 28.45 | 33.19 | 37.93 | 42.68 | 47.42 | 52.16 | 56.9 |
| Phenoxy Ethyl Acrylate | 64.68 | 58.52 | 52.35 | 46.19 | 40.03 | 33.86 | 27.7 | 21.53 |
| Ethoxylated Nonylphenol Acrylate Ester | 7.11 | 8.53 | 9.95 | 11.38 | 12.87 | 14.22 | 15.64 | 17.06 |
| Thiodiethylene bis(3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone Bis(2,6-Dimethoxybenzyl) (2,4,4-Trimethylpentyl) Phosphine Oxide | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Test Results |  |  |  |  |  |  |  |  |
| Viscosity mPa.s (25 C.) | 430 | 730 | 1200 | 2000 | 3270 | 5070 | 8500 | 14,500 |
| Urethane Concentration (%) | 1.25 | 1.5 | 1.75 | 2 | 2.25 | 2.5 | 2.75 | 3 |
| Fiber Pull-Out Friction (g/mm) | 20.5 | 22.7 | 23.9 | 28.7 | 26.4 | 35.2 | 31.8 | 40.1 |
| Crack Propagation (mm) | 2.31 | 2.32 | 1.96 | 1.89 | 1.8 | 1.77 | 1.75 | 1.51 |

The oligomers in Table 17 were formulated from the following compounds:
H = Hydroxyethylacrylate
I = Isophoronediisocyanate
PTGL 2000 = polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol having an average molecular weight of 2000, (Mitsui, NY)

still dependent upon the molecular weight of the polymeric block and/or the concentration of urethane if used. In particular, as the concentration of urethane decreases, the crack propagation increases and the fiber friction decreases. Furthermore, as the molecular weight of the polymeric blocks increases, the crack propagation increases and the fiber friction decreases.

Examples 10-4, 10-7 and 10-10 through 10-14 used different amounts of the same radiation-curable oligomer. The experimental results demonstrate that the trend in crack propagation and fiber friction is based on the molecular weight of the polymeric block and/or the concentration of urethane.

The test results in Table 15 demonstrate that the above described trends regarding crack propagation and fiber friction based on molecular weight and/or urethane concentration are independent of the type of oligomers and is generally consistent among the different types of oligomers.

FIG. 7 illustrates a graph which includes the data shown in Tables 15 and 16, above. As can be seen from FIG. 7, the urethane concentration in the inner primary composition directly affects the fiber pull-out friction. As the urethane concentration is decreased, the fiber pull-out friction is decreased.

FIG. 8 illustrates of the fiber friction versus urethane concentration for Examples 10-10 through 10-14. FIG. 8 clearly demonstrates the direct correlation between fiber pull-out friction and urethane concentration in the inner primary composition. In particular, as the urethane concentration decreases the fiber pull-out friction decreases.

EXAMPLES 10-15 THROUGH 10-22

Inner primary compositions were made by combining the components shown in Table 17, in the same manner as described herein above. The viscosity of the compositions was measured as described above, and the results are shown in Table 17. The inner primary compositions were cured by exposure to UV radiation and the fiber friction and crack

FIG. 9 illustrates a graph of the experimental results of Examples 10-15 through 10-22. As can be seen from FIG. 9, as the urethane concentration decreases the fiber pull-out friction decreases.

EXAMPLES 10-22A THROUGH 10-24

Inner primary compositions were made by combining the components shown in Table 18, in the same manner as described herein above. The viscosity of the compositions was measured as described above, and the results are shown in Table 18. The inner primary compositions were cured by exposure to UV radiation and the fiber friction and crack propagation properties were measured, in the same manner as described herein above. The test results are shown in Table 18.

TABLE 18

| Component (% by weight based on total weight of composition) | Example 10-22A | Example 10-23 | Example 10-24 |
|---|---|---|---|
| Oligomer H-I-PTGL4200-I-H | 0 | 49.38 | 45.01 |
| Oligomer H-(I-PTGL2000)$_2$-I-H | 49.38 | 0 | 0 |
| Monomer H-HI | 0 | 0 | 8.85 |
| Ethoxylated Nonylphenol Acrylate Ester | 40.32 | 40.32 | 36.75 |
| Thiodiethylene bis (3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | 0.3 | 0.3 | 0.27 |
| Lauryl Acrylate | 6 | 6 | 5.47 |
| 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone Bis (2,6-Dimethoxybenzyl) (2,4,4-Trimethylpentyl) Phosphine Oxide | 3 | 3 | 2.73 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 | 1 | .91 |
| Test Results |  |  |  |
| Viscosity mPa.s (25 C) | 9260 | 7050 | 5100 |
| Urethane Concentration (%) | 2.61 | 1.72 | 2.61 |
| Fiber Pull-Out Friction (g/mm) | 20.85 | 16.85 | 17.4 |
| Crack Propagation (mm) | 1.62 | 2.06 | 1.74 |

The oligomers and monomers in Table 18 were formulated from the following components:

US 6,298,189 B1

65

TABLE 18-continued

| Component (% by weight based on total weight of composition) | Example 10-22A | Example 10-23 | Example 10-24 |
|---|---|---|---|

H = Hydroxyethylacrylate
I = Isophoronediisocyanate
HI = Hexane isocyanate
PTGL 4200 = polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol having an average molecular weight of 4200, (Mitsui, NY)
PTGL 2000 = polymethyltetrahydrofurfuryl/polytetrahydrofurfuryl copolymer diol having an average molecular weight of 2000, (Mitsui, NY)

By comparing Example 10-22A with 10-24, it becomes clear that by using a higher molecular weight polymeric block, 4200 g/mole in Example 10-24 compared to 2000 g/mole in Example 10-22A, the fiber friction can be significantly decreased and the crack propagation can be increased. The urethane concentration was the same for both Examples 10-22A and 10-24. The oligomer used contained a polyether backbone.

### EXAMPLES 10-25 THROUGH 10-28

Inner primary compositions were made by combining the components shown in Table 19, in the same manner as described herein above. The viscosity of the compositions was measured as described above, and the results are shown in Table 19. The inner primary compositions were cured by exposure to UV radiation and the fiber friction and crack propagation properties were measured, in the same manner as described herein above. The test results are shown in Table 19.

TABLE 19

| Component (% by weight based on total weight of composition) | Ex. 10-25 | Ex. 10-26 | Ex. 10-27 | Ex. 10-28 |
|---|---|---|---|---|
| Oligomer H-I-(NissoPB2000)₂-I-H | 50 | 45 | 40 | 35 |
| Ethoxylated Nonylphenol Acrylate Ester | 29.5 | 34.5 | 39.5 | 44.5 |
| Isobornyl Acrylate | 10 | 10 | 10 | 10 |
| Thiodiethylene bis (3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | 0.5 | 0.5 | 0.5 | 0.5 |
| Lauryl Acrylate | 6 | 6 | 6 | 6 |
| 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone Bis (2,6-Dimethoxybenzyl) (2,4,4-Trimethylpentyl) Phosphine Oxide | 3 | 3 | 3 | 3 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 | 1 | 1 | 1 |
| Test Results | | | | |
| Viscosity mPa.s (25 C) | | | | |
| Urethane Concentration (%) | 2.64 | 2.37 | 2.11 | 1.84 |
| Fiber Pull-Out Friction (g/mm) | 13.88 | 13.49 | 9.24 | 6.94 |
| Crack Propagation (mm) | 1.79 | 1.52 | * | * |

The oligomers and monomers in Table 19 were formulated from the following components:
H = Hydroxyethylacrylate
I = Isophoronediisocyanate
NissoPB 2000 = polybutadiene copolymer diol having an average molecular weight of 2000, (Nippon Soda)
*The crack propagation could not be measured for these two coatings.

FIG. 10 illustrates a graph of the experimental results of Examples 10-25 through 10-28. As can be seen from FIG. 10, as the urethane concentration decreases the fiber pull-out friction decreases. The oligomer used contained a polyolefin backbone.

### EXAMPLES 10-29 THROUGH 10-32

Inner primary compositions were made by combining the components shown in Table 20 in the same manner as described herein above. The viscosity of the compositions was measured as described herein above, and the results are shown in Table 20. The inner primary compositions were cured by exposure to UV radiation and the fiber friction and crack propagation properties were measured, in the same manner as described herein above. The test results are shown in Table 20.

TABLE 20

| Component (% by weight based on total weight of composition) | Ex. 10-29 | Ex. 10-30 | Ex. 10-31 | Ex. 10-32 |
|---|---|---|---|---|
| Oligomer H-I-PTGL2000-I-H | 40 | 40 | 40 | 40 |
| H-BI | 0 | 4.24 | 9.18 | 14.12 |
| Ethoxylated Nonylphenol Acrylate Ester | 10 | 10 | 10 | 10 |
| Phenoxyethyl Acrylate | 45.5 | 41.26 | 36.32 | 31.38 |
| Thiodiethylene bis (3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | 0.5 | 0.5 | 0.5 | 0.5 |
| 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone Bis (2,6-Dimethoxybenzyl) (2,4,4-Trimethylpentyl) Phosphine Oxide | 3 | 3 | 3 | 3 |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 | 1 | 1 | 1 |
| Test Results | | | | |
| Viscosity mPa.s (25 C) | 770 | 810 | 870 | 950 |
| Urethane Concentration (%) | 2.5 | 3 | 3.5 | 4 |
| Fiber Pull-Out Friction (g/mm) | 39.1 | 40.4 | 42.7 | 47.9 |
| Crack Propagation (mm) | 1.27 | 1.24 | 1.28 | 1.13 |

The oligomers and monomers in Table 20 were formulated from the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
BI = Butyl Isocyanate

FIG. 11 illustrates a graph of the experimental results of Examples 10-29 through 10-32. As can be seen from FIG. 11, as the urethane concentration decreases the fiber pull-out friction decreases.

### EXAMPLES 10-33 THROUGH 10-36

Inner primary compositions were made by combining the components shown in Table 21, in the same manner as described herein above. The viscosity of the compositions was measured as described above, and the results are shown in Table 21. The inner primary compositions were cured by exposure to UV radiation and the fiber friction and crack propagation properties were measured, in the same manner as described herein above. The test results are shown in Table 21.

TABLE 21

| Component (% by weight based on total weight of composition) | Ex. 10-33 | Ex. 10-34 | Ex. 10-35 | Ex. 10-36 | Comp. Ex. J-1 |
|---|---|---|---|---|---|
| Oligomer H-I-PPG2025-I-Perm2000-I-H | 50 | 45 | 40 | 35 | 0 |
| Oligomer H-I-(PPG2025)₁.₄-I-(Perm1000)₁.₀₆-I-H | 0 | 0 | 0 | 0 | 70 |

US 6,298,189 B1

67                                                                                              68

TABLE 21-continued

| Component (% by weight based on total weight of composition) | Ex. 10-33 | Ex. 10-34 | Ex. 10-35 | Ex. 10-36 | Comp. Ex. J-1 |
|---|---|---|---|---|---|
| Ethoxylated Nonylphenol Acrylate Ester | 10 | 10 | 10 | 10 | 25.5 |
| Lauryl Acrylate | 6 | 6 | 6 | 6 | 0 |
| Thiodiethylene bis(3,5-di-tert-butyl-4-Hydroxy) Hydrocinnamate | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| 2-Hydroxy-2-Methyl-1-Phenyl-1-Propanone | 1.5 | 1.5 | 1.5 | 1.5 | 3 |
| Bis(2,6-Dimethoxybenzyl) (2,4,4-Trimethylpentyl) Phosphine Oxide | | | | | |
| gamma-Mercaptopropyl Trimethoxy Silane | 1 | 1 | 1 | 1 | 1 |
| Test Results | | | | | |
| Viscosity mPa · s (25 C.) | | | | | 6000 |
| Urethane Concentration (%) | 2.03 | 1.83 | 1.62 | 1.42 | 4.9 |
| Fiber Pull-Out Friction (g/mm) | 11.87 | 11.5 | 9.9 | 9.8 | 44 |
| Crack Propagation (mm) | 0 | 3.3 | 3.2 | 3.1 | 1 |

The oligomers and monomers in Table 21 were formulated from the following components:
H = Hydroxyethyl Acrylate
I = Isophorone Diisocyanate
Perm 1000 = Permanol KM10-1733 polycarbonate/polyether copolymer diol having an average molecular weight of 1000
PPG2025 = PC1122 a polycarbonate/polyether copolymer diol having an average molecular weight of 2000

The test results in Table 21 illustrate that as the urethane concentration decreases the fiber pull-out friction decreases and the crack propagation increases. The test results in Table 21 also illustrate that as the molecular weight of the polymeric block increases the fiber pull-out friction decreases and the crack propagation increases. The polymeric block used was a polycarbonate.

Ribbon Assemblies

Ribbon assemblies are now well known in the art and one skilled in the art will readily be able to use the disclosure provided herein to prepare the novel ribbon assemblies having enhanced ribbon strippability for the desired applications. The novel ribbon assembly made according to this invention can be advantageously used in various telecommunication systems. Such telecommunication systems typically include ribbon assemblies containing optical glass fibers, in combination with transmitters, receivers, and switches. The ribbon assemblies containing the coated optical glass fibers are the fundamental connecting units of telecommunication systems. The ribbon assembly can be buried under ground or water for long distance connections, such as between cities. The ribbon assembly can also be used to connect directly to residential homes.

The novel ribbon assembly made according to this invention can also be used in cable television systems. Such cable television systems typically include ribbon assemblies containing optical glass fibers, transmitters, receivers, and switches. The ribbon assemblies containing the coated optical glass fibers are the fundamental connecting units of such cable television systems. The ribbon assembly can be buried under ground or water for long distance connections, such as between cities. The ribbon assembly can also be used to connect directly to residential homes.

The novel ribbon assemblies can also be used in a wide variety of technologies, including but not limited to, various security systems, data transmission lines, high density television, and computer appliance systems. It will be appreciated that as a result of the fundamental discoveries described herein including the relationship between the fiber friction forces and the cohesive strength of the coatings themselves, and the means to control and establish such features and functions, the optical fiber art is now able to realize significant advantages. These are primarily exhibited, as explained above, in the stripping and cable splicing function, but those operations are nonetheless critical in the establishment of a ribbon/cable network of communication.

While the invention has been described in detail and with reference to specific embodiments thereof, it will be apparent to those of ordinary skill in the art that various changes and modifications can be made to the claimed invention without departing from the spirit and scope thereof. For instance, while this invention has principally been described with reference to ribbon constructions and assemblies of optical fibers, it is equally adaptable to other geometric and structural arrays of multiple fiber conduits and cables.

Accordingly, applicants believe that the scope of this invention is defined solely by the terminology set forth in the following claims and is not otherwise limited.

What is claimed is:

1. A radiation-curable inner primary coating composition for an optical glass fiber comprising an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said composition after radiation cure having the combination of properties of:

(a) a fiber pull-out friction of less than 20 g/mm at stripping temperature;

(b) a crack propagation of greater than 1.0 mm at stripping temperature;

(c) a glass transition temperature of below 10° C.; and

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling.

2. A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises propoxylated nonyl phenol acrylate and an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;

(b) a crack propagation of greater than 1.0 mm at stripping temperature;

(c) a glass transition temperature of below 10° C.; and

US 6,298,189 B1

69

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition after radiation cure having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

**3.** A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;

(b) a crack propagation of greater than 1.0 mm at stripping temperature;

(c) a glass transition temperature of below 10° C.; and

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**4.** A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together; wherein:

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;

(b) a crack propagation of greater than 1.0 mm at stripping temperature;

(c) a glass transition temperature of below 10° C.; and

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

70

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**5.** A radiation-curable inner primary coating composition for an optical glass fiber comprising at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said composition, after radiation cure, having the combination of properties of:

(a) a fiber pull-out friction of less than 20 g/mm at 90° C.;

(b) a crack propagation of greater than 1.0 mm at 90° C.;

(c) a glass transition temperature of below 10° C.; and

(d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity.

**6.** A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises propoxylated nonyl phenol acrylate and at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition, after radiation cure, having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 1.0 mm at 90° C.;

(c) a glass transition temperature of below 10° C.; and

(d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity; and

said outer primary coating composition comprises at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition, after radiation cure, having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

**7.** A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 1.0 mm at 90° C.;

(c) a glass transition temperature of below 10° C.; and

(d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**A138**

US 6,298,189 B1

71

72

**8**. A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein:

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 1.0 mm at 90° C.;

(c) a glass transition temperature of below 10° C.; and

(d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa measured at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**9**. A radiation-curable inner primary coating composition for an optical glass fiber comprising an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said composition after radiation cure having the combination of properties of:

(a) a fiber pull-out friction of less than 20 g/mm at stripping temperature;

(b) a crack propagation of greater than 0.7 mm at stripping temperature;

(c) a glass transition temperature of below 0° C.; and

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling.

**10**. A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises propoxylated nonyl phenol acrylate and an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;

(b) a crack propagation of greater than 0.7 mm at stripping temperature;

(c) a glass transition temperature of below 0° C.; and

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition after radiation cure having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

**11**. A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;

(b) a crack propagation of greater than 0.7 mm at stripping temperature;

(c) a glass transition temperature of below 0° C.; and

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**12**. A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein:

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;

(b) a crack propagation of greater than 0.7 mm at stripping temperature;

(c) a glass transition temperature of below 0° C.; and

(d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**13**. A radiation-curable inner primary coating composition for an optical glass fiber comprising at least one oligomer having an at least one functional group capable of polymerizing under the influence of radiation, saod composition, after radiation cure, having the combination of properties of:

US 6,298,189 B1

73

(a) a fiber pull-out friction of less than 20 g/mm at least at 90° C.;

(b) a crack propagation of greater than 0.7 mm at 90° C.;

(c) a glass transition temperature of below 0° C.; and

(d) adhesion to glass of at least 5 g/in which conditioned at 95% relative humidity.

14. A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises propoxylated nonyl phenol acrylate and at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition, after radiation cure, having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 0.7 mm at 90° C.;

(c) a glass transition temperature of below 0° C.; and

(d) adhesion to glass of at least 5 g/in when conditioned at 95% relative humidity; and

said outer primary coating composition comprises at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition, after radiation cure, having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

15. A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 0.7 mm at 90° C.;

(c) a glass transition temperature of below 0° C.; and

(d) adhesion to glass of at least 5 g/in when conditioned at 95% relative humidity; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

16. A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein:

74

said inner primary coating is obtained by curing a composition comprising propoxylated nonyl phenol acrylate, said inner primary coating having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 0.7 mm at 90° C.;

(c) a glass transition temperature of below 0° C.; and

(d) adhesion to glass of at least 5 g/in when conditioned at 95% relative humidity; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa measured at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

17. The radiation-curable inner primary coating composition of claim 5 or 13 wherein at least one oligomer is a radiation curable oligomer comprising:

at least one glass coupling moiety;

at least one slip agent moiety; and

at least one radiation-curable moiety.

18. The system of claim 6 or 14 wherein at least one oligomer in said inner primary coating composition is a radiation curable oligomer comprising:

at least one glass coupling moiety;

at least one slip agent moiety; and

at least one radiation-curable moiety.

19. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a radiation curable oligomer comprising:

at least one glass coupling moiety;

at least one slip agent moiety; and

at least one radiation-curable moiety.

20. The ribbon assembly of claim 8 or 16 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a radiation curable oligomer comprising:

at least one glass coupling moiety;

at least one slip agent moiety; and

at least one radiation-curable moiety.

21. The radiation-curable inner primary coating composition of claim 5 or 13 additionally comprising a soluble wax that is soluble in said inner primary coating composition.

22. The system of claim 6 or 14 wherein said inner primary coating composition additionally comprises a soluble wax that is soluble in said inner primary coating composition.

23. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition containing a soluble wax that is soluble in said inner primary coating.

24. The ribbon assembly of claim 8 or 16 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition containing a soluble wax that is soluble in said inner primary coating.

**A140**

US 6,298,189 B1

75

25. The radiation-curable inner primary coating composition of claim 5 or 13 wherein at least one oligomer is a radiation-curable silicone oligomer comprising:

a silicone compound; and

at least one radiation-curable moiety.

26. The system of claim 6 or 14 wherein at least one oligomer in said inner primary coating composition is a radiation-curable silicone oligomer comprising:

a silicone compound; and

at least one radiation-curable moiety.

27. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured radiation-curable inner primary coating material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a radiation-curable silicone oligomer comprising:

a silicone compound; and

at least one radiation-curable moiety.

28. The ribbon assembly of claim 8 or 16 wherein said radiation cured radiation-curable inner primary coating material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a radiation-curable silicone oligomer comprising:

a silicone compound; and

at least one radiation-curable moiety.

29. The radiation-curable inner primary coating composition of claim 5 or 13 additionally containing a non-radiation-curable silicone compound.

30. The system of claim 6 or 14 wherein said inner primary coating composition additionally contains a non-radiation-curable silicone compound.

31. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition containing a non-radiation-curable silicone compound.

32. The ribbon assembly of claim 8 or 16 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition containing a non-radiation-curable silicone compound.

33. The radiation-curable inner primary coating composition of claim 5 or 13 wherein said composition comprises a fluorinated component selected from the group consisting of a radiation-curable fluorinated oligomer, a radiation-curable fluorinated monomer and a non-radiation curable fluorinated compound.

34. The system of claim 6 or 14 wherein said inner primary coating composition comprises: a fluorinated component selected from the group consisting of a radiation-curable fluorinated oligomer, a radiation-curable fluorinated monomer and a non-radiation curable fluorinated compound.

35. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition comprising a fluorinated component selected from the group consisting of a radiation-curable fluorinated oligomer, a radiation-curable fluorinated monomer and a non-radiation curable fluorinated compound.

36. The ribbon assembly of claim 8 or 16 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition comprising a fluorinated component selected from the group consisting of a radiation-curable fluorinated oligomer, a radiation-curable fluorinated monomer and a non-radiation curable fluorinated compound.

37. The radiation-curable inner primary coating composition of claim 5 or 13 wherein at least one oligomer is a radiation curable oligomer comprising:

at least one terminal linear moiety.

76

38. The system of claim 6 or 14 wherein at least one oligomer in said inner primary coating composition is a radiation curable oligomer comprising:

at least one terminal linear moiety.

39. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a radiation curable oligomer comprising:

at least one terminal linear moiety.

40. The ribbon assembly of claim 8 or 16 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a radiation curable oligomer comprising:

at least one terminal linear moiety.

41. The radiation-curable inner primary coating composition of claim 5 or 13 additionally containing a solid lubricant.

42. The system of claim 6 or 14 wherein said inner primary coating composition additionally contains a solid lubricant.

43. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition containing a solid lubricant.

44. The ribbon assembly of claim 8 or 16 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition containing a solid lubricant.

45. The radiation-curable inner primary coating composition of claim 5 or 13 wherein at least one oligomer is a urethane oligomer having at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a urethane group, wherein the concentration of said urethane groups is about 4% by weight or less, based on the total weight of said inner primary coating composition.

46. The system of claim 6 or 14 wherein at least one oligomer is a urethane oligomer having at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a urethane group, wherein the concentration of said urethane groups is about 4% by weight or less, based on the total weight of said inner primary coating composition.

47. The coated optical glass fiber of claim 7 or 15 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a urethane oligomer having at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a urethane group, wherein the concentration of said urethane groups is about 4% by weight or less, based on the total weight of said inner primary coating.

48. The ribbon assembly of claim 8 or 16 wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is a urethane oligomer having at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a urethane group, wherein the concentration of said urethane groups is about 4% by weight or less, based on the total weight of said inner primary coating.

49. The radiation-curable inner primary coating composition of claim 5 or 13 wherein at least one oligomer is comprised of at least one polymeric block linked to at least

A141

US 6,298,189 B1

one functional group capable of polymerizing under the influence of radiation via a linking group, and wherein said at least one polymeric block has a calculated molecular weight of at least about 2000.

**50.** The system of claim **6** or **14** wherein at least one oligomer is comprised of at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a linking group, and wherein said at least one polymeric block has a calculated molecular weight of at least about 2000.

**51.** The coated optical glass fiber of claim **7** or **15** wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is comprised of at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a linking group, and wherein said at least one polymeric block has a calculated molecular weight of at least about 2000.

**52.** The ribbon assembly of claim **8** or **16** wherein said radiation cured polymeric material is comprised of a cured radiation-curable inner primary coating composition wherein at least one oligomer is comprised of at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a linking group, and wherein said at least one polymeric block has a calculated molecular weight of at least about 2000.

**53.** A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:
  (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
  (b) a crack propagation of greater than 1.0 mm at stripping temperature;
  (c) a glass transition temperature of below −20° C.; and
  (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition after radiation cure having the combination of properties of:
  (e) a glass transition temperature of above 40° C.; and
  (f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

**54.** A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
  (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
  (b) a crack propagation of greater than 1.0 mm at stripping temperature;

  (c) a glass transition temperature of below −20° C.; and
  (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
  (e) a glass transition temperature of above 40° C.; and
  (f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**55.** A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein:
  said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
    (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
    (b) a crack propagation of greater than 1.0 mm at stripping temperature;
    (c) a glass transition temperature of below −20° C.; and
    (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and
  said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
    (e) a glass transition temperature of above 40° C.; and
    (f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**56.** A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:
  (a) a fiber pull-out friction of less than 40 g/mm at 90° C.;
  (b) a crack propagation of greater than 1.0 mm at 90° C.;
  (c) a glass transition temperature of below −20° C.; and
  (d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity; and

said outer primary coating composition comprises at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition, after radiation cure, having the combination of properties of:
  (e) a glass transition temperature of above 40° C.; and

US 6,298,189 B1

79

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

57. A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
    (a) a fiber pull-out friction of less than 40 g/mm at 90° C.;
    (b) a crack propagation of greater than 1.0 mm at 90° C.;
    (c) a glass transition temperature of below −20° C.; and
    (d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity; and
said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
    (e) a glass transition temperature of above 40° C.; and
    (f) a modulus of elasticity of between about 10 MPa to about 40 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

58. A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein:
    said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
        (a) a fiber pull-out friction of less than 40 g/mm at 90° C.;
        (b) a crack propagation of greater than 1.0 mm at 90° C.;
        (c) a glass transition temperature of below −20° C.; and
        (d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity; and
    said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
        (e) a glass transition temperature of above 40° C.; and
        (f) a modulus of elasticity of between about 10 MPa to about 40 MPa measured at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

59. A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:

80

    (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
    (b) a crack propagation of greater than 0.7 mm at stripping temperature;
    (c) a glass transition temperature of below −20° C.; and
    (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition after radiation cure having the combination of properties of:
    (e) a glass transition temperature of above 40° C.; and
    (f) a modulus of elasticity of greater than 25 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

60. A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
    (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
    (b) a crack propagation of greater than 0.7 mm at stripping temperature;
    (c) a glass transition temperature of below −20° C.; and
    (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
    (e) a glass transition temperature of above 40° C.; and
    (f) a modulus of elasticity of greater than 25 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

61. A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein:
    said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:
        (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
        (b) a crack propagation of greater than 0.7 mm at stripping temperature;
        (c) a glass transition temperature of below −20° C.; and
        (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and
    said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

A143

81

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**62**. A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:

said inner primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 0.7 mm at 90° C.;

(c) a glass transition temperature of below –20° C.; and

(d) adhesion to glass of at least 5 g/in when conditioned at 95% relative humidity; and

said outer primary coating composition comprises at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition, after radiation cure, having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

**63**. A coated optical glass fiber, coated with at least an inner primary coating and an outer primary coating, wherein

said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 0.7 mm at 90° C.;

(c) a glass transition temperature of below –20° C.; and

(d) adhesion to glass of at least 5 g/in when conditioned at 95% relative humidity; and

82

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**64**. A ribbon assembly comprising:

a plurality of coated optical glass fibers, at least one optical glass fiber coated with at least an inner primary coating and an outer primary coating, and optionally an ink coating; and

a matrix material bonding said plurality of coated optical glass fibers together, wherein:

said inner primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(a) a fiber pull-out friction of less than 40 g/mm at 90° C.;

(b) a crack propagation of greater than 0.7 mm at 90° C.;

(c) a glass transition temperature of below –20° C.; and

(d) adhesion to glass of at least 5 g/in when conditioned at 95% relative humidity; and

said outer primary coating is comprised of a radiation cured polymeric material having the combination of properties of:

(e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of greater than 25 MPa measured at 100° C.;

and wherein the ratio of the change in length of said inner primary coating to the change in length of said outer primary coating is less than 2 when said coatings are heated from 25° C. to stripping temperature.

**65**. The composition according to any one of claims **53, 56, 59**, and **62**, wherein said oligomer of said inner primary coating composition comprises an aliphatic diisocyanate residue.

**66**. The composition according to any one of claims **54, 55, 57, 58, 60, 61, 63**, and **64**, wherein said inner primary coating is obtained by curing a composition having an oligomer comprising an aliphatic diisocyanate residue.

* * * * *

## CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure ("FRAP") 25(a)(2)(D) and 25(c) and the May 17, 2012 Administrative Order Regarding Electronic Case Filing ("Order"), I hereby certify that on this 21st day of January, 2015, I caused true and correct copies of the foregoing **BRIEF OF APPELLANT CORNING INCORPORATED** to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

Pursuant to ECF-10 of the Order, six (6) paper copies of the foregoing **BRIEF OF APPELLANT CORNING INCORPORATED** will be filed with the clerk within five (5) days of the Court's acceptance of the **BRIEF OF APPELLANT CORNING INCORPORATED** in ECF.

Pursuant to FRAP 25(c) and ECF-6, true and correct copies of the foregoing **BRIEF OF APPELLANT CORNING INCORPORATED** were electronically served on counsel listed below on this 21st day of January, 2015.

Sharon A. Israel
Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
Telephone: (713) 238-2630
Facsimile: (713) 238-4630
E-mail: sisrael@mayerbrown.com

*Counsel for Cross-Appellant*
*DSM IP Assets B.V.*

Erick J. Palmer
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8352
Facsimile: (312) 701-7711
E-mail: ejpalmer@mayerbrown.com

*Counsel for Cross-Appellant*
*DSM IP Assets B.V.*

Kyle E. Friesen
Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
Telephone:  (713) 238-2691
Facsimile:  (713) 238-4691
E-mail: kfriesen@mayerbrown.com

*Counsel for Cross-Appellant*
*DSM IP Assets B.V.*

Joseph A. Mahoney
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 701-8979
Facsimile:  (312) 701-7711
E-mail: jmahoney@mayerbrown.com

*Counsel for Cross-Appellant*
*DSM IP Assets B.V.*

*/s/ Michael L. Goldman*
Michael L. Goldman

LeClairRyan, A Professional Corporation
70 Linden Oaks, Suite 210
Rochester, New York  14625
Telephone:  (585) 270-2101
Facsimile:  (585) 270-2179
E-mail:  michael.goldman@leclairryan.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify on this the 21st day of January, 2015, that the foregoing BRIEF OF APPELLANT CORNING INCORPORATED complies with the relevant type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief is typed in Times New Roman (14 point) and contains 13,695 words according to the Microsoft Word 2003 system used to prepare it excluding those items exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) ad Federal Circuit Rule 32(b).

Dated:  January 21, 2015                    By: */s/ Michael L. Goldman*
                                            Michael L. Goldman, Esq.

                                            *Attorney for Appellant*
                                            *Corning Incorporated*